# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., and SONTERRA CAPITAL MASTER FUND, LTD., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>CITIBANK, N.A., CITIGROUP INC., BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS SECURITIES JAPAN LIMITED, UBS AG, UBS SECURITIES JAPAN CO. LTD., ING GROEP N.V., ING BANK N.V., BNP PARIBAS, S.A., BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS SECURITIES CORP., BNP PARIBAS PRIME BROKERAGE, INC., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT AGRICOLE S.A., CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, DBS BANK LTD., DBS GROUP HOLDINGS LTD., DBS VICKERS SECURITIES (USA) INC., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, HSBC BANK USA, N.A., HSBC HOLDINGS PLC, HSBC NORTH AMERICA HOLDINGS INC., HSBC USA INC., MACQUARIE BANK LTD., MACQUARIE GROUP LTD., COMMERZBANK AG, AND JOHN DOES NOS. 1-50<br><br>Defendants. | Docket No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ...................................................................................... 4

PARTIES ........................................................................................................................ 8

FACTS .......................................................................................................................... 29

I. Background ............................................................................................................... 29

A.      SIBOR and SOR ................................................................................................ 29

B.      SIBOR- and SOR-based Derivatives ................................................................ 32

C.      The CFTC, FSA, and MAS Found that Defendants Manipulated SIBOR and SOR......... 36

II. Plaintiffs Transacted in SIBOR- and SOR-based Derivatives at Artificial Prices that were
Proximately Caused by Defendants' Manipulative Conduct.................................... 41

TRADE AND COMMERCE......................................................................................... 42

CLASS ACTION ALLEGATIONS ............................................................................. 43

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ......................... 45

CLAIMS FOR RELIEF ................................................................................................ 46

FIRST CLAIM FOR RELIEF ...................................................................................... 46

SECOND CLAIM FOR RELIEF ................................................................................. 48

THIRD CLAIM FOR RELIEF ..................................................................................... 52

FOURTH CLAIM FOR RELIEF ................................................................................. 53

FIFTH CLAIM FOR RELIEF ...................................................................................... 54

PRAYER FOR RELIEF ................................................................................................ 56

DEMAND FOR JURY TRIAL ..................................................................................... 57

i

Plaintiffs Sonterra Capital Master Fund, Ltd. and FrontPoint Asian Event Driven Fund L.P. (collectively "Plaintiffs") complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 20-89) for their violations of law from at least January 1, 2007, through at least December 31, 2011, ("Class Period") as follows:

## **INTRODUCTION**

1.       Defendants are horizontal competitors that deal in financial products priced, benchmarked, and/or settled based on two related benchmark interest rates—the Singapore Interbank Offered Rate ("SIBOR") and Singapore Swap Offer Rate ("SOR"). SIBOR and SOR are both administered by the Association of Banks in Singapore ("ABS")—a trade group formed by Defendants—and represent the cost of borrowing funds in the Singapore market.

2.       In June 2013, the Monetary Authority of Singapore ("MAS"), Singapore's central bank and financial regulator, announced that it had uncovered a massive conspiracy by Defendants to rig the prices of financial derivatives that incorporate SIBOR and/or SOR as a component of price (collectively, "SIBOR- and SOR-based derivatives").

3.       This conspiracy involved at least 133 traders employed by Defendants and spanned multiple years, from 2007 to 2011. MAS uncovered rare "smoking gun" evidence of anticompetitive conduct and found that traders from "several banks communicated with each other over electronic messaging about what rates they were going to submit . . . aiming to benefit their trading books." These collusive communications involved "traders talking to traders, saying 'I need you to help me today, I need to fix low.'"[1]

---

[1] Rachel Armstrong, *Bank Probes find Manipulation in Singapore's Offshore FX market – Source*, REUTERS (Jan. 27, 2013), *available at* http://www.reuters.com/article/us-singapore-probe-ndfs-idUSBRE90Q0IF20130128.

4.      Three quarters of the traders MAS identified were fired or forced to resign in the wake of its investigation.[2] For example, after MAS launched its inquiry, Defendant RBS suspended senior trader Chong Wen Kuang—"one of the bankers whose duties involved providing [SIBOR and other] rate setters with input on where they should fix the benchmark"—for manipulating SOR to benefit the bank's trading positions.[3] Public reports indicate that traders employed by at least Defendants Citibank, UBS, Macquarie, and Commerzbank, were also fired.[4]

5.      As punishment for manipulating SIBOR and SOR, MAS forced Defendants to collectively deposit $9.6 billion—interest free—in additional capital with the central bank for a full year, among other penalties and remedial measures. These massive interest-free deposits prevented the conspiracy from using these funds and stripped its profit-making potential. The penalties MAS imposed on each Defendant is indicated in the following table:

| Defendant Banks | Amount of Forced Deposit with MAS |
|---|---|
| ING Bank<br>RBS<br>UBS | **1 – 1.2 billion SGD**<br><br>*(approximately 800 – 960 million USD)* |
| Bank of America<br>BNP Paribas<br>OCBC | **700 – 800 million SGD**<br><br>*(approximately 560 – 640 million USD)* |
| Barclays<br>Credit Agricole CIB<br>Credit Suisse<br>DBS Bank<br>Deutsche Bank | **400 – 600 million SGD** |

---

[2] Martin Vaughan, *Singapore Censures 20 Banks Over Rates*, WALL STREET JOURNAL (June 15, 2013), *available at* http://www.wsj.com/articles/SB10001424127887323734304578545110537362372.

[3] Gavin Finch et al., *RBS Said to Suspend Trader Over Interest Rate Rigging,* BLOOMBERG NEWS (Oct. 4, 2012), *available at* http://www.bloomberg.com/news/articles/2012-10-05/rbs-said-to-suspend-trader-over-interest-rate-rigging.

[4] *See infra* ¶¶ 118-23.

| Standard Chartered<br>UOB | *(approximately 320 – 480 million USD)* |
|---|---|
| ANZ Bank<br>Citibank<br>JPMorgan Chase<br>Macquarie Bank<br>Bank of Tokyo-Mitsubishi<br>HSBC | **100 – 300 million SGD**<br><br>*(approximately 80 – 240 million USD)* |

6.      Multiple regulators have confirmed MAS's finding. For example, the U.S. Commodity Futures Trading Commission ("CFTC") found that Defendants Deutsche Bank, RBS, and UBS manipulated SIBOR and SOR, among other benchmark interest rates, during the Class Period, imposing a $1.825 billion penalty on these three banks.[5] The CFTC stated that Deutsche Bank, RBS, and UBS engaged in "similar misconduct" when manipulating SIBOR and SOR to the manipulation of interbank rates for other currencies, including USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, Euribor, Yen-LIBOR, and Euroyen TIBOR.[6]

7.      The U.K. Financial Services Authority ("FSA") also found direct evidence of anticompetitive conduct, identifying at least 34 written requests by RBS traders to manipulate SIBOR and SOR during the Class Period.[7] These findings are consistent with the pervasive manipulation described by RBS' former head of Asian delta trading, Jimmy Tan, who admitted

---

[5] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) at 59 (hereinafter "CFTC UBS Order"); CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making findings, and Imposing Remedial Sanctions against Deutsche Bank AG CFTC, Docket No. 15-20 (Apr. 23, 2015) at 44 (hereinafter "CFTC Deutsche Bank Order"); CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act,  Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (Feb. 6, 2013) at 39 (hereinafter "CFTC RBS Order").

[6] CFTC Deutsche Bank Order at 3 n.3; CFTC RBS Order at 4 & n.3; CFTC UBS order at 38 & n.21.

[7] Financial Services Authority Final Notice to The Royal Bank of Scotland plc, FSA  Ref. No. 121882 (Feb. 6, 2013) at 14. The Financial Conduct Authority ("FCA") succeeded the Financial Services Authority in 2013.

that "rate manipulation was systemic at RBS and involved traders and managers across the company."[8] Similarly, others told Bloomberg that "RBS derivatives traders and managers . . . regularly asked inputters to submit rates favorable to their trading positions" as part of Defendants' scheme to manipulate interbank offered rates.[9]

8.    These government settlements, factual findings, and admissions, demonstrate that Defendants stopped competing during the Class Period and operated a secret cartel to manipulate SIBOR and SOR by, *inter alia*, submitting artificial interest rate quotes and engaging in manipulative trades, to maximize their own profits in SIBOR- and SOR-based derivatives at the expense of Plaintiffs and the Class (defined in ¶¶ 18-19, 130).

9.     Given the persistent, pervasive, and secret nature of Defendants' multi-year conspiracy, as well as the negotiated nature of public settlements that have revealed evidence of this conspiracy to date, Plaintiffs believe that substantial evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, Section 1964 of RICO, 18 U.S.C. §1964. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

---

[8] Liam Vaughan et al., *RBS Managers Said to Condone Manipulation of Libor Rates*, BLOOMBERG NEWS (Sep. 25, 2012), *available at* http://www.bloomberg.com/news/articles/2012-09-24/rbs-managers-said-to-condone-manipulation-of-libor-rates.

[9] Gavin Finch et al., *supra* note 3.

11.     Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, §1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. §1391(b), (c), and (d). One or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial portion of the affected interstate trade and commerce described in this complaint was carried out in this district.

12.     Each Defendant is subject to personal jurisdiction because it transacted business throughout the United States, including by transacting in SIBOR- and SOR-based derivatives. For example, Defendants Citibank, Bank of America, Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, RBS, Standard Chartered, and UBS purposefully availed themselves of the privilege and benefit of trading foreign exchange and/or interest rate derivatives, including SIBOR- and SOR-based derivatives, in the United States throughout the Class Period.[10] Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located.

13.     In 2007, approximately $28 billion in notional value of SIBOR- and SOR-based derivatives were traded in the United States.[11] By 2010, that number increased to approximately

---

[10]  *See* The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2007) at 16-17 (hereinafter "Federal Reserve Bank of New York 2007 Survey") at 16-17; The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2010, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2010) at 17-18 (hereinafter "Federal Reserve Bank of New York 2010 Survey").

