**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., and SONTERRA CAPITAL MASTER FUND, LTD., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CITIBANK, N.A., CITIGROUP INC., BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS SECURITIES JAPAN LIMITED, UBS AG, UBS SECURITIES JAPAN CO. LTD., ING GROEP N.V., ING BANK N.V., ING CAPITAL MARKETS LLC, BNP PARIBAS, S.A., BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS SECURITIES CORP., BNP PARIBAS PRIME BROKERAGE, INC., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT AGRICOLE S.A., CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, DBS BANK LTD., DBS GROUP HOLDINGS LTD., DBS VICKERS SECURITIES (USA) INC., UNITED OVERSEAS BANK LIMITED, UOB GLOBAL CAPITAL, LLC, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., ANZ SECURITIES, INC., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, HSBC BANK USA, N.A., HSBC HOLDINGS PLC, HSBC NORTH AMERICA HOLDINGS INC., HSBC USA INC., MACQUARIE BANK LTD., MACQUARIE GROUP LTD., COMMERZBANK AG, AND JOHN DOES NOS. 1-50,

Defendants.

Docket No.: 1:16-cv-05263-AKH

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND VENUE**

# TABLE OF CONTENTS


TABLE OF CONTENTS ....... i

TABLE OF AUTHORITIES ....... iii

PRELIMINARY STATEMENT ....... 1

SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS ....... 3

ARGUMENT ....... 6

I. Plaintiffs do not rely on the principles of the general personal jurisdiction "at home" test.......... ....... 6

II. Deutsche Bank consented to jurisdiction in the ISDA Master Agreement it executed with FrontPoint ....... 6

III. The Consenting Defendants registered to do business in New York, thereby consenting to this Court's exercise of jurisdiction ....... 7

A. New York courts, including this one, have long construed registration to do business in New York, including registration of a branch of a foreign bank, to constitute consent to jurisdiction for any matter.. ....... 7

B. *Vera* is consistent with *Daimler* and *Gucci* and is supported by *Brown* ....... 12

IV. Moving Defendants are subject to specific jurisdiction because they purposefully availed themselves of the forum and their suit-related acts caused harmful effects in the forum......... ....... 14

A. Plaintiffs adequately plead personal jurisdiction over each defendant ....... 15

B. Moving Defendants' in-forum and out-of-forum acts to manipulate SIBOR, SOR, and related derivatives are suit-related contacts ....... 16

C. Moving Defendants purposefully availed themselves of the United States, intentionally caused harmful effects in the United States, and expressly aimed their conduct at the United States ....... 19

V. Plaintiffs' conspiracy allegations provide a prima facie basis for this Court's jurisdiction over Moving Defendants ....... 26

A. Conspiracy jurisdiction is consistent with due process ....... 27

B. To plead jurisdiction by participation in a conspiracy, Plaintiffs need only (and did) allege that co-conspirators' conduct in or directed to the forum was for the benefit or on behalf of the conspiracy ....... 29

C. Plaintiffs properly plead personal jurisdiction under the relevant statutes ....... 31

VI. Personal jurisdiction over Moving Defendants comports with fair play and substantial justice ....... 33

VII. This Court is a proper venue for this case ....... 33

VIII. Alternatively, this Court should allow jurisdictional discovery or a transfer to the Eastern District of Pennsylvania ........ 34

CONCLUSION ........ 36

## TABLE OF AUTHORITIES

### *Cases*

*7 W. 57th Street Realty Co. v. CitiGroup, Inc.*, No. 13-cv-981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) .....17

*AM Trust v. UBS AG*, 78 F. Supp. 3d 977 (N.D. Cal. 2015) .....24

*Amalgamet, Inc. v. Ledoux & Co.*, 645 F. Supp. 248 (S.D.N.Y. 1986) ..... 8, 9

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003) .....35

*Augsbury Corp. v. Petrokey Corp.*, 97 A.D.2d 173, 470 N.Y.S.2d 787 (3d Dep't 1983) ..... 8, 9

*Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432 (1916) ..... 8, 9

*Bane v. Netlink, Inc.*, 925 F.2d 637 (3d Cir. 1991) .....35

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002) .....25

*Brown v. Kerkhoff*, 504 F. Supp. 2d 464 (S.D. Iowa 2007) .....30

*Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 641 (2d Cir. 2016) .....8, 13, 14, 35

*Calder v. Jones*, 465 U.S. 783 (1984) ..... 23, 24

*Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998) ..... 15, 32

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) .....19

*Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574 (E.D.N.Y. 1998) .....30

*Daimler AG v. Bauman,* 134 S. Ct. 746 (2014) .....12

*Davis v. A.J. Electronics*, 792 F.2d 74 (7th Cir. 1986) .....31

*De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) .....13

*Del. Midland Corp. v. Westhampton Beach*, 359 N.Y.S.2d 944 (Sup. Ct. Suffolk Cty. 1974) .....9

*Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1 (D.D.C. 2003) .....31

*Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013) .....14, 15, 16

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161 (2d Cir. 2015) .....14

*Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012) .....27

*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 (1940) ....................11

*First Capital Inv. Holdings LLC v. Wilson Capital Group, Inc.*, No. 10-cv-2948 (JSR), 2010 WL 4967833 (S.D.N.Y. Nov. 29, 2010) ....................27

*Flag Co. v. Maynard*, 376 F. Supp. 2d 849 (N.D. Ill. 2005) ....................31

*Ford v. United States*, 273 U.S. 593 (1927) ....................26

*Galderma S.A. v. Peri*, No. 15-cv-667, 2016 U.S. Dist. LEXIS 61203 (S.D.N.Y. Mar. 30, 2016) ....................35

*Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016) .................... 17, 18, 19, 32

*General Elec. Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037 (S.D.N.Y. 1982) ....................34

*Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998) .................... 9, 11

*Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293 (S.D.N.Y. 1986) ....................34

*Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d Cir. 1981) ....................29

*Gucci Am. Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ....................16

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) .................... 11, 15

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279 (S.D.N.Y. 2000) ....................33

*Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716 (2d Cir. 1980) ....................14

*In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219 (S.D.N.Y. 2015) .................... 28, 29

*In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144 (2d Cir. 2015) ....................16

*In re Fannie Mae 2008 Sec. Litig.,* 891 F. Supp. 2d 458 (S.D.N.Y. 2012) .................... 14, 32

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) ....................24

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ....................10, 16, 22, 24, 25, 29

*In re Hellas Telecommunications (Luxembourg) II SCA*, 547 B.R. 80 (S.D.N.Y. 2016) ....................15

*In re LIBOR-Based Fin. Instrs. Antitrust Litig.* ("LIBOR IV"), No. 11-mdl-2262 (NRB), 2015 WL 1634541 (S.D.N.Y. Aug. 4, 2015), *amended* 2015 WL 6243526 (Oct. 20, 2015) .................... 7, 15, 22, 26, 27

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) .................... 14, 18, 19, 22

*In re Satyam Comput. Servs. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013) .................... 26, 29

*In re Shulman Transp. Enters., Inc.*, 744 F.2d 293 (2d Cir. 1984) ....29

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328 (S.D.N.Y. 2000) ....29

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ....17

*In re Vitamin C Antitrust Litig.*, No. 05-cv-453, 2012 WL 12355046 (E.D.N.Y. Aug. 8, 2012) ....23

*In re: Term Commodities Cotton Futures Litig.*, No. 12-cv-5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ....33

*In the Matter of B&M Kingstone, LLC v. Mega Intl. Commercial Bank Co., Ltd.*, 15 N.Y.S.3d 318 (1st Dep't 2015) ....8, 9, 10, 11

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002) .... 10, 21

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945) ....14

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ....23

*LaChapelle v. Torres*, 1 F. Supp. 3d 163, (S.D.N.Y. 2014) ....29

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ....17

*Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) ....22

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ....22

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*, 753 F.3d 395 (2d Cir. 2014) ....16

*McDonald AG Inc. v. Syngenta AG (In re Syngenta AG MIR 162 Corn Litig.)*, No. MDL No. 2591, 2016 WL 2866166 (D. Kan. May 17, 2016) ....11

*Miller v. Holzmann*, No. 95-cv-1231 (RCL), 2007 WL 778568 (D.D.C. Mar. 7, 2007) ....32

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939) ....12

*Newbro v. Freed*, No. 03-cv-10308, 2004 WL 691392 (S.D.N.Y. Mar. 26, 2004) ....35

*Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013) ....27

*Penn. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917) ....8

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ....14

*Pilot Corp. v. U.S. Robotics, Inc.*, No. 96-cv-5483 (SHS), 1997 WL 47790 (S.D.N.Y. Feb. 6, 1997) ....34

*Reno v. Flores*, 507 U.S. 292 (1993) ....12

*Robert Mitchell Furniture Co. v. Selden Breck Construction Co.*, 257 U.S. 213 (1921) ....................................... 8

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) ....................................................................................... 7

*Romak USA, Inc. v. Rich*, 384 F.3d 979 (8th Cir. 2004) ........................................................................................ 29

*S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010) .................................................... 15

*S.E.C. v. Morton*, No. 10-cv-1720, 2011 WL 1344259 (S.D.N.Y. Mar. 31, 2011) .................................. 33

*Sabal v. Deutsche Bank*, No. 16-cv-300, 2016 WL 5080385 (W.D. Tex. Sept. 19, 2016) .......................... 6

*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013) ........................................................................ 14, 32

*Shpak v. Curtis*, No. 10-cv-1818, 2011 WL 4460605 (E.D.N.Y. Sept. 26, 2011) .................................... 27

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984) ................................................................................. 26

*SLSJ, LLC v. Kleban*, No. 14-cv-390 (CSH), 2015 WL 1973307 (D. Conn. Apr. 30, 2015) ................ 32

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014) ............................................ 17

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010) ........................................................................................ 8

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) ....................................................... 17, 25

*TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370 (S.D.N.Y. 2010) ................................................ 7

*Tymoshenko v. Firtash*, No. 11-cv-2794 (KMW), 2013 WL 1234943 (S.D.N.Y. Mar. 27, 2013) ............ 31

*United States v. Fernandez-Antonia*, 278 F.3d 150 (2d Cir. 2002) ............................................................. 11

*United States v. Hayes*, 99 F. Supp. 3d 409 (S.D.N.Y. 2015) ........................................................ 17, 23, 26

*United States v. Hayes*, No. 12-mj-3229 (PAC) (JCF), 2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) ...... 17

*United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982) ............................................................................. 30

*United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55 (D.D.C. 2004) .................................................. 31

*Varga v. Credit Suisse*, 157 N.Y.S.2d 391 (1st Dep't 1956) ................................................................... 9, 10

*Varga v. Credit-Suisse*, 155 N.Y.S.2d 655 (Sup. Ct. N.Y. Co. 1956) ..................................................... 9, 11

*Vera v. Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015) ................................ 1, 2, 7, 8, 9, 11, 12, 13

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ........................................................................................... 23, 28

*Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016)....................................19, 20, 25

*Wiwa v. Royal Dutch Petroleum Company*, 226 F.3d 88 (2d Cir. 2000)..........................................................17

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006)..................23

***Statutes***

15 U.S.C. § 22 ..........................................................................................................................................15

18 U.S.C. § 1965 ......................................................................................................................................15

28 U.S.C. § 1391 ......................................................................................................................................34

N.Y. Banking Law § 200(3) .........................................................................................................................9

N.Y. Banking Law § 200-b(2) ....................................................................................................................10

***Rules***

FED. R. CIV. P. 4(k)(1)(C)..................................................................................................................14, 32

FED. R. CIV. P. 4(k)(2) ...............................................................................................................................32

N.Y. C.P.L.R. § 302 ..................................................................................................................................31

## PRELIMINARY STATEMENT

Moving Defendants[1] ask this Court to absolve them of violations of United States law because they are incorporated abroad. These foreign banks want the Court to leave their domestic co-conspirator banks responsible to pay the entire bill for the domestic injury they, together, caused. But "[t]here is no reason to give advantage to a foreign bank with a branch in New York, over a domestic bank" (*Vera v. Republic of Cuba*, 91 F. Supp. 3d 561, 570 (S.D.N.Y. 2015)), especially when 12 of the Moving Defendants registered to do business and consented to jurisdiction in New York, and all defendants established U.S. offices, marketed their U.S. business operations, opened U.S. bank accounts, hired U.S. employees, and used their U.S. presence to trade directly with U.S. counterparties in SIBOR- and SOR-based derivatives.[2] "[A]kin to a legitimate business storefront which launders money from illegal operations in the back room," (*id.*) these banks conspired to manipulate SIBOR and SOR to guarantee they would win and their U.S. counterparties would lose on every trade. The motion should fail; Moving Defendants are subject to this Court's personal jurisdiction for several reasons:

*First*, 12 of them[3] consented to personal jurisdiction in New York.[4] When the Consenting Defendants registered to do business in New York under N.Y. Banking Law § 200, they consented

[1] "Moving Defendants" means Australia and New Zealand Banking Group, Ltd.; Barclays plc; Barclays Bank plc; BNP Paribas, S.A.; Crédit Agricole Corporate and Investment Bank; Crédit Agricole S.A.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse International; Commerzbank AG; DBS Bank Ltd.; DBS Group Holdings Ltd; Deutsche Bank AG; HSBC Holdings plc; ING Groep N.V.; ING Bank N.V.; Macquarie Bank Ltd.; Macquarie Group Ltd.; The Royal Bank of Scotland plc; The Royal Bank of Scotland Group plc; RBS Securities Japan Limited; Standard Chartered Bank; Standard Chartered PLC; The Bank of Tokyo-Mitsubishi UFJ, Ltd.; The Hong Kong and Shanghai Banking Corporation Limited; The Oversea-Chinese Banking Corporation Ltd.; UBS AG; UBS Securities Japan Co. Ltd.; and United Overseas Bank Limited.

[2] SIBOR- and SOR-based derivatives are financial products priced, benchmarked, and/or settled based on two financial benchmarks: the Singapore Interbank Offered Rate ("SIBOR") and Singapore Swap Offer Rate ("SOR").

[3] The Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Agricole CIB, Credit Suisse, Deutsche Bank, ING Bank, N.V., Macquarie Bank Ltd., The Oversea-Chinese Banking Corporation Ltd., Standard Chartered, United Overseas Bank Ltd. (collectively the "Consenting Defendants").

[4] Deutsche Bank consented twice—once by registration and again when it signed an ISDA governing the equity swaps it traded with Plaintiff FrontPoint with a clause consenting to this Court's jurisdiction for disputes arising thereunder.

to personal jurisdiction in this Court. *See Vera*, 91 F. Supp. 3d at 570. It can "both sue and be sued" in New York. *Id.* The Court's jurisdictional analysis ends at registration for the same reasons Your Honor identified in *Vera*.

*Second*, Moving Defendants are subject to specific jurisdiction for their suit-related, in-forum and out-of-forum acts. By manipulating SIBOR and SOR, Moving Defendants intentionally caused harmful effects in the United States. Defendants reaped illicit profits off the backs of U.S. investors in the SIBOR- and SOR-based derivatives market they manipulated using their U.S. operations. Deutsche Bank's trades with Plaintiff FrontPoint Asian Event Driven Fund, L.P. ("FrontPoint") exemplify the industry-wide practice: banks traded SIBOR- and SOR-based derivatives with U.S. counterparties pursuant to ISDA Master Agreements wherein they consented to this Court's jurisdiction for disputes arising from the trades, required collateral to be held in the U.S., appointed U.S. process agents, and even directed notices to be sent to their U.S. offices. The transactions themselves are suit-related contacts sufficient for this Court to exercise specific personal jurisdiction.

*Finally*, because the Complaint[5] alleges that Moving Defendants' co-conspirators reached into the United States or acted from within the United States, the entire conspiracy and all of its members are subject to this Court's jurisdiction. Moving Defendants overlook that the Complaint alleges the conspiracy's trades, contracts, employees, facilities, bank accounts, and illicit profits are all a part of their manipulative scheme and were present in the United States.

"The Second Circuit recognized that the privileges and benefits associated with a foreign bank operating a branch in New York give rise to commensurate, reciprocal obligations." *Vera*, 91 F. Supp. 3d at 570. Moving Defendants should be held to those obligations now and must answer to the U.S. victims of their SIBOR/SOR conspiracy in this United States court.

---

[5] The "Complaint" or "¶" references the First Amended Complaint, ECF No. 119.

## SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS

Defendants' conspiracy travelled along the following arc:

*Step One: Contract with U.S. investors*

Moving Defendants used their large trading operations in the United States to target the over-the-counter U.S. derivatives market. *See* ¶¶ 13-14, 22-98. Many of the Defendants chose to register branches in this District with the New York State Department of Financial Services ("NYSDFS") to tout their legitimacy and take full advantage of New York, the world's financial capital. ¶ 18 (Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank, Credit Agricole, Credit Suisse, Deutsche Bank, ING, Macquarie, Oversea-Chinese Banking Corporation, Standard Chartered, United Overseas Bank, and RBS).

Targeting the U.S. market for SIBOR- and SOR-based derivatives, Moving Defendants promoted and marketed their U.S.-based operations and offered these products to U.S. investors. Moving Defendants then executed ISDA Master Agreements with their U.S. counterparties. *See, e.g.*, Declaration of Lee J. Lefkowitz in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Venue ("*Lefkowitz Decl.*"), filed concurrently herewith, Exs. 2-21. These contracts allowed the parties to select either this District and the state courts of New York or the English courts as the forum to hear all disputes arising thereunder. *Lefkowitz Decl.* Exs. 1a at 33-34 and 1b at 38-39. Publicly available evidence indicates that the derivatives industry convention is to select this District and New York state courts when dealing with counterparties in the United States. *Lefkowitz Decl.* ¶ 9, Exs. 2-21; *see also* Paul C. Harding, Mastering the ISDA Master Agreements (1992 and 2002), Pearson Education Ltd. (3d ed. 2010) at 405 ("U.S. parties will often insist that New York law be applied to govern the ISDA Master Agreement."). For example, Deutsche Bank executed trades with Plaintiff FrontPoint pursuant to an ISDA Master Agreement dated January 20, 2010, in which Deutsche Bank consented to New York

law, and thereby consented to jurisdiction in New York in any suit or action (like this one) relating to the ISDA Master Agreement and routed money through New York bank accounts in connection with the agreement. ¶ 19. *Lefkowitz Decl.* Ex. 2 at Schedule, Part 4(h). Citibank (not a movant here), executed a similar contract with FrontPoint. *Lefkowitz Decl.* Ex. 3.

*Step Two: Trade SIBOR- and SOR-based derivatives with U.S. counterparties*

Upon execution of the ISDA Master Agreement, the parties entered into individual SIBOR- or SOR-based derivatives trades pursuant to the agreement. ¶ 19. Moving Defendants communicated with the U.S. counterparties to discuss prices for each trade and used U.S. correspondent bank accounts to hold collateral/margin for funds exchanged. *Lefkowitz Decl.*, Exs. 2-21. Each trade called for resets (or periodic payments) based on future SIBOR or SOR rates or "fixes" calculated by Thomson Reuters on behalf of the Association of Banks in Singapore ("ABS"). ¶¶ 116-17.

Many Defendants reported to the Federal Reserve Bank of New York ("FRBNY"), which conducts a triennial survey of the U.S. over-the-counter interest rate derivatives and foreign exchange market, that they transacted interest rate and foreign exchange derivatives in the United States, including SIBOR- and SOR-based derivatives. ¶ 14 (Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Suisse, Deutsche Bank, HSBC, RBS, Standard Chartered, and UBS). Many other Defendants are dealers who offer SIBOR- and SOR-based derivatives for sale in the U.S. to U.S. investors through the Bloomberg Terminal. ¶ 113 (ANZ, Barclays, BNP Paribas, Commerzbank, Credit Agricole, Credit Suisse, Deutsche Bank, HSBC, Oversea-Chinese Banking Corporation, Standard Chartered, and UBS).[6]

[6] When Moving Defendants argue that "[c]ertain of the Foreign Defendants do not conduct business in or direct business at the United States at all" (*Defs Br.* at 3), they mean six. *See* Declaration of Cheuk-Man Derek Ng, ECF No. 159, at 4 (Hongkong Shanghai Banking Corporation Ltd.); Declaration of William Gougherty, ECF No. 166, at 2 (holding company The Royal Bank of Scotland Group plc); Declaration of Beh Ean Lim, ECF No. 171, at 2 ( United Overseas Bank Limited and UOB Global Capital, LLC); and Declaration of Debbie Lam Thuan Meng, ECF No. 174, at 3 (DBS Bank and DBS Vickers Securities (USA) Inc.). The other 23 out of 29 Moving Defendants do not dispute that they traded SIBOR- and SOR-based derivatives in the U.S. with U.S. counterparties in their declarations submitted in

*Step Three: Examine positions and determine which way to move SIBOR and SOR to make illegal profits*

After the trades were placed, and before the reset date(s), Moving Defendants' traders, including their U.S. traders, assessed the banks' aggregate proprietary trading positions to determine if the bank was "long" or "short" in its SIBOR- or SOR-based derivatives trading, which counterparties were involved, their positions, locations, and their funding information. Once the banks knew which direction (higher or lower) they needed to move SIBOR and SOR to benefit their positions, only then could they skew the rates in a direction that made money, minimized potential losses, and ripped off its counterparties. *See* ¶¶ 16, 109-10.

*Step Four: Skew SIBOR and SOR*

Moving Defendants gave Thomson Reuters false rates with which to calculate SIBOR. Those artificial fixes were then disseminated within the U.S. on behalf of the ABS. Moving Defendants say their rate submitters were overseas, but even if that were true, they still knew they were harming U.S. counterparties with each false submission and at times coordinated with their U.S.-based traders to enhance the banks' derivatives books. ¶¶ 6 & n. 5, 126-27. The CFTC found that traders at Deutsche Bank, RBS, and UBS manipulated SIBOR and SOR by "similar misconduct" to the methods used to rig other benchmark rates, including Yen-LIBOR, USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, and EURIBOR. *Id.* Such "similar misconduct" included U.S.-based derivatives traders and managers requesting that the banks' overseas submitters enter favorable LIBOR submissions to benefit their own and the derivative desks' trading positions to increase profits or minimize losses at the expense of their U.S. counterparties. *See id.*

And irrespective of the false submissions, all Defendants engaged in non-rate setting manipulation directly in the U.S. market for SIBOR- and SOR-based derivatives by publishing false

---

support of their motion to dismiss. And all 29 are subject to this Court's personal jurisdiction based on their involvement in a conspiracy that had suit-related purposeful contacts with the United States. *See* PART V, *infra*.

prices for derivatives and entering into trades with U.S. counterparties incorporating those false prices. ¶¶ 14, 20-21, 102, 106, 113. Defendants colluded with each other and co-conspirators to maximize the effect of their manipulation. *See, e.g.*, ¶¶ 3, 8, 105.

*Step Five: Profit from U.S. counterparties based on manipulated trades*

After Thomson Reuters published the artificial SIBOR and SOR fixes, Moving Defendants returned to their U.S. counterparties to collect. Each time a SIBOR- or SOR-based derivative was initiated, reset, matured, or terminated, Moving Defendants received more from or paid less to U.S. counterparties than they would have under honest market conditions. Throughout, they used U.S. employees and facilities to funnel their illicit proceeds through U.S. bank accounts at the expense of U.S. investors. ¶¶ 17, 180-81; *see also Lefkowitz Decl.* Exs. 2-3.

## ARGUMENT

### I. Plaintiffs do not rely on the principles of the general personal jurisdiction "at home" test

Moving Defendants spend the first point of their brief arguing that Plaintiffs cannot satisfy *Daimler's* "at home" test for general jurisdiction. But Plaintiffs do not rely on general personal jurisdiction as to any of the Moving Defendants. Hence, the Court need not rule on this issue.

### II. Deutsche Bank consented to jurisdiction in the ISDA Master Agreement it executed with FrontPoint

Defendant Deutsche Bank executed an ISDA Master Agreement with Plaintiff FrontPoint on January 20, 2010 in which it consented to jurisdiction in New York. ¶ 19; *Lefkowitz Decl.* Ex. 2. Deutsche Bank does not dispute that it then traded with FrontPoint pursuant to the ISDA Master Agreement in the SIBOR derivatives market it and the conspiracy rigged. *Id.* Under the ISDA Master Agreement governing the trades, Deutsche Bank irrevocably consented to jurisdiction in New York and waived any right to contest jurisdiction in this case. *Id. See also Lefkowitz Decl.* Exs. 1a at 33-34 and 1b at 38-39.[7]

[7] Deutsche Bank itself recognizes Plaintiffs' point. In *Sabal v. Deutsche Bank*, No. 16-cv-300, 2016 WL 5080385 (W.D. Tex. Sept. 19, 2016), Deutsche Bank successfully moved for a transfer of venue to the Southern District of New York

Deutsche Bank's conjecture that trade confirmations between it and FrontPoint might have altered the ISDA Master Agreement's *irrevocable* consent is unsupported even by Deutsche Bank's own submission—it never provides a document or declaration implying its consent was ever revoked. *See* Joint Memorandum of Law in Support of Foreign Defendants' Motion to Dismiss All Claims for Lack of Personal Jurisdiction and Venue, ECF No. 145 ("*Defs. Br.*") at 42-43. Deutsche Bank does not dispute that it traded with FrontPoint under this agreement and the January 20, 2010 agreement was never superseded nor the consent provision altered.[8]

## III. The Consenting Defendants registered to do business in New York, thereby consenting to this Court's exercise of jurisdiction

The Consenting Defendants registered under N.Y. Banking Law § 200 and appointed the Superintendent of the New York State Department of Financial Services ("NYSDFS") as their agent for service of process. ¶ 18. These banks consented to state oversight in exchange for permission to enjoy the benefits of conducting business in New York. Under New York law, they are subject to this Court's jurisdiction. *See Vera*, 91 F. Supp. 3d at 570.

### A. New York courts, including this one, have long construed registration to do business in New York, including registration of a branch of a foreign bank, to constitute consent to jurisdiction for any matter

"Foreign corporations which do business in New York are bound by the laws of both the state of New York and the United States, and are bound by the same judicial constraints as domestic

based on its New York consent in an ISDA Master Agreement, which it argued called for mandatory jurisdiction in New York for disputes related to the agreement. *See* Deutsche Bank's Motion to Transfer Venue or Dismiss the Amended Complaint and Brief in Support, *Sabal v. Deutsche Bank*, No. 16-cv-300 (W.D. Tex.), Dkt. #9, attached as Exhibit 32 of the *Lefkowitz Declaration*.

[8] Deutsche Bank's argument (*Defs. Br.* at 42-43) that its consent in the ISDA Master Agreement with FrontPoint only applies to disputes arising under or relating to the agreement must fail because this case relates to the agreement: "claims brought against counterparties in their capacity as counterparties relate to the ISDA Agreements." *In re LIBOR-Based Fin. Instruments Antitrust Litigation* ("LIBOR IV"), No. 11-mdl-2262, 2015 WL 6243526, at *34 (S.D.N.Y. Oct. 20, 2015) ("[D]efendants argue that they constitute consent only to jurisdiction over claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and not claims sounding in tort and unjust enrichment. We do not interpret the clauses so narrowly."); *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 379 (S.D.N.Y. 2010) ("antitrust claims [that] 'arise out of' or 'relate to' [the contract] are subject to the forum selection clause."); *see also Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (A forum-selection clause covering claims "in connection with" or "relating to" plaintiffs' contracts applied to securities and RICO claims against non-signatories).

corporations. Under New York Banking Law, *foreign banks operating local branches in New York can both sue and be sued*." *Vera*, 91 F. Supp. 3d at 570 (emphasis added).

Moving Defendants recognize that Your Honor held in *Vera* that their New York registrations "can be read as consent to personal jurisdiction." *Defs. Br.* at 11 n. 12. Nevertheless, they ask the Court to disregard its own holding despite decades of New York case law and a recent subsequent decision supporting the result. *See In the Matter of B&M Kingstone, LLC v. Mega Int'l Commercial Bank Co., Ltd.*, 131 A.D.3d 259, 15 N.Y.S.3d 318 (1st Dep't 2015) (following *Vera*'s holding that registrants under N.Y. Banking Law § 200 consent to personal jurisdiction in New York).

*Vera* is rightly decided. It has been the law for the last century that foreign corporations voluntarily registering to do business in New York consent to the jurisdiction of New York courts. *See Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432, 436-37 (1916) ("the appointment [of an agent for service of process under a business registration statute] is for any action which under the laws of this state may be brought against a foreign corporation"); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) ("The registration statute in the state of New York has been definitively construed" to bring about jurisdiction by consent); *Spiegel v. Schulmann*, 604 F.3d 72, 77 n.1 (2d Cir. 2010) (registering to do business in New York "would have been sufficient to establish personal jurisdiction") (per curiam); *Amalgamet, Inc. v. Ledoux & Co.*, 645 F. Supp. 248, 249 (S.D.N.Y. 1986) (holding that foreign corporations' privilege of doing business in New York is conditioned on their consent to personal jurisdiction); *Augsbury Corp. v. Petrokey Corp.*, 97 A.D.2d 173, 470 N.Y.S.2d 787 (3d Dep't 1983) (same).[9]

[9] Supreme Court precedent holds that: (1) a state may interpret its 'registration to do business' statute as conferring jurisdiction by consent; and (2) a foreign defendant may consent to jurisdiction, even for conduct that occurred overseas. *See Penn. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 94-95 (1917) (finding jurisdiction where defendant appointed an agent pursuant to a state law with language requiring consent to personal jurisdiction); *Robert Mitchell Furniture Co. v. Selden Breck Constr. Co.*, 257 U.S. 213, 214-16 (1921) (finding that a state court may construe a statute requiring businesses to appoint in-state agents to "extend [jurisdiction] to suits in respect of business transacted by [a] foreign corporation elsewhere.").

Both state and federal courts in New York have ruled that the banking registration statute at issue here, N.Y. Banking Law § 200, operates in the same way.[10] *Vera*, 91 F. Supp. 3d at 570; *see also B&M Kingstone*, 131 A.D.3d at 265, 15 N.Y.S.3d at 322-23 (applying *Vera* to find N.Y. Banking Law § 200 subjects registering banks to the personal jurisdiction of New York courts by their consent); *Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998); *Varga v. Credit Suisse*, 155 N.Y.S.2d 655 (Sup. Ct. N.Y. Co. 1956), *aff'd*, 157 N.Y.S.2d 391, 393 (1st Dep't 1956) (holding that registration under § 200 amounts to consent to personal jurisdiction in New York as parties to a case and for all actions). A foreign corporation's "privilege of doing business in New York is accompanied by an automatic basis for personal jurisdiction" due in part to the fact that it "has reaped the benefits of doing business in New York." *Amalgamet*, 645 F. Supp. at 249 (quoting *Augsbury*, 97 A.D.2d at 176, 470 N.Y.S.2d at 789); *see Bagdon*, 217 N.Y. at 436-37 (registering and designating an agent for service of process is "real consent"); *Augsbury*, 97 A.D.2d at 175, 470 N.Y.S.2d at 789 (The "voluntary use of certain State procedures" such as "authorization to do business in the State and concomitant designation of the Secretary of State as its agent for service of process . . . is in fact a form of constructive consent to personal jurisdiction.").

The plain language of New York Banking Law § 200-b(2) confirms these repeated holdings.[11]

[10] N.Y. Bus. Corp. Law § 1314 (the general business registration statute) and N.Y. Banking Law § 200 are analogues according to their legislative histories. *See* Bill Jacket for BJ 1964, CH 849, N.Y. Banking Law § 200-b (McKinney) at 42, attached as *Lefkowitz Decl.* Ex. 28. "Statutes which relate to the same thing or class of things are *in pari materia* and may be construed together. A . . . new enactment of fragmentary nature is taken as intended to fit into existing laws on the same subject unless a different purpose is clearly shown." *Del. Midland Corp. v. Westhampton Beach*, 79 Misc.2d 438, 444, 359 N.Y.S.2d 944, 950 (Sup. Ct. Suffolk Cty. 1974) (internal citations omitted), *aff'd*, 39 N.Y.2d 1029, 48 A.D.2d 681, 369 N.Y.S.2d 378 (2d Dep't 1975), *aff'd* 387 N.Y.S.2d 248 (1976).

[11] The amendment to § 200(3) that Moving Defendants cite (*Defs. Br.* at 10 n.10) only changed the service of process language of the statute. N.Y. Banking Law § 200(3) (requiring a registering foreign bank to appoint the banking superintendent as "its true and lawful attorney" such that process "may be served with same force and effect as if [the foreign bank] were a domestic corporation and had been lawfully served with process in the state"). The 1951 amendment provided the option for resident and non-resident plaintiffs to use the banking superintendent to serve a foreign bank. The New York Legislature added N.Y. Banking Law § 200-b thirteen years *after* defendants claim the New York Legislature amended N.Y. Banking Law § 200(3) to limit the reach of a foreign bank's consent to personal jurisdiction. Had the Legislature amended N.Y. Banking Law § 200(3) to limit personal jurisdiction, one would expect

The statute provides that foreign banking corporations registered to do business in New York consent to jurisdiction in any action by non-New York residents, like the Plaintiffs (¶¶ 20-21), where "the defendant is a foreign banking corporation doing business in this state." N.Y. Banking Law § 200-b(2). The Consenting Defendants never contest that they do business in New York, rendering their registration consent to personal jurisdiction in New York in any action against them.

Despite Your Honor's conclusive ruling on § 200's grant of jurisdiction by consent, Consenting Defendants claim that Section 200-b is not a grant of jurisdiction, but a limitation on the subject matter of cases that can be brought against them. *Defs. Br.* at 9-10. Your Honor's decision was well-founded, as *Varga* held that "[t]he purpose of [Section 200, subd. 3] is not to circumscribe and limit, but to expand and amplify the opportunities of plaintiffs, to effect service and to facilitate acquisition of jurisdiction *in personam* over defendant foreign banks in cases where adequate methods of obtaining redress for a wrong might not be otherwise afforded and where it is most needed." *Varga*, 2 A.D.2d at 598, 157 N.Y.S.2d at 393-94 (emphasis added); *accord B&M*, 131 A.D.2d at 265, 15 N.Y.S.3d at 318. In doing so, *Varga* rejected the same argument Consenting Defendants make here, that the statute limits the subject matter jurisdiction of this Court. *Compare Varga*, 2 A.D.2d at 597, 157 N.Y.S.2d at 393 (rejecting "the contention of defendant that under the provisions of section 200, subd. 3 of the Banking Law the Legislature intended to subject foreign banks to suit only for causes of action arising out of transactions of their agencies here") *with Defs. Br.* at 9-10.[12]

---

the inclusion of similar language upon enacting § 200-b to avoid conflicting interpretations. No such conforming language exists in the current statute.

[12] Contrary to Consenting Defendants' assertion, *Indosuez* did not hold that N.Y. Banking Law § 200 was a limitation on subject matter jurisdiction. *See Defs. Br.* at 9. The *Indosuez* Court interpreted, and found, jurisdiction based on consent in an ISDA Master Agreement, and had no reason to reach consent jurisdiction based on registration. Rather, *Indosuez* merely interpreted one of the bases delineated in § 200 for claims to be brought against foreign registrants in breach of contract matters: "where the action is brought to recover damages for the breach of a contract made or to be performed within this state." *Indosuez International Finance B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 248, 746 N.Y.S.2d 631, 637 (2002). *Indosuez* held that this condition could be satisfied after the contract is formed. *Id.* But the Court reached no holding regarding N.Y. Banking Law § 200 and personal jurisdiction. And to the extent *In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FX II")*, No. 13-cv-7789 (LGS), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) interpreted § 200 as a subject matter jurisdiction statute, it should not be followed. Supreme Court and Second Circuit precedent requires this

Consenting Defendants fixate on the only way this case differs, albeit immaterially, from *Vera* and *B&M Kingstone*. Those two cases dealt with jurisdiction over third parties. But courts interpret Section 200 as applying equally to defendants and third-parties. *See Greenbaum*, 26 F. Supp. 2d at 649; *Varga*, 155 N.Y.S.2d at 659. Corporations that consent to jurisdiction in this way do so for any case, as parties or nonparties. *See, e.g., Varga*, 155 N.Y.S.2d at 655 (finding consent to jurisdiction by a defendant's registration); *B&M*, 131 A.D.3d at 265, 15 N.Y.S.3d at 318 (finding consent to jurisdiction by a non-party's registration). Your Honor acknowledged this in *Vera*, noting that the statute operates to allow registrant banks to "both sue and be sued," and that "[t]his legal status *also* confers obligations to participate as third-parties in lawsuits which involve assets under their management." *Vera*, 91 F. Supp. 3d at 570 (emphasis added).[13]

In a final attempt to avoid personal jurisdiction through their registration in New York, Defendants claim Plaintiffs' interpretation of Section 200 would violate the "unconstitutional conditions" or the "constitutional doubt" doctrines. Both arguments fail. Courts have considered and rejected the argument that registration statutes effecting consent to personal jurisdiction deprive a defendant of due process and constitute an unconstitutional condition. *See McDonald AG Inc. v. Syngenta AG (In re Syngenta AG MIR 162 Corn Litig.)*, No. MDL No. 2591, 2016 WL 2866166, at *1-3 (D. Kan. May 17, 2016) (on reconsideration, rejecting defendant's unconstitutional conditions argument with respect to personal jurisdiction under Kansas' business registration statue, finding

---

Court to follow the New York courts' interpretation of N.Y. Banking Law § 200 in *Varga*. *See Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177-78 (1940) (holding that an intermediate state court's interpretation of state law, "in the absence of more convincing evidence of what the state law is, should be followed by a federal court"); *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002) ("when interpreting state statutes federal courts defer to state courts' interpretation of their own statutes").

[13] Consenting Defendants never explain why a different jurisdictional standard should (or does) apply to third parties than would apply to Defendants, much less a more permissive one. The Second Circuit in *Gucci* expressly cast doubt on this suggestion. *Gucci Am. v. Bank of China*, 768 F.3d 122, 137 n.17 (2d Cir. 2014) ("On the one hand, a 'person who is subjected to liability . . . far from home may have better cause to complain of an outrage to fair play' than a nonparty . . . But on the other hand, a nonparty with few if any connections to the activities giving rise to the suit, or any stake in it, may have a strong interest in its freedom to take actions that are 'genuinely independent' of any intent to frustrate a court's injunction.") (internal citation omitted).

*Pennsylvania Fire* and *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165 (1939) remain good law after *Daimler*). The "constitutional doubt" doctrine has been called "the last refuge of many an interpretive lost cause." *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1993). While courts should construe statutes to avoid "serious constitutional doubts," courts may not contort constructions "to eliminate all possible contentions that the statute *might* be unconstitutional." *Id.* Here, Plaintiffs' construction of section 200 not only avoids serious constitutional doubts, it presently embodies the law of the forum stretching back to *Bagdon*, and is consistent with the U.S. Supreme Court's rulings in *Pennsylvania Fire* and subsequent cases. That Defendants believe *Daimler* changed the constitutionality of laws obtaining consent by registration does not make it so, and more importantly, cannot be used to create an issue for which the "constitutional doubt" doctrine should be applied.

"Foreign banks should not be permitted to promote the legitimacy of their business by registering to do business in New York, and then hide illicit activity . . . ." *Vera*, 91 F. Supp. 3d at 571. The defendant banks here are no different; this Court should find it has personal jurisdiction over the Consenting Defendants.

### B. *Vera* is consistent with *Daimler* and *Gucci* and is supported by *Brown*

This Court correctly ruled that "*Daimler* and *Gucci* should not be read so broadly as to eliminate the necessary regulatory oversight into foreign entities that operate within the boundaries of the United States. There is no reason to give advantage to a foreign bank with a branch in New York, over a domestic bank." *Vera*, 91 F. Supp. 3d at 570.

*Daimler* held that a long arm statute imposing general jurisdiction on corporations doing systematic and continuous business in a state does not allow them "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Daimler AG v. Bauman,* 134 S. Ct. 746, 761-62 (2014) (internal quotation marks and citation omitted). N.Y. Banking Law § 200 fosters *Daimler*'s view of due process: that defendants should

have notice of where they can be sued. Moving Defendants had a choice: they could either register in New York, or not, and in so doing "structure their primary conduct" so that jurisdiction over them was predictable. Unlike the nebulous "systematic and continuous business" standard that *Daimler* rejected, here Consenting Defendants knew—or certainly should have known—that New York has construed its registration statutes as bringing about consent for the last 100 years, and specifically N.Y. Banking Law § 200 for the last 60 years. *Gucci* extolled consent-by-registration when "it explicitly left open for the district court to 'consider whether [Bank of China] has consented to personal jurisdiction in New York by applying for authorization to conduct business in New York and designating the New York Secretary of State as its agent for service of process.'" *Vera*, 91 F. Supp. 3d at 569 (quoting *Gucci*, 768 F.3d at 136 n.15 and N.Y. Banking Law § 200).

*Brown* only analyzed Connecticut's business registration statutes, which have not been interpreted by Connecticut courts to bring about jurisdiction by consent, and therefore "do not speak clearly on th[e] point" of jurisdiction. *Brown*, 814 F.3d at 623.[14] In contrast to Connecticut's statute, *Brown* specifically cited New York as an example of a registration statute that *has* been authoritatively interpreted to confer jurisdiction. *Id.* at 640 ("The registration statute in the state of New York has been definitively construed to accomplish [consent to personal jurisdiction by registration] and legislation has been introduced to ratify that construction of the statute."). *Brown* expressly declined to reach the question of whether such statutes comply with due process. But the Second Circuit indicated it would likely find New York's statute constitutional because it "plainly advise[s] the registrant that enrolling in the state as a foreign corporation and transacting business"

[14] Not wishing to "implicate Due Process and other constitutional concerns," and "in the absence of a controlling interpretation by the Connecticut Supreme Court, or a clearer legislative mandate," the Second Circuit "decline[d] to construe the state's registration and agent-appointment statutes as embodying actual consent." *Id.* at *13-14. It did not reach the constitutional issue for good reason, because the Second Circuit has no authority to deem *Pennsylvania Fire* implicitly overruled. *De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) (only the Supreme Court has "the prerogative of overruling its own decisions").

would subject it to jurisdiction, consistent with *Daimler*'s teachings. *Id.* at 640.[15]

## IV. Moving Defendants are subject to specific jurisdiction because they purposefully availed themselves of the forum and their suit-related acts caused harmful effects in the forum

A court may exercise specific jurisdiction over a defendant who maintains minimum contacts with the forum based on "single or occasional" acts. *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *accord Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) ("[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."). Moving Defendants' contacts meet this standard, particularly before discovery, when a plaintiff need only allege facts that support (not prove) a prima facie basis for jurisdiction. *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).

The relevant forum in this case is the entire United States. "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nation-wide service of process . . . the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013); *see* FED. R. CIV. P. 4(k)(1)(C).[16]

---

[15] Contrary to Moving Defendants' argument (*Defs. Br.* at 12), no case in the Second Circuit or Supreme Court has ever held that consent by registration violates the unconstitutional conditions doctrine; and defendants cite no authority for their argument. Consenting Defendants argue that somehow they suffer a due process violation by being haled into court in New York, a jurisdiction where they registered to do business, and knew for decades of case law interpreting their registration to be consent to jurisdiction here. Quite the contrary: Defendants' position would deprive *Plaintiffs* of their due process right of a meaningful opportunity to have their day in court. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807-811 (1985) ("a chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs" protected by due process).

[16] Pendent jurisdiction allows a federal court to exercise personal jurisdiction over related state law claims. "[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact,' the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." *In re Fannie Mae 2008 Sec. Litig.,* 891 F. Supp. 2d 458, 481 (S.D.N.Y. 2012) (citation omitted) (quoting *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1056 (2d Cir. 1993); *see also Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719 (2d Cir. 1980) (allowing personal jurisdiction over state law claims where they share a common nucleus of operative facts with a federal claim). Plaintiffs' state law claims inarguably arise from the same facts as Plaintiffs' federal law claims.

Plaintiffs' Sherman Act and RICO claims arise under statutes that permit a defendant to be sued in any district where the defendant is found or where the violation occurred, and for process to be served wherever a defendant is found. *See* 15 U.S.C. § 22; 18 U.S.C. § 1965.[17]

**A. Plaintiffs adequately plead personal jurisdiction over each defendant**

A motion to dismiss for lack of personal jurisdiction must be denied when Plaintiffs' "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). Defendants' affidavits and supporting materials are not entitled to the same benefit: The Second Circuit *rejected* the proposition that when "a defendant rebuts a plaintiff's unsupported allegations with direct, highly specific testimonial evidence regarding a fact essential to jurisdiction—and the plaintiff does not counter that evidence—the allegation may be deemed refuted." *Dorchester*, 722 F.3d at 86 (internal quotations omitted). Instead, Defendants' contrary evidence *cannot be considered* before Plaintiffs test it through discovery and an evidentiary hearing. *Id.* at 87.

Moving Defendants assert various merits defenses, *e.g.*, that their trading activity had no effect on the setting of SOR (*Defs. Br.* at 16 n.16) and that Singapore Dollar FX forwards were not priced based on SIBOR or SOR.[18] These merits disputes cannot be resolved on a jurisdictional motion,

---

[17] Moving Defendants' claim that it remains an "open question" whether this Court should assess their nationwide contacts. *Defs. Br.* at 35. But this is not correct as the Second Circuit in *Gucci* recognized that nationwide contacts were appropriately considered where a federal statute authorizes nationwide service of process. *See Gucci*, 768 F.3d at 142 ("In evaluating [Bank of China's] contacts with the forum, the district court may wish to consider whether the relevant contacts for this inquiry are with the United States, rather than with New York."); *In re Hellas Telecommunications (Luxembourg) II SCA*, 547 Bankr. 80, 97 (S.D.N.Y. 2016) ("[C]ourts have routinely held that a nationwide minimum contacts test applies where nationwide service of process is authorized by federal law."); *LIBOR IV*, 2015 WL 6243526, at *23 n.39 ("Nothing in [*Walden v. Fiore*, 134 S. Ct. 1115, 1123-24 (2014) or *Daimler*] so much as hints that the national contacts rule might be unconstitutional where it is supported by a federal statute."); *Chew v. Dietrich*, 143 F.3d 24, 30 (2d Cir. 1998) ("[S]ince the question of personal jurisdiction is one of federal law, we are free to consider all of [Defendant]'s contacts with the United States in deciding whether the exercise of personal jurisdiction is proper.").

[18] *Defs. Br.* at 18-19. Defendants' argument that FX forwards are not priced based on SIBOR and/or SOR is flawed; this is a fact-dispute which must be resolved in Plaintiffs' favor at the pleadings stage. In any event, FX forwards are priced based on SIBOR and/or SOR. *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Class Action Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("*Pls. Merits Br.*"), filed concurrently herewith, at PART II.B.1.

much less resolved in Moving Defendants' favor; the well-pleaded complaint must be presumed true at this stage. *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*, 753 F.3d 395, 403 n.3 (2d Cir. 2014) ("Jurisdiction is an issue distinct from and logically prior to the merits of a claim, and the Supreme Court has held that the nonexistence of a cause of action [i]s no proper basis for a jurisdictional dismissal.") (internal quotation omitted); *see In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 154 n.16 (2d Cir. 2015) (same); *see also Dorchester*, 722 F.3d at 86.

### B. Moving Defendants' in-forum and out-of-forum acts to manipulate SIBOR, SOR, and related derivatives are suit-related contacts

Contacts with the forum satisfy specific personal jurisdiction when they are suit-related. There must be "an articulable nexus or substantial relationship" between the contacts and the claim, but this "does not require a *causal relationship* . . . it is enough that the latter is not completely unmoored from the former." *Gucci Am. Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93-94 (S.D.N.Y. 2015) (internal quotations omitted).

If a contact creates "a 'plausible inference' based on factual allegations that a defendant acted illegally in the United States or 'intended his [actions] to cause injury in the United States,'" the contact is by definition suit-related. *FX II*, 2016 WL 1268267, at *6. Plaintiffs plead both types of contacts with the United States. *See* PART IV.C., *infra*.

*First,* Plaintiffs plead that Moving Defendants "deliberately thrust[ ] [themselves] into the New York financial market by establishing" SIBOR/SOR trading enterprises to take advantage of the enormous profits they could reap here by transacting products priced to an artificial rate. *See* ¶¶ 22-98; *see also Gucci*, 135 F. Supp. 3d at 95. As Moving Defendants concede, "[a] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Defs. Br.* at 30 (quoting *Daimler*, 134 S. Ct. at 759 n.13).[19] Defendants' U.S.-based trades create a

[19] Despite conceding that *Daimler* endorsed specific jurisdiction by the acts of an agent (*Defs. Br.* at 30), Moving Defendants argue that *Daimler* espoused a "critical view toward an agency analysis." *Defs. Br.* at 7 n.7. For this dubious proposition, Moving Defendants cite *Sonera*, wherein the Second Circuit explicitly declined to opine whether *Daimler*

relationship between "transactions occurring within the [forum] and the cause of action sued upon." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (internal quotations omitted). *See* PART IV.C.1., *infra.*

*Second*, Plaintiffs plead that Defendants intended their manipulation to impact SIBOR- and SOR-based derivatives transacted in the United States. *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013) (out-of-forum conduct gives rise to specific jurisdiction where the defendant participates in a scheme "known to be targeting the United States"); *United States v. Hayes*, 99 F. Supp. 3d 409, 423 n.4 (S.D.N.Y. 2015), *endorsed*, 2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) (rejecting Yen-LIBOR criminal defendant's argument that his "knowledge that the LIBOR figures were published globally . . . cannot provide a sufficiently targeted basis for personal jurisdiction . . . .").[20] *See* PART IV.C.2., *infra.*

*Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016) signals that both of these types of contacts are suit-related in the context of price-fixing claims. The *Gelboim* plaintiffs brought antitrust and other claims against panel banks that contributed rates to fix the U.S. dollar LIBOR ("USD LIBOR"). In its decision, the Second Circuit confirmed that allegations describing "*the influence that a conspiracy exerts on the starting point for prices*" are sufficient to make a prima facie *per se* price-fixing antitrust claim. *Id.* at 776 (emphasis added). In so holding, the Second Circuit recognized that a conspiracy to manipulate the USD LIBOR fix had such a tangible impact on the market prices of

impacted the Court's prior holding in *Wiwa v. Royal Dutch Petroleum Company*, 226 F.3d 88 (2d Cir. 2000). *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014). All this means is that the Second Circuit's *Wiwa* agency principles continue to bind this Court.

[20] Defendants urge this Court to follow other "IBOR"-related decisions in this District. *Defs. Br.* at 17. But those cases, for different reasons, do not and should not apply to the claims before the Court. Defendants' citation of *7 W. 57th Street* is unavailing. There, Judge Gardephe granted a motion to dismiss because "[o]nly two paragraphs in the 72-page Amended Complaint even hint at a connection between New York and the Defendants' suit-related conduct." *7 W. 57th Street Realty Co. v. CitiGroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015). That is hardly the pleading here. Further, the allegations against Defendants here are distinct from the allegations made against the Japanese bank defendants in *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015). There were no public government settlements confirming manipulation and conspiracy among the Japanese banks available at the time the *Laydon* action was filed.

related derivatives that it constituted actionable conduct. Acts that facilitated the price-fixing scheme are therefore related to the suit. Moving Defendants injected price artificiality into the U.S. market by manipulating SIBOR and SOR, and those acts of rigging, on their own, whether done in the United States or elsewhere intermittently, caused an injury in the U.S. markets, violated antitrust laws, and are therefore suit-related. *Id.*

*Gelboim* further noted that "the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all." *Id.* at 780. The Second Circuit allowed the *Gelboim* plaintiffs' antitrust claims to go forward despite the fact that the manipulation was directed not just to the U.S., but globally. Harming a global market does not render the U.S. markets' portion of that harm unrelated to this suit. *Id*; *see also Magnetic Audiotape*, 334 F.3d at 204; *see also* Complaint, *Moon v. SKM, Ltd.*, No. BC150995 (Cal. Super. Ct. July 19, 1996), attached as *Lefkowitz Decl.* Ex. 27 (noting that the *Magnetic Audiotape* antitrust violation that arose from injury in both the U.S. and elsewhere still satisfied the effects test in the United States).

The Second Circuit decision in *Magnetic Audiotape* is dispositive on this issue. There, the Court concluded that a single price-fixing meeting held overseas could have effects on the U.S. market sufficient to subject the foreign colluders to personal jurisdiction in an antitrust suit brought by affected U.S. consumers. *Magnetic Audiotape*, 334 F.3d at 208. The overseas meeting, therefore, constituted a suit-related contact. This Court's inquiry is not limited to whether the employees were sitting in the United States when they clicked "send" on e-mails to Thomson Reuters with phony rates. Moving Defendants traded with Plaintiffs and others who were at the mercy of the conspiracy's "influence . . . on the starting point for prices" in the United States and elsewhere. *Gelboim*, 823 F.3d at 776, at *11. The acts by which Moving Defendants influenced prices in the U.S. are therefore suit-related contacts that, as discussed below, give rise to jurisdiction. *Magnetic*

*Audiotape*, 334 F.3d at 208 ("[Plaintiffs] point to minutes from a meeting showing that an executive of SKM was present at a meeting in Seoul in which price-fixing activities took place. For purposes of a motion to dismiss, this arguably would satisfy the 'effects' test frequently used in the analysis of specific personal jurisdiction.").

The allegations in the complaint, which are suit-related under *Gelboim* and *Magnetic Audiotape*, bring about personal jurisdiction both by Moving Defendants' in-forum acts and by their acts abroad that caused a harmful effect in the forum.

### C. Moving Defendants purposefully availed themselves of the United States, intentionally caused harmful effects in the United States, and expressly aimed their conduct at the United States

#### 1. *Moving Defendants purposefully availed themselves of the United States*

Availment of a forum is sufficient to give rise to jurisdiction when there is a substantial relationship between the contacts and the claim. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 167 (2d Cir. 2010) (holding that it is sufficient for specific jurisdiction that the plaintiff's injury arises as a part of a defendant's "larger business plan purposefully directed at [the forum's] consumers."). Every time a co-conspirator Defendant targeted a U.S. counterparty by entering into an ISDA and/or a trade with that counterparty; manipulated SIBOR- and SOR-based derivatives knowing that it would impact trades in the U.S. market; or collected illicit returns on manipulated trades from its U.S.-based victims, it purposefully availed itself of the forum and, in the process, committed a *per se* violation of the antitrust laws. *See Gelboim*, 823 F.3d at 776.

Moving Defendants focus on *Waldman*, which involved foreign extremist attacks in Israel, including terrorists shooting "indiscriminately at the people on [the] street" and detonating suicide bombs in locations "full of people during the afternoon." *Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 324 (2d Cir. 2016). These acts had a physical impact limited to the area "in and around Jerusalem," with the only connection to the United States being the passports of the U.S. citizens

traveling abroad who were harmed in the attacks. *Id.* at 335-36. It was "random and fortuitous" that U.S. citizens happened to be in the area of the bombings in Israel; in contrast, it was not "random and fortuitous" that U.S. investors were the counterparties in this case because Moving Defendants used their U.S.-based trading conglomerates designed to exploit the U.S. market. Plaintiffs in this case never left the United States—the banks came here.

Far from "random and fortuitous," Moving Defendants executed essential elements of their scheme here using, to their benefit, their status as panel banks and U.S. derivatives dealers. Deutsche Bank traded SIBOR-based derivatives directly with Plaintiff FrontPoint, by which Deutsche Bank executed a New York forum selection clause, appointed its New York Branch as its process agent, noted that it could act through its New York office, required all demands and notices under the agreement's Credit Support Annex be directed to its New York office, and designated collateral be held in a New York bank account. *Lefkowitz Decl.* Ex. 2. The CFTC found that Deutsche Bank (as well as RBS and UBS) manipulated SIBOR and SOR. ¶¶ 6, 126-27. It was revealed during the allocution of former Deutsche Bank USD LIBOR submitter Michael Curtler in this District that "[w]ith regard to the venue issue, the scheme involved multiple international wires into and out of the Southern District of New York . . . . Also, there were derivative traders that worked at Deutsche Bank who submitted requests that were working here in the Manhattan office." *Lefkowitz Decl.* Ex. 22 at 25:24-25, 26:1-6. On June 2, 2016, the DOJ announced the indictment of another Deutsche Bank director, Michael Connolly, who is New York-based and accused of directing his subordinates on the New York Pool Trading Desk to "submit false or fraudulent LIBOR contributions consistent with the traders' or the bank's financial interests, rather than the honest and unbiased cost of borrowing." Press Release, U.S. Dep't of Justice, Two Former Deutsche Bank Employees Indicted on Fraud Charges in Connection with Long-Running Manipulation of Libor (June 2, 2016), attached as *Lefkowitz Decl.* Ex. 30. The indictment describes manipulation by Deutsche Bank New York's

traders in USD LIBOR derivatives products "*among other products*." *Lefkowitz Decl.* Ex. 31 at 5-6 (emphasis added). At least the following defendants offered SIBOR- and SOR-based derivatives for sale in the U.S. to U.S. investors through the Bloomberg Terminal: ANZ, Barclays, BNP Paribas, Commerzbank, Credit Agricole, Credit Suisse, Deutsche Bank, HSBC, Oversea-Chinese Banking Corporation, Standard Chartered, and UBS. ¶ 113.[21] Certain defendants also reported to the FRBNY that they transacted interest rate and foreign exchange derivatives, including SIBOR- and SOR-based derivatives, in the United States. ¶ 14 (Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Suisse, Deutsche Bank, HSBC, RBS, Standard Chartered, and UBS).

This case concerns only the U.S. portion of Defendants' global scheme, cabining the class definition to affected U.S. investors and U.S. trades.[22] This part of the conspiracy undoubtedly had U.S. roots. Moving Defendants used ISDA Master Agreements (adhering to the practice of using New York jurisdiction selection clauses and selecting New York law to apply to contracts with their U.S. counterparties), routed funds through U.S.-based accounts, and used U.S.-based employees and facilities as they manipulated trades with in-forum counterparties to take more money than they deserved. The New York Court of Appeals has noted that ISDA Master Agreement, in addition to providing personal jurisdiction by consent in its forum selection clause, also demonstrates purposeful availment by use of the forum selection clause and bank accounts in the course of the transactions. *Indosuez*, 98 N.Y.2d at 247, 746 N.Y.S.2d at 636-37 (finding that "a course of dealing [using 1992 ISDA Master Agreements] has been established between the parties . . . [in] transactions

[21] Moving Defendants' arguments against the relevance of their Bloomberg sales activity (*see Defs. Br.* at 20-21) should be disregarded. Moving Defendants do not state in any of their declarations that they were not similarly offering derivatives through Bloomberg during the Class Period. Whether Moving Defendants entered into transaction via Bloomberg or merely made offers is immaterial; even the offers demonstrate Moving Defendants' efforts to form relationships with the forum, and create a nexus with the harm. Moving Defendants also cannot avoid the significance of their sales activities on Bloomberg by claiming they were targeting worldwide investors. *See* PART IV.B, *supra*. Finally whether the offering entity on Bloomberg was a Moving Defendant's U.S.-based affiliate is a fact question for discovery.

[22] The proposed class definition is limited to "[a]ll persons or entities that engaged in *U.S.-based transactions* in financial instruments that were priced, benchmarked, and/or settled based on SIBOR and/or SOR." ¶ 148 (emphasis added).

through a New York bank. Such conduct constitutes purposeful exercise . . . . Not only is [defendant] subject to this state's jurisdiction because it has the requisite minimum contacts . . . it is also subject to jurisdiction based on the [consent] language in the confirmations"). *See also LIBOR IV*, 2015 WL 6243526, at *31 (holding that jurisdiction selection clauses in ISDA Master Agreements were a sound basis for jurisdiction in the manipulation of OTC swaps, noting that "[f]or jurisdictional purposes, the most significant type of contract are the ISDA Master Agreements used in the context of swap agreements"). The express utilization of New York financial institutions in the course of this case, like contracts and bank accounts, submits a defendant to the forum's jurisdiction. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 64 (2d Cir. 2012), *certified question answered*, 20 N.Y.3d 327 (2012) (denying a motion to dismiss for lack of personal jurisdiction by virtue of defendants suit-related "transact[ion] of business within New York . . . by the defendant's use of a correspondent bank account.").[23]

2. *Moving Defendants intentionally caused harmful effects in the United States*

Moving Defendants are also subject to jurisdiction because they caused harmful effects in the forum. Their overseas manipulators intended their acts to cause harmful effects in the United States (and they succeeded).

In *Magnetic Audiotape*, the Second Circuit found these very acts satisfied the effects test. *Magnetic Audiotape*, 334 F.3d at 208 (the effects test was satisfied by an allegation that defendants met once in Korea to discuss price fixing that may have impacted a worldwide market) (citing *Calder v. Jones*, 465

[23] While the Defendants spend two pages of footnotes solely to claim all of their phony rate-setting was done by employees seated abroad (though these acts still satisfy the effects test, PART IV.C.2., *infra*), they do not disclaim that U.S.-based employees had input in or influence on the submissions. *See Defs. Br.* 15-16. And notwithstanding, the Complaint also pleads non-rate setting collusion and anti-competitive conduct that, as found in *FX II*, is also sufficient to create suit-related contacts. *FX II*, 2016 WL 1268267, at *5 (noting that manipulation besides the false fixing of benchmarks, like the execution of "prop" trades, also gives rise to specific jurisdiction). The Complaint pleads that Moving Defendants published false prices for derivatives and entered into trades with U.S. counterparties incorporating those false prices. ¶¶ 17, 20-21, 102, 106, 113. Moving Defendants never assert that these non-rate setting acts of manipulation were done wholly overseas.

U.S. 783, 789-90 (1984)); *see also In re Vitamin C Antitrust Litig.*, No. 05-cv-453, 2012 WL 12355046, at *6 (E.D.N.Y. Aug. 8, 2012) (noting, "[a]ntitrust violations are the sort of 'tortious act' that can give rise to personal jurisdiction . . . if the violations caused injury in New York that the defendant should reasonably have expected").[24] By comparison, Plaintiffs' allegations dwarf those in *Magnetic Audiotape*. Because Moving Defendants intended their manipulation to impact SIBOR- and SOR-based derivatives transacted in the U.S., "particularly in a center of international finance like New York," they should be "held to account for [their] illegal actions wherever [their] manipulation efforts had effects." *Hayes*, 99 F. Supp. 3d at 422-33. There is no requirement that the bulk of the harm be felt in the forum, as was the case in *Keeton*, where a plaintiff could sue for libel in any jurisdiction the libelous publication was disseminated—even states with small circulations. *See Keeton*, 465 U.S. at 780; *accord Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) ("[W]e are following *Keeton* . . . in which the Court sustained the exercise of personal jurisdiction in New Hampshire even though 'it is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire.'").

Deutsche Bank submitter Michael Curtler admitted he knew of these harmful effects in the United States in his allocution in this district for criminal wire fraud when he testified:

> [w]hen I altered Libor to support Deutsche Bank's trading positions, I understood that the counterparties on the opposite side of these trades could be negatively affected. *I knew that some of the affected parties were American financial institutions and that some of these trades would involve wire transfers beginning or ending in the United States.*

[24] Defendants erroneously rely on *Walden* to assert that their conduct did not sufficiently cause an effect in the United States. *Walden* was filed in the District of Nevada and involved a seizure of cash in Georgia. *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014). The Supreme Court held that under those circumstances, the forum in which specific jurisdiction could exist was naturally confined due to the few people involved and the limited geographical scope of the tort. *Id.* Notwithstanding this conclusion, *Walden* reaffirmed the holdings in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder*. *See Walden*, 134 S. Ct. at 1123-24. Purposeful availment existed in *Calder* because the injurious "effects" were "communicated to (and read and understood by) third persons," (*id.* at 1124), but such widespread dissemination of the injury was absent in *Walden*. Defendants cannot equate their global conspiracy to the constrained effects in *Walden*.

*Lefkowitz Decl.* Ex. 22 at 25:8-13 (emphasis added). And Curtler's acts were not limited to "IBORs" of certain currencies. In fact, Curtler received an e-mail message in 2007 from David Nicholls, who managed Deutsche Bank's global finance and FX forward trading desk, in which Nicholls instructed Curtler "[m]ake sure our libors are on the low side *for all ccys [currencies]*." *See* Tom Schoenberg and Suzi Ring, *Deutsche Bank Libor Probe Said to Rise to Former Trading Manager*, BLOOMBERG, Oct. 15, 2015, attached as *Lefkowitz Decl.* Ex. 29. This e-mail was cited by both New York and German regulators investigating the culture of manipulation at Deutsche Bank. *Id.* Discovery will likely reveal similar instructions from other Defendants' employees.

3. *Moving Defendants expressly aimed their conduct at the United States*

The express aim of Moving Defendants' SIBOR- and SOR-based derivatives trading operations in the United States was to avail themselves of the United States market and ultimately exploit U.S. investors. The U.S.-based trading conglomerates here mirror those found by Judge Schofield to be sufficient, when combined with allegations of manipulation, to support personal jurisdiction.[25] *See FX II*, 2016 WL 1268267, at *6 (The argument that the failure to identify a single manipulated trade in the United States justified dismissal was "unavailing, and amounts to 'a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.'") (citing *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015)). Judge Schofield found that a plaintiff pleads personal jurisdiction by "provid[ing] undisputed

[25] Moving Defendants urge the Court to ignore their substantial suit-related trading activities in the forum because they directed much of their rigged trading at non-party residents of this forum. *Defs. Br.* at 21, n.25. In fact, contacts with non-parties (class members or not) in the forum *are* relevant for specific jurisdiction because such contacts are part of a defendant's "relationship" with the forum. *See Calder v. Jones*, 465 U.S. 783 (1984) (finding jurisdiction due to defendants' telephonic interviews with non-parties in the forum, circulating their magazine to non-parties in the forum, and causing injury to plaintiff that defendants knew would occur in the forum). Defendants cite *AM Trust v. UBS AG* for the proposition that SIBOR- and SOR-based transactions with absent class members are not contacts with the forum. *Defs. Br.* at 21 n.25. But the *AM Trust* court noted that the *only* connection between the defendant and the forum was that "some members of the [class of plaintiffs whose funds were allegedly embezzled by a Swiss bank in Switzerland to accounts also located in Switzerland] reside in California and in this District." 78 F. Supp. 3d 977, 983 (N.D. Cal. 2015). In *AM Trust,* the plaintiffs did not allege that the defendant reached into the forum to defraud investors (or do anything else), as Plaintiffs do here.

averments concerning the . . . Defendants' extensive U.S.-based [derivative trading] operations." *Id.* The Complaint cites myriad other examples of defendants' in-forum acts that were expressly aimed at the U.S. market. *See* SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS, *supra*.

And contrary to Moving Defendants' argument, "express aiming" does not mean "exclusive aiming." *Waldman* does not impose a requirement that Defendants exclusively target the United States. Rather, *Waldman* confirmed that federal courts may exercise personal jurisdiction over defendants even when the claim does not "arise from" the defendants' purposeful contacts with the United States, so long as the contacts are "sufficiently *related to*" the claims at issue in that suit. *See Waldman*, 835 F.3d at 343 (emphasis added). In *Waldman*, the Second Circuit distinguished the facts from those in *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002), because the *Bank Brussels* plaintiff's New York citizenship was not the only link to the forum:

> [A]lthough the [defendant] did not solicit [the plaintiff] as a client in New York, [the defendant] maintained an apartment in New York partially for the purpose of better servicing its New York clients, the firm faxed newsletters regarding Puerto Rican legal developments to persons in New York, the firm had numerous New York clients, and its marketing materials touted the firm's close relationship with the Federal Reserve Bank of New York.

*Waldman*, 835 F.3d at 343; *see also Bank Brussels*, 305 F.3d at 128 ("The engagement which gave rise to the dispute here is not simply one of a string of fortunate coincidences [but rather, the defendant sought] to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom.").

As in *Bank Brussels*, Moving Defendants here set up U.S.-based trading operations and executed U.S.-based contracts, creating a relationship between "transactions occurring within the [forum] and the cause of action sued upon." *Sunward*, 362 F.3d at 23 (internal citations and quotations omitted). Moving Defendants' conduct here of repeatedly reaching into the SIBOR- and SOR-based derivatives market to acquire clients who suffered financial losses as a proximate result of the

conspiracy is indistinguishable from *Bank Brussels*.

Moving Defendants' manipulation created a U.S. trading environment in which defendants won every time, akin to the conspiracies exposed in *Magnetic Audiotape* and *Gelboim*. The express aim was to profit off of Plaintiffs and other U.S. investors by altering the prices of and payments due under SIBOR- and SOR-based derivatives. These profits arose from self-directed contacts with and at the expense of counterparties in New York and elsewhere in the United States.

## V. Plaintiffs' conspiracy allegations provide a prima facie basis for this Court's jurisdiction over Moving Defendants

Plaintiffs have satisfied their pleading burden to establish a prima facie basis for conspiracy jurisdiction over every Moving Defendant. *See In re Satyam Comput. Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013) (to find conspiracy jurisdiction, a plaintiff need only "(1) make a *prima facie* factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy, and (3) set forth evidentiary facts to connect the defendants with transactions occurring in the United States."); *accord LIBOR IV*, 2015 WL 6243526, at *29; *Singer v. Bell*, 585 F. Supp. 300, 302-03 (S.D.N.Y. 1984). In the first instance, Plaintiffs properly plead the existence of a conspiracy to manipulate SIBOR and SOR. *See, generally, Pls. Merits Br.* Plaintiffs allege facts describing Moving Defendants' involvement in the conspiracy to manipulate SIBOR and SOR. *See* SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS. Finally, as described *infra*, through their co-conspirators' acts in and directed to the forum, Moving Defendants' relationship with the forum supports finding personal jurisdiction over them.

To avoid conspiracy jurisdiction, Moving Defendants argue that the doctrine is dead—a flatly untrue assertion. *See Ford v. United States*, 273 U.S. 593, 622 (1927) (jurisdiction "exists to try one who is a conspirator whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against."); *Hayes*, 99 F. Supp. 3d at 423 n.4 ("[O]ne who enters in a conspiracy with a global scale risk[s] being held to account for his illegal actions where[ever] his [ ] manipulation

efforts had effects."); *LIBOR IV*, 2015 WL 6243526, at *29 (noting the viability of the conspiracy jurisdiction doctrine).[26] Moving Defendants also argue that the doctrine violates due process. *Defs. Br.* at 31-32. They construct a heightened pleading obligation, claiming agency concepts require Plaintiffs to show that each Moving Defendant directed and controlled an in-forum tortious act to be subject to conspiracy jurisdiction. But the very cases Moving Defendants cite undermine this formulation: they are not conspiracy jurisdiction cases. Direction and control, while sufficient, is not necessary, nor is there any statutory hurdle preventing this Court from finding jurisdiction.

### A. Conspiracy jurisdiction is consistent with due process

Moving Defendants manufacture a non-existent due process conflict between conspiracy jurisdiction and *Walden*. The salient issue in jurisdiction by conspiracy is whether a defendant or its co-conspirators knew their conspiracy caused harmful effects in the forum. *See Newsome v. Gallacher*, 722 F.3d 1257, 1265 (10th Cir. 2013). Due process does not require this Court to disregard the *Keeton* effects test simply because a conspiracy is involved. Rather, the elements inherent to existing theories of specific jurisdiction under *Calder* and *Keeton*, such as foreseeability, effects, and purposeful availment, equally apply in the conspiracy context. As *Newsome* stated: "If three Kansans conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas." *Newsome*, 722 F.3d at 1266. Moving Defendants did not confine themselves abroad; but even if they did, it would not matter. If a conspiracy aims to, and does, cause harm in the forum, each member is subject to jurisdiction in the forum.

[26] In *LIBOR IV*, Judge Buchwald acknowledged the viability and applicability of the conspiracy jurisdiction doctrine, but determined the U.S. Dollar LIBOR complaint did not plausibly allege a conspiracy. *See LIBOR IV*, 2015 WL 6243526, at *29 ("[T]he contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators."). *See also Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418 (E.D.N.Y. 2012) (same); *First Capital Inv. Holdings LLC v. Wilson Capital Group, Inc.*, No. 10-cv-2948 (JSR), 2010 WL 4967833 (S.D.N.Y. Nov. 30, 2010) (same); *Shpak v. Curtis*, No. 10-cv-1818, 2011 WL 4460605 (E.D.N.Y. Sept. 26, 2011) (same).

Moving Defendants rely heavily on *Walden* to refute conspiracy jurisdiction, though the case does not address the doctrine. *See Walden*, 134 S. Ct. at 1120 (noting that the issue under review was whether "the *petitioner* 'expressly aimed' his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a "significant connection" to Nevada.") (emphasis added). Even in *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219 (S.D.N.Y. 2015) ("*Aluminum*"), on which Defendants rely, Judge Forrest opined that jurisdiction through conspiracy is viable as a particular application of specific jurisdiction—which Plaintiffs adequately allege here. *See id.* at 227. Judge Forrest stated: "[I]f an entity has in fact engaged in some affirmative act directed at the forum, it may be subject to jurisdiction for that reason." *Id. Aluminum* confirmed that allegations showing a defendant took actions in furtherance of the conspiracy or participated "in a particular meeting (as in *In re Magnetic Audiotape*) in which the unlawful conspiracy was furthered in some manner" could support personal jurisdiction. *Id.* at 234.

Contrary to Moving Defendants' argument that the conspiracy theory would allow jurisdiction based on another's unilateral activity, conspiracy jurisdiction is limited in its scope and is consistent with due process.[27] Conspiracy jurisdiction still requires an evaluation of each defendant's connection with the forum, examining whether the defendant has purposefully directed its conduct to the forum or purposefully availed itself of the forum's benefits, and whether such conduct is suit-related. Under conspiracy jurisdiction, the analysis accounts for the fact that each co-conspirator reaps the benefits of one another's efforts to further the conspiracy.

[27] Moving Defendants' fixation on the language in *Walden* stating that the relevant contacts are those the "defendant himself" creates with the forum is misplaced. *Walden* made that point in the course of its explanation that the unilateral acts of a third party or the contacts of a plaintiff cannot be the only link between the defendant and the forum. *Walden*, 134 S. Ct. at 1118. Moving Defendants ignore that one such act the defendant "himself" could take to reach into the forum is to join a conspiracy that has contacts with the United States.

### B. To plead jurisdiction by participation in a conspiracy, Plaintiffs need only (and did) allege that co-conspirators' conduct in or directed to the forum was for the benefit or on behalf of the conspiracy

Jurisdiction through participation in a conspiracy is an application of specific personal jurisdiction, not jurisdiction arising from a principal-agent relationship; so Moving Defendants' discussion of principal-agent pleading requirements is unfounded. To establish jurisdiction via conspiracy, a plaintiff need only show a prima facie case of conspiracy, facts warranting the inference that Defendants were part of the conspiracy, and a co-conspirator's suit-related conduct in or directed to the forum. *See In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 338 (S.D.N.Y. 2000); *accord LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169-70 (S.D.N.Y. 2014); *Aluminum*, 90 F. Supp. 3d at 228 (separately analyzing conspiracy jurisdiction and "agency and 'mere department' jurisdiction").

As a result, Moving Defendants' assertion that Plaintiffs need to allege each Defendants' direction and control of its co-conspirators, an argument Moving Defendants rustle from principle-agency law, concocted from two law review articles, is devoid of support in case law. *See Defs. Br.* at 31-32.[28] While allegations of direction and control of a co-conspirator may be sufficient to find jurisdiction through conspiracy, under current law it is not necessary. The proper focus is a furtherance of or benefit from the conspiracy, such as Moving Defendants' connection with transactions occurring in the United States or allegations of "conspiratorial communications or unlawful manipulation of [benchmark price] [f]ixes either taking place in, or directed into, the United States." *FX II*, 2016 WL 1268267, at *5; *see also Satyam*, 915 F. Supp. 2d at 484. Such jurisdiction can arise on account of a tort in or directed to the forum. *FX II*, 2016 WL 1268267, at *6 (finding jurisdiction where the defendants "participated in a conspiracy to manipulate FX spreads or FX benchmark rates—in the forum, or did so elsewhere with the express intent to cause harm in the

[28] Consequently, the cases Defendants cited in making their argument, focusing on agency-related arguments, are inapposite. *See In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984); *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981); *Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004).

forum"); *see also Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 517-18 (S.D. Iowa 2007) ("Clearly, nonresident co-conspirator defendants cannot hunker in distant states and claim the lack of a physical presence in the forum defeats personal jurisdiction.").

Plaintiffs have satisfied this requirement. Citibank and Deutsche Bank both executed SIBOR-based derivatives transactions with FrontPoint under ISDA Master Agreements designating New York as the forum to which it would consent to jurisdiction, applying New York law and using New York bank accounts. *Lefkowitz Decl.* Exs. 2-3. As the end-goal of the conspiracy was to profit off of the manipulated rates, Citibank's and Deutsche Bank's transactions with FrontPoint in the United States were an effort to benefit from the manipulation. *See United States v. Mennuti*, 679 F.2d 1032, 1035-36 (2d Cir. 1982) ("conspiracy continues until the conspirators receive their anticipated economic benefits."); *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 583–584 (E.D.N.Y. 1998) (A defendant's co-conspirator status for purposes of conferring personal jurisdiction was established where "the conspiracy was of a continuing nature" and the defendant supplied "a critical and necessary part in the overall scheme to defraud").

And Citibank and Deutsche Bank are not alone: Bank of America, Bank of Tokyo-Mitsubishi, BNP Paribas, Barclays, Commerzbank, Credit Suisse, HSBC, JPMorgan Chase, RBS, Standard Chartered and UBS each entered into foreign exchange and interest rate derivatives transactions, including transactions priced based on SIBOR and SOR, from the United States. ¶¶ 13-14. These co-conspirators similarly benefited from the conspiracy's efforts to manipulate SIBOR and SOR at the expense of U.S. investors. Moving Defendants knew the manipulated benchmark rates would be transmitted via Thomson Reuters to the United States and New York to facilitate their ability to engage in manipulated transactions with U.S. counterparties.[29]

[29] Judge Rakoff found that Rabobank's transmission of false Yen-LIBOR (among other currencies) rates through U.S. wires, vis-à-vis Thomson Reuters, "even if not exclusively, to the United States – was a necessary part of the fraudulent

### C. Plaintiffs properly plead personal jurisdiction under the relevant statutes

Given that Plaintiffs' conspiracy jurisdiction allegations comport with due process, Moving Defendants have no choice but to claim that Plaintiffs cannot satisfy the underlying statutory requirements for personal jurisdiction. But Plaintiffs' allegations fully comply with the applicable statutory requirements, whether under the Federal Rules of Civil Procedure or New York's long arm statute, N.Y. C.P.L.R. § 302.

1. *Plaintiffs satisfy the requirements for personal jurisdiction under the Federal Rules by pleading Moving Defendants' nationwide contacts*

Moving Defendants' blanket assertion that conspiracy jurisdiction is not viable under the Federal Rules mistakenly presupposes that conspiracy jurisdiction violates due process. As described above, conspiracy jurisdiction is entirely consistent with due process. *See* PART V.A., *supra*.[30]

Defendants are also incorrect to suggest that to find conspiracy jurisdiction under federal law would require the Court to impermissibly resolve the merits of whether a conspiracy existed. The Court need not reach a conclusion about the conspiracy to determine whether Plaintiffs pleaded a prima facie case of jurisdiction. "Resolution of the merits of a case is a function of the jury, not the function of a court conducting a simple sufficient minimum contacts inquiry. Rather, a minimum contacts inquiry is limited to an assessment of whether the defendant, by its actions, should have expected that it would be sued in this forum." *Miller v. Holzmann*, No. 95-cv-1231 (RCL), 2007 WL

---

scheme of which defendants were charged and convicted." Opinion and Order, *United States v. Allen*, No. 14-cr-272, (S.D.N.Y. Feb. 16, 2016), ECF No. 221, at 15. The same rationale applies in this case.

[30] The cases Moving Defendants cite to claim conspiracy jurisdiction cannot exist under federal law are either readily distinguishable or do not support the proposition at all. *See Flag Co. v. Maynard*, 376 F. Supp. 2d 849, 854 n.8 (N.D. Ill. 2005) (rejecting *Davis v. A.J. Electronics*, 792 F.2d 74 (7th Cir. 1986), finding that "this case was decided before the 1993 amendments to Rule 4, and did not involve the application or Rule 4(k)(2)."); *Tymoshenko v. Firtash*, no. 11-CV-2794 (KMW), 2013 WL 1234943, at *4 (S.D.N.Y. Mar. 27, 2013) (in declining to apply conspiracy jurisdiction noting that "[w]hether a plaintiff can establish personal jurisdiction over a defendant pursuant to Rule 4(k)(2) through the imputation of contacts of that defendant's putative co-conspirators with the United States *has not been [decisively] addressed*") (emphasis added); *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 12 (D.D.C. 2003) (to attribute contacts of a subsidiary to a parent corporation under alter ego requires the court to find the parent had control over the subsidiary); *United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 61-62 (D.D.C. 2004) (same).

778568, at *3 (D.D.C. Mar. 7, 2007); *see also Gelboim*, 823 F.3d at 781 ("Skepticism of a conspiracy's existence is insufficient to warrant dismissal."). Accepting the Complaint's non-conclusory allegations as true, as the Court must, Plaintiffs plead a prima facie case of conspiracy jurisdiction.

Further, FED. R. CIV. P. 4(k)(1)(C) provides that this Court should assess personal jurisdiction of co-conspirators (and consequently of members of the conspiracy) based on Moving Defendants' nationwide contacts.[31] *See Straub*, 921 F. Supp. at 259; *Chew*, 143 F.3d at 30; FED. R. CIV. P. 4(k)(1)(C).[32] Accordingly, Rule 4(k)(2) provides a basis for conspiracy jurisdiction, and contrary to Defendants' claim, is not so nebulous as to prevent its use under the circumstances.[33]

2. *New York's long arm statute provides an alternative statutory basis for jurisdiction*

While the Court need not reach this issue, conspiracy jurisdiction can also be acquired using the New York long arm statute. At a bare minimum, the contracts by Citibank and Deutsche indicate how they each have reached into the forum and sought to profit off of their SIBOR- and SOR-based transactions in New York. Indeed, the banks *chose* New York as the governing law and jurisdiction in their transactions. Given that the manipulation of SIBOR and SOR by Defendants

---

[31] Such a personal jurisdiction statute is present not only in Section 12 of the Clayton Act, 15 U.S.C. § 22, but also in RICO, 18 U.S.C. § 1965. To the extent Moving Defendants claim any deficiency in establishing venue under Section 12 of the Clayton Act, they make no such claim under RICO. This Court may hear any claims arising under the same facts and circumstances under its pendent jurisdiction power even if the Court may not independently exert personal jurisdiction over the claim. *See* n.16, *supra*; *see In re Fannie Mae 2008 Sec. Litig.,* 891 F. Supp. 2d 458, 481 (S.D.N.Y. 2012). Moreover, as explained in PART VII, *infra*, the venue provision of the Clayton Act supplements, and does not restrict the general venue provisions under 28 U.S.C. 1391, which expressly contemplates venue being proper in a district where just one defendant or member of a conspiracy is subject personal jurisdiction. *See* 28 U.S.C. § 1391(b)(3) ("A civil action may be brought in . . . if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action).

[32] The Court does not need to engage in an analysis of the New York's long arm statute. *See SLSJ, LLC v. Kleban*, No. 14-cv-390 (CSH), 2015 WL 1973307, at *5 (D. Conn. Apr. 30, 2015) ("[W]here jurisdiction is predicated on a federal statute which confers nationwide service of process, the Court's analysis for determining personal jurisdiction does not include an examination of the state's long-arm statute. . . . In other words, '[t]he jurisdiction of the Act extends to foreign non-residents to the extent permitted by the Fifth Amendment due process clause of the United States Constitution.'").

[33] In addition, Moving Defendants' reliance on avoiding jurisdiction under Rule 4(k)(2) because Plaintiffs have not filed a certification is simply an attempt to argue form over substance. Defendants have filed with this Court 28 declarations purporting that they are not subject to general or specific jurisdiction in any one state. In effect, for purposes of Rule 4(k)(2), Defendants have conceded the point. Nevertheless, if the Court requires, Plaintiffs would be willing to submit a certification to proceed using Rule 4(k)(2).

was designed to effectuate maximum profits and minimal losses from such trades, Moving Defendants' argument that no overt act occurred in the forum sufficient to satisfy New York's long arm statue is without merit. Deutsche Bank and Citibank's acts in New York furthered the ultimate purpose of the conspiracy, to profit off of U.S. investors.

## VI. Personal jurisdiction over Moving Defendants comports with fair play and substantial justice

The "fair play" prong of personal jurisdiction due process has diminished as modern technology and transportation have eased the burden of litigating in a distant forum. Moving Defendants are major international corporations with "significant international resources," and all have a U.S. presence. *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126, 2013 WL 9815198, at *30 (S.D.N.Y. Dec. 20, 2013) (holding "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."); *see Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 284 (S.D.N.Y. 2000) (courts analyzing personal jurisdiction in cases brought under statutes authorizing nationwide service of process "undertake[ ] little independent inquiry into the fairness of subjecting the defendant to the jurisdiction of the forum."). There are no concerns about fair play here, as "such unfairness will rarely be found . . . in a federal-question case coupled with nationwide service of process." *S.E.C. v. Morton*, No. 10-cv-1720 (LAK), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011), *report and recommendation adopted,* 2011 WL 11768504 (S.D.N.Y. Nov. 3, 2011).

## VII. This Court is a proper venue for this case

Some Defendants argue that the Court should not resolve this dispute because, as to "certain Foreign Defendants" (*Defs. Br.* at 3),[34] Plaintiffs fail to satisfy Section 12 of the Clayton Act,

[34] Defendants call this sub-group the "Venue Defendants," comprising Barclays PLC, Crédit Agricole S.A.; Credit Suisse Group AG; Credit Suisse International; DBS Group Holdings; The Hongkong and Shanghai Banking Corporation Limited; HSBC Holdings plc; ING Groep N.V.; ING Bank, N.V.; The Royal Bank of Scotland plc, The Royal Bank of Scotland Group plc, RBS Securities Japan Limited; Standard Chartered PLC; UBS Securities Japan Co. Ltd.; Macquarie Group Ltd.

providing that venue in an antitrust case is appropriate "not only in the judicial district whereof [a defendant] is an inhabitant, but also in any district wherein it may be found or transacts business." 15 U.S.C. § 22. Seventeen Defendants have declined to join this frivolous argument.

Supreme Court and Second Circuit precedent both hold that the Clayton Act's venue provision supplements, and does not restrict, 28 U.S.C. § 1391. *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1313 (S.D.N.Y. 1986), *aff'd*, 859 F.2d 148 (2d Cir. 1988) ("[T]he provisions of the general venue statute are supplemental to—not superseded by—the special antitrust venue statute."); *General Elec. Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037, 1040 (S.D.N.Y. 1982) ("[S]ection 12 of the Clayton Act was passed not to restrict venue, but rather to expand it. Its 'plain remedial purpose . . . was . . . to enlarge the jurisdiction given by section 7 of the Sherman Act over corporations'.") (quoting *United States v. Scophony Corp.,* 333 U.S. 795 (1948)).

Venue Defendants do not dispute that Plaintiffs properly plead venue under 28 U.S.C. § 1391. Nor could they: 28 U.S.C. § 1391(b)(3) provides for venue over all Defendants where venue is proper over one defendant and "there is no district in which an action may otherwise be brought as provided in this section."[35] This Court, of course, has venue over Citibank and JPMorgan, both New York banks. Venue Defendants' argument, as their 17 co-Defendants recognize, is totally meritless.

## VIII. Alternatively, this Court should allow jurisdictional discovery or a transfer to the Eastern District of Pennsylvania

*First*, the Court should decline to dismiss any Moving Defendant before simple, targeted jurisdictional discovery has occurred. Moving Defendants themselves demonstrate that the vast majority of discoverable information remains exclusively in their hands by providing declarations

[35] Independently, the motion should be denied because Venue Defendants do not propose an alternative proper court in which the action may be brought—a requirement to obtain dismissal for lack of venue. *See Pilot Corp. v. U.S. Robotics, Inc.*, No. 96-cv-5483 (SHS), 1997 WL 47790, at *1 (S.D.N.Y. Feb. 6, 1997) (the moving party[ ] bears the burden here of showing 'the availability of an alternative forum and that that forum is clearly more appropriate than the Southern District of New York.'") (quoting *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F. Supp. 433, 437 (S.D.N.Y. May 1, 1996)).

and documents that only tell half the story, omitting any reference to the influence U.S.-based traders and employees had on their submissions and the impact of their manipulation on their U.S. trades. At an absolute minimum, the facts alleged give rise to "non-frivolous contentions" that jurisdiction in this Court is proper. *Newbro v. Freed*, No. 03-cv-10308, 2004 WL 691392, at *6 (S.D.N.Y. Mar. 26, 2004). Moving Defendants sidestep any discussion of their trades in the United States, use of U.S.-based personnel, facilities, and accounts, and consent to jurisdiction in ISDA Master Agreements. Should the Court find that the Complaint's allegations need further enlargement to establish a prima facie case for jurisdiction, the Court should defer ruling and grant leave to take jurisdictional discovery, at least as to these very discrete issues. *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (a plaintiff should be provided with "ample opportunity to secure and present evidence relevant to the existence of jurisdiction" through jurisdictional discovery).

*Second*, pursuant to 28 U.S.C. §§ 1406(a) and 1631, in the interest of justice, this Court should decline to dismiss any Moving Defendant for lack of jurisdiction where another district might properly assert jurisdiction over it. *Galderma S.A. v. Peri*, No. 15-cv-667, 2016 U.S. Dist. LEXIS 61203, at *22-24 (S.D.N.Y. Mar. 30, 2016) (acknowledging that a transfer to another district does not require a finding that there would be jurisdiction there, only that "the court to which the action is transferred would likely be able to exercise personal jurisdiction over the defendants . . . [and the transferee court] will make the ultimate decision."). The Eastern District of Pennsylvania has personal jurisdiction over Barclays Bank, RBS, and UBS. These defendants each registered to do business in Pennsylvania pursuant to 42 Pa. Cons. Stat. Ann. § 5301. *See* ¶¶ 12, 18; *Lefkowitz Decl.* Ex. 33. Like New York, Pennsylvania has definitively construed its business registration statute to provide jurisdiction by consent. *Bane v. Netlink, Inc.*, 925 F.2d 637, 640 (3d Cir. 1991); *Brown*, 814 F.3d at 637. Because the Eastern District of Pennsylvania has personal jurisdiction over these defendants, Your Honor should transfer, rather than dismiss, Plaintiffs' claims in the event this

Court concludes it lacks personal jurisdiction.

## CONCLUSION

Moving Defendants' designed their cartel to trade SIBOR- and SOR-based derivatives in the United States while simultaneously manipulating the prices of those financial instruments. The Complaint alleges that each defendant utilized its New York and U.S. operations, employees, facilities, accounts, and ISDA Master Agreements (in which they consented to New York jurisdiction) on their own and as a conspiracy to manipulate SIBOR to the detriment U.S. counterparties, like Plaintiffs. And Moving Defendants' plan all along was to victimize U.S. investors with each trade and each act of manipulation.

Moving Defendants must answer to their U.S. victims in the U.S. courts. This Court should deny Moving Defendants' Rule 12(b)(2) motion.

Dated: White Plains, New York
December 16, 2016

LOWEY DANNENBERG COHEN
& HART, P.C.

By: <u>/s/ *Geoffrey M. Horn*</u>
Geoffrey M. Horn
Vincent Briganti
Peter D. St. Phillip
Sitso Bediako
Lee J. Lefkowitz
One North Broadway
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
ghorn@lowey.com
vbriganti@lowey.com
pstphillip@lowey.com
sbediako@lowey.com
llefkowitz@lowey.com

*Counsel for Plaintiffs and Proposed Interim Class Counsel*