UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., and SONTERRA CAPITAL MASTER FUND, LTD., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CITIBANK, N.A., CITIGROUP INC., BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS SECURITIES JAPAN LIMITED, UBS AG, UBS SECURITIES JAPAN CO. LTD., ING GROEP N.V., ING BANK N.V., ING CAPITAL MARKETS LLC, BNP PARIBAS, S.A., BNP PARIBAS NORTH AMERICA, INC., BNP PARIBAS SECURITIES CORP., BNP PARIBAS PRIME BROKERAGE, INC., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT AGRICOLE S.A., CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, DBS BANK LTD., DBS GROUP HOLDINGS LTD, DBS VICKERS SECURITIES (USA) INC., UNITED OVERSEAS BANK LIMITED, UOB GLOBAL CAPITAL, LLC, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., ANZ SECURITIES, INC., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, HSBC BANK USA, N.A., HSBC HOLDINGS PLC, HSBC NORTH AMERICA HOLDINGS INC., HSBC USA INC., MACQUARIE BANK LTD., MACQUARIE GROUP LTD., COMMERZBANK AG, AND JOHN DOES NOS. 1-50,

Defendants.

Docket No.: 1:16-cv-05263-AKH

**JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION AND <u>FAILURE TO STATE A CLAIM</u>**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ..............................................................................................................1

I. PLAINTIFFS FAIL TO PLEAD INJURY-IN-FACT OR DAMAGES.............................1

II. PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED. ...............................5

A. Plaintiffs Fail to Plausibly Allege a Conspiracy. ..................................................5

1. Reported Regulatory Findings Are Neither Direct nor Circumstantial Evidence of Any Conspiracy to Manipulate SIBOR or SOR. ..........................................................................................6

2. None of the Newspaper Articles Cited by Plaintiffs References a Conspiracy to Manipulate SIBOR or SOR. ................................................8

3. Plaintiffs Allege No Plausible Common Motive to Conspire to Manipulate SIBOR or SOR. .........................................................................9

B. Plaintiffs Offer No Justification for Their Improper Group Pleading. ..................11

C. Plaintiffs Lack Antitrust Standing Because They Are Not Efficient Enforcers. ...............................................................................................11

1. Failure to Adequately Allege Causation. .................................................12

2. Failure to Show Directness. ........................................................................14

3. Plaintiffs' Alleged Damages Are Speculative. ..........................................15

D. Plaintiffs' Allegations Are Not Actionable under the FTAIA. .............................16

E. Plaintiffs' Untimely Antitrust Claims Are Not Salvaged by Fraudulent Concealment. .........................................................................................17

III. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED. .........................................18

A. Plaintiffs Lack Standing. .......................................................................................18

B. Plaintiffs' RICO Claims Are Impermissibly Extraterritorial. ...............................18

C. Plaintiffs Fail to Adequately Allege a § 1962(c) Claim. ......................................19

D. Plaintiffs Do Not Adequately Allege a RICO Conspiracy. ..................................21

IV. PLAINTIFFS' BREACH OF THE IMPLIED COVENANT CLAIMS FAIL. ................21

V. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS SHOULD BE DISMISSED. ..........22

CONCLUSION ...........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Electrical Pension Fund* v. *Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016)....................4, 5, 8

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)....................12

*Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)....................13

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)....................11

*Baur* v. *Veneman*,
352 F.3d 625 (2d Cir. 2003)....................2

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................3

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)....................3

*Blue Shield of Virginia* v. *McCready*,
457 U.S. 465 (1982)....................12, 13

*Boyle* v. *United States*,
556 U.S. 938 (2009)....................20

*Carter* v. *HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016)....................2

*Chamberlain* v. *City of White Plains*,
986 F. Supp. 2d 363 (S.D.N.Y. 2013)....................22

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012)....................23

*DiVittorio* v. *Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987)....................20

*Eastman Kodak Co.* v. *Camarata*,
2006 WL 3538944 (W.D.N.Y. Dec. 6, 2006)....................23

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)....................1, 8, 11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Elsevier, Inc.* v. *W.H.P.R., Inc.*,
692 F. Supp. 2d 297 (S.D.N.Y. 2010)....................21

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d 581 (S.D.N.Y. 2015)....................4, 5, 7

*Fort Worth Employers' Ret. Fund* v. *Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)....................6

*Garb* v. *Republic of Poland*,
440 F.3d 579 (2d Cir. 2006)....................3

*Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013)....................16

*Gelboim* v. *Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016).................... *passim*

*Georgia Malone & Co., Inc.* v. *Rieder*,
19 N.Y.3d 511 (2012) .................... 22-23

*GICC Capital Corp.* v. *Tech. Fin. Grp., Inc.*,
67 F.3d 463 (2d Cir. 1995)....................21

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)....................11

*Hecht* v. *Commerce Clearing House, Inc.*,
897 F.2d 21 (2d Cir. 1990)....................21

*Holmes* v. *Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)....................14

*Hyland* v. *HomeServices of Am., Inc.*,
771 F.3d 310 (6th Cir. 2014) ....................10

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ....................3

*Ingrami* v. *Rovner*,
45 A.D.3d 806 (2d Dep't 2007) ....................23

*In re Intel Corp. Microprocessor Antitrust Litig.*,
452 F. Supp. 2d 555 (D. Del. 2006)....................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Jerome M. Sobel & Co.* v. *Fleck*,
2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ....................19

*Laydon* v. *Mizuho Bank, Ltd.*,
2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ....................13, 14, 16

*Laydon* v. *Mizuho Bank, Ltd.*,
2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015) ....................17, 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
962 F. Supp. 2d 606 (S.D.N.Y. 2013).................... 3-4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014)....................4, 22, 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ....................8, 17, 22

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11–md–2262, ECF No. 1229 (S.D.N.Y. Oct. 29, 2015) ....................17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ....................10, 12, 15

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016).................... *passim*

*Lotes Co.* v. *Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014)....................16

*Minn-Chem, Inc.* v. *Agrium, Inc.*,
683 F.3d 845 (7th Cir. 2012) ....................16

*Norex Petroleum Ltd.* v. *Access Indus., Inc.*,
631 F.3d 29 (2d Cir. 2010)....................18

*Petroleos Mexicanos* v. *SK Eng'g & Constr. Co.*,
572 F. App'x 60 (2d Cir. 2014) ....................18, 19

*Reading Indus., Inc.* v. *Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980)....................12, 13, 14

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi.* v. *Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)....................1

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Ross* v. *Am. Exp. Co.*,
35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014)....10

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009)....11

*Shak* v. *JPMorgan Chase & Co.*,
156 F. Supp. 3d 462 (S.D.N.Y. 2016)....23

*Shak* v. *JPMorgan Chase & Co.*,
2016 WL 3637105 (S.D.N.Y. June 29, 2016)....3

*Spinelli* v. *National Football League*,
96 F. Supp. 3d 81 (S.D.N.Y. 2015)....16

*Starr* v. *Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)....7

*Stoner* v. *Walsh*,
772 F. Supp. 790 (S.D.N.Y. 1991)....11

*In re Sumitomo Copper Litig.*,
995 F. Supp. 451 (S.D.N.Y. 1998)....19, 21

*U.S. Fire Ins. Co.* v. *United Limousine Serv., Inc.*,
303 F. Supp. 2d 432 (S.D.N.Y. 2004)....20

*Ubiquiti Networks, Inc.* v. *Kozumi USA Corp.*,
2013 WL 368365 (N.D. Cal. Jan. 29, 2013)....16

*United States* v. *Guadagna*,
183 F.3d 122 (2d Cir. 1999)....20

*United States* v. *Hayes*,
99 F. Supp. 3d 409 (S.D.N.Y. 2015)....19

*United States* v. *Levis*,
488 F. App'x 481 (2d Cir. 2012)....20

*United States* v. *Trapilo*,
130 F.3d 547 (2d Cir. 1997)....20

*In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*,
167 F. Supp. 3d 524 (S.D.N.Y. 2016)....4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Worldwide Directories, S.A. De C.V.* v. *Yahoo! Inc.*,
2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) ............ 18-19

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016) ............ 11

**Rules**

Fed. R. Civ. P. 8 ............ 11

Fed. R. Civ. P. 9(b) ............ 17

Fed. R. Evid. 201(b)(2) ............ 2

**PRELIMINARY STATEMENT**

Plaintiffs' opposition ("Opp.") merely confirms the fundamental pleading deficiencies identified by Defendants in their opening brief: Plaintiffs fail to plead any facts showing that they suffered any injury at all, let alone one caused by a global conspiracy to manipulate SIBOR or SOR.[1] Recognizing these deficiencies, Plaintiffs attempt to avoid their pleading burden by demanding that this Court credit their implausible assertions as true. But Plaintiffs offer no factual support for their assertions. Instead, they mischaracterize regulatory findings by MAS, the CFTC, and the FSA, which contain no finding of a conspiracy to manipulate SIBOR or SOR. They also point to allegations made in *different* cases involving *different* benchmark rates—an inappropriate "if it happened there, it could have happened here" theory of the case that the Second Circuit has rejected. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). All of Plaintiffs' claims should be dismissed.

**ARGUMENT**

**I. PLAINTIFFS FAIL TO PLEAD INJURY-IN-FACT OR DAMAGES.**

Defendants' opening brief highlighted Plaintiffs' failure to plausibly allege that (i) SIBOR or SOR was ever manipulated to artificial levels or (ii) any alleged manipulation adversely affected FrontPoint's swaps or Sonterra's forwards.[2] (Br. at 11-15.) In response,

---

[1] Unless otherwise indicated, capitalized terms have the same meaning ascribed to them in Defendants' Joint Memorandum of Law in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 169) ("Br."). All exhibits referenced herein are exhibits to the Declaration of Matthew J. Porpora. (ECF No. 172.) All internal quotation marks, internal citations and alterations are omitted.

[2] Plaintiffs lack standing to bring claims on behalf of absent parties who transacted in wholly different instruments. (Br. at 11 n.20.) Plaintiffs' argument to the contrary (Opp. at 4 n.4) mischaracterizes Second Circuit precedent, which requires a plaintiff to plausibly allege that her claim is similar to an absent party's claim in "all essential respects." *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi.* v. *Bank of N.Y. Mellon*, 775 F.3d 154, 161 (2d Cir. 2014). By Plaintiffs' own admission (*see* AC ¶¶ 117-18), foreign exchange swaps and forward rate agreements are structured and priced differently from the instruments Plaintiffs allegedly traded.

Plaintiffs merely regurgitate the Complaint's conclusory assertions and declare their pleading burden satisfied because Article III supposedly imposes a "low threshold." (Opp. at 5.) But Plaintiffs' own cited authorities (Opp. at 3) hold that "a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing."[3] And aside from their failure to plead facts sufficient to establish Article III standing, Plaintiffs also fail to plausibly allege damages and thus cannot state a claim. (Br. at 10 & n.19.)

***Failure to Adequately Allege Artificiality.*** Plaintiffs do not dispute that the regulatory statements on which they rely (AC ¶¶ 6-7, 121-28) contain no finding that SIBOR or SOR was ever actually manipulated (Br. at 11). Further, Defendants' opening brief exposed Plaintiffs' so-called economic evidence of artificiality as fatally flawed. (Br. at 11-14.) In response, Plaintiffs mischaracterize Defendants' arguments as "counterfactual[s]" that cannot be considered on a motion to dismiss. (Opp. at 15.) This is wrong: Even assuming the truth of what Plaintiffs' charts purport to show—that the average spread between SGD SIBOR and SOR widened during the Class Period—Plaintiffs still fail to plausibly allege why that spread demonstrates artificiality, given that SGD SIBOR and SOR each reflected different markets,[4] were based on submissions by different panels of banks,[5] and diverged most notably during the unprecedented

---

[3] *Baur* v. *Veneman*, 352 F.3d 625, 637 (2d Cir. 2003); *see also Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (plaintiff must plead "facts that . . . *plausibly* suggest . . . standing to sue") (emphasis added).

[4] While SGD SIBOR represented the average expected cost of directly borrowing Singapore dollars in Singapore as reported by one panel, SOR was based on different submissions from different panels, and represented the cost of borrowing Singapore dollars by exchanging U.S. dollars in the foreign exchange market. (Br. at 12.) Thus, only SOR incorporated SGD-USD exchange rates. (*Id.*)

[5] Plaintiffs do not dispute that their Complaint "misstates the SOR calculation process" (Br. at 5), but instead contend that materials discussing the correct submissions process "should be disregarded" because they are "materials outside of the Complaint." (Opp. at 2 n.2 (citing Defs.' Ex. B (SFEMC Statement) and Ex. C (ISDA Definitions).) This is wrong. The SFEMC Statement is a publicly available industry publication subject to judicial notice because its "accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), and the Complaint plainly relies on ISDA Master Agreements (AC ¶¶ 12, 19, 107), thereby incorporating the ISDA Definitions by reference.

market turmoil of the financial crisis.[6] Defendants' challenges to Plaintiffs' faulty economic assumptions—including that the "law of one price"[7] somehow applies to submission-based benchmark rates[8]—do not require a choice between "competing factual inferences." (Opp. at 15-16.) Rather, they go to the heart of plausibility.[9] Because Plaintiffs' economic arguments regarding SGD SIBOR and SOR defy "common economic experience," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 565 (2007), they can—and should—be disregarded. Regardless, Plaintiffs also assert claims based on USD SIBOR, but they allege no economic evidence *at all* regarding the purported artificiality of that benchmark.[10]

***Failure to Adequately Allege Harm.*** Because Plaintiffs allege sporadic, multidirectional manipulation (AC ¶ 162), they must specify both the direction of any manipulation and their respective trading positions on particular days to plausibly allege injury. *See In re LIBOR-Based*

---

*See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 584 (S.D.N.Y. 2011). In any event, documents cited in the Complaint also discuss SOR's submission-based methodology. (Br. at 5 n.5.)

[6] An economic analysis that "fails to account for the particular circumstances impacting financial institutions during the financial crisis" is one that suffers from an obvious, fatal flaw and need not be credited. *See IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *16 (S.D.N.Y. Oct. 29, 2013).

[7] Plaintiffs suggest that Defendants "improperly offer[ed]" (Opp. at 2 n.3) an economic treatise to explain the definition of the "law of one price," but the Court may take judicial notice of "authoritative text[s]." *Garb* v. *Republic of Poland*, 440 F.3d 579, 594 n.18 (2d Cir. 2006). That is particularly appropriate where *Plaintiffs* introduced the economic concept in their own pleading. (AC ¶ 134.)

[8] As explained in Defendants' opening brief, as a matter of common sense, the "law of one price" has no application to submission-based benchmark rates like SIBOR or SOR because these rates are not widgets that can be bought or sold at any "price." (Br. at 13 n.25). Plaintiffs, however, contend that both rates are in fact "commodities" whose "price" can be enforced by arbitrageurs because the Commodity Exchange Act's ("CEA") definition of "excluded commodity" includes, among other things, "interest rate[s]." (Opp. at 15.) This is an absurd game of semantics. The fact that the CEA may define "excluded commodity" expansively to broaden the reach of the CFTC's jurisdiction says nothing about whether the "law of one price" applies to SIBOR or SOR.

[9] *See Shak* v. *JPMorgan Chase & Co.*, 2016 WL 3637105, at *9 (S.D.N.Y. June 29, 2016). Plaintiffs' attempt to distinguish *Shak* (Opp. at 14 n.17) only confirms its applicability. Like the plaintiffs in *Shak*, Plaintiffs fail "to explain why [SGD SIBOR] should track [SOR], and to concretely plead that it did so consistently." 2016 WL 3637105, at *9. At most, Plaintiffs allege a "mere general correlation between" them, which is "not sufficient." *Id.*

[10] Unlike SGD SIBOR or SOR, USD SIBOR represents the average expected cost of borrowing U.S. dollars in Singapore. (Br. at 4.)

*Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620-21 (S.D.N.Y. 2013) ("*LIBOR II*"). And because artificially high or low SIBOR or SOR could have *benefitted* Plaintiffs "depending on their position in the market," Plaintiffs' failure to allege trading positions that were *harmed* means that "damages are . . . insufficiently pled."[11] Plaintiffs cannot escape this deficiency by citing inapposite cases (Opp. at 3-6), involving allegations of unidirectional (rather than multidirectional) manipulation.[12]

Nor do the rulings in *Alaska Electrical Pension Fund* v. *Bank of America Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016) ("*ISDAfix*") or *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) ("*FX*") salvage Plaintiffs' claims. In fact, *ISDAfix* shows just how deficient Plaintiffs' Complaint is here. In *ISDAfix*, the court found that plaintiffs plausibly alleged injury where the complaint "contain[ed] extensive allegations" of misconduct "on nearly every trading day during the class period," and specifically identified nearly 2,000 individual ISDAfix-linked transactions (*see* Am. Compl., App. A, (No. 14-cv-7126, ECF No. 164-2)), including trades "with one or more Defendant Banks on days that have been identified as being subject to manipulation." *ISDAfix*, 175 F. Supp. 3d at 51-54. Similarly, the *FX* court found that plaintiffs there established standing because the complaint "describ[ed] the alleged conspiracy" to fix prices "in great detail," including "direct evidence . . . of a Section 1

---

[11] *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) ("*LIBOR III*"); *see In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 167 F. Supp. 3d 524, 535 (S.D.N.Y. 2016) (a "claim based only on probabilistic evidence of injury, devoid of any factual allegations particular to the plaintiff and without a basis to plausibly infer that all covered products were implicated, does not adequately plead injury-in-fact").

[12] *See Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016) (addressing persistent "suppression" of benchmark); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ("*Silver Fix*") (same). The distinction between persistent unidirectional manipulation and the multidirectional manipulation alleged here matters because greater specificity is required to plausibly plead injury under the latter theory than the former. *See LIBOR II*, 962 F. Supp. 2d at 620-23.

violation"—on that basis, the court concluded that the plaintiffs did not need to allege certain transactional details that they "could not be reasonably expected to know." 74 F. Supp. 3d at 591-95. The allegations here pale in comparison. Plaintiffs fail to plead any direct evidence of a conspiracy (Br. at 15-17), relying instead upon conclusory economic arguments purporting to show that the spread between SGD SIBOR and SOR was artificially wide. (AC ¶¶ 134-41.) Further, Plaintiffs fail to plead any specifics regarding their trading positions—which are uniquely within their knowledge—to show they were harmed when SGD SIBOR and SOR were purportedly artificial.[13]

## II. PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE DISMISSED.

### A. Plaintiffs Fail to Plausibly Allege a Conspiracy.

Plaintiffs continue to insist that the reported findings of MAS, the CFTC and the FSA "provide 'smoking gun' evidence of a conspiracy" among Defendants to manipulate SIBOR and SOR. (Opp. at 9.) This assertion is transparently false. (Br. at 15-17.) Plaintiffs also argue that the Complaint "alleges more than enough circumstantial facts to support the inference that a conspiracy existed." (Opp. at 7 (emphasis omitted).) Not so. The Complaint fails to set out even the barest of circumstantial facts showing that Defendants ever engaged in any parallel conduct or were committed to a common scheme. Instead, Plaintiffs make irrelevant arguments about reported conduct involving other benchmark interest rates and disciplinary actions against traders at a few banks. (Opp. at 8-12.) Plaintiffs also invent an implausible "common motive to conspire"—that is not alleged in the Complaint—in an effort to justify reliance on their fatally

---

[13] Plaintiffs highlight (Opp. at 6) the *ISDAfix* court's observation that "the mere fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." *ISDAfix*, 175 F. Supp. 3d at 53. But an injury cannot be "*outweighed* by other benefits" unless there is some injury to begin with. Plaintiffs here lack standing because they fail to plausibly allege they suffered any injury at all.

flawed "economic evidence of price artificiality." (Opp. at 13-16.) But, without direct or circumstantial evidence to support their claims, Plaintiffs cannot plausibly allege a conspiracy.

**1. Reported Regulatory Findings Are Neither Direct nor Circumstantial Evidence of Any Conspiracy to Manipulate SIBOR or SOR.**

Plaintiffs insist that MAS, the CFTC and the FSA "found evidence of a conspiracy to manipulate SIBOR and SOR." (Opp. at 8.) That is false. Indeed, no government authority has ever reported finding a conspiracy to manipulate SIBOR or SOR. (Br. at 5-8.)

**MAS.** Plaintiffs contend that "MAS uncovered a widespread conspiracy among 133 traders from 19 banks . . . to illegally manipulate [SIBOR and SOR]." (Opp. at 8.) Not so. Plaintiffs mischaracterize the MAS Press Release, which, in summarizing MAS' review of a number of ABS benchmarks (including several rates other than SIBOR or SOR), describes attempts to influence unspecified ABS benchmarks by "a small proportion of the trading community in Singapore." (Ex. A (MAS Press Release).) It did not state that any of those traders attempted to influence *SIBOR or SOR*, or did so as part of any conspiracy.[14]

**FSA.** Plaintiffs concede that "the FSA did not explicitly state in its settlement with RBS that [RBS traders' requests regarding SIBOR and SOR] were sent to traders at other banks."[15] (Opp. at 9 n.8.) Plaintiffs protest, however, that the alleged requests were made "in the context of a broader conspiracy to fix multiple IBOR rates." (*Id.*) But Plaintiffs point to no facts

---

[14] Indeed, the Complaint itself undermines any inference of interbank conspiracy, since every news article Plaintiffs cite that describes interbank communications refers to *other* benchmarks—not SIBOR or SOR. (*See infra* Section II.A.2.) Plaintiffs' patent mischaracterizations of the articles (Opp. at 8-9) can be readily disregarded. *See Fort Worth Employers' Ret. Fund* v. *Biovail Corp.*, 615 F. Supp. 2d 218, 221, 223 n.1 (S.D.N.Y. 2009).

[15] Indeed, the FSA finding concerning RBS' SIBOR- and SOR-related conduct was in the section of the settlement addressing *intrabank* requests. *See* Ex. D (FSA-RBS settlement) ¶¶ 46-56. A separate section of the settlement dealt with *interbank* requests, where there is not a single reference to SIBOR or SOR. *Id.* ¶¶ 57-67. Further, given the FSA's findings of intrabank conduct only, it defies common sense to read the CFTC settlement—released on the same day as the FSA settlement—any differently. *See* Ex. J (RBS-CFTC Settlement).

showing that any such "broader conspiracy" existed, let alone that it encompassed SIBOR and SOR. Plaintiffs cannot salvage their deficient allegations by exaggerating the FSA's unadjudicated findings concerning interbank misconduct in relation to other benchmarks.

**CFTC.** The sum total of the CFTC's statements regarding SIBOR and SOR are footnotes in orders stating that RBS engaged in "similar misconduct" with respect to SIBOR and SOR as with certain other rates, and that UBS and Deutsche Bank had "identified evidence of similar misconduct" with respect to SIBOR and SOR. (Br. at 6-7.) The CFTC orders, however, dealt primarily with unilateral conduct, and contain no assertions of interbank activity in relation to SIBOR or SOR.[16] Thus, Plaintiffs place more weight on the words "similar misconduct" than they can bear.[17]

More broadly, Plaintiffs argue that Defendants "ignore[] the significance courts place on government investigations." (Opp. at 11.) But none of the cases Plaintiffs cite shows that a government investigation, by itself, renders allegations of an antitrust conspiracy plausible.[18] Instead, the cases Plaintiffs rely upon are plainly distinguishable because regulators there had penalized or were investigating defendants for "the very conduct alleged in the Complaint."[19]

---

[16] *See* Ex. H (UBS-CFTC settlement (devoting 12 out of 74 pages to interbank conduct, concerning only two rates)); Ex. J (RBS-CFTC settlement (6 of 54 pages, concerning two rates)); Ex. I (Deutsche Bank-CFTC settlement (10 of 58 pages, concerning three rates)). Moreover, the footnote in the UBS settlement appears in a section dealing only with *intrabank* conduct. Ex. H at 38-41. Likewise, the footnote in the RBS settlement appears two sentences *before* a separate statement regarding interbank conduct unrelated to SIBOR or SOR. Ex. J at 3-4.

[17] *See Silver Fix*, 2016 WL 5794777, at *16 ("[T]he mere fact that regulatory entities are investigating the possibility of similar misconduct with respect to silver is not a 'plus factor.'").

[18] *See FX*, 74 F. Supp. 3d at 592 ("reported investigations and their outcomes merely buttress" otherwise plausible allegations); *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 323-25 (2d Cir. 2010) (upholding antitrust claim based on *seven* types of parallel conduct and *six* additional plus factors, and then noting that "two new investigations" by the Department of Justice provided further support).

[19] *FX*, 74 F. Supp. 3d at 592; *see Starr*, 592 F.3d at 325 (conspiracy plausible where the Department of Justice had just "launched two new investigations" into the very conduct plaintiffs were suing over).

Here, no regulator has ever reported finding a conspiracy to manipulate SIBOR or SOR, and no regulator is alleged to be investigating one. (Br. at 5-8.)

Plaintiffs attempt to fill this gap by referencing conduct concerning other benchmark rates, including "U.S. Dollar LIBOR, Sterling LIBOR, Swiss Franc LIBOR, Euribor, Yen-LIBOR, [and] Euroyen TIBOR," as well as various rates administered by the ABS. (Opp. at 9-10.) But the Second Circuit rejected this type of faulty reasoning in *In re Elevator*, where the court dismissed a complaint premised—like Plaintiffs'—on nothing more than the allegation that "if it happened there, it could have happened here."[20] This common-sense ruling avoids the absurd result that would flow from Plaintiffs' reasoning—that a defendant that purportedly engaged in actionable conduct concerning one rate in one country during one time period would be subject to suit concerning *every* rate, in *every* country for *every* time period. This is not the law.[21] Despite Plaintiffs' misleading description, *ISDAfix* is not to the contrary.[22]

### 2. None of the Newspaper Articles Cited by Plaintiffs References a Conspiracy to Manipulate SIBOR or SOR.

Plaintiffs rely heavily on six newspaper articles regarding disciplinary actions taken against traders at a few banks. (Opp. at 8-9.) But the articles themselves show that Plaintiffs' assertions regarding "widespread collusion" to manipulate SIBOR or SOR are baseless:

---

[20] 502 F.3d at 52 (rejecting allegations of anticompetitive wrongdoing in Europe as an insufficient factual basis for assertions of a worldwide conspiracy affecting a global market).

[21] *See, e.g.*, *Silver Fix*, 2016 WL 5794777, at *15-16 ("[E]vidence of Defendants' wrongdoing with respect to LIBOR and FX . . . do not substantiate Plaintiffs' antitrust claims with respect to the Silver Fixing."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *44-45 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") ("Admissions . . . to manipulating *Yen* LIBOR are not relevant to this MDL, which deals only with USD LIBOR.")

[22] In *ISDAfix*, Judge Furman held that the *means* by which defendants allegedly conspired was "economically sensible and feasible" because certain defendants had admitted to manipulating other benchmarks in a similar way. 175 F. Supp. 3d at 55. Judge Furman, however, found that the alleged conspiracy itself was plausible *not* because of conspiracies concerning other rates, but because plaintiffs pleaded facts showing both parallel conduct and plus factors raising the inference of conspiracy. *Id.* Plaintiffs here have pled nothing remotely similar. (Br. at 17-19.)

1) Although Plaintiffs state that "senior RBS trader Chong Wen Kuang . . . was fired after he was caught rigging SOR" (Opp. at 8), nothing in the article supports Plaintiffs' claim of a conspiracy. *See* Ex. N.

2) Plaintiffs assert that "UBS also fired two high-level managers" for "manipulating SIBOR, SOR, and foreign exchange rates, along with engaging in other 'serious misconduct' that remains undisclosed." (Opp. at 8.) But the article Plaintiffs cite to support this allegation makes no reference to SIBOR, SOR, or any purported interbank conduct. *See* Ex. R.

3) According to Plaintiffs, "Macquarie Bank fired one of its traders for 'inappropriately collaborating with staff at other banks' to rig SIBOR, SOR, and other foreign exchange rates." (Opp. at 8.) The article cited to make this allegation, however, never states that the Macquarie trader engaged in any conduct with respect to SIBOR or SOR. *See* Ex. M.

4) Plaintiffs state that a "Commerzbank trader . . . was also fired for manipulating related *foreign exchange rates*." (Opp. at 9 (emphasis added).) As Plaintiffs themselves acknowledge, the reported conduct involved rates other than SIBOR or SOR, which have nothing to do with this case. *See* Ex. Q.

5) Plaintiffs claim that "Defendant ANZ . . . clawed back two SIBOR- and SOR-based derivatives traders' bonuses for engaging in 'inappropriate electronic communications and unacceptable behavior' with respect to these benchmarks." (Opp. at 9.) Not only does the article Plaintiffs cite *not* state that the traders in question were "SIBOR- and SOR-based derivatives traders," but Plaintiffs do not even contend that the so-called "unacceptable behavior" involved a conspiracy. *See* Ex. M.

6) Plaintiffs quote an unidentified source who described "traders talking to traders, saying 'I need you to help me today, I need to fix low.'" (Opp. at 9.) But the source article expressly references rates other than SIBOR or SOR. *See* Ex. F.

In the end, Plaintiffs' assertions undermine, rather than support, their allegations of conspiracy. The government reviews and news reports they cite mostly do not even touch on SIBOR or SOR, and even where they do, they contain no plausible suggestion that a conspiracy ever existed.

### 3. Plaintiffs Allege No Plausible Common Motive to Conspire to Manipulate SIBOR or SOR.

Plaintiffs attempt to salvage their claims by arguing that Defendants had a "'common motive' to generate increased profits from SIBOR- and SOR-based derivatives trading." (Opp.

at 13.) But such generalized allegations are facially deficient because all companies are motivated to generate profit.[23] Recognizing this fact, Plaintiffs in their opposition invent a new (but equally unavailing) theory of the case that appears nowhere in the Complaint: Plaintiffs argue that Defendants sought to profit from arbitraging artificially wide SGD SIBOR-SOR spreads by engaging in some unidentified types of transactions at unidentified times. (Opp. at 13-14.) Plaintiffs' assertion that wider spreads created an "arbitrage opportunity" is wholly conclusory. Indeed, Plaintiffs fail to allege how Defendants supposedly constructed trades to profit from the spread between SGD SIBOR and SOR. But, even assuming that one could profit from the spread between SGD SIBOR and SOR, anyone in the market—including Plaintiffs—would have had the same incentive to arbitrage the spread. Thus, Plaintiffs' newfound theory does not support an inference of conspiracy.[24] Further, Plaintiffs do not plead any facts showing that any Defendants (much less all 46) actually had an interest in the spread between SGD SIBOR and SOR being artificially wide.[25] Nor do they plead anything to show that, even if any Defendants had any such interest, they conspired to manipulate the rates and, therefore, the spreads, to the detriment of Plaintiffs. Plaintiffs' allegations amount to nothing more than bare speculation.[26]

---

[23] *See Hyland* v. *HomeServices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014) (if the "motive to maximize profits supported an inference of an illegal conspiracy, then all businesses would be subject to anti-trust liability").

[24] *See Ross* v. *Am. Exp. Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014), *aff'd sub nom. Ross* v. *Citigroup, Inc.*, 630 Fed. App'x 79 (2d Cir. 2015) ("Courts may not infer a conspiracy where the defendants have no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations.").

[25] *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *3 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") (profit-motivated conspiracy to manipulate implausible where plaintiffs failed to allege that defendants had collective interest to move benchmark in one direction).

[26] This is in stark contrast to *Silver Fix*, the only case on which Plaintiffs rely. There, the plaintiffs alleged *1,900 days* where (1) the defendants made below-market quotes for silver (*i.e.*, showing an interest in a low fix), and (2) the Silver fix (which defendants controlled) was artificially low. 2016 WL 5794777, at *4.

### B. Plaintiffs Offer No Justification for Their Improper Group Pleading.

The Complaint includes two separate types of improper group pleading. First, Plaintiffs lump Defendants together as alleged participants in a single, vaguely-defined conspiracy, without making any allegations specific to most Defendants; second, Plaintiffs haphazardly name corporate families in the aggregate without making allegations specific to particular, legally distinct entities. (Br. at 19-20.) Plaintiffs do not even try to justify the first type of group pleading, and their defense of the second is self-defeating. (Opp. at 12.) Plaintiffs concede that they failed to "identify the precise role that each of Defendants' subsidiaries played in the conspiracy" (Opp. at 12), as is their burden, *see In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016). Nevertheless, Plaintiffs contend that they should be permitted to drag dozens of Defendants through the "potentially enormous cost of fact discovery" to see if they participated in an implausible conspiracy.[27] Plaintiffs have it backwards: they must plausibly allege claims against each Defendant in order to obtain discovery from them.[28]

### C. Plaintiffs Lack Antitrust Standing Because They Are Not Efficient Enforcers.

Plaintiffs fail to explain how any of the "efficient enforcer" factors of causation, directness, or non-speculative damages support their antitrust standing.

---

[27] *In re Elevator*, 502 F.3d at 50 n.4. Plaintiffs cannot rely on *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 212-13 (S.D.N.Y. 2003), which allowed claims against affiliates to proceed where it would entail no "unnecessary expense." Here, many of the affiliates have operations in different countries and employ different personnel from their SIBOR- or SOR-submitting affiliates, opening up countless streams of unwarranted discovery.

[28] *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 686 (2009) (A plaintiff whose complaint is "deficient under Rule 8 . . . is not entitled to discovery"); *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (plaintiff's "hope to develop . . . evidence in discovery . . . underscores, rather than cures, the deficiency in the Complaint"); *Stoner* v. *Walsh*, 772 F. Supp. 790, 800 (S.D.N.Y. 1991) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.").

**1. Failure to Adequately Allege Causation.**

Defendants' opening brief (Br. at 22-24) showed that neither Plaintiff adequately alleges a "legally significant causal relationship" between any manipulation of SIBOR or SOR and its purported injuries. *Reading Indus., Inc.* v. *Kennecott Copper Corp.*, 631 F.2d 10, 12 (2d Cir. 1980). Rather than attempting to show otherwise, Plaintiffs argue that causation should somehow be *assumed* despite their failure to plausibly allege it. (*See, e.g.*, Opp. at 17-19.)

*First*, Plaintiffs claim that causation is somehow satisfied here because "all Plaintiffs transacted in the relevant market for SIBOR- and SOR-based derivatives." (Opp. at 17-18.)[29] But this assertion only begs the very questions raised by the *Gelboim* court because of the need to avoid "overkill" recoveries: (1) what constitutes the "relevant" market,[30] and (2) what "percentage" of that market Defendants "control." 823 F.3d at 778-79. Plaintiffs fail to explain why the conclusory allegation that they transacted in "SIBOR- and SOR-based derivatives" is sufficient, by itself, to show causation here but not in *Gelboim*, where plaintiffs similarly alleged transactions in "LIBOR-based instruments." *Id.* at 779.[31]

---

[29] Plaintiffs also posit that causation should be assumed because their injury was an "integral . . . aspect of" and "inextricably intertwined" with the alleged restraint. (Opp. at 18.) But the Second Circuit recently made clear that this analysis, derived from the Supreme Court's opinion in *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465, 484 (1982), goes to antitrust *injury*, not efficient enforcer status. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 162-63 (2d Cir. 2016).

[30] *Silver Fix* is distinguishable. There, plaintiffs alleged facts to show that the "Fix Price determines the price of the *entire silver market*," 2016 WL 5794777, at *12 (emphasis added), so that the prices of all silver or silver-linked contracts were "directly" impacted by the manipulation, *id.* at *2. Here, Plaintiffs fail to provide any details as to how their trades were priced, let alone that SIBOR or SOR itself "determine[d] the price" of the entire market in which they traded.

[31] Indeed, on remand, Judge Buchwald rejected the *Gelboim* plaintiffs' allegations of causation despite claims that all relevant trades were in "the LIBOR-denominated bond market." *LIBOR VI*, 2016 WL 7378980, at *16 ("artificial market delineation is unrelated to the causation question and has no analytical force").

Plaintiffs' vague assertions about transacting in a market for "SIBOR- and SOR-based derivatives" do not cure their failure to demonstrate the link between their trades and SIBOR or SOR. Sonterra's assertion that its forwards were priced "using a formula that incorporates both SGD SOR and USD SIBOR" (AC ¶ 119) is contradicted by the very document on which Sonterra relies for that "formula." (Br. at 22-23.)[32] FrontPoint's claim that its swaps were "based on" SGD SIBOR (AC ¶ 142) is also insufficient, as it fails to show how those individually negotiated contracts were impacted by movements in SGD SIBOR. Further, Plaintiffs ignore the fact that they are asserting claims based on three different benchmarks—SGD SIBOR, USD SIBOR, and SOR—but Sonterra alleges no transactions related to SGD SIBOR and FrontPoint alleges no transactions related to USD SIBOR or SOR. (AC ¶¶ 142-43.) Sonterra and FrontPoint cannot be efficient enforcers of claims relating to benchmarks that their transactions did not allegedly incorporate.[33]

*Second*, Plaintiffs argue that causation should be assumed because their supposed injuries were not "contingent on some other third party being harmed first." (Opp. at 19.) But this argument is at odds with the law. In *Laydon*, for example, the court dismissed antitrust claims based on the "attenuated causation between the alleged conspiracy and the asserted injury," even though plaintiff's theory of injury did not derive from alleged harm to any third parties. 2014

[32] Where an allegation "is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011).

[33] *See, e.g.*, *Reading*, 631 F.2d at 13-14; *Laydon* v. *Mizuho Bank, Ltd.*, 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (plaintiff was not an efficient enforcer of the antitrust laws because there was no "clearly traceable means by which Defendants' alleged manipulation of one benchmark [the Tokyo Interbank Offered Rate for Japanese Yen] led to a loss to [plaintiff] on contracts linked to an entirely separate benchmark [the London Interbank Offered Rate for Japanese Yen]"). Plaintiffs' argument that they are nonetheless "efficient enforcers" with respect to these rates (Opp. at 20 n.23) is not only contrary to common sense but reflects a misunderstanding of *McCready*. *See supra* n.29.

WL 1280464, at *9. Indeed, the Second Circuit has found the "causal relationship between defendants' alleged [antitrust] violation and [plaintiffs' injury] too remote," even where plaintiffs were "not claiming injury derived from harm to some other party." *Reading*, 631 F.2d at 13.[34]

*Third*, Plaintiffs misconstrue *Gelboim* to suggest that, because courts generally "assume[] the existence of a violation in addressing the issue of [antitrust] standing," 823 F.3d at 770, Plaintiffs have no burden to plead each step in the causal chain to establish antitrust standing. (Opp. at 20 & n.22.) This argument is also contrary to law, as it would eliminate the need for the efficient enforcer analysis, the significance of which *Gelboim* emphasized. 823 F.3d at 778. That a court must generally assume the existence of an antitrust *violation* in addressing antitrust standing does not mean it must assume that the violation *caused the plaintiff harm*.

**2. Failure to Show Directness.**

Defendants' opening brief showed (Br. at 25) that Sonterra's claims—premised solely on trades with non-defendants—rely on an impermissible theory of "umbrella standing" that would lead to "damages disproportionate to wrongdoing." *Gelboim*, 823 F.3d at 779.[35] In response, Sonterra argues, first, that "there are no 'more direct' victims" because the forwards it purchased "incorporated the rates that Defendants manipulated." (Opp. at 20-21.) This cannot be squared with *Gelboim*, which described plaintiffs who purchased LIBOR-linked products from non-

[34] *Gelboim* did nothing to disturb this principle. *See* 823 F.3d at 779-80 (remanding all claimants, regardless whether their "transactions were conducted directly or indirectly with the [defendant] Banks"). The cases Plaintiffs cite are not to the contrary. (Opp. at 19.) The fact that alleging injury "purely contingent on the harm suffered by [a third party]" deprives a party of standing, *see Holmes* v. *Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 271 (1992), does not mean that other forms of attenuation cannot also break the causal chain.

[35] Plaintiffs argue that the antitrust laws do not require "privity." (Opp. at 21.) Defendants do not contend otherwise. Nevertheless, the "standing of those plaintiffs who did not deal directly with the Banks," *Gelboim*, 823 F.3d at 778, is central to the efficient enforcer inquiry—not because privity is required, but because the relationship between the parties affects the causal chain linking the alleged violation to any injury. Where there is no transactional link—or only an attenuated one—plaintiffs must plead specific allegations of direct causation, which are missing here.

defendants as "remote victims," 823 F.3d at 779, and fails in any event because, as explained *supra*, Sonterra has not pled a link between its forwards and USD SIBOR or SGD SOR.

Sonterra next argues that the impermissible "'umbrella theory' is simply not in play" in benchmark rate cases where "the prices of all financial instruments that incorporate the illegally fixed rate are 'directly' affected in the same way." (Opp. at 21-23.)[36] This same argument was recently rejected by Judge Buchwald, who dismissed claims asserted by a similar class of "umbrella purchasers." *See LIBOR VI*, 2016 WL 7378980, at *16. As Judge Buchwald explained, courts reject umbrella standing where "significant intervening causative factors, most notably, the independent pricing decisions of" third parties, "attenuate the causal connection," leading to disproportionate damages because "the defendants secured no illegal benefit at [the plaintiffs'] expense." *Id.* at *15. This reasoning has particular force here because Sonterra "and a third party" could "easily incorporate [SIBOR or SOR] into a financial transaction without any action by defendants whatsoever" and "[t]heir independent decision to do so breaks the chain of causation between defendants' actions and [Sonterra's] injury." *Id.* at *16.

**3. Plaintiffs' Alleged Damages Are Speculative.**

As *Gelboim* recognized, "highly speculative damages" are "a sign that a given plaintiff is an inefficient engine of enforcement." 823 F.3d at 779. Plaintiffs do not even attempt to address the difficulty of reconstructing individualized pricing decisions[37] and "but-for" SIBOR and/or

---

[36] Plaintiffs' discussion of the *Illinois Brick* doctrine is irrelevant. (Opp. at 21-22.) Defendants have never relied on *Illinois Brick*, but rather the fact that Plaintiffs are not efficient enforcers. *See Gelboim*, 823 F.3d at 778-79.

[37] It makes no difference that FrontPoint's "transactions were entered into pursuant to FrontPoint's ISDA Master Agreements," which FrontPoint now alleges "incorporated the same standardized terms in each trade." (Opp. at 24 n.26.) None of those purportedly "standardized terms" set the price of any individual swap transaction, let alone explained how SGD SIBOR would relate to or impact that price. And even if they did, Plaintiffs' failure to include

SOR submissions and rates, as would be required to determine any purported damages in this case. *See Laydon*, 2014 WL 1280464, at *10 (standing absent where damages "would require the reconstruction of hypothetical 'but for' . . . benchmark rates"). While the actual calculation of damages is not performed at the pleading stage, the efficient enforcer inquiry nevertheless requires a plaintiff to plead that the fact and amount of damages could be calculated in a "just and reasonable" way. *Gelboim*, 823 F.3d at 779. Courts routinely dismiss cases for lack of antitrust standing where, as here, no such showing is alleged. *See, e.g.*, *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 79 (2d Cir. 2013); *Spinelli* v. *National Football League*, 96 F. Supp. 3d 81, 110-11 (S.D.N.Y. 2015).

### D. Plaintiffs' Allegations Are Not Actionable under the FTAIA.

Plaintiffs contend that the FTAIA does not apply where a plaintiff is injured in the United States. (Opp. at 26-27.) But that proposition is incorrect.[38] Rather, the test is whether there is a "direct, substantial, and reasonably foreseeable effect" on the U.S. market. *Lotes Co.* v. *Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014). Plaintiffs cannot even satisfy the very first element of this test because their alleged injury is too remote. *See supra* Section II.C.1.[39]

---

such highly pertinent information in their Complaint (or even submit it in support of their opposition) proves their claims are entirely deficient as pled.

[38] *See Ubiquiti Networks, Inc.* v. *Kozumi USA Corp.*, 2013 WL 368365, *6 (N.D. Cal. Jan. 29, 2013) ("Defendants' assertion that they were injured in Florida . . . is too narrow to satisfy [the FTAIA] and does not implicate the broader concerns about market competition that the Sherman Act targets."). Further, Plaintiffs do not rely on (and therefore waive) application of the import commerce exclusion to the FTAIA's extraterritoriality provision.

[39] Plaintiffs' reliance on *Minn-Chem, Inc.* v. *Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012), is misguided. There, plaintiffs alleged that defendants restricted the supply of a product, which had a direct effect on U.S. prices. *Id.* at 859. Plaintiffs allege no such restriction here. Further, *Minn-Chem* found that U.S. effects were direct where defendants fixed "a benchmark price *intended* to govern later U.S. sales." *Id.* (emphasis added). Plaintiffs offer nothing to show that any manipulation of SIBOR or SOR was targeted at U.S. products such that any impact was more than a mere "ripple effect." *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006).

### E. Plaintiffs' Untimely Antitrust Claims Are Not Salvaged by Fraudulent Concealment.

Plaintiffs concede that their antitrust claims are time-barred unless the doctrine of fraudulent concealment tolls the statute of limitations. It does not. Because they fail to allege reasonable diligence in investigating their claims, Plaintiffs argue that "questions of reasonable diligence are premature at the pleading stage." (Opp. at 38-39.) But the only authority they rely upon for that proposition is a nonbinding summary order applying Pennsylvania law, which did not change the established standard for fraudulent concealment under federal statutes of limitations. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11–md–2262, ECF No. 1229 (S.D.N.Y. Oct. 29, 2015). Plaintiffs' failure to make *any* allegations of their diligence is dispositive.[40] Similarly, Plaintiffs' failure to plead *any* affirmative acts of concealment by Defendants, let alone to plead such acts with the particularity required by Rule 9(b), forecloses any attempt to benefit from tolling. (Br. at 29.) Finally, because the data underlying Plaintiffs' so-called economic analysis—supposedly showing SIBOR and SOR's artificiality—was publicly available throughout the Class Period, Plaintiffs cannot credibly argue that Defendants' alleged conduct was self-concealing.[41]

---

[40] Plaintiffs' position is that proving SIBOR and SOR's artificiality is simple: it is shown by the spread between the two rates. Assuming that is true, it is implausible that Plaintiffs—two sophisticated hedge funds that supposedly traded products linked to SIBOR and SOR—would not have been aware of the alleged artificiality years ago.

[41] *See LIBOR IV*, 2015 WL 6243526, at *115 ("LIBOR manipulation was not 'inherently self-concealing'"); *Laydon* v. *Mizuho Bank, Ltd.*, 2015 WL 1515487, at *6 (S.D.N.Y. Mar. 31, 2015).

## III. PLAINTIFFS' RICO CLAIMS SHOULD BE DISMISSED.

### A. Plaintiffs Lack Standing.

Plaintiffs lack standing to assert RICO claims for the same reasons they lack standing under the antitrust laws. Contrary to Plaintiffs' argument (Opp. at 28), nothing in *Gelboim* changes this conclusion. *See supra* Section II.C.

### B. Plaintiffs' RICO Claims Are Impermissibly Extraterritorial.

Plaintiffs contend that the presumption against extraterritoriality is "irrelevant in this case" because their RICO claims "arise from Defendants' domestic violations of the wire fraud statute."[42] (Opp. at 28-31.) But Plaintiffs have, at most, alleged only "some domestic conduct," which does not show, as it must, that the alleged scheme was "directed from (or to) the United States." *Petroleos Mexicanos* v. *SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014).

Plaintiffs' attempt to downplay the significance of *Petroleos* is unavailing.[43] For example, in *Worldwide Directories, S.A. De C.V.* v. *Yahoo! Inc.*, the court held that RICO claims based on wire and mail fraud were impermissibly extraterritorial notwithstanding that plaintiffs

---

[42] Plaintiffs' assertion that *RJR Nabisco* rejected the notion that the extraterritoriality analysis turns on the location of the alleged RICO enterprise is a red herring. (*See* Opp. at 28-29.) Defendants did not argue that Plaintiffs' RICO claim fails because the alleged enterprise is foreign, but because the Complaint alleges no specific conduct in, or directed at, the U.S.; Plaintiffs have not alleged that SIBOR or SOR submissions were made in the U.S. or that the alleged "collusive communications" were made by individuals located in the U.S. Instead, the Complaint alleges a RICO violation based on purported collusion between foreign and international institutions to submit false information to a Singapore banking association in Singapore. Defendants' argument is fully supported by *RJR Nabisco* and Second Circuit precedent, which Plaintiffs implicitly acknowledge. (*See* Opp. at 30 (noting that in *Petroleos*, as here, "all of the conduct giving rise to plaintiffs' injury occurred" abroad).)

[43] Plaintiffs contend that the *Laydon* court improperly required the plaintiff to plead that a scheme to defraud was "both managed from *and* directed at the U.S." (Opp. at 30 n.32.) But *Laydon* used the conjunctive only to emphasize that both allegations were present in *RJR Nabisco*—not to require the same of the plaintiff there. *See Laydon*, 2015 WL 1515487 at *8. In any event, the distinction is irrelevant because Plaintiffs have not pled that Defendants' purported scheme was directed *either* from *or* at the U.S. Moreover, Plaintiffs' statement that this case is not the "kind of 'foreign-cubed litigation'" at issue in *Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010), does not undermine the Second Circuit's holding, reiterated in *Petroleos*, that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Norex*, 631 F.3d at 33.

"plausibly alleged that [defendants] used the U.S. mails and wires in furtherance of their scheme and with the intent to do so." 2016 WL 1298987, at *10 (S.D.N.Y. Mar. 31, 2016). The court reasoned that the use of U.S. mails or wires "may be necessary, but *Petroleos* makes clear that it is not sufficient: if the domestic conduct alleged is peripheral to the overall scheme, and the scheme is not directed to or from the United States, it does not matter that the defendant intentionally used U.S. wires in furtherance of a fraudulent scheme."[44] Because Plaintiffs do not plausibly allege the existence of a scheme to defraud that was "directed from (or to) the United States," *Petroleos*, 572 F. App'x at 61, Plaintiffs' RICO claims should be dismissed.

**C. Plaintiffs Fail to Adequately Allege a § 1962(c) Claim.**

Plaintiffs fail to allege with requisite specificity that *each* Defendant either committed or aided and abetted multiple acts of wire fraud, as required by Plaintiffs' own authority.[45] Plaintiffs must either allege "a detailed description of the underlying scheme and the connection therewith of the . . . wire communications" (if claiming the wire communications were in furtherance of an underlying scheme), or "specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred" (if claiming the wire communications themselves were fraudulent).[46] Plaintiffs do neither. Rather, Plaintiffs rely on

---

[44] *Id.* at *10. Plaintiffs rely on criminal cases, *see, e.g.*, *United States* v. *Hayes*, 99 F. Supp. 3d 409, 420-22 (S.D.N.Y. 2015), to suggest that *any* alleged use of domestic servers or wires is sufficient to plead domestic wire fraud and therefore a domestic RICO claim. (Opp. at 29-30.) But this is plainly inconsistent with *Petroleos*'s requirement that, in civil cases, there be more than just "minimal contacts with the United States." 572 F. App'x at 61. Indeed, *Hayes* cautioned that its holdings were "not relevant" in a civil case. 99 F. Supp. 3d at 423 n.4.

[45] *See Jerome M. Sobel & Co.* v. *Fleck*, 2003 WL 22839799, at *5-6 (S.D.N.Y. Dec. 1, 2003) ("[P]laintiffs must allege that each defendant committed at least two predicate acts of racketeering activity.").

[46] *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *accord Fleck*, 2003 WL 22839799, at *5.

generalized allegations that are facially deficient because they provide no details as to how any specific Defendants' SIBOR or SOR submissions, or related communications, were fraudulent.[47]

Plaintiffs also fail to plead either the "scheme to defraud" element of wire fraud or the existence of a RICO enterprise. (Br. at 34-35.) Plaintiffs' reliance on "*Gelboim*'s holding that manipulating LIBOR is a *per se* violation of the Sherman Act" (Opp. at 33), coupled with conclusory assertions that Defendants "caused false SIBOR and SOR rates" on unspecified dates in unspecified directions or "corrupted the SIBOR-setting process," without more, does not adequately allege that *each* Defendant knowingly participated in a fraudulent plan in pursuit of a common purpose.[48] And contrary to Plaintiffs' argument (*see id.*), Plaintiffs' own authority suggests that targeting a victim is indeed integral to a "scheme to defraud."[49]

Finally, Plaintiffs' opposition simply reiterates the conclusory allegations in the Complaint that "Defendants conducted the affairs of the enterprise through a pattern of racketeering activity." (*Id.* (citing ¶¶ 17, 179-81).) Not only do these allegations lack any details

---

[47] *See DiVittorio* v. *Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (allegations must "inform each defendant of the nature of his alleged participation in the fraud"); *U.S. Fire Ins. Co.* v. *United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004) (elements of claim "must be established as to each . . . defendant").

[48] While a RICO enterprise need not have a particular hierarchy (Opp. at 32), a RICO enterprise must have at least "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose," *Boyle* v. *United States*, 556 U.S. 938, 946 (2009). Plaintiffs' vague pleadings lack any of these elements.

[49] Plaintiffs' reliance on *United States* v. *Guadagna* (Opp. at 33 n.34) is misplaced because the court there required that the defendant have "a conscious knowing intent to defraud and . . . contemplate[] or intend[] some harm to the property rights of the victim." 183 F.3d 122, 129 (2d Cir. 1999). Relying on *United States* v. *Trapilo*, 130 F.3d 547 (2d Cir. 1997), Plaintiffs argue that a scheme to defraud need not target any particular victim because "[t]he identity and location of the victim . . . are irrelevant." (Opp. at 33 n.34.) But the issue in *Trapilo* was whether the wire fraud statute "precludes the prosecution of a scheme to defraud a *foreign government* of tax revenue," 130 F.3d at 551 (emphasis added); it was in this context that "identity" did not matter. The court did not hold that a scheme need not be targeted at any particular victim. *See United States* v. *Levis*, 488 F. App'x 481, 485 (2d Cir. 2012).

about specific acts or alleged misconduct,[50] but they also fail to demonstrate that any alleged acts constitute a "pattern of racketeering activity" as opposed to "isolated" or "sporadic" incidents. *GICC Capital Corp.* v. *Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466-67 (2d Cir. 1995).

### D. Plaintiffs Do Not Adequately Allege a RICO Conspiracy.

Because Plaintiffs cannot dispute that a RICO conspiracy claim must fail where the underlying RICO claim fails, they rely upon legal truisms regarding a "less demanding" standard for their RICO conspiracy claim. (Opp. at 34.) But even assuming Plaintiffs adequately allege an underlying RICO claim, Plaintiffs' conspiracy claim still fails as Plaintiffs have not alleged a "conscious agreement" among any or all 46 Defendants to commit predicate acts. *Hecht* v. *Commerce Clearing House, Inc.*, 897 F.2d 21, 25-26 & n.4 (2d Cir. 1990). The portions of the Complaint Plaintiffs cite to argue that their conspiracy claim should survive (Opp. at 34) do not set forth "specific facts tending to show that each of the Defendants entered into an agreement," *Elsevier, Inc.* v. *W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010), to manipulate SIBOR or SOR over the five-year Class Period.

## IV. PLAINTIFFS' BREACH OF THE IMPLIED COVENANT CLAIMS FAIL.

Plaintiffs fail to explain how their conclusory allegations—that FrontPoint entered into an unspecified number[51] of SGD SIBOR-based swap transactions with Deutsche Bank and/or Citibank, N.A. over a five-month period (AC ¶ 142)—suffice to plausibly plead the existence of

---

[50] Plaintiffs' assertion that they need not plead any details regarding Defendants' alleged conduct (*see* Opp. at 34 n.35), is wrong. *Sumitomo*, which held that the "generalized allegations" regarding the use of wires and mails were sufficient when read "in the context of the *specific allegations* made previously in the Complaint," 995 F. Supp. at 456-57, is inapplicable here because Plaintiffs do not provide *any* plausible allegations of a scheme to defraud.

[51] Although FrontPoint purports to have entered into 24 swap transactions with Deutsche Bank and/or Citibank, N.A., it alleges that only some of these transactions were "based on one-month SGD SIBOR." AC ¶ 142.

a contract, let alone that either Defendant breached that contract or injured FrontPoint.[52] Plaintiffs' reliance on *LIBOR III* is also misplaced. In that case, Judge Buchwald held that plaintiffs—like FrontPoint—who allege "manipulation [that] was episodic [and] varying in direction" must specifically allege facts to show how trades were harmed by particular manipulative acts. 27 F. Supp. 3d at 482. But FrontPoint makes no effort to do so.[53]

Plaintiffs' claims are also time-barred. Plaintiffs allege that any breach occurred during the "period" of "January 2010 [to] May 2010"—more than six years before Plaintiffs filed suit. (AC ¶ 142.) Faced with this infirmity, FrontPoint now asserts that its claims are timely because it filed within six years of the purported last reset date of its swap contracts, in May 2011. (Opp. at 40.) But the Complaint nowhere alleges any swap transaction with a reset date in May 2011.[54]

## V. PLAINTIFFS' UNJUST ENRICHMENT CLAIMS SHOULD BE DISMISSED.

FrontPoint's unjust enrichment claims against Deutsche Bank and Citibank, N.A. fail because FrontPoint has not plausibly alleged that either Defendant was actually enriched, or that FrontPoint actually lost money, as a result of the alleged misconduct. (Br. at 39-40.) FrontPoint's argument that these Defendants *would have* benefitted *if* FrontPoint had suffered a loss (Opp. at 35-36) is merely a hypothetical and thus irrelevant. FrontPoint's claims against other Defendants fail because it "simply had no dealings" with them. *Georgia Malone & Co.,*

[52] Plaintiffs apparently concede that Sonterra cannot state implied covenant or unjust enrichment claims (*see* Br. at 36 n.65), as these sections of their opposition brief refer only to FrontPoint (Opp. at 34-36).

[53] Plaintiffs rely instead on the sort of "generalized allegations" that Judge Buchwald found are sufficient *only* in the context of a theory of persistent suppression or inflation. *LIBOR III*, 27 F. Supp. 3d at 482.

[54] Paragraph 116 of the Complaint does not support the proposition that FrontPoint's swap transactions "continued to reset monthly for the following year until May 2011." (Opp. at 39.) Paragraph 116 contains only a hypothetical explanation of swap transactions and does not purport to identify any "typical" duration or structure. (AC ¶ 116.) Plaintiffs cannot use their opposition brief to bolster their deficient complaint. *See Chamberlain* v. *City of White Plains*, 986 F. Supp. 2d 363, 390 n.19 (S.D.N.Y. 2013). Nevertheless, it is undisputed that any claims arising prior to July 1, 2010 are untimely. *See LIBOR IV*, 2015 WL 6243526, at *136-37.

*Inc.* v. *Rieder*, 19 N.Y.3d 511, 517-18 (2012). Plaintiffs mistakenly rely on cases where defendants ended up with plaintiffs' money,[55] but here, FrontPoint does not plead that it had *any* relationship with the other Defendants or that its dealings with Deutsche Bank or Citibank, N.A., had any effect on the other Defendants. *See id.* at 516; *LIBOR III*, 27 F. Supp. 3d at 478-79. In any event, Plaintiffs' unjust enrichment claims against all Defendants are barred by New York's three-year statute of limitations, which applies where, as here, "the plaintiff is seeking monetary, as opposed to equitable, relief."[56]

**CONCLUSION**

For the foregoing reasons, and the reasons stated in Defendants' opening brief, Plaintiffs' Complaint should be dismissed with prejudice.

---

[55] *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 207 & n.2 (S.D.N.Y. 2012) (plaintiffs were indirect purchasers of a product made by defendants); *Eastman Kodak Co.* v. *Camarata*, 2006 WL 3538944, at *1-2, 14–15 (W.D.N.Y. Dec. 6, 2006) (plaintiff's funds were improperly transferred to defendant, who knowingly laundered the ill-gotten gains).

[56] *Ingrami* v. *Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007); *see also Shak* v. *JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479 (S.D.N.Y. 2016). Even if a six-year statute of limitations were applied, Plaintiffs' unjust enrichment claims would still be time-barred for the same reason as their implied covenant claims. Additionally, Plaintiffs have failed to plead fraudulent concealment with sufficient particularity. *See supra* Section II.E.

Dated: January 13, 2017
New York, New York

Respectfully submitted,

/s/ Penny Shane

Penny Shane
Corey Omer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
shanep@sullcrom.com
omerc@sullcrom.com

*Attorneys for defendants Australia and New Zealand Banking Group, Ltd. and ANZ Securities, Inc.*

/s/ Arthur J. Burke

Lawrence J. Portnoy
Arthur J. Burke
Paul S. Mishkin
Adam G. Mehes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 701-5800
lawrence.portnoy@davispolk.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Attorneys for defendants Bank of America Corporation and Bank of America, N.A.*

/s/ Daryl A. Libow
Daryl A. Libow
Christopher M. Viapiano
Elizabeth A. Cassady
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Fax: (202) 293-6330
libowd@sullcrom.com
viapianoc@sullcrom.com
cassadye@sullcrom.com

*Attorneys for defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd.*

/s/ Matthew J. Porpora
David H. Braff
Yvonne S. Quinn
Jeffrey T. Scott
Matthew J. Porpora
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
braffd@sullcrom.com
quinny@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

Jonathan D. Schiller
Leigh M. Nathanson
Amos E. Friedland
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
lnathanson@bsfllp.com
afriedland@bsfllp.com

Michael Brille
Melissa Felder Zappala
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
Telephone: (202) 237-2727
mbrille@bsfllp.com
mfelder@bsfllp.com

*Attorneys for defendants Barclays plc, Barclays Bank plc and Barclays Capital Inc.*

/s/ Stephen J. Obie
Jayant W. Tambe
Stephen J. Obie
Kelly A. Carrero
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-3939
jtambe@jonesday.com
sobie@jonesday.com
kacarrero@jonesday.com

*Attorneys for defendants BNP Paribas S.A., BNP Paribas North America, Inc., BNP Paribas Securities Corp. and BNP Paribas Prime Brokerage, Inc.*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com

*Attorneys for defendants Citibank, N.A. and Citigroup Inc.*

/s/ David R. Gelfand
David R. Gelfand
Mark D. Villaverde
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005
Telephone: (212) 530-5000
dgelfand@milbank.com
mvillaverde@milbank.com

*Attorneys for defendant Commerzbank AG*

/s/ Andrew Hammond
Andrew Hammond
Kim Haviv
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Fax: (212) 354-8113
ahammond@whitecase.com
khaviv@whitecase.com

Darryl S. Lew
701 Thirteenth Street, NW
Washington, D.C. 20005
Telephone: (202) 626-3600
Fax: (202) 639-9355
dlew@whitecase.com

*Attorneys for defendants Crédit Agricole Corporate and Investment Bank and Crédit Agricole S.A.*

/s/ Joel Kurtzberg
Herbert S. Washer
Elai Katz
Joel Kurtzberg
Jason M. Hall
Adam S. Mintz
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com
jhall@cahill.com
amintz@cahill.com

*Attorneys for defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse International*

/s/ Gary W. Kubek
Gary W. Kubek
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Fax: (212) 909-6836
gwkubek@debevoise.com
eweisgerber@debevoise.com

*Attorneys for defendants DBS Bank Ltd., DBS Group Holdings Ltd and DBS Vickers Securities (USA) Inc.*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
Matthew J. Weiser
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
msilverman@paulweiss.com
afinch@paulweiss.com
mweiser@paulweiss.com

*Attorneys for defendant Deutsche Bank AG*

/s/ Lewis J. Liman
Lewis J. Liman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
lliman@cgsh.com

Nowell D. Bamberger
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 974-1500
Fax: (202) 974-1999
nbamberger@cgsh.com

*Attorneys for defendants The Hongkong and Shanghai Banking Corporation Limited, HSBC Bank USA, N.A., HSBC Holdings plc, HSBC North America Holdings Inc. and HSBC USA Inc.*

/s/ Karen P. Seymour

Karen P. Seymour
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
seymourk@sullcrom.com

Amanda F. Davidoff
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Fax: (202) 293-6330
davidoffa@sullcrom.com

*Attorneys for defendants ING Groep N.V., ING Bank N.V. and ING Capital Markets LLC*

/s/ Paul C. Gluckow

Thomas C. Rice
Paul C. Gluckow
Omari L. Mason
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
trice@stblaw.com
pgluckow@stblaw.com
omason@stblaw.com

Abram J. Ellis
900 G Street, N.W.
Washington, D.C. 20001
Telephone: (202) 636-5500
aellis@stblaw.com

*Attorneys for defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.*

/s/ Christopher M. Paparella

Christopher M. Paparella
Marc Weinstein
Justin Ben-Asher
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
Chris.Paparella@hugheshubbard.com
Marc.Weinstein@hugheshubbard.com
Justin.Ben-Asher@hugheshubbard.com

*Attorneys for defendants Macquarie Bank Ltd. and Macquarie Group Ltd.*

/s/ Nicholas Adams

Nicholas Adams
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
nadams@akingump.com

C. Fairley Spillman
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
fspillman@akingump.com

*Attorneys for defendant Oversea-Chinese Banking Corporation Limited*

/s/ Fraser L. Hunter, Jr.
Fraser L. Hunter, Jr.
David S. Lesser
Jamie S. Dycus
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com

*Attorneys for defendants The Royal Bank of Scotland plc, The Royal Bank of Scotland Group plc and RBS Securities Japan Limited*

/s/ Marc J. Gottridge
Marc J. Gottridge
Lisa J. Fried
Benjamin A. Fleming
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com
benjamin.fleming@hoganlovells.com

*Attorneys for defendants Standard Chartered Bank and Standard Chartered plc*

/s/ Peter Sullivan
Peter Sullivan
Eric J. Stock
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com

Joel S. Sanders
555 Mission Street, Suite 3000
San Francisco, California 94105
Telephone: (415) 393-8200
jsanders@gibsondunn.com

*Attorneys for defendants UBS AG and UBS Securities Japan Co. Ltd.*

/s/ Dale C. Christensen, Jr.
Dale C. Christensen, Jr.
Michael B. Weitman
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Fax: (212) 480-8421
christensen@sewkis.com
weitman@sewkis.com

*Attorneys for defendants United Overseas Bank Limited and UOB Global Capital, LLC*