[11] *See* Federal Reserve Bank of New York 2007 Survey at 25-26.

$543 billion.[12] Defendants Bank of America, Bank of Tokyo-Mitsubishi, BNP Paribas, Barclays, Citibank, Commerzbank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, RBS, Standard Chartered, and UBS each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled based on SIBOR and SOR, from within the United States.[13] As of June 2013, there was approximately $1.6 trillion in outstanding derivatives contracts tied to either SIBOR or SOR worldwide.[14]

14.    Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint. For example through their daily electronic transmission of false SIBOR submissions and confirmations for collusive transactions intended to impact SOR, Defendants themselves transmitted and caused Thomson Reuters to electronically transmit false SIBOR and SOR rates to U.S. market participants who transacted in SIBOR- and SOR-based derivatives.

15.    Defendants' restraints of trade, intentional false reporting, manipulation and agreements to fix SIBOR and SOR and manipulate the prices of SIBOR- and SOR-based derivatives had direct, substantial, and foreseeable effects on commerce in the United States, and on the SIBOR- and SOR-based derivatives that Plaintiffs and members of the Class transacted in

---

[12] *See* Federal Reserve Bank of New York 2010 Survey at 26-27.

[13] *See id.* at 16-17, 22, 25-27; Federal Reserve Bank of New York 2007 Survey at 16-17, 21, 24-26.

[14] Rachel Armstrong, *Banks slow to revive Singapore trading desks after rate-fixing cull*, REUTERS (June 25, 2013), *available at* http://www.reuters.com/article/us-singapore-rates-idUSBRE95O1GF20130625.

during the Class Period. Trillions of dollars in SIBOR- and SOR-based derivatives were traded in the United States by U.S. market participants during the Class Period. *See supra* ¶ 13. Defendants, as SIBOR contributor banks and sophisticated market participants, knew that SIBOR and SOR are disseminated by Thomson Reuters and other financial information services in the United States. Defendants also knew that SIBOR and SOR were used in the United States to price, benchmark and/or settle SIBOR- and SOR-based derivatives purchased, sold, or owned here. For these reasons, Defendants knew that making false SIBOR submissions to the ABS and engaging in collusive transactions that would manipulate SOR would distort SIBOR and SOR away from their competitive prices and would (and did) have direct, substantial, and reasonably foreseeable effects in the United States. This included the direct effect of manipulating to artificial levels the prices of SIBOR- and SOR-based derivatives contracts transacted in the United States.

16.     Defendants' manipulative conduct occurred within the United States, as Defendants caused false SIBOR and SOR rates, trade confirmations incorporating these false rates, and communications containing requests to manipulate these rates to be distributed over U.S. wires using servers located in the United States. Defendants' manipulative conduct, as alleged herein, had a direct, substantial and reasonably foreseeable effect on United States' domestic commerce. Such direct effects injured Plaintiffs and give rise to Plaintiffs' claims within the meaning of the Foreign Trade Antitrust Improvements Act.

17.     Defendants The Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Agricole CIB, Credit Suisse, Deutsche Bank, ING Bank, N.V., Macquarie Bank Ltd., The Oversea-Chinese Banking Corporation Ltd., Standard Chartered, United Overseas Bank Ltd., and RBS consented to personal jurisdiction by registering their New

York branch or representative or agency offices with the New York State Department of Financial Services ("NYSDFS") under New York Banking Law § 200-b. To benefit from the advantages of transacting business in this forum, these Defendants registered with the NYSDFS, which confers privileges and benefits and binds these entities to the same judicial constraints as domestic corporations.[15] New York Banking Law § 200-b provides that by so registering, these Defendants consent to the personal jurisdiction of this Court. The Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Agricole CIB, Credit Suisse, Deutsche Bank, ING Bank, N.V., Macquarie Bank Ltd., The Oversea-Chinese Banking Corporation Ltd., Standard Chartered, United Overseas Bank Ltd., and RBS promoted the legitimacy of their businesses by registering to do business in New York and have therefore consented to jurisdiction within this district. In addition, Barclays Bank plc, The Royal Bank of Scotland plc, and UBS AG registered to do business in Pennsylvania pursuant to 15 Pa.C.S.A § 4124. By registering pursuant to 15 Pa.C.S.A § 4124, these Defendants likewise consented to personal jurisdiction in Pennsylvania courts.

## PARTIES

18.     Plaintiff FrontPoint Asian Event Driven Fund, L.P. ("FrontPoint") is an investment fund with its principal place of business in Greenwich, Connecticut. FrontPoint engaged in transactions from within the U.S. for SIBOR-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. For example, FrontPoint entered into U.S.-based swap transactions with Defendants Citibank, N.A. and Deutsche Bank AG during the Class Period, agreeing to make interest rate payments based on one-month SIBOR. As a consequence of Defendants'

---

[15] *See Vera v. Republic of Cuba*, No. 12-cv-1596, 2015 U.S. Dist. LEXIS 32846 (S.D.N.Y. Mar. 17, 2015).

manipulative conduct, FrontPoint was damaged when it was overcharged and/or underpaid in these SIBOR-based derivative transactions during the Class Period.

19.     Plaintiff Sonterra Capital Master Fund, Ltd. ("Sonterra") is an investment fund with its principal place of business in New York. Sonterra engaged in U.S.-based transactions for SIBOR-based derivatives, including Singapore Dollar foreign exchange forwards, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein. As a consequence of Defendants' manipulative conduct, Sonterra was damaged when it was overcharged and/or underpaid in transactions for Singapore Dollar foreign exchange forwards during the Class Period.

### A.    The Citibank Defendants

20.     Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation with its headquarters at 399 Park Avenue, New York, New York 10043.

21.     Defendant Citibank, N.A is a federally-chartered national banking association incorporated in South Dakota and a wholly-owned subsidiary of Defendant Citigroup. Citibank, N.A. maintains an office at 399 Park Avenue, New York, New York 10043. Citibank N.A. was a member of the SIBOR panel during the Class Period.

22.     Collectively, Citigroup, Inc. and Citibank, N.A. are referred to as "Citibank."

### B.    The Bank of America Defendants

23.     Defendant Bank of America Corporation is incorporated in Delaware and headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of America Corporation operates an investment banking division located at Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036.

24.     Defendant Bank of America, N.A. is a federally-chartered national banking association headquartered at 101 South Tyron Street, Charlotte, North Carolina 28255. Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corporation. Bank of America operates an office at the Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036. Bank of America, N.A. is a provisionally registered swap dealer with the CFTC. During the Class Period, Bank of America, N.A. was a member of the SIBOR panel.

25.     Collectively, Bank of America Corporation and Bank of America, N.A. are referred to as "Bank of America."

## C.     The JPMorgan Defendants

26.     Defendant JPMorgan Chase & Co. is a Delaware corporation with its headquarters located at 270 Park Avenue, New York, New York 10017. JPMorgan Chase & Co. provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[16] JPMorgan Chase & Co. is registered with the Board of Governors of the Federal Reserve System.

27.     Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017. JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of Defendant J.P. Morgan Chase & Co. JPMorgan

---

[16] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (JPMorgan participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC. During the Class Period, JPMorgan Chase Bank, N.A. was a member of the panel that set SIBOR.

28.     Collectively, JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to as "JPMorgan."

### D.     __The Royal Bank of Scotland Defendants__

29.     Defendant The Royal Bank of Scotland Group plc is a registered bank holding company headquartered in the United Kingdom. According to The Royal Bank of Scotland Group plc's 2013 U.S. Resolution Plan, the Group made 20% of its income for the 2012 year in the United States.

30.     Defendant The Royal Bank of Scotland plc, a direct subsidiary of The Royal Bank of Scotland Group plc, is a banking and financial services company headquartered in the United Kingdom. During the Class Period, The Royal Bank of Scotland plc was a member of the SIBOR panel.

31.     The Royal Bank of Scotland plc maintains an office at 340 Madison Avenue, New York, NY 10173. RBS' New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. The Royal Bank of Scotland plc also has a branch located at 600 Washington Boulevard, Stamford, CT 06901. The Connecticut branch is a registered foreign bank with the Connecticut Department of Banking. The Royal Bank of Scotland plc is also regulated by the Board of Governors of the Federal Reserve System and is registered with CFTC as a provisionally-registered swap dealer. RBS' U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps.[17]

---

[17] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (RBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

32.     Defendant RBS Securities Japan Limited ("RBS Japan") is a wholly-owned subsidiary of RBS that functions as a broker-dealer in addition to having market operations. In their settlement with the CFTC for manipulating Yen-LIBOR and Swiss Franc LIBOR, The Royal Bank of Scotland plc and RBS Japan both admitted to successfully manipulating SIBOR and SOR.[18]

33.     Collectively, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, and RBS Japan are referred to as "RBS."

**E.     UBS**

34.     Defendant UBS AG ("UBS") is a banking and financial services company headquartered in Switzerland. UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide. During the Class Period, UBS was a member of the SIBOR panel.

35.     UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its headquarters in New York and Stamford, Connecticut. UBS is registered with the Office of the Comptroller of the Currency ("OCC") and the CFTC as a provisionally-registered swap dealer. UBS is also licensed and supervised by the Board of Governors of the Federal Reserve System. UBS' U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, and foreign exchange swaps.[19]

36.     UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in

---

[18] *See* CFTC RBS Order at 3-4 & n.3.

[19] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (UBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

Switzerland, the United Kingdom, and the United States.[20] UBS' shares are registered as Global Registered Shares on the New York Stock Exchange ("NYSE").

37.     Defendant UBS Securities Japan Co. Ltd., the successor company to UBS Securities Japan, Ltd. (collectively, "UBS Japan"), is one of UBS' wholly-owned subsidiaries that engages in investment banking and broker-dealer operations. UBS Securities Japan Co. Ltd. admitted and acknowledged that it is responsible for the acts of its predecessor company's officers and employees. In their settlement with the CFTC for manipulating Yen-LIBOR, UBS AG and UBS Securities Japan Co., Ltd. both admitted to manipulating submissions for SIBOR and SOR, among other rates.[21]

### F.     The ING Defendants

38.     Defendant ING Groep N.V. is a holding company organized under the laws of The Netherlands. ING Groep N.V. offers banking, insurance, and investment management service worldwide. The American Depositary Receipts ("ADRs") for ING Groep N.V. are listed on the NYSE.

39.     Defendant ING Bank N.V., a wholly-owned subsidiary of Defendant ING Groep N.V., is a global financial services company headquartered in Amsterdam, The Netherlands. ING Bank N.V. maintains a bank representative office at 1325 Avenue of the Americas, New York, New York 10019, which is regulated by the Board of Governors of the Federal Reserve System and the NYSDFS. During the Class Period, ING Bank N.V. was a member of the SIBOR panel.

40.     Collectively, ING Groep, N.V. and ING Bank N.V. are referred to as "ING."

---

[20] *2014 UBS US Resolution Plan - Public Section*, UBS AG (July 2014) at 4.

[21] *See* CFTC UBS Order at 38 n. 21.

G.     **The BNP Paribas Defendants**

41.     BNP Paribas, S.A. is one of the world's largest global banking organizations, with its headquarters in Paris. During the Class Period, BNP Paribas S.A. was a member of the SIBOR panel.

42.     BNP Paribas, S.A. maintains a branch at 787 Seventh Avenue, New York, New York 10019. BNP Paribas S.A.'s New York branch, which serves as the headquarters of BNP Paribas S.A.'s  U.S. operations, is licensed, supervised, and regulated to do business in this state by the NYSDFS. BNP Paribas S.A. is also regulated by the Board of Governors of the Federal Reserve System. BNP Paribas S.A. considers its New York Branch to be a "material entity" within the United States.[22] BNP Paribas S.A. is a provisionally registered swap dealer with the CFTC.

43.     BNP Paribas S.A. has significant retail operations in the U.S., and offers corporate and investment banking services to clients in New York through its Global Equities and Commodity Derivatives division, among others.[23] BNP Paribas S.A., together with its subsidiaries, employs approximately 15,000 people in the U.S. and maintains locations in nine states.[24] According to its 2013 U.S. Resolution Plan, BNP Paribas S.A. is "a global player in the derivatives markets" and "actively trades in derivatives . . . including swaps, forwards, futures, and options."[25] BNP Paribas S.A.'s U.S.-based dealers trade in the over-the-counter foreign

---

[22] *Public Section, BNP Paribas 165(d) Resolution Plan*, BNP PARIBAS (July 1, 2013) at 4.

[23] *Id*. at 2.

[24] *Id*.

[25] *Id*. at 7.

exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[26]

44.     BNP Paribas North America, Inc. is a Delaware corporation headquartered at 787 7th Avenue, New York, New York 10019. BNP Paribas North America Inc. provides corporate, investment banking, and securities brokerage activities and is a subsidiary of BNP Paribas S.A.

45.     Defendant BNP Paribas Securities Corp. is a financial services firm incorporated in Delaware with its principal place of business in New York, New York. BNP Paribas Securities Corp. "underwrites, trades and markets a vast array of global and domestic fixed income and equity products."[27] BNP Paribas Securities Corp. is a wholly-owned subsidiary of Defendant BNP Paribas North America, Inc. BNP Paribas Securities Corp. is registered as a broker-dealer with the Securities and Exchange Commission ("SEC") and as a futures commission merchant with the CFTC. BNP Paribas Securities Corp. is also a clearing member of the Chicago Mercantile Exchange ("CME") and an approved Swap Firm and National Futures Association Member.

46.     BNP Paribas Prime Brokerage, Inc. is a Delaware corporation with its principal place of business in New York, New York. BNP Prime Brokerage, Inc, provides brokerage and futures commission merchant services in the U.S., Europe, and Asia.[28] Its brokerage services include financing solutions such as equity and portfolio swaps.[29] BNP Paribas Prime Brokerage,

---

[26] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (BNP Paribas participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

[27] *About BNP Paribas*, *available at* https://group.bnpparibas/en/news/bnp-paribas-securities-corp-establishes-institutional-sales-operation-san-francisco-1.

[28] *Company Overview of BNP Paribas Prime Brokerage, Inc.*, BLOOMBERG, *available at* http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=69090707.

[29] *Id.*

Inc. is a wholly-owned subsidiary of BNP Paribas North America, Inc. BNP Paribas Prime

Brokerage, Inc. is registered as a futures commission merchant with the CFTC.

47.     Collectively, BNP Paribas, S.A., BNP Paribas North America, Inc., BNP Paribas

Securities Corp., and BNP Paribas Prime Brokerage, Inc. are referred to as "BNP Paribas."

### H.     Oversea-Chinese Banking Corporation

48.     The Oversea-Chinese Banking Corporation Ltd. ("OCBC") is a banking and

financial services organization headquartered in Singapore. During the Class Period, OCBC was

a member of the SIBOR panel.

49.     OCBC maintains a NYSDFS-regulated agency office at 1700 Broadway, New

York, New York 10019. OCBC is also regulated by the Board of Governors of the Federal

Reserve System.

### I.     The Barclays Defendants

50.     Defendant Barclays PLC is a global financial services company headquartered

and incorporated in England. The ADRs for Barclays PLC are listed on the NYSE.

51.     Defendant Barclays Bank PLC, a wholly-owned subsidiary of Defendant Barclays

PLC, maintains a branch at 745 Seventh Avenue New York, New York 10019. Barclays Bank

PLC's New York branch has been licensed, supervised, and regulated by the NYSDFS to do

business in this state since 1963. Barclays Bank PLC's New York branch has over 500

employees and more than $36 billion in total assets.[30] Barclays Bank PLC is also regulated by

the Board of Governors of the Federal Reserve System and the Florida Office of Financial

Regulation. Barclays Bank PLC is a provisionally registered swap dealer with the CFTC.

---

[30] NYSDFS Consent Order under New York Banking Law § 44 against Barclays Bank PLC and Barclays Bank
PLC, New York Branch (Nov. 17, 2015) at 1.

52.     Defendant Barclays Capital Inc. ("BCI"), a wholly-owned subsidiary of Barclays PLC, is a financial services firm incorporated in Connecticut that offers advisory, brokerage, and banking services. BCI maintains its headquarters at 745 Seventh Avenue New York, New York 10019. BCI's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[31] BCI is a clearing firm on the CME, the Chicago Board of Trade ("CBOT"), the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc. ("COMEX"). BCI is registered with the CFTC as a Futures Commission Merchant, an Exempt Foreign Agent, a Commodity Pool Operator, and Commodity Trading Advisor. In its 2013 U.S. Resolution Plan, Barclays PLC identified Barclays Bank PLC's New York branch and Barclays Capital Inc. as material entities within the U.S.[32]

53.     Collectively, Barclays PLC, Barclays Bank PLC, and BCI are referred to as "Barclays."

## J.     __Deutsche Bank__

54.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. During the Class Period, Deutsche Bank was a member of the SIBOR panel.

55.     Deutsche Bank's U.S. headquarters is in New York. Its New York branch is located at 60 Wall Street, New York, New York 10005. Deutsche Bank considers its New York branch to be a "material entity" within the United States.[33] Deutsche Bank AG's New York

---

[31] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (BCI participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

[32] *Resolution Plan - Public Section*, BARCLAYS PLC (Oct. 2013) at 6, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/barclays-plc-1g-20131001.pdf.

[33] *Resolution Plan July 2014 Submission, Section 1: Public Section*, DEUTSCHE BANK AG (July 1, 2014) at 4.

branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System. Deutsche Bank AG's New York branch has more than 1,700 employees and total assets exceeding $152 billion. Deutsche Bank is a registered swap dealer with the CFTC. Deutsche Bank's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[34] Deutsche Bank admitted to manipulating SIBOR and SOR in its settlement with the CFTC for manipulating Yen-LIBOR, USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, and EURIBOR.[35]

### K.   The Credit Agricole Defendants

56.    Defendant Crédit Agricole S.A. is a financial services company headquartered and incorporated in France.  Crédit Agricole S.A. owns a 97.8% interest in Defendant Crédit Agricole Corporate and Investment Bank ("Credit Agricole CIB"), which Crédit Agricole S.A. considers its only business line that has a significant presence in the United States.[36]  Crédit Agricole S.A. lists Crédit Agricole CIB's New York branch as a "material entity" in the United States.[37] Crédit Agricole S.A.'s "core business lines" that it conducts from within the United States include Crédit Agricole CIB New York Branch's Global Markets Division, which sells and trades certain debt instruments and derivatives, including interest rates and foreign exchange.[38]

---

[34] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Deutsche Bank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[35] CFTC Deutsche Bank Order at 2-3 & n.3.

[36] U.S. Resolution Plan Public Section, CRÉDIT AGRICOLE S.A. (Dec. 27, 2013) at 1-2.

[37] *Id.* at 4.

[38] *Id.*

57.     Crédit Agricole CIB's New York branch is located in this district at 1301 Avenue of the Americas New York, New York 10019. Crédit Agricole CIB's New York branch is licensed, supervised, and regulated by the NYSDFS. Crédit Agricole CIB is a provisionally registered swap dealer with the CFTC. Crédit Agricole CIB is also regulated by the Board of Governors of the Federal Reserve System.

58.     Collectively, Credit Agricole CIB and Credit Agricole S.A. are referred to as "Credit Agricole."

### L.     The Credit Suisse Defendants

59.     Defendant Credit Suisse Group AG ("Credit Suisse Group") is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management. Of its six primary offices, one is located at 11 Madison Avenue, New York, New York 10010. Together with its subsidiaries, Credit Suisse Group employs over 8,000 people in the United States, 7,840 of which are in New York.[39]

60.     Defendant Credit Suisse AG, a wholly-owned subsidiary of Defendant Credit Suisse Group, maintains a branch office at 11 Madison Avenue, New York 10010. Credit Suisse AG is licensed, supervised, and regulated by the NYSDFS to do business in this state. Credit Suisse AG is also licensed and supervised by the Board of Governors of the Federal Reserve System. During the Class Period, Credit Suisse AG was a member of the SIBOR panel.

61.     Collectively, Defendants Credit Suisse Group and Credit Suisse AG are referred to as "Credit Suisse."

---

[39] Decl. of Pierre Schreiber in Support of Credit Suisse Group AG's Mot. to Dismiss, *In re: Libor-Based Financial Instruments Litigation*, 11-cv-2262, No. 765 (S.D.N.Y. Nov. 6, 2014).

62.     In 2013, Credit Suisse ranked first in overall fixed income trading in the United States with the largest market share of all dealers.[40] Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps.[41] Credit Suisse's Investment Banking Department houses its Rate Products Team, which is a global market maker in cash and derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps and options and other risk management structures and forms.

63.     In Credit Suisse's Form 20-F filed annually with the SEC, Credit Suisse lists numerous securities that are listed on the NYSE and other U.S. exchanges. Credit Suisse also operates in the United States through direct and indirect subsidiaries, including Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA), Inc., Credit Suisse Securities (USA) LLC and Credit Suisse International. All have offices in New York. Credit Suisse's wholly-owned subsidiary, Credit Suisse Securities (USA) LLC ("CSSU"), is headquartered in New York. During the Class Period, CSSU was a Clearing Firm on several of the CME Group's Exchanges, including the CME, NYMEX, Chicago Board of Trade ("CBOT"), and Commodities Exchange Inc. ("COMEX").

### M.     The Standard Chartered Defendants

64.     Defendant Standard Chartered plc is an international banking and financial services company headquartered in London, England.

---

[40] *See* GREENWICH ASSOCIATES, *2013 Greenwich Leaders: U.S. Fixed Income* (July 24, 2013) at 1, *available at* https://www.greenwich.com/fixed-income-fx-cmds/2013-greenwich-leaders-us-fixed-income.

[41] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Credit Suisse Group participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

65.    Defendant Standard Chartered Bank is an international bank headquartered in London, England. Standard Chartered Bank is a wholly owned subsidiary of Standard Chartered plc. During the Class Period, Standard Chartered Bank was a member of the SIBOR panel.

66.    Standard Chartered Bank maintains a branch at 1095 Avenue of the Americas, New York, New York 10036. Standard Chartered Bank's New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Standard Chartered Bank's New York branch is also regulated by the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York.

67.    Standard Chartered plc considers its New York branch to be a "material entity" within the United States.[42] Standard Chartered Bank's New York branch offers banking services to corporate and institutional clients in the Americas who have trade or investment links with markets in Asia, Africa, and the Middle East.[43] Standard Chartered Bank maintains offices in New York, California, Florida, and Texas and has 1,200 employees in the United States. Standard Chartered's U.S.-based dealers trade in the over-the-counter foreign exchange market.[44] Collectively, Standard Chartered plc and Standard Chartered Bank are referred to as "Standard Chartered."

## N.    The DBS Bank Defendants

68.    Defendant DBS Group Holdings Limited is an investment holding company headquartered in Singapore. Defendant DBS Bank Ltd. is a multinational banking and financial services company headquartered in Singapore. DBS Bank Ltd. is a wholly-owned subsidiary of

---

[42], 2013 US Resolution Plan Section I – Public Section, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK, STANDARD CHARTERED BANK NEW YORK BRANCH (Dec. 19, 2013) at 1, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/standard-chartered-bk-3g-20131231.pdf.

[43] *Id.*

[44] *See* Federal Reserve Bank of New York 2010 Survey at 13, 17-18 (Standard Chartered participated in the survey as a foreign exchange dealer).

DBS Group Holdings Limited and is the largest banking group incorporated in southeast Asia by

total assets.[45] DBS Bank Ltd. maintains a U.S. branch at 725 S. Figueroa Street, Los Angeles,

California. DBS Bank's U.S. branch is regulated by the Board of Governors of the Federal

Reserve, the FDIC, and the California Department of Business Oversight. During the Class

Panel, DBS Bank Ltd. was a member of the SIBOR panel.

69.     Defendant DBS Vickers Securities (USA) Inc. is a Delaware corporation with its

principal place of business at 777 3rd Avenue, New York, New York, 10017. DBS Vickers

Securities is the securities and derivatives arm of Defendant DBS Group and offers a broad range

of financial services, including derivatives trading.[46] Defendant DBS Vickers Securities (USA)

Inc. is a subsidiary of DBS Vickers Securities Holdings PTE Ltd., a Singapore company, which

is in turn wholly-owned by DBS Bank Ltd.[47] DBS Vickers Securities (USA) Inc. is regulated by

the Financial Industry Regulator Authority (FINRA).

**O.     United Overseas Bank Limited**

70.     United Overseas Bank Limited ("UOB") is a multinational banking organization

headquartered in Singapore and has more than 500 offices in 19 countries and territories

throughout Asia, Europe, and North America. UOB maintains Agency offices in both New York

and Los Angeles, with over 50 employees in the United States. UOB's NYSDFS-regulated New

York Agency office is at 592 Fifth Avenue, New York, NY 10036. According to its 2013 U.S.

---

[45] *U.S. Resolution Plan, Section 1: Public Section*, DBS BANK LTD. (Dec. 31, 2013) at 2.

[46] *About DBS Vickers Securities*, *available at* https://www.dbs.com/newsroom/print-news.page?newsId=i0bk3q1y&locale=en.

[47] Resolution Plan, Section 1: Public Section, DBS BANK LTD. (Dec. 31, 2013) at 1, available at https://www.federalreserve.gov/bankinforeg/resolution-plans/dbs-bk-3g-20131231.pdf.

Resolution Plan, UOB's New York Agency office held approximately $5 billion dollars in assets as of December 31, 2012.[48] During the Class Period, UOB was a member of the SIBOR panel.

### P.    Australia and New Zealand Banking Group

71.    Defendant Australia and New Zealand Banking Group Ltd. ("ANZ") is headquartered in Melbourne, Australia and is the fourth-largest bank in Australia and among the top twenty largest banks in the world.[49] ANZ was a member of the SIBOR panel during the Class Period.

72.    ANZ maintains a licensed branch at 277 Park Avenue, New York, New York 10172. ANZ's New York branch is registered as a Foreign Banking Organization with the U.S. Office of the Comptroller of Currency ("OCC") and regulated by the Federal Reserve Bank of New York. ANZ is also regulated by the Board of Governors of the Federal Reserve System. ANZ has operated its New York branch since December 1968.

73.    ANZ provides corporate and investment banking services and international trade finance from its New York branch, including foreign exchange, currency options, and credit and interest rate derivatives.[50] ANZ considers its New York branch to be an "extension" of the bank in the United States.[51] ANZ's ADRs are listed on the NYSE.

### Q.    The Bank of Tokyo – Mitsubishi

74.    Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-Mitsubishi") is a Japanese commercial bank that provides deposits, loans, insurance agency, and

---

[48] *UOB U.S. Resolution Plan, Public Section*, UNITED OVERSEAS BANK LIMITED (Dec. 31, 2013) at 2.

[49] *2015 Annual Report*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD (2015) at 1.

[50] *Public Section of 2013 § 165(d) Tailored Resolution Plan*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., (Dec. 31, 2013) at 3, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/australia-new-zealand-bking-3g-20131231.pdf.

[51] *Id.* at 2.

securities investment trusts for individuals and businesses. During the Class Period, the Bank of Tokyo-Mitsubishi was a member of the SIBOR panel.

75.     Bank of Tokyo-Mitsubishi maintains a branch at 1251 Avenue of the Americas, New York, New York 10020-1104, as well as branches in Chicago and Los Angeles. Bank of Tokyo-Mitsubishi has maintained "a presence in New York since 1880" and is a provisionally registered swap dealer with the CFTC. The Bank of Tokyo-Mitsubishi's New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Bank of Tokyo-Mitsubishi is also regulated by the Board of Governors of the Federal Reserve System and the National Futures Association.

76.     As of March 31, 2014, Bank of Tokyo-Mitsubishi had $134 billion in total assets and 2,135 full-time employees at its New York branch.[52]  One of the New York branch's "core business lines" is its Global Markets Division for the Americas, which transacts in financial market products and is responsible for market risk control management, hedge income management, and liquidity risk control.[53] Bank of Tokyo-Mitsubishi's New York Branch's other core business line is the U.S. Corporate Banking Division, which transacts in foreign exchange and derivatives products.[54]

**R.     The HSBC Defendants**

77.     Defendant HSBC Holdings plc is a British public limited company with its principal place of business in London. HSBC Holdings plc is the parent company of one of the world's largest banking and financial services groups, with subsidiaries providing services in 75 countries and territories and approximately 16,000 employees in the United States. HSBC

---

[52] *Public Mitsubishi UFJ Financial Group, Inc. Resolution Plan,* MITSUBISHI FINANCIAL GROUP INC. (July 1, 2014) at 5-6, *available at* http://www.federalreserve.gov/bankinforeg/resolution-plans/mitsubishi-fin-3g-20141231.pdf.

[53] *Id*. at 10.

[54]  *Id*.

Holdings plc owns 100% of the equity and voting interests in Defendants HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc.  HSBC Holdings plc and its subsidiaries' "core business lines" within the United States include its Global Markets-Rates Division, which transacts in interest rate swaps and other derivatives. HSBC's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps.[55] HSBC Holdings plc's ADRs are listed on the NYSE.

78.     In its 2013 U.S. Resolution Plan filed with the U.S. Federal Reserve Board, HSBC Holdings plc identified six U.S. material entities: HSBC North America Holdings Inc.; HSBC USA Inc.; HSBC Bank USA, National Association; HSBC Securities USA, Inc.; HSBC Technology & Services (USA) Inc.; and HSBC Finance Corporation.[56]

79.     Defendant HSBC North America Holdings Inc. is a Delaware corporation and the top level holding company for HSBC Holding plc's operations in the U.S. Its principal place of business is located at 452 Fifth Avenue, New York, NY 10018.

80.     Defendant HSBC USA Inc. is a Maryland corporation and an intermediate level holding company for HSBC Holdings plc's operations in the U.S. Its principal subsidiary is HSBC Bank USA, N.A.

81.     Defendant HSBC Bank USA, N.A. is HSBC Holdings plc's principal U.S. banking subsidiary and is a national banking association chartered by the OCC, with 253 branches in the U.S. and 22 representative offices in the U.S., including 165 branches in the State

---

[55] *See* Federal Reserve Bank of New York 2010 Survey at 13, 17-18 (HSBC participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[56] *US Resolution Plan Section I – Public Section*, HSBC HOLDINGS PLC, HSBC BANK USA, NATIONAL ASSOCIATION (July 1, 2013) at 5-6, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/hsbc-2g-20130701.pdf.

of New York. Its main office is in McLean, Virginia, and its principal executive offices are located at 452 Fifth Avenue, New York, NY. Its domestic operations are located primarily in the State of New York. HSBC Bank USA, N.A. has total assets of $183.1 billion as of December 31, 2015 and serves 2.4 million customers through its retail banking and wealth management, commercial banking, private banking, asset management, and global banking and markets segments. HSBC Bank USA, N.A. is subject to regulation by the OCC, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau and the Federal Reserve System. HSBC Bank USA, N.A. is registered with the CFTC as a provisionally registered swap dealer.

82.     Defendant The Hongkong and Shanghai Banking Corporation Limited is a wholly-owned subsidiary of Defendant HSBC Holdings plc incorporated in Hong Kong and is HSBC Group's principal banking subsidiary in the Asia-Pacific region, including in Singapore.[57] During the Class Period, Defendant The Hongkong and Shanghai Banking Corporation Limited was a member of the SIBOR panel.

83.     HSBC Holdings plc identifies The Honkong and Shanghai Banking Corporation Limited as a non-U.S. material entity because it is highly connected with HSBC Group's U.S. operations.[58] Further, there is "significant" financial and operational interconnectedness between Defendant The Hongkong and Shanghai Banking Corporation Limited and HSBC's U.S. entities.[59] For example, The Hongkong and Shanghai Banking Corporation Limited is provided an uncommitted line of credit from certain HSBC entities in the U.S., and holds uninsured

---

[57] *Id*. at 6.

[58] *Id*. at 5-6.

[59] *US Resolution Plans Section I – Public Section,* HSBC HOLDINGS PLC, HSBC BANK USA, NATIONAL ASSOCIATION (Dec. 31, 2015) at 49.

deposits from HSBC's U.S. entities as well.[60] The Hongkong and Shanghai Banking Corporation Limited also "enters into back-to-back derivatives trades with HSBC Bank USA, N.A. in order to transfer market risk arising from the activities of certain business lines within HSBC Bank USA, N.A." to other non-U.S. HSBC entities.[61] The Hongkong and Shanghai Banking Corporation Limited "also provides operational support to HSBC's material entities within the U.S., and receives operational support from these U.S. material entities in return."[62]

84.     Collectively, HSBC Holdings plc,  HSBC Bank USA, N.A., HSBC USA Inc., HSBC North America Holdings Inc., and The Hongkong and Shanghai Banking Corporation Limited are referred to as "HSBC."

**S.      The Macquarie Bank Defendants**

85.     Defendant Macquarie Group Ltd. is a global banking and diversified financial services corporation headquartered in Sydney, Australia.

86.     Defendant Macquarie Bank Ltd. is a global provider of banking, advisory, trading, asset management, and retail financial services and is headquartered in Sydney, Australia. Macquarie Bank Ltd. is a wholly-owned subsidiary of Defendant Macquarie Group Ltd. Macquarie Bank Ltd. maintains a foreign representative office at 125 West 55th Street, 22nd Floor, New York, NY 10019, which is regulated by the NYSDFS.

**T.      Commerzbank AG**

87.     Commerzbank AG ("Commerzbank") is a global banking and financial services company headquartered in Germany with total assets exceeding $670 billion.

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

88.     Commerzbank maintains a branch at 225 Liberty Street, New York, New York 10281. Commerzbank's New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Commerzbank is also regulated by the Board of Governors of the Federal Reserve System. In its 2013 U.S. Resolution Plan, Commerzbank listed its New York branch as a "material entity" within the U.S.[63]

89.     Commerzbank's U.S. operations include its Corporates & Markets business units, which "provide[] a broad range of products and services including: Equity Markets & Commodities, Fixed Income & Commodities . . . Corporate Finance and Credit Portfolio Management."[64] Commerzbank engages in transactions for "credit derivatives, interest rate products, electronic FX trading . . . cash equities, commodities, [and] equity derivatives" from within the U.S.[65] Commerzbank's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[66]

90.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, derivatives traders, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade and manipulation of SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives.

91.     **SIBOR Panel.** The following bank Defendants served as SIBOR panel banks during the Class Period: (i) Australia and New Zealand Banking Group; (ii) Bank of America

---

[63] *Section 1: Public Section - US Resolution Plan*, COMMERZBANK AG  (2013) at 3.

[64] *Id*. at 3.

[65] *See id*. at 5-6.

[66] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Commerzbank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

N.A.; (iii) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (iv) BNP Paribas; (v) Citibank N.A.; (vi)

Credit Suisse AG; (vii) DBS Bank Ltd.; (viii) Deutsche Bank AG; (ix) The Hongkong and

Shanghai Banking Corporation Ltd.; (x) ING Bank N.V.; (xi) JPMorgan Chase Bank, N.A.; (xii)

Oversea-Chinese Banking Corporation Ltd.; (xiii) The Royal Bank of Scotland PLC; (xiv)

Standard Chartered Bank; (xv) UBS AG; and (xvi) United Overseas Bank Ltd. The defendants

that served on the SIBOR panel are collectively referred herein as the "SIBOR Contributor

Defendants."

**FACTS**

**I. Background**

   **A. <u>SIBOR and SOR</u>**

     92.    SIBOR is a benchmark interest rate that represents the cost of borrowing funds in

the Singapore market and reflects the average competitive rate of interest charged on interbank

loans denominated in U.S. dollars ("USD SIBOR") or Singapore dollars ("SGD SIBOR").

Thomson Reuters calculates USD SIBOR and SGD SIBOR on behalf of ABS using interest rate

quotes submitted by as many as 16 panel banks that reflect the rate at which they could borrow

U.S. dollars or Singapore dollars, respectively, as of 11 A.M. Singapore time. In addition to

being used as a benchmark for pricing interbank loans, various derivative instruments are priced,

benchmarked, and/or settled based on SIBOR.

     93.    Prior to 11:00 AM Singapore time every business day, each participating bank

submits the interest rate at which it could borrow U.S. and Singapore dollars in the interbank

market for four different maturities, also known as tenors: one, three, six, and twelve month.

Thomson Reuters, as agent for the ABS, collects and calculates the SIBOR fixes for each tenor

by averaging the middle 50% of submissions. The daily SIBOR rates are then published,

distributed, and disseminated throughout the United States by Thomson Reuters via U.S. wires

where they are used to price, benchmark, and/or settle billions of dollars of SIBOR-based derivatives traded in the United States.

94.     SOR also represents the cost of borrowing Singapore dollars, but does so based on transactions in foreign exchange swaps—interest rate derivatives that function like a loan—in which two parties agree to exchange Singapore dollars for U.S. dollars on some future date at a price that reflects the current cost of Singapore dollars plus interest. Thomson Reuters calculates SOR on behalf of ABS based on the volume-weighted average price of swap transactions entered between 7:30 A.M and 4:30 P.M. Singapore time.

95.     Trillions of dollars of SIBOR and SOR-based derivatives, which incorporate each rate, respectively, as a component of price, were traded within the United States during the Class Period. Between 2007 and 2010, the U.S. market for these derivatives experienced dramatic growth.

96.     Capitalizing on this increase in trade, Defendants, all of which maintain offices and/or conduct business in this District,[67] colluded to rig SIBOR and SOR by, *inter alia*, collusively making false SIBOR submissions and entering into collusive transactions directly in the swap market, thereby fixing the prices of SIBOR- and SOR-based derivatives traded in the U.S. during the Class Period at artificial levels for their collective financial benefit.

97.     Of these Defendant banks, at least 16 were SIBOR panel members during the Class Period,[68] giving the conspiracy substantial control over SIBOR submissions and, therefore, direct control over the daily SIBOR fix published in the United States and relied on by the U.S. market.

---

[67] *See supra* ¶¶ 20-89.

[68] *See supra* ¶ 91.

98.     The SIBOR-setting process—a *process created by Defendants* through their own trade association, the ABS—was governed by rules established to prevent collusion and ensure that SIBOR reflected the average competitive market rate for Singapore dollars. Defendants corrupted the SIBOR-setting process by violating the rules they established and agreed to follow. The ABS SIBOR rules were as follows:

a)     Contributor Banks will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting the interbank offers in reasonable market size, just prior to 11:00 AM Singapore time.

b)     The rates shall be for deposits in Singapore Dollars for such maturities and according to the agreed conventions.

c)     Each Contributor Bank shall **contribute their rates without reference to rates contributed by other Contributor Banks**. (emphasis added)

d)     The rates shall be for deposits: (1) in reasonable market size; (2) that are simple and unsecured; and (3) governed by the laws of Singapore, where the parties are subject to the jurisdiction of the courts of Singapore.

e)     Maturity dates for the deposits shall be subject to the ISDA Modified Following Business Day Convention.

f)     The rates shall be contributed up to five decimal places.

99.     Three key principles governed the SIBOR-setting process: each panel bank was to independently exercise good faith judgment and submit an interest rate based on its own expert knowledge of market conditions; the daily submissions of each bank were to remain confidential until after SIBOR was finally computed and published; and all Defendants' individual submissions were to be published along with the final daily rate and would be transparent on *ex post* basis.

100.    These rules, had they not been circumvented in concert by the SIBOR Contributor Defendants, would have operated as safeguards to ensure that SIBOR submissions constituted a competitive market rate. But Defendants violated the rules and systematically made false daily SIBOR submissions to alter the fixing, and thereby affect the prices of SIBOR-based derivatives for their own financial benefit to the detriment of Plaintiffs and the Class. Defendants also routinely made manipulative requests to influence the rate.

101.    Although SIBOR was jointly set, Defendants remained horizontal competitors in the sale of SIBOR-based derivatives. Defendants abused their position as contributor panel banks and corrupted the SIBOR-setting process, turning a joint process into an anticompetitive, collusive enterprise to increase Defendants' profits at the expense of Plaintiffs and the Class.

### B.  SIBOR- and SOR-based Derivatives

102.    Trillions of dollars of SIBOR- and SOR-based derivatives were traded within the United States during the Class Period. *See supra* ¶¶ 13, 95. United States-based trading in SIBOR- and SOR-based derivatives increased dramatically between 2007 and 2010 as Singapore eased decades of tight monetary and capital restrictions, allowing non-resident financial entities to transact freely in SIBOR- and SOR-based swaps, options, and derivatives, including with other non-resident foreign entities.[69] After signing a free trade agreement with the U.S. in 2004, Singapore also began to issue full licenses to foreign banks to do business in Singapore and conducted further deregulation of its banking market.[70] By 2008, Singapore had issued full service banking licenses to 24 foreign banks, including nearly all of the Defendants.[71] The

---

[69] Ong Chong Tee, *Singapore's Policy of Non-Internationalisation of the Singapore Dollar and the Asian Dollar Market*, BIS Papers No. 15 (2003), *available at* http://www.bis.org/publ/bppdf/bispap15l.pdf.

[70] EUL-SOO PANG, THE U.S.-SINGAPORE FREE TRADE AGREEMENT: AN AMERICAN PERSPECTIVE ON POWER, TRADE, AND SECURITY IN THE ASIA PACIFIC (2011, Institute of Southeast Asian Studies, Singapore) at 80.

[71] *See id.* at 79; *see also* U.S. Department of State, 2008 Investment Climate Statement – Singapore, *available at* http://2001-2009.state.gov/e/eeb/ifd/2008/101008.htm.

Singapore Exchange ("SGX") also launched a clearing facility for Singapore Dollar interest rate swaps in 2010, followed in 2012 by expanded clearing services for nondeliverable forwards ("NDFs") in several Asian currencies.[72] As a result of these changes, Singapore was Asia's second-largest financial center after Tokyo and the world's third-largest foreign exchange market by the end of the Class Period in 2011.[73]

103.    There are many different types of SIBOR- and SOR-based derivatives, including, *inter alia*, over-the-counter instruments (which are traded directly between counterparties and not listed on a public exchange) such as interest rate swaps, forward rate agreements, and foreign exchange swaps and forwards.

### 1.    Interest Rate Swaps

104.    Interest rate swaps ("swaps") are the most common type of interest rate derivatives. They are traded over-the-counter and allow two counterparties to exchange interest rate payment obligations on an agreed upon "notional" or principal amount. There are several types of interest rate swaps. For example, in the most common "plain vanilla" swap, the parties will typically agree to a "fixed-for-floating" exchange, in which one party will make payments based on a variable price or rate in exchange for receiving fixed interest rate payments (*e.g.*, 0.5%) for the same notional amount. Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate. For example, one party can agree to make payments equal to the return on a certain stock or index (*e.g.*, $1,000,000 of IBM common stock), in exchange for receiving interest payments based on a variable interest rate (*e.g.*, SGD SIBOR) for the same notional amount.

---

[72] Adil Siddiqui, *Singapore's SGX, the new home for Asian NDF's*, FINANCE MAGNATE (July 27, 2011), *available at* http://www.financemagnates.com/forex/analysis/singapores-sgx-the-new-home-for-asian-ndfs/.

[73] Pang, *supra* note 64 at 79.

105.    Payments under a swap contract are due at regular intervals (*e.g.*, every month) for the duration of the agreement. Each time a payment is due, the amounts owed by the two parties are netted against each other. Only the party with the larger obligation will make a payment. For example, assume Party A enters into a swap contract with Party B and agrees to make payments every six months to Party B equal to the return on $1,000,000 of IBM stock. In exchange, Party B agrees to make payments to Party A every six months based on six-month SGD SIBOR for the same $1,000,000 principal amount. On each "fixing" or "reset" date, if six-month SGD SIBOR is greater than percentage return on IBM stock, Party B has the larger obligation and will make a payment to Party A. However, if IBM stock returns more on a percentage basis than six-month SGD SIBOR, Party A has the larger obligation and will make a payment to Party B. As a result, SGD SIBOR determines the value of a SGD SIBOR-based swap by determining the amount paid or received by each party.

### 2.    Forward Rate Agreement

106.    A forward rate agreement ("FRA") is an interest rate forward contract. The contract sets a rate of interest to be paid or received on an obligation beginning at a future start date. FRAs, also known as single period swaps, function like interest rate swaps in that they only have one reset date. The contract will determine the interest rate to be used along with the termination date and notional value. Similar to an interest rate swap, on the settlement date, the party with the larger obligation makes an interest rate payment equal to the difference between the fixed and floating rate. For example, assume Party A enters into a FRA with Party B in which Party A will receive 0.5% interest on $10,000,000 Singapore dollars. In return, Party B will receive six-month SGD SIBOR, determined one year in the future, on the same underlying amount. If, after one year, six-month SGD-SIBOR is higher than 0.5% (*e.g.*, 0.6%), Party A must

34

pay Party B the difference in interest (*i.e.*, 0.1%), on the underlying $10,000,000 SGD. If six-month SGD-SIBOR is lower than 0.5%, Party B must pay Party A the difference in interest.

### 3. Foreign Exchange Swap

107.    A foreign exchange swap is a contract in which two counterparties agree to exchange streams of interest payments in different currencies for an agreed upon period of time and to exchange principal amounts in different currencies at an agreed-upon exchange rate at maturity. There are two components to a foreign exchange swap: (1) a spot transaction, in which the parties buy or sell a certain amount of one currency (*e.g.*, SGD) at the current market price for immediate delivery (*i.e.*, in less than two days); and (2) a foreign exchange forward, which is used to reverse the spot transaction by buying or selling an equivalent amount of a second currency (*e.g.*, USD) with the proceeds of the initial spot transaction on some date further in the future (*e.g.*, 30 days later). As explained below, the price of a foreign exchange forward reflects the spot price of that currency pair plus the amount of interest earned over the duration of the agreement.

### 4. Foreign Exchange Forwards

108.    A foreign exchange forward is a derivative in which counterparties agree to buy or sell one currency (*e.g.*, SGD) in terms of another (*e.g.*, USD) on some future date (*e.g.*, 90 days from now) at a price agreed upon today. The price paid for this contract is calculated using a formula that incorporates both SGD SOR and USD SIBOR as components of price. For example, the chart below, which was published by Defendant OCBC,[74] shows that SIBOR and SOR rates are used to adjust the spot price of the USD-SGD currency pair to account for interest

---

[74] OCBC Bank, *Negative SOR – OCBC Treasury Research's FAQ* (Aug. 18, 2011).

earned over the length ("daycount") of the agreement. As a result, a change in USD SIBOR or SGD SOR will affect the prices of Singapore dollar foreign exchange forwards.



### C. The CFTC, FSA, and MAS Found that Defendants Manipulated SIBOR and SOR

109.    Multiple government investigations conducted by the MAS, CFTC, and the FSA revealed Defendants' agreement to illegally manipulate SIBOR and SOR.

110.    **MAS' Findings**. MAS uncovered a widespread conspiracy in which 133 of Defendants' traders sought to manipulate both SIBOR and SOR.

111.    As punishment for their manipulative conduct, MAS forced all of the Defendants to make massive interest-free deposits of between 100 million and 1.2 billion Singapore dollars each, or 9.6 billion U.S. dollars collectively, preventing the conspiracy from using these funds (and stripping its profit-making potential) for a full year.[75]

---

[75] *MAS Proposes Regulatory Framework for Financial Benchmarks*, MONETARY AUTHORITY OF SINGAPORE (June 14, 2013) *available at* http://www.mas.gov.sg/news-and-publications/media-releases/2013/mas-proposes-regulatory-framework-for-financial-benchmarks.aspx). Defendant Commerzbank was not required to place a deposit with MAS.

112.    The amount that each Defendant was required to deposit depended on the severity of its misconduct. MAS considered several factors when calculating the amount of these punitive deposits, including: (1) the number of traders within the bank involved in manipulating the benchmarks; (2) the number of banks with which the trader(s) had colluded; and (3) the frequency of their manipulative conduct.[76] The penalties MAS imposed on each Defendant is indicated in the following table:

| Defendant Banks | Amount of Forced Deposit with MAS |
|---|---|
| ING Bank<br>RBS<br>UBS | **1 – 1.2 billion SGD**<br><br>*(approximately 800 – 960 million USD)* |
| Bank of America<br>BNP Paribas<br>OCBC | **700 – 800 million SGD**<br><br>*(approximately 560 – 640 million USD)* |
| Barclays<br>Credit Agricole CIB<br>Credit Suisse<br>DBS Bank<br>Deutsche Bank<br>Standard Chartered<br>UOB | **400 – 600 million SGD**<br><br>*(approximately 320 – 480 million USD)* |
| ANZ Bank<br>Citibank<br>JPMorgan Chase<br>Macquarie Bank<br>Bank of Tokyo-Mitsubishi<br>HSBC | **100 – 300 million SGD**<br><br>*(approximately 80 – 240 million USD)* |

113.    MAS also censured all of the Defendants and prescribed remedial measures to correct the deficiencies in their rate-setting procedures, overall governance, risk management,

---

[76] *Id.*

internal controls, and surveillance systems identified by its investigation, appointing an independent monitor at each bank to ensure compliance with these new procedures.[77]

114. MAS referred some cases of manipulation to the Singapore Commercial Affairs Department and the Singapore Attorney-General's Chambers for criminal prosecution, and introduced new legislation making manipulation of any financial benchmark punishable by additional criminal penalties and civil sanctions.

115. Other U.S. and U.K. regulators confirmed MAS' findings that Defendants manipulated SIBOR and SOR during the Class Period. The CFTC specifically found that Defendants Deutsche Bank, RBS, and UBS all manipulated SIBOR and SOR during the Class Period and engaged in "similar misconduct" to the methods these Defendants used to manipulate other financial benchmarks, including USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, Euribor, Yen-LIBOR, and Euroyen TIBOR.[78] Specifically, the CFTC found that:

(a) **Deutsche Bank** engaged in systemic and pervasive misconduct directed at manipulating these international financial benchmark rates over a six-year period, including manipulating SIBOR.[79]

(b) **UBS** derivatives traders manipulated the official fixings of LIBORs for multiple currencies, including SIBOR, SOR, Yen LIBOR, Swiss Franc LIBOR, Sterling LIBOR, and Euro LIBOR.[80] The CFTC noted that UBS' manipulative

---

[77] *See* Reply to Parliamentary Question on Financial Benchmark Question Numbers 1241, 1246, 1270 and 1275 (Jul. 9, 2013), *available at* http://www.mas.gov.sg/news-and-publications/parliamentary-replies/2013/reply-to-parliamentary-question-on-financial-benchmark.aspx.

[78] *See* CFTC UBS Order at 59; CFTC Deutsche Order at 43; CFTC RBS Order at 39.

[79] *See* CFTC Deutsche Order at 1, 3 n.3.

[80] *See* CFTC UBS at 38.

misconduct for SIBOR and SOR was "similar" to that found in UBS' manipulation of other interbank offered rates.[81]

(c) **RBS** derivatives and money market traders manipulated SIBOR and SOR from May 2010 – August 2011, even as RBS was being investigated for (and conducting its own internal investigation related to) manipulating other interbank offered rates.[82]

116.     As a result of their manipulation of multiple interbank offered rates, Deutsche Bank, RBS, and UBS collectively paid nearly $2 billion in fines as part of their settlement agreements with the CFTC.

117.     In addition, the FSA found that RBS traders made at least 34 written requests to manipulate SIBOR and SOR.[83] The FSA also found that RBS submitters would regularly take their own trading positions into account when they made submissions for financial benchmark rates. These findings are consistent with the pervasive manipulation described by RBS' former Singapore-based head of Asian delta trading, Jimmy Tan, who admitted that "rate manipulation was *systemic* at RBS and involved traders and managers across the company."[84] Tan was fired by RBS for manipulating other interbank offered rates.[85] Similarly, others told Bloomberg that "RBS derivatives traders and managers . . . regularly asked inputters to submit rates favorable to their trading positions" as part of Defendants scheme to manipulate interbank offered rates.[86]

---

[81] *Id.*

[82] *See* CFTC RBS Order at 4 n.3.

[83]  *See* Financial Services Authority, supra note at 14.

[84] Vaughan et al., *supra* note 8.

[85] *Former RBS trader saw Libor fixing as 'cartel' – report*, REUTERS (Sep. 26, 2012), *available at* http://www.reuters.com/article/singapore-libor-idUSL4E8KQ3B220120926.

[86] Finch et al., *supra* note 3 (emphasis added).

118.     Multiple Defendants' SIBOR and SOR derivative traders were fired or faced disciplinary action for manipulating SIBOR, SOR, and foreign exchange rates in the wake of the investigations by MAS, the CFTC, and the FSA. For example, RBS senior trader Chong Wen Kuang was fired for rigging SOR to "benefit his own trading position."[87] Chong's duties at RBS "involved providing rate setters with input on where they should fix the benchmark."[88]

119.     Two high-level UBS managers, Mukesh Kumar Chhaganlal, UBS' co-head of macro-trading for emerging markets, and Prashant Miripuri, an executive director, were fired for their roles in manipulating SIBOR, SOR, and foreign exchange rates.[89] Both Chhaganlal and Miripuri engaged in "serious misconduct," according to UBS.[90]

120.     A Macquarie Bank trader was fired for "inappropriately collaborating with staff at other banks" to rig SIBOR, SOR, and foreign exchange rates.[91] The MAS investigated this trader and subsequently confirmed that he had "committed breaches."[92]

121.     ANZ Bank clawed back the bonuses of two of its SIBOR and SOR derivative traders for rate manipulation and engaging in "inappropriate electronic communications and unacceptable behavior."[93] ANZ Bank also admitted that numerous other traders had engaged in inappropriate behavior with respect to SIBOR, SOR, and foreign exchange rates.[94]

---

[87] *Id.*

[88] *Id.*

[89] Andrea Tan, *UBS Says Singapore Traders Fired for Serious Misconduct,* BLOOMBERG NEWS (April 2, 2013), available at http://www.bloomberg.com/news/articles/2013-04-02/ubs-says-singapore-traders-fired-for-serious-misconduct-i2zn75zm.

[90] *Id.*

[91] John Kehoe, *Macquarie trader sacked, ANZ reclaims bonuses after scandal*, FINANCIAL REVIEW (June 17, 2013), *available at* http://www.afr.com/business/banking-and-finance/financial-services/macquarie-trader-sacked-anz-reclaims-bonuses-after-scandal-20130615-jhoa3#ixzz4CEohSVSS.

[92] *Id.*

[93] *Id.*

[94] *See id.*

122.    A Citibank currency spot options trader, Tian Yuhui, was fired for manipulating the U.S. Dollar-Japanese yen spot price.[95] Citibank uncovered at least five chats from 2011 – 2013 in which Yuhui discussed with a Japanese colleague her intention to engage in manipulative trading to alter the U.S. dollar-Japanese yen spot price around the time of the fix.[96] Tian told her Japanese colleague to "push the fix" and responded "you are the best" after Tian's colleague informed her that he placed a "fake bid" to ensure an artificial fixing price.[97]

123.    Commerzbank trader Eugene Wong Ming-Wey was fired in January 2013 for manipulating foreign exchange forward rates after Commerzbank discovered a chat conversation from during the Class Period in which Ming-Wey discussed his manipulation with traders from other banks.[98] These conversations showed Wong soliciting other traders' opinions and asking for rates to move in a certain direction, according to Commerzbank.[99]

## II.    Plaintiffs Transacted in SIBOR- and SOR-based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct

124.    FrontPoint engaged in U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR during the Class Period at artificial prices proximately caused by the Defendants' manipulative conduct. Specifically, FrontPoint entered into at least 24 SIBOR-based swap transactions between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A. where FrontPoint agreed to pay interest equal to 1-month SGD SIBOR. This period coincides with dates when the CFTC found that Defendants, including

---

[95] Andrea Tan, *Citigroup Trader Fired Over Currency Probe Sues in Singapore*, BLOOMBERG NEWS (Dec. 10, 2015), *available at* http://www.bloomberg.com/news/articles/2015-12-11/citigroup-trader-fired-over-currency-probe-sues-in-singapore-ii0y2c6p.

[96] *Id.*

[97] *Id.*

[98] Andrea Tan, *Commerzbank Sued by Trader Fired Over Rate Probe in Singapore*, BLOOMBERG NEWS (July 7, 2015), *available at* http://www.bloomberg.com/news/articles/2015-07-08/commerzbank-sued-by-trader-fired-over-rate-probe-in-singapore.

[99] *Id.*

FrontPoint's counterparty Deutsche Bank, were actively manipulating SIBOR. As a result of Defendants' manipulation of SIBOR, FrontPoint paid more for or received less on its SIBOR-based swap transactions with Defendants.

125.    Sonterra engaged in U.S.-based transactions for SIBOR-based derivatives during the Class Period. Specifically, Sonterra engaged in SGD foreign exchange forwards between September 2010 and August 2011. SGD foreign exchange forwards are priced using a formula that incorporates SGD SOR and USD SIBOR as components of price. *See supra* ¶ 108. SGD foreign exchange forwards are also one half of a foreign exchange swap trade, the same financial instrument Defendants used to manipulate SOR. Accordingly, Sonterra was harmed by Defendants' manipulations in two ways. First, Defendants' false SIBOR submissions to Thomson Reuters manipulated a component of the price of Sonterra's SGD foreign exchange forwards. Second, Defendants manipulated the prices of SGD foreign exchange forwards by "acting as a trading bloc" and engaging in collusive swap trades to alter the SOR fixing.[100] As a result of Defendants' manipulation of both SIBOR and SOR, Sonterra paid more for or received less on its foreign exchange forward transactions.

## TRADE AND COMMERCE

126.    Beginning on at least January 1, 2007 and continuing at least until December 31, 2011, Defendants engaged in a continuing contract, combination, or conspiracy in restraint of trade in violation of the Sherman Act.

127.    During the Class Period, Defendants sold substantial quantities of SIBOR- and SOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to

---

[100] *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 1241533, at *6-7 (S.D.N.Y. Mar. 28, 2016) (finding that Defendants' acts of collusive trading to manipulate ISDAfix violated the antitrust laws).

customers located in states other than the states in which Defendants produced SIBOR- and

SOR-based derivatives.

128.    The Defendants' business activities that are subject to this Complaint were within

the flow of and substantially affected interstate trade and commerce.

129.    During the Class Period, the Defendants' conduct and their co-conspirator's

conduct occurred in, affected, and foreseeably restrained interstate commerce of the United

States.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on their own behalf and as representative of the following Class:[101]

> All persons or entities that engaged in U.S.-based transactions in financial
> instruments that were priced, benchmarked, and/or settled based on
> SIBOR and/or SOR at any time from at least January 1, 2007 through
> December 31, 2011 (the "Class").

> Excluded from the Class are Defendants and their employees, agents,
> affiliates, parents, subsidiaries and co-conspirators, whether or not named
> in this complaint, and the United States government.

131.    The Class is so numerous that individual joinder of all members is impracticable.

While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are

informed and believe that at least thousands of geographically-dispersed Class members

transacted in SIBOR- and SOR-based derivatives worth trillions of dollars during the Class

Period.

132.    Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as complained of herein. The injuries and damages of each

---

[101] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend
the definition of the Class, including, without limitation, membership criteria and the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

133.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

134.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

> a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives in violation of the Sherman Act;

> b. the identity of the participants in the conspiracy;

> c. the duration of the conspiracy;

> d. the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

> e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

> f. whether Defendants' unlawful acts violate RICO;

> g. the appropriate measure of damages sustained by Plaintiffs and Class members.

135.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of

44

claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

136.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

137.    The applicable statute of limitations relating to the claims for relief alleged in herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

138.    The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives—was intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

139.    Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) Defendants knowingly submitted (or caused to be submitted) SIBOR quotes that were false, misleading, or inaccurate because they were manipulative, based in whole or in part on impermissible and illegitimate factors, such as the rate that would financially benefit Defendants' SIBOR-based derivatives positions and/or the SIBOR-based derivatives positions of their coconspirators; (2) Defendants implicitly represented that their SIBOR submissions were a reliable and truthful assessment of, and only of, each Defendant's competitive market borrowing costs; (3) Defendants used secret, collusive trades in

45

the swap market to manipulate SOR and the prices of SOR-based derivatives. Due to the ABS's status as a trade organization, Defendants were themselves representing through these submission rules that their submissions would be in compliance with their own guidelines.

140. Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other Members of the Class.

141. As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of SIBOR and SOR and the prices of SIBOR- and SOR-based derivatives. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)**

**(Against all Defendants)**

142. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

143. Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

144.     During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of SIBOR and SOR and the prices of SIBOR- and SOR-based derivatives, by conspiring to, *inter alia*, make false SIBOR submissions to the ABS designed to artificially suppress, inflate, maintain, or otherwise alter SIBOR, and, acting as a trading bloc, engaged in secret, collusive trades in the swap market to manipulate SOR.

145.     This conspiracy to manipulate the prices of SIBOR- and SOR-based derivatives caused both Plaintiffs and members of the Class to be overcharged and underpaid in their SIBOR- and SOR-based derivatives transactions. Plaintiffs and members of the Class also were deprived of the ability to accurately price SIBOR- and SOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of SIBOR- and SOR-based derivatives by reference to an accurate SIBOR and SOR. Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

146.     The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the SIBOR- and SOR-based derivatives market. There is no legitimate business justification for, nor pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

147.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

148.    Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

149.    Plaintiffs and members of the class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)

### 18 U.S.C. §§ 1961 *et seq.*

### (Against all Defendants)

150.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

151.    18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

152.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

153.    Under 18 U.S.C. § 1961(1), and as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

154.    18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years

(excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

155.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

156.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, fraud, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

157.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including, *inter alia*, by transmitting false SIBOR submissions and confirmations for collusive transactions intended to impact SOR, or directing other employees to do so, among other predicate acts of wire fraud), were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

158.    At all relevant times, Plaintiffs were a "person" within the meaning of 18 U.S.C. § 1961(3).

159.    Defendants' collective association, including through their participation together (i) as members of ABS; (ii) as SIBOR contributor banks; and (iii) acting as a trading bloc and

49

engaging in secret collusive trades in the swap market to manipulate SOR, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of transmitting or causing to be transmitted false and artificial SIBOR submissions, SOR and SIBOR-based derivative price quotes, trade confirmations including those false rates, and confirmations for collusive transactions intended to impact SOR, during the Class Period. As alleged herein, each Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a member of the association-in-fact enterprise.

160.    Defendants completed all elements of wire fraud within the United States or while crossing United States borders. Defendants did so by: (a) transmitting or causing to be transmitted artificial SIBOR quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false and artificial SIBOR quotes that were relied on by Thomson Reuters and the ABS in collecting, calculating, publishing, and/or disseminating the daily SIBOR submissions of each Defendant and the daily SIBOR fix that was transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; and (c) transmitting or causing to be transmitted confirmations for collusive transactions intended to impact SOR in the U.S. or while crossing U.S. borders through electronic servers located in the United States.

161.    The common purpose of the enterprise was simple: profiteering. By engaging in the predicate acts alleged including, but not limited to, transmitting or causing false and artificial SIBOR submissions to be transmitted to Thomson Reuters as Agent for the ABS, and by exchanging SIBOR- and SOR-based derivatives positions and prices, Defendants affected the prices of SIBOR- and SOR-based derivatives, rendering them artificial. This directly resulted in

Defendants reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their SIBOR- and SOR-based derivatives positions.

162.    Defendants each committed far more than two predicate acts of wire fraud. As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

   a. The transmission of false SIBOR rates to Thomson Reuters in the United States for further dissemination;

   b. The electronic transmission of confirmations for collusive transactions intended to manipulate SOR;

   c. Causing the transmission and dissemination in the United States of the false SIBOR and SOR fixes by Thomson Reuters as agent for the ABS;

   d. Causing the transmission and dissemination in the United States of false SIBOR individual bank quotes by Thomson Reuters;

   e. The transmission and dissemination of false bid and ask price quotes for SIBOR-based derivatives within the United States;

   f. Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States; and

   g. Sending trade confirmations based on manipulated and false SIBOR and SOR rates to counterparties within the United States.

163.    Defendants' misconduct underlying the predicate acts of wire fraud occurred within the United States. Defendants caused and conspired to cause the manipulated SIBOR and SOR to be published to servers in the U.S., and used U.S. wires to transmit false SIBOR and fixes, confirmations for collusive transactions intended to impact SOR, and other electronic communications containing requests to manipulate these rates.

164.    Defendants' racketeering scheme affected interstate commerce. Trillions of dollars in SIBOR- and SOR-based derivatives were traded within the United States during the

Class Period, including, but not limited to, currency forward agreements, interest rate swaps, and forward rate agreements.

165.    As alleged herein, Plaintiffs' and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, depriving Plaintiffs and the Class of their money relative to their SIBOR- and SOR-based derivatives contracts was the very purpose of the Defendants' scheme. Plaintiffs and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

166.    As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

### THIRD CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**18 U.S.C. §§ 1961 *et seq.***

**(Against all Defendants)**

167.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

168.    Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

169.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

170.     Defendants organized and implemented the scheme, and insured it continued uninterrupted, by concealing their manipulation of SIBOR and SOR and the prices of SIBOR- and SOR-based derivatives from Plaintiffs and members of the Class.

171.     Defendants knew their manipulative scheme would defraud participants in the SIBOR- and SOR-based derivatives market yet each Defendant agreed to participate despite their understanding the fraudulent nature of the enterprise.

172.     As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiffs and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

173.     Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

174.     As a direct and proximate result of the subject racketeering activity, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

**FOURTH CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**(Against Defendants Deutsche Bank and Citibank)**

175.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

176.     To the extent required this claim is pled in the alternative to Plaintiffs' fourth claim for relief in accordance with FED. R. CIV. P. 8(d) and other applicable law.

177.    Plaintiff FrontPoint entered into binding and enforceable contracts with Defendants Deutsche Bank and Citibank in connection with transactions for SIBOR-based derivatives.

178.    Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

179.    Defendants Deutsche Bank and Citibank breached their duty to Plaintiff FrontPoint and, without reasonable basis and with improper motive, acted in bad faith by, among other things, (a) intentionally making false SIBOR submissions to the ABS for the express purpose of generating illicit profits from its SIBOR-based derivatives; and (b) conspiring with other Defendants to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives.

180.    As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiff FrontPoint, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**

**(Unjust Enrichment in Violation of Common Law)**

**(Against all Defendants)**

181.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

182.    To the extent required this claim is pleaded in the alternative to Plaintiffs' fifth claim for relief in accordance with FED. R. CIV. P. 8(d).

183.    Defendants and members of the Class, including Plaintiffs, entered into SIBOR- and SOR-based derivatives transactions. These transactions were directly priced, benchmarked, and/or settled based on SIBOR, which was supposed to reflect actual market conditions, or SOR, which was set, at least in part, by reference to actual transactions in a market where Defendants were supposed to be perpetually competing. Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives to ensure they had an unfair advantage in the marketplace.

184.    Defendants financially benefitted from their unlawful acts, reaping illicit profits by, *inter alia*, (i) coordinating the manipulation of SIBOR by taking advantage of the ABS submission process or other activities designed to artificially suppress, inflate, maintain, or otherwise alter SIBOR and the prices of SIBOR-based derivatives; and (ii) acting as a trading bloc and engaging in secret, collusive trades in the swap market to manipulate SOR.  These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate SIBOR and SOR rates, as well as the ability to accurately price, benchmark and or settle SIBOR- and SOR-based derivatives transactions. As a result, Plaintiffs and the Class received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs and the Class' losses correspond to Defendants' unlawful gains.

185.    Because of the acts of Defendant and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

186.     Plaintiffs and members of the Class seek restitution of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.     That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.     That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.     That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.     That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.     For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.     That the Court order Defendants to disgorge their ill-gotten for restitution to Plaintiffs and the Class;

H.     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

I.      That the Court award Plaintiffs and Class prejudgment interest at the maximum

rate allowable by law; and

J.      That the Court directs such further relief as it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a jury trial as to all issues triable by a jury.

Dated:  July 1, 2016                              Respectfully submitted,


                                                  LOWEY DANNENBERG COHEN &
                                                  HART, P.C.

                                                  /s/ Geoffrey M. Horn
                                                  Geoffrey M. Horn
                                                  Vincent Briganti
                                                  Peter St. Phillip
                                                  Raymond Girnys
                                                  Christian P. Levis
                                                  One North Broadway
                                                  White Plains, NY 10601
                                                  Tel.: (914) 997-0500
                                                  Fax: (914) 997-0035
                                                  Email: ghorn@lowey.com
                                                          vbriganti@lowey.com
                                                          pstphilip@lowey.com
                                                          rgirnys@lowey.com
                                                          clevis@lowey.com