UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X
                 :

FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., and :
SONTERRA CAPITAL MASTER FUND, LTD., on behalf : **OPINION AND ORDER**
of themselves and all others similarly situated,,    : **GRANTING IN PART AND**
                 : **DENYING IN PART**
          Plaintiffs,     : **DEFENDANTS' MOTION**
      v.              : **TO DISMISS**
                 :

CITIBANK, N.A., CITIGROUP INC., BANK OF    : 16 Civ. 5263 (AKH)
AMERICA CORPORATION, BANK OF AMERICA,    :
N.A., JPMORGAN CHASE & CO., JPMORGAN CHASE :
BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, :
THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS :
SECURITIES JAPAN LIMITED, UBS AG, UBS    :
SECURITIES JAPAN CO. LTD., ING GROEP N.V., ING :
BANK N.V., ING CAPITAL MARKETS LLC, BNP   :
PARIBAS, S.A., BNP PARIBAS NORTH AMERICA,  :
INC., BNP PARIBAS SECURITIES CORP., BNP    :
PARIBAS PRIME BROKERAGE, INC., OVERSEA-  :
CHINESE BANKING CORPORATION LTD.,     :
BARCLAYS PLC, BARCLAYS BANK PLC,      :
BARCLAYS CAPITAL INC., DEUTSCHE BANK AG,  :
CREDIT AGRICOLE CORPORATE AND INVESTMENT :
BANK, CREDIT AGRICOLE S.A., CREDIT SUISSE  :
GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE  :
INTERNATIONAL, STANDARD CHARTERED    :
BANK, STANDARD CHARTERED PLC, DBS BANK  :
LTD., DBS GROUP HOLDINGS LTD, DBS VICKERS  :
SECURITIES (USA) INC., UNITED OVERSEAS BANK :
LIMITED, UOB GLOBAL CAPITAL, LLC, AUSTRALIA :
AND NEW ZEALAND BANKING GROUP, LTD., ANZ  :
SECURITIES, INC., THE BANK OF TOKYO-     :
MITSUBISHI UFJ, LTD., THE HONGKONG AND   :
SHANGHAI BANKING CORPORATION LIMITED,  :
HSBC BANK USA, N.A., HSBC HOLDINGS PLC, HSBC :
NORTH AMERICA HOLDINGS INC., HSBC USA INC., :
MACQUARIE BANK LTD., MACQUARIE GROUP  :
LTD., COMMERZBANK AG, AND JOHN DOES NOS. :
1-50,                   :
                 :
          Defendants.    :
-------------------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/18/17

ALVIN K. HELLERSTEIN, U.S.D.J.:

Defendants move to dismiss plaintiffs' First Amended Class Action Complaint ("FAC"). Plaintiffs, FrontPoint Asian Event Driven Fund L.P. ("FrontPoint") and Sonterra Capital Master Fund, Ltd. ("Sonterra"), investment funds, sue defendants, 46 corporate entities representing 20 banking institutions. Plaintiffs allege that defendants conspired to manipulate the price of two related benchmark interest rates: the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate ("SOR"). Plaintiffs allege that they entered into transactions involving financial products whose price was impacted by SIBOR and/or SOR, and were economically injured as a result of defendants' alleged manipulation of those benchmarks. Plaintiffs assert claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Plaintiffs also allege common law claims of unjust enrichment and breach of implied covenants of good faith and fair dealing.

Defendants move to dismiss the FAC for lack of subject matter jurisdiction and for failure to state a legally sufficient and plausible claim. A subset of the defendants ("Foreign Defendants") move also to dismiss for lack of personal jurisdiction over them. After considering the briefs submitted by the parties and their oral arguments, for the reasons discussed in this opinion and order, I hold that defendants' motion is granted in part and denied in part. I grant plaintiffs leave to file a second amended complaint, except with respect to their unjust enrichment claim, which is dismissed with prejudice.

## I.    The First Amended Complaint

*SIBOR and SOR.* The Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate ("SOR") are related benchmark interest rates that are meant to reflect the cost of borrowing funds in the Singapore market. Both SIBOR and SOR are administered by

2

the Association of Banks in Singapore ("ABS"), a trade group made up of many of the defendants in this case. FAC ¶ 1. Each day, Thomson Reuters, as agent of ABS, calculates the daily SIBOR rate, based on interest rate quotes submitted by a panel of banks, including many of the defendants. Thomson Reuters, applying a set formula, calculates an average rate, and publishes that average each day as the SIBOR rate. FAC ¶¶ 101-02. SOR, a related benchmark interest rate that is in part based on the SIBOR rate, is also meant to reflect the cost of borrowing Singapore dollars, but is premised on a foreign exchange swap in which U.S. dollars are to be exchanged for Singapore dollars at a specified future date, using a price that reflects current value of Singapore dollars, *i.e.*, the "spot rate." FAC ¶ 103. Thomas Reuters publishes the SIBOR and SOR rate for four different maturities, which are also known as tenors: one, three, six, and twelve months. FAC ¶ 102.

> *Defendants' Alleged Conspiracy to Manipulate SIBOR and SOR*. Plaintiffs allege that during the class period, trillions of dollars of "SIBOR- and SOR-based derivatives" – that is, financial derivatives that incorporate SIBOR and/or SOR as a component of price – were traded within the United States, including interest rate swaps, forward rate agreements, foreign exchange swaps and foreign exchange forwards. FAC ¶¶ 104, 115-119.

> Plaintiffs allege that in June 2013, the Monetary Authority of Singapore ("MAS"), Singapore's central bank and financial regulator, "announced that it had uncovered a massive conspiracy by Defendants to rig the prices of financial derivatives that incorporate SIBOR and/or SOR as a component of price." FAC ¶ 2. Plaintiffs allege that MAS "uncovered rare 'smoking gun' evidence of anticompetitive conduct," FAC ¶ 3, and that "MAS found that" several of the defendants "manipulated SIBOR and SOR." *See, e.g.,* FAC ¶¶ 23, 26, 54. However, the June 13, 2013 MAS press release, upon which plaintiffs base these allegations, contains none of these findings. Rather, MAS stated that "twenty banks were found to have deficiencies in the governance, risk management, internal controls, and surveillance systems for

3

their involvement in benchmark submissions." Porpora Decl., Ex. A. MAS also stated that "a total of 133 traders were found to have engaged in several attempts to inappropriately influence the benchmarks," but noted that "there is no conclusive finding that SIBOR, SOR and FX Benchmarks were successfully manipulated." *Id.* Many of defendants' SIBOR and SOR derivative traders were fired or disciplined in the wake of the MAS investigation. FAC ¶¶ 129-33.

Plaintiffs also allege that "U.S. and U.K. regulators confirmed MAS' findings that Defendants manipulated SIBOR and SOR." FAC ¶ 126. Specifically, plaintiffs allege that the Commodity Futures Trading Commission ("CFTC") found that defendants Deutsche Bank, RBS, and UBS "all manipulated SIBOR and SOR during the Class Period and engaged in 'similar misconduct' to the methods these Defendants used to manipulate other financial benchmarks." *Id.* These allegations are based on the CFTC's settlements with these three defendants regarding their manipulation of other benchmark interest rates not at issue in this case, such as LIBOR and Euribor. The Deutsche Bank settlement contained a footnote stating that "through its internal investigation, Deutsche Bank identified evidence of similar misconduct with respect to attempts to influence, and at times attempts to manipulate, other interest rate benchmarks," including SIBOR and SOR. Porpora Decl. Ex. I at 3, n.3. The UBS settlement contains a similar footnote stating that "through its internal investigation, UBS identified evidence of similar misconduct involving submissions for" SIBOR and SOR. Porpora Decl. Ex. H at 38, n.21. The RBS settlement likewise contained a footnote stating that "RBS traders engaged in similar misconduct in connection with" SIBOR and SOR. Porpora Decl. Ex. J at 4, n.3.

Plaintiffs also allege that the U.K.'s Financial Services Authority ("FSA"), in its settlement with RBS with respect to LIBOR manipulation, found that RBS traders made at least 34 written requests to manipulate SIBOR and SOR. FAC ¶ 28.

4

Lastly, plaintiffs allege what they describe as "economic evidence," which they present as proof that SIBOR and SOR were manipulated during the relevant period. Plaintiffs' economic evidence is premised on the assumption that "because SOR and SIBOR both represent the cost of borrowing Singapore dollars, the 'law of one price' dictates that the difference, or 'spread,' between the same tenor of SOR and SIBOR should be very small absent manipulation, since the cost of borrowing Singapore dollars for the same amount of time should be roughly the same." FAC ¶ 134. Put more simply, plaintiffs allege that the SIBOR and SOR rates should generally be the same. Plaintiffs' economic evidence consists of three charts showing that for three different tenors (one-month, three-month, and six-month), the spread between SIBOR and SOR became more pronounced and erratic during the relevant period. FAC ¶¶ 134-141. Prior to the start of the Class Period, for example, SOR's relationship to SIBOR was generally positive; that is, the SOR rate was higher than the SIBOR rate. During the Class Period, however, the SOR's relationship to SIBOR fluctuated, and at times became negative. In addition to this fluctuation, the spread also became more pronounced during the Class Period; that is, the spread became larger. Plaintiffs allege that this fluctuation and variability "indicates that both SIBOR and SOR were manipulated to artificial levels during the Class Period." FAC ¶ 137.

            *Allegations of Personal Jurisdiction.* Plaintiffs allege five bases of personal jurisdiction against the Foreign Defendants. First, plaintiffs allege that certain defendants "purposefully availed themselves of the privilege and benefit of trading foreign exchange and/or interest rate derivatives, including SIBOR- and SOR-based derivatives, in the United States." FAC ¶ 13. In support of this allegation, the plaintiffs cite to a survey conducted every three years by the Federal Reserve Bank of New York, which "measures the 'turnover,' or volume of transactions, in foreign exchange and interest rate derivatives within the United States." *Id.* According to plaintiffs, the fact that some of the defendants participated in this survey is evidence that those defendants engaged in domestic trading of SIBOR- and SOR-based

derivatives. Plaintiffs do not explain how this trading, to the extent it occurred, relates to the alleged conspiracy to manipulate SIBOR and SOR.

Second, plaintiffs allege, generally, that defendants purposefully directed their wrongful conduct at the United States. Plaintiffs allege that "through their daily electronic transmission of false SIBOR submissions and confirmations for collusive transactions intended to impact SIBOR and SOR, Defendants themselves transmitted and caused Thomson Reuters to electronically transmit false SIBOR and SOR rates to U.S. market participants who transacted in SIBOR- and SOR-based derivatives." FAC ¶ 14.

Third, plaintiffs allege that defendants' illegal conduct "had direct, substantial, and foreseeable effects on commerce in the United States." FAC ¶ 16.

Fourth, plaintiffs allege that certain defendants consented to general jurisdiction in New York by registering New York branches with the New York State Department of Financial Services pursuant to New York Banking Law Section 200. FAC ¶ 17

Lastly, plaintiffs allege that defendant Deutsche Bank consented to jurisdiction in New York by entering into an ISDA Master Agreement with plaintiff FrontPoint, under which the parties agreed to the jurisdiction of the courts of New York and United States District Courts of the Southern District of New York. FAC ¶ 18.

## II.    Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

The Foreign Defendants[1] move pursuant to Rules 12(b)(2) and 12(b)(3) to dismiss the FAC for lack of personal jurisdiction and venue.

---

[1] The Foreign Defendants are: Australia and New Zealand Banking Group, Ltd.; Barclays plc; Barclays Bank plc; BNP Paribas, S.A.; Crédit Agricole Corporate and Investment Bank; Crédit Agricole S.A.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse International; Commerzbank AG; DBS Bank Ltd.; DBS Group Holdings Ltd; Deutsche Bank AG; HSBC Holdings plc; ING Groep N.V.; ING Bank N.V.; Macquarie Bank Ltd.; Macquarie Group Ltd.; The Royal Bank of Scotland plc; The Royal Bank of Scotland Group plc; RBS Securities Japan Limited; Standard Chartered Bank; Standard Chartered PLC; The Bank of Tokyo-Mitsubishi UFJ, Ltd.; The Hong Kong and Shanghai Banking Corporation Limited; The Oversea-Chinese Banking Corporation Ltd.; UBS AG, UBS Securities Japan Co. Ltd.; and United Overseas Bank Limited.

### a. General Jurisdiction by Consent

Plaintiffs concede that the Foreign Defendants are not subject to general

jurisdiction because they are not "essentially at home" in New York or the United States.

*Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). Plaintiffs argue, however, that certain

Foreign Defendants consented to general jurisdiction in New York by registering New York

branches with the New York State Department of Financial Services pursuant to New York

Banking Law § 200. FAC ¶ 18. This argument fails.

Section 200(3) provides that a foreign banking corporation may not do business in

New York:

> unless such corporation shall have ... [f]iled in the office of the
> superintendent ... a duly executed instrument in writing, by its terms
> of indefinite duration and irrevocable, appointing the superintendent
> and his or her successors its true and lawful attorney, upon whom
> all process in any action or proceeding against it on a cause of action
> arising out of a transaction with its New York agency or agencies or
> branch or branches, may be served with the same force and effect as
> if it were a domestic corporation and had been lawfully served with
> process within the state.

New York Banking Law § 200(3).

By its express terms, this statute limits a foreign bank's consent to suits "arising

out of a transaction with its New York agency or agencies or branch or branches," and is thus

relevant only to specific jurisdiction, not general jurisdiction. Courts have been virtually

unanimous in concluding that this statute does not provide for general jurisdiction. *See, e.g.*,

*Sullivan v. Barclays PLC*, 2017 WL 685570, at \*39 (S.D.N.Y. Feb. 21, 2017) ("The statute does

not establish a consent to jurisdiction by the branch's foreign parent, and courts in this District

have uniformly rejected plaintiffs' argument."); *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,

2015 WL 1514539, at \*11 (S.D.N.Y. Mar. 31, 2015) ("The plain language of this provision

limits any consent to personal jurisdiction by registered banks to *specific* personal jurisdiction.");

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), 2016 WL 1558504, at \*7

7

(S.D.N.Y. Apr. 15, 2016) ("[T]he most natural reading of the provision *does not* provide general jurisdiction.").

As the Second Circuit recently explained in *Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016), which involved the question of whether Connecticut's registration statute could give rise to general jurisdiction, interpreting registration statutes such as New York Banking Law § 200 to confer general jurisdiction would "risk unravelling the jurisdictional structure envisioned in *Daimler* and *Goodyear* based only on a slender inference of consent pulled from routine bureaucratic measures that were largely designed for another purpose entirely." *Brown,* 814 F.3d at 639. A corporation's consent to be sued in a particular jurisdiction for any cause of action must be explicit, not inferential, for if "mere registration and the accompanying appointment of an in-state agent—without an express consent to general jurisdiction—nonetheless sufficed to confer general jurisdiction by implicit consent, every corporation would be subject to general jurisdiction in every state in which it registered, and *Daimler's* ruling would be robbed of meaning by a back-door thief." *Id.* at 640.

Plaintiffs point to dicta in *Brown*, in which the Second Circuit referred to a New York registration statute as one that "more plainly advise[s] the registrant that enrolling in the state as a foreign corporation and transacting business will vest the local courts with general jurisdiction over the corporation." *Id.* However, it does not appear that the Second Circuit was even referring to New York Banking Law § 200, for the law review article it cited for this proposition contained only a discussion of New York Business Corporation Law § 1301, a different statute. Regardless, under no plausible reading does Section 200 "plainly advise" corporations that complying with the statute will subject them to general jurisdiction in New York, and no court has held as much since the Second Circuit's decision in *Brown*.

My decision in *Vera v. Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015) (Hellerstein, J.) is distinguishable. That decision concerned whether a foreign bank with

8

branches registered in New York must identify assets of judgment debtors over which it has custody, regardless of where the particular branches holding those assets might be located. I answered that question in favor of disclosure in order to avoid "a notion of jurisdiction that allows banks to hide information concerning assets connected to terrorism in other countries." 91 F. Supp. 3d at 570–71. The questions and concerns raised in *Vera* are not present here. In any event, the Second Circuit recently reversed my decision in *Vera*, holding that I lacked subject matter jurisdiction over the action. *See Vera v. Republic of Cuba*, No. 16-1227, 2017 WL 3469204 (2d Cir. Aug. 14, 2017).

Plaintiffs may not use New York's registration statute as a basis for asserting general jurisdiction over the Foreign Defendants.

### b. Specific Jurisdiction

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). The exercise of specific jurisdiction thus "depends on in-state activity that '*gave rise to the episode-in-suit*.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)). However, the FAC contains no plausible allegations that any conduct related to the conspiracy to manipulate SIBOR and SOR occurred within the United States. Plaintiffs do not allege that the conspiracy originated in the United States, or that Foreign Defendants who served as panel members submitted manipulative rates from within the United States.[2]

---

[2] I assume for purposes of this motion, without expressly holding, that the relevant geographic area is the United States as a whole, and not just New York. *See In re Magnetic Audiotape Antitrust Litig*, 334 F.3d 204, 207 (2d Cir. 2003) (assuming that Section 12 of the Clayton Act permits a minimum contacts analysis that "looks to a corporation's contacts with the United States as a whole to determine if the federal court's exercise of personal jurisdiction comports with due process."); *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, ("*LIBOR IV*"), 2015 WL 6243526, at *23 and n. 39 (noting that "courts in this Circuit commonly hold" that the minimum-contacts test should consider nationwide contacts when the "jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process," and noting further that

9

### i. Suit-Related Conduct

Instead of directly alleging facts in their pleading, plaintiffs instead contend that an inference of U.S.-based suit-related conduct can be drawn from a document referenced in the FAC. Specifically, Deutsche Bank's settlement with CFTC, which concerned manipulation of other benchmarks (LIBOR and Euribor), states that Deutsche Bank's manipulative conduct "occurred across multiple trading desks and offices," including New York. A footnote then states that through its internal investigation, Deutsche Bank "identified evidence of similar misconduct" with respect to attempts to manipulate other interest rate benchmarks, including SIBOR and SOR. Porpora Decl. Ex. I at 2-3, n.3. This footnote contains no specific facts regarding U.S.-based attempts to manipulate SIBOR or SOR, and cannot serve as a basis for exercising jurisdiction over the twenty-nine Foreign Defendants. I cannot reasonably infer that suit-related conduct occurred within the United States based on such a generalized, ambiguous statement, or on similar statements made in the CFTC's settlements with UBS and RBS.

Plaintiffs also attempt to connect some of the Foreign Defendants to the United States by alleging that those defendants entered into "manipulative" or "collusive" transactions involving SIBOR- and SOR-based derivatives with counterparties in the United States. FAC ¶¶ 8, 15. Plaintiffs' conclusory allegations are not sufficient to make these transactions "suit-related." *Walden*, 134 S. Ct. at 1121 (2014). Plaintiffs fail to allege which defendants entered into which derivative contracts, how these trades were collusive, or how they related to the alleged fixing of the SIBOR and SOR rates. In *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017), for example, one of the foreign defendants was alleged to have traded the commodity at issue within the United States. The court held that this

---

nothing in recent Supreme Court opinions such as *Daimler* and *Walden* "so much as hints that the national contacts rule might be unconstitutional where it is supported by a federal statute.").

was insufficient to establish jurisdiction over the defendant because that trading had no connection to the wrongful conduct at issue: manipulation of a pricing benchmark that occurred outside of the United States. *Id.* at *45. Similarly, in *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017), which involved alleged manipulation of the Euribor benchmark, the court acknowledged that "some of [defendant's] counterparties were located in the United States," but held that absent a United States nexus to the manipulation, "the presence of U.S. victims alone does not make out jurisdiction." *Id.* at *44.

The Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017) did not ease the standard for pleading personal jurisdiction, as plaintiffs suggest. In that case, the Supreme Court merely applied its "settled principles regarding specific jurisdiction," and held that there "must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" 137 S. Ct. at 1781 (quoting *Goodyear*, 564 U.S. at 919). But when "there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* As currently alleged, the relevant conduct giving rise to plaintiffs' alleged injury occurred elsewhere: Singapore. The fact that defendants may have engaged in non-suit related activity in the United States does not change this result.

But even if plaintiffs had adequately alleged that this derivative trading was "suit-related," plaintiffs have failed to allege that the Foreign Defendants actually engaged in such trading. Plaintiffs do not identify *any* specific trades or contracts that are alleged to have been collusive, nor do they identify which Foreign Defendants were party to such transactions. Instead, plaintiffs refer to two surveys conducted by the Federal Reserve Bank of New York ("FRBNY"), which polled participants in the derivatives market, including some of the

11

defendants. The purpose of the surveys was to determine the volume of trading of various derivatives in the United States. In light of certain Foreign Defendants' participation in these surveys, plaintiffs urge the Court to infer that those defendants engaged in collusive trading of SIBOR-based derivatives with U.S. counterparties. But the surveys make no specific mention of SIBOR- or SOR-based derivatives; they merely concern the swaps and derivatives market generally. Nor do the surveys identify the specific corporate entities that participated. For example, the survey identifies "BNP Paribas" as a participant, but it is impossible to know whether this refers to BNP Paribas, S.A., which has moved to dismiss for lack of personal jurisdiction, or to BNP Paribas North America, Inc., which does not object to jurisdiction. For purposes of alleging that there is personal jurisdiction over each Foreign Defendant, plaintiffs may not refer to affiliated defendants by a conclusory collective name unless plaintiffs adequately allege that the conduct of one affiliate is attributable to another.[3]

Plaintiffs must do more than infer that the Foreign Defendants likely were participants in the U.S. derivatives market. They must allege specific facts that plausibly suggest that the Foreign Defendants entered into SIBOR- and SOR-based transactions with counterparties based in the United States, and that those transactions had a nexus to the benchmark interest rate manipulation at issue in this lawsuit.

### i. Purposeful Direction

Plaintiffs argue that the Foreign Defendants purposefully directed their wrongdoing at the United States by submitting false interest rates to Thomson Reuters, knowing that Thomson Reuters, as agent for the Association of Banks of Singapore ("ABS"), the trade

---

[3] For this same reason, plaintiffs' allegation that certain Foreign Defendants have offered SIBOR- and SOR-based derivatives using the Bloomberg Terminal cannot serve as a basis for jurisdiction. For example, plaintiffs allege that "Barclays" marketed SIBOR-based derivatives using the Bloomberg Terminal, but do not specify which of the three Barclay defendants did so.

12

group that administers SIBOR and SOR, would publish an average of those rates as the daily SIBOR rate throughout the United States and other areas of the world. FAC ¶¶ 15, 102.

Under the so-called "effects" test, specific jurisdiction may exist where an out-of-forum defendant purposefully directed the wrongful conduct at the forum. "The effects test is a theory of personal jurisdiction typically invoked where … the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013). Thus, where the alleged conduct took place outside of the forum, as is the case here, the defendant must have "'purposefully directed' his activities at residents of the forum." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985)).

The FAC contains no non-conclusory allegations that the Foreign Defendants purposefully directed their activities at residents of the United States. The consequences of the Foreign Defendants' conduct were global, and the FAC contains no allegations that the Foreign Defendants singled out the United States as their target. *See 7 W. 57th St. Realty Co.*, 2015 WL 1514539, at *11 ("Because the Amended Complaint does not plead facts demonstrating that the LIBOR manipulation was done with the express aim of causing an effect in New York, the 'effects test' is not satisfied."); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *44 (absent allegation that defendant's conduct was expressly aimed at the United States, the fact "that Defendants' alleged manipulation of the Fix Price had harmful effects on U.S.-based exchanges is insufficient" to confer personal jurisdiction).

Nor can plaintiffs argue that the Foreign Defendants should have been aware of these effects, for "it is bedrock law that merely foreseeable effects of defendants' conduct do not

13

support personal jurisdiction." *LIBOR IV*, 2015 WL 6243526, at \*32 (S.D.N.Y. Oct. 20, 2015); *see also In re Terrorist Attacks*, 714 F.3d at 674 ("The fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant."). Moreover, the "fact that electronic communications were routed through U.S.-wires or servers, or that recipients of those communications were located in the United States, is insufficient to establish minimum contacts with the United States." *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.* ("*Laydon V*"), 2017 WL 1113080, at \*3 (S.D.N.Y. Mar. 10, 2017). Finally, to the extent plaintiffs rely on conduct of third-party Thomson Reuters that relates to the United States, such reliance is insufficient, for the relationship with the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 134 S. Ct. at 1122.

### c. Conspiracy Jurisdiction

Plaintiffs also contend that the Foreign Defendants are subject to personal jurisdiction under a theory of conspiracy jurisdiction. "The underlying rationale for exercising personal jurisdiction on the basis of conspiracy is that, because co-conspirators are deemed to be each other's agents, the contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators." *LIBOR IV*, 2015 WL 6243526, at \*29.

Federal courts "have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute." *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at \*3 (S.D.N.Y. Mar. 31, 2015); *see also In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) (rejecting notion that "participation in a conspiracy generally can provide a standalone basis for jurisdiction," for the "rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine.").

14

Plaintiffs have failed to allege facts sufficient to support their conspiracy jurisdiction theory. Even assuming that plaintiffs have plausibly alleged the existence of a conspiracy, they have not alleged that any defendant – including those who do not contest jurisdiction – committed any act in furtherance of the conspiracy from within the United States or purposefully directed its misconduct at the United States. If the conspiracy has no connection to the United States, it cannot serve as a basis for jurisdiction, even if some of the alleged members of the conspiracy are subject to general jurisdiction in the United States. *See LIBOR VI*, 2016 WL 7378980, at *3 ("Because plaintiffs have failed to establish that any defendant committed an act in furtherance of the conspiracy in or directed at the United States, this Court has only general personal jurisdiction over certain panel banks as to the antitrust claims, and therefore the conspiracy jurisdiction argument has no purchase."); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *49 (rejecting theory of conspiracy jurisdiction on grounds that "because Plaintiffs failed to allege that any conduct relevant to the alleged price manipulation took place in New York, they have failed to allege sufficient facts to establish personal jurisdiction on that basis.").[4]

### d. Deutsche Bank's Consent to Jurisdiction

Plaintiff FrontPoint alleges that defendant Deutsche Bank consented to jurisdiction in New York because FrontPoint and Deutsche Bank entered into an ISDA [International Swap Dealers Association] Master Agreement containing a forum selection clause that designated New York as the proper forum for any dispute relating to that agreement. FAC ¶ 19. This allegation is insufficient for several reasons. First, FrontPoint does not allege the precise language of the forum selection clause, and the copy of the ISDA Master Agreement submitted to the Court is missing the pages containing the relevant clause. *See* Lefkowitz Decl.

---

[4] Because I have held that the Court lacks personal jurisdiction over the Foreign Defendants, I need not reach the issue of whether venue is proper.

15

Ex. 2. Second, although FrontPoint alleges that it entered into at least 24 swap transactions with Deutsche Bank, including some transactions that involved SIBOR-based derivatives, it does not allege that those transactions were made pursuant to the ISDA Master Agreement. As a result, the relationship between FrontPoint's trading with Deutsche Bank and the ISDA Master Agreement containing the forum selection clause remains unclear. FrontPoint notes that Deutsche Bank has not submitted a document or declaration proving that trade confirmations did not incorporate the terms of the ISDA Master Agreement, but it is FrontPoint's burden to show jurisdiction, not Deutche Bank's burden to disprove it. Third, even assuming that the forum selection clause applied, it is unclear whether it applies to all of FrontPoint's claims, or only to those sounding in contract and quasi-contract. Because FrontPoint has not supplied the Court with the actual language of the forum selection clause, it is not currently possible to rule on the scope of the clause. For these reasons, I reject FrontPoint's argument that Deutsche Bank consented to jurisdiction in New York.

### e. Conclusion

The Foreign Defendants' motion to dismiss for lack of personal jurisdiction is granted in its entirety. The claims against the Foreign Defendants are dismissed without prejudice, and with leave to amend.

## III. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and For Failure to State a Claim

Defendants also move pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the FAC for lack of standing and for failure to state a claim.

### a. Standing

"To meet the Article III standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Denney v. Deutsche*

16

*Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs have satisfied this standard.

Defendants argue that plaintiffs have failed to plead the existence of an "injury in fact" because they fail to allege that any intended manipulation of SIBOR or SOR was successful. Defendants argue that absent a plausible allegation of successful manipulation, plaintiffs could not have suffered any injury. However, this is a merits argument, and a plaintiff need not prove his case at the pleading stage in order to have constitutional standing. *See Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) ("[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."). The standing requirement exists to ensure there is a proper case or controversy before the Court, not to dismiss lawsuits on the merits.

Plaintiffs also have sufficiently alleged that they suffered an economic injury as a result of defendants' alleged manipulation. Plaintiffs have alleged that they were "overcharged and/or underpaid" in transactions involving SIBOR-based derivatives. FAC ¶¶ 20-21. This is sufficient. As the Second Circuit recently held in *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016), which involved alleged manipulation of LIBOR, "the harm component of constitutional standing is ... easily satisfied by [plaintiffs'] pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR." 823 F.3d at 770. It is possible that defendants' alleged manipulation, at different times, may have both hurt and helped plaintiffs' trading positions, depending on the day or the particular trade. But that possibility does not mean that plaintiffs lack constitutional standing to bring this lawsuit, for "that sort of 'paid too much' or 'received too little' harm is classic economic injury-in-fact." *Alaska Elec. Pension Fund v. Bank of Am. Corp.* ("*ISDAfix*"), 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016). As the court in *ISDAfix* explained, "discovery may well show that, for some Plaintiffs on some days, the alleged ISDAfix manipulation actually resulted

17

in a benefit. But the mere fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." *Id.* (internal quotation marks and citation omitted).

### b. Antitrust

#### i. Antitrust Conspiracy

In antitrust cases, a "plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). To do this, a plaintiff will typically "present circumstantial facts supporting the *inference* that a conspiracy existed." *Id.* A court "cannot take Plaintiffs' failure to present direct evidence as a sign that no conspiracy existed." *In re London Silver Fixing, Ltd., Antitrust Litig..* ("*Silver Fix*"), 213 F. Supp. 3d 530, 558 (S.D.N.Y. Oct. 3, 2016). A court may draw an inference based on circumstantial facts where the plaintiff alleges the existence of "conscious parallelism," as well as "plus factors," which may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup, Inc.*, 709 F.3d at 136. "[T]hese plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* at 136 n. 6.

"To survive dismissal, 'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" *Gelboim*, 823 F.3d at 781 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012)). "Skepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that

18

actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"" *Gelboim*, 823 F.3d at 781 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Plaintiffs have plausibly alleged the existence of a conspiracy to manipulate SIBOR and SOR. It is true that plaintiffs have failed to identify any specific interbank communications between or among defendants regarding the alleged manipulation. However, plaintiffs need not allege this type of "smoking gun" evidence to survive a motion to dismiss. The Monetary Authority of Singapore ("MAS"), Singapore's financial regulator, after conducting a year-long review of the interest rate benchmark submission process employed by various banks, found that several defendants in this case had deficiencies in the "governance, risk management, internal controls, and surveillance systems for their involvement in benchmark submissions," and that over 100 traders from these banks engaged in several attempts to "inappropriately influence" benchmarks such as SIBOR and SOR. Porpora Decl. Ex. A. The CFTC also found that defendants RBS, UBS, and Deutsche Bank engaged in attempts to manipulate these benchmarks, and the Financial Services Authority ("FSA"), the United Kingdom's financial regulator, also found that RBS had done the same. Porpora Decl. Exs. D, H, I, and J.

These investigations and findings, while not direct or conclusive proof that a conspiracy existed, provide circumstantial evidence from which an inference of coordinated conduct may be drawn. In *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), 74 F. Supp. 3d 581 (S.D.N.Y. 2015), for example, the court rejected defendants' argument that "the existence of pending government investigations cannot support the inference of an unlawful conspiracy." The court reasoned that it had "taken judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and for the very conduct alleged in the Complaint. The penalties provide non-speculative support for the inference of a conspiracy. In addition, while the fact of a

single investigation may not be probative, the detailed allegations of investigations into the manipulation of FX benchmark rates by regulators in seemingly every significant financial market in the world lends some credence to the conspiracy allegation." 74 F. Supp. 3d at 592. The investigations discussed above likewise provide non-speculative support for plaintiffs' antitrust conspiracy allegations. *See also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (finding fact that government "launched two new investigations into whether defendants engaged in collusion and price fixing" relevant to question of whether inference of conspiracy is reasonable).

Plaintiffs have also alleged a "plus factor." Specifically, plaintiffs have alleged a "common motive" to coordinate the manipulation of SIBOR and SOR because these rates are calculated based on submissions from each panel member. As a result, manipulation is not possible absent coordination among the submitting banks. In *ISDAfix*, the court found a common motive to conspire because "the very nature of ISDAfix suggests that any attempt to unilaterally control ISDAfix would be risky and likely futile, as any individual bank's submission to ICAP would be drowned out in the polling process by which ISDAfix was set each day." 175 F. Supp. 3d at 55. The same is true here.

Plaintiffs' so-called "economic evidence," however, does not support an inference of the existence of an antitrust conspiracy. Plaintiffs present charts indicating that the spread between SIBOR and SOR became more erratic and pronounced during the Class Period, and argue that this "indicates that both SIBOR and SOR were manipulated to artificial levels during the Class Period." FAC ¶ 137. But plaintiffs provide no explanation – other than a vague reference to the "law of one price" – as to why the SIBOR and SOR rates should necessarily be the same. As plaintiffs themselves allege, SOR is calculated in part by reference to the U.S. dollar, a variable that is entirely absent from SIBOR. FAC ¶ 103. Plaintiffs' failure to explain why this key difference between SIBOR and SOR does not account for variations between the

20

two benchmarks renders their economic evidence irrelevant. Plaintiffs must allege with specificity why the SIBOR and SOR rate should be the same.

Finally, although I hold that plaintiffs have sufficiently alleged the existence of an antitrust conspiracy, plaintiffs have failed to allege with specificity how *each* individual defendant participated in the conspiracy. "[E]ach defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose. Mere generalizations as to any particular defendant—or even defendants as a group—are insufficient." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (internal citation omitted). Plaintiffs argue that they "named as Defendants the targets specifically identified in multiple government investigations, regulatory settlements, news reports, and disclosures that Defendants made to the Federal Reserve Bank of New York regarding their derivatives dealing, including in SIBOR- and SOR-based derivatives, within the United States." Dkt. No. 178 at 12. But as discussed above in the context of specific jurisdiction, plaintiffs have not shown how defendants' involvement in SIBOR-based derivatives trading – as opposed to involvement in the SIBOR rate submission process – was part of the conspiracy. Accordingly, the antitrust claim is dismissed as alleged against all defendants other than those who served on the SIBOR panel during the relevant period. *See* FAC ¶ 100.[5]

## ii. Antitrust Standing

"To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). Thus, "[e]ven a plaintiff that has suffered an antitrust injury must also

---

[5] The defendants alleged to have served on the panel are: Australia and New Zealand Banking Group, Bank of America N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., BNP Paribas, Citibank N.A., Credit Suisse AG, DBS Bank Ltd, Deutsche Bank AG, The Hongkong and Shanghai Banking Corporation Ltd., ING Bank N.V., JPMorgan Chase Bank, N.A., Oversea-Chinese Banking Corporation Ltd, The Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, and the United Overseas Bank Ltd.

demonstrate that it is a suitable plaintiff, i.e., an 'efficient enforcer' of the antitrust laws. *Id.* at 157–58 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).

## 1. Antitrust Injury

"Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Gelboim*, 823 F.3d at 772 (internal quotation marks and citation omitted). In *Gelboim*, the Second Circuit held that the plaintiffs had sufficiently alleged an antitrust injury because they claimed "violation (and injury in the form of higher prices) flowing from the corruption of the rate-setting process, which (allegedly) turned a process in which the Banks jointly participated into conspiracy." 823 F.3d at 775. Plaintiffs have alleged the same injury here, and numerous courts have held that benchmark price or rate manipulation gives rise to an antitrust injury. *See In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *20.

## 2. Efficient Enforcer

"The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury. Built into the analysis is an assessment of the 'chain of causation' between the violation and the injury." *Gelboim*, 823 F.3d at 772 (internal citations omitted).

Plaintiff FrontPoint is an efficient enforcer. FrontPoint alleges that it "engaged in U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR during the Class Period," including transactions "based on one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A." FAC ¶

22

142. "Evaluating the directness of an injury is essentially a proximate cause analysis that hinges upon 'whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'" *Silver Fix*, 213 F. Supp. 3d at 552 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). FrontPoint alleges that it traded in derivatives whose price was directly impacted by the SIBOR rate. This satisfies a proximate cause inquiry, even if other variables are involved. It is difficult to think of a more direct victim than FrontPoint, given that it entered into transactions directly with two of the defendants. Regarding the speculative nature of damages, it is true that FrontPoint has not alleged any facts regarding the damages it claims to have incurred. The Court has no doubt that should plaintiffs prevail on the merits in this case, calculating damages would be an extremely complex endeavor. However, the potential for this difficulty and uncertainty is not grounds for dismissing plaintiffs' antitrust claim, for "potential difficulty in ascertaining and apportioning damages is not ... an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark*, 134 S. Ct. at 1392.

Plaintiff Sonterra, however, is not an efficient enforcer, and thus lacks antitrust standing. Plaintiff Sonterra alleges that it "engaged in SGD foreign exchange forwards between September 2010 and August 2011." Sonterra alleges that it was damaged "when it paid more for or received less on its foreign exchange forward transactions." FAC ¶ 143. Sonterra does not allege that it traded directly with any of the defendants.

Based on these allegations, Sonterra has failed to establish any connection between defendants' conduct and its alleged injury. Plaintiffs allege that the price paid for a foreign exchange forward contract "is calculated using a formula that incorporates both SGD SOR and USD SIBOR as components of price." FAC ¶ 119. In support of this conclusory statement, plaintiffs refer to a chart which they claim "shows that SIBOR and SOR rates are used

23

to adjust the spot price of the USD-SGD currency pair to account for interest earned over the length ("daycount") of the agreement." *Id.* The Court cannot draw any reasonable inferences from the chart referenced in the FAC. If the foreign exchange forward contracts that Sonterra entered into incorporated SIBOR and SOR as a component of price, Sonterra should allege why this is so in plain, intelligible sentences, rather than refer to an obtuse, ambiguous chart. Since defendants' alleged manipulation of SIBOR and SOR had no impact on the currency exchange forwards that Sonterra traded in, Sonterra is not an efficient enforcer and does not have antitrust standing.

In light of this holding, I need not address whether Sonterra also lacks antitrust standing because it did not enter into transactions directly with any of the defendants. This "umbrella standing" inquiry hinges, at least in part, on how remote Sonterra's injury is from defendants' conduct. The answer to that question cannot be answered without first understanding whether the transactions Sonterra participated in had any relationship to the benchmarks at issue, and if so, to what extent.

### iii. Foreign Trade Antitrust Improvements Act

Plaintiffs' antitrust claim is not barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"). That statute provides that antitrust actions may not be maintained with respect to "conduct involving trade or commerce … with foreign nations unless -- (1) such conduct has a direct, substantial, and reasonably foreseeable effect-- (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States." 15 U.S.C. § 6a. Plaintiffs have sufficiently alleged that defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, and in "adopting the FTAIA, Congress expressly endorsed an extraterritorial application of the Sherman Act." *Sullivan*, 2017 WL 685570, at \*22.

24

#### iv. Statute of Limitations and Fraudulent Concealment

Plaintiffs' antitrust claim is not barred by the Sherman Act's four-year statute of limitations. It is true that the class period ends on December 21, 2011, and that plaintiffs did not file this action until July 5, 2016. However, plaintiffs have appropriately invoked the doctrine of fraudulent concealment, the availability of which is subject to a specific standard in the antitrust context. An "antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

Although Circuit courts have adopted different standards with respect to the first prong, the Second Circuit "has adopted the more lenient standard requiring plaintiffs to prove concealment by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing." *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (citing *Hendrickson Bros.*, 840 F.2d at 1083). Here, plaintiffs have plausibly alleged that the alleged conspiracy was inherently self-concealing, for by its very nature, the conspiracy could not succeed unless kept a secret. FAC ¶¶ 155-58; *see also ISDAfix*, 175 F. Supp. at 66 (finding antitrust plaintiffs plausibly alleged fraudulent concealment where "the alleged conspiracy in these cases was secretive and covert by its very nature—it was an agreement that was 'designed to endure over a period of time' and, '[i]n order to endure, it [had to] remain concealed' from the market." (quoting *Hendrickson Bros.*, 840 F.2d at 1083)).

With respect to the third prong, defendants argue that plaintiffs have failed to allege specific facts showing that they investigated their claims with "due diligence" during the

25

limitations period. This overstates the standard. Plaintiffs must allege only that their "continuing ignorance was not attributable to lack of diligence" on their part. Here, plaintiffs have alleged that it was defendants' concealment, and not a lack of diligence on their part, that prevented them from knowing of their claim prior to public disclosure of the MAS investigation in 2013. FAC ¶¶ 158-59. Defendants counter that the data used to construct plaintiffs' "economic evidence" was available to plaintiffs during the limitations period, and therefore was not concealed. But if this argument were accepted, fraudulent concealment would never be available to plaintiffs in the antitrust context because data regarding the affected price is always available to the public throughout the duration of the conspiracy. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX II*"), 2016 WL 5108131, at *16 (S.D.N.Y. Sept. 20, 2016) (rejecting argument that availability of transaction data put plaintiffs on notice of defendants' alleged price-fixing conspiracy). Accordingly, plaintiffs' antitrust claim is not barred by the statute of limitations.

### c. RICO

"RICO recognizes a private right of action when a defendant commits a predicate act that is 'indictable' under specified federal criminal statutes." *Sullivan*, 2017 WL 685570, at *32. Here, plaintiffs' RICO claim is based on defendants' alleged violation of the wire fraud statute. *See* 18 U.S.C. § 1343.

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016). Plaintiffs' RICO claim fails because it violates this presumption against extraterritoriality. RICO applies extraterritorially "only to the extent that the predicates alleged in a particular case themselves apply extra extraterritorially." *Id.* at 2102. Here, the only predicate offense plaintiffs allege is wire fraud, which does not apply extraterritorially. *See Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (holding that

26

"wire fraud cannot serve as such an extraterritorial predicate" and that "because [plaintiff] relies exclusively on the wire fraud statute in pleading predicate acts, it has failed to state a claim sufficient to support extraterritorial application of RICO."); *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), *rev'd and remanded on other grounds*, 136 S. Ct. 2090 (2016) (seeing "no basis for finding a manifestation of congressional intent that the mail fraud statute apply extraterritorially."").

   As a result, to state a RICO claim predicated on wire fraud, plaintiffs must allege "sufficient domestic conduct for the claims involving ... wire fraud ... to sustain the application of RICO." *Laydon*, 2015 WL 1515487, at *8 (quoting *RJR Nabisco*, 764 F.3d at 141). Plaintiffs' only well-pled allegation concerning defendants' use of U.S. wires to manipulate SIBOR and SOR is that defendants submitted rates to Thomson Reuters, which then disseminated the daily rate throughout the United States. FAC ¶ 15. However, "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (dismissing civil RICO claim because the "slim contacts with the United States alleged by [plaintiff] are insufficient to support extraterritorial application of the RICO statute."). As the Supreme Court has explained, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010).

   In other cases involving alleged manipulation of foreign market interest rate benchmarks, courts have declined to allow RICO claims to proceed where the use of domestic wires is incidental, as is the case here. In *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017), for example, the complaint made "generalized allegations about the defendants' use of interstate wires to coordinate the Euribor scheme," as well as other allegations that are absent from this case, such as phone calls involving U.S. participants. The court held that the

27

allegations did not "plausibly allege that any acts of wire fraud were primarily domestic in nature," and emphasized that virtually all of the conduct at issue occurred in Europe, not the United States. *Id.* at \*33. The same is true here. Even if defendants' allegedly wrongful conduct had an impact on the United States, any act of wire fraud committed in furtherance of the conspiracy was not sufficiently domestic as to overcome the presumption against extraterritoriality.

Plaintiffs' reliance on criminal RICO cases is unfounded, for extraterritorial application of RICO in civil cases presents distinct considerations absent in the criminal context. *See RJR Nabisco*, 136 S. Ct. at 2107 ("Allowing recovery for foreign injuries in a civil RICO action, including treble damages, presents [a] danger of international friction."); *Sullivan*, 2017 WL 685570, at \*32 ("A private plaintiff seeking extraterritorial application of RICO is subject to considerations that do not apply to criminal prosecutions under the statute, and must specifically allege a domestic injury.").

Plaintiffs, of course, argue that the scope of defendants' conspiracy was not limited to the submission of manipulated rates, but also included defendants' trading of SIBOR- and SOR-based derivatives with U.S. counterparties. As discussed elsewhere in this opinion, plaintiffs have failed to allege facts sufficient to support this theory.[6]

### d. Implied Covenant of Good Faith and Fair Dealing

Plaintiff FrontPoint has failed to state a plausible claim for breach of the implied covenant and good faith and fair dealing against defendants Deutsche Bank and Citibank. FrontPoint alleges that it entered into ISDA Master Agreements with both Deutsche Bank and Citibank, and that it entered into twenty-four transactions with these defendants, some of which involved SIBOR-based derivatives. FAC ¶¶ 19, 142. But, as previously discussed in the context

---

[6] Because I have dismissed plaintiffs' RICO claims on extraterritoriality grounds, I need not address whether plaintiffs have adequately pled the elements of a RICO claim.

28

of personal jurisdiction, FrontPoint has failed to allege that any of the transactions involving SIBOR-based derivatives were entered into pursuant to the ISDA Master Agreement. Nor does FrontPoint allege a breach of the ISDA Master Agreement. Instead, FrontPoint alleges that it "entered into binding and enforceable contracts with Defendants Deutsche Bank and Citibank in connection with transactions for SIBOR-based derivatives," and that "each contract includes an implied covenant of good faith and fair dealing." FAC ¶¶ 195-96.

"As a matter of law," however, "a contract claim asserting breach of the implied covenants of good faith and fair dealing does not survive a motion to dismiss when it is based only on generalized allegations and grievances." *U.S. ex rel. Smith v. New York Presbyterian Hosp.*, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007). Furthermore, "the implied covenant arises only in connection with the rights or obligations set forth in the terms of the contract." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 632 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). Here, FrontPoint has failed to allege any specific facts regarding the individual contracts it entered into with defendants Deutsche Bank and Citibank to establish a plausible basis for a claim of the implied covenant of good faith and fair dealing. FrontPoint refers to "24 swap transactions," but it does not identify the dates of those transactions, who the counterparties were, the value of the swap, or any of the terms and conditions. Nor has FrontPoint alleged with any degree of specificity the rights it enjoyed under the contracts, or how defendants' conduct had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (internal quotation marks omitted). Such generalized allegations are insufficient. *See Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 625 (S.D.N.Y. 2013) (rejecting plaintiff's attempt to "plead over 270 breaches of contract with a handful of sweeping, conclusory allegations.").

29

### e. Unjust Enrichment

Plaintiffs' unjust enrichment claim fails for two reasons. First, because "unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013), *rev'd on other grounds, sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016). "[W]hile 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'" *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (N.Y. 2007)). Here, with the exception of FrontPoint's transactions with Deutsche Bank and Citibank, neither plaintiff has alleged that it entered into a transaction with any of the defendants, or that it otherwise had a relationship with any of the defendants. The connection is therefore "too attenuated."

Second, FrontPoint has alleged that it entered into transactions with defendants Deutsche Bank and Citibank. Those transactions, however, were governed by a contract (albeit a contract that FrontPoint provides no information about). A claim for unjust enrichment is only actionable "in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (N.Y. 2009); *see also Cox v. NAP Const. Co.*, 10 N.Y.3d 592, 607 (N.Y. 2008) ("[A] party may not recover in ... unjust enrichment where the parties have entered into a contract that governs the subject matter."). Accordingly, defendants' motion to dismiss plaintiffs' unjust enrichment claim is granted. The claim is dismissed with prejudice and without leave to amend.

30

## CONCLUSION

For the reasons stated herein, defendants' motion is granted in part and denied in part, as follows:

- The Foreign Defendants' (Australia and New Zealand Banking Group, Ltd.; Barclays plc; Barclays Bank plc; BNP Paribas, S.A.; Crédit Agricole Corporate and Investment Bank; Crédit Agricole S.A.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse International; Commerzbank AG; DBS Bank Ltd.; DBS Group Holdings Ltd; Deutsche Bank AG; HSBC Holdings plc; ING Groep N.V.; ING Bank N.V.; Macquarie Bank Ltd.; Macquarie Group Ltd.; The Royal Bank of Scotland plc; The Royal Bank of Scotland Group plc; RBS Securities Japan Limited; Standard Chartered Bank; Standard Chartered PLC; The Bank of Tokyo-Mitsubishi UFJ, Ltd.; The Hong Kong and Shanghai Banking Corporation Limited; The Oversea-Chinese Banking Corporation Ltd.; UBS AG, UBS Securities Japan Co. Ltd.; and United Overseas Bank Limited) motion to dismiss for lack of personal jurisdiction is granted. All claims against the Foreign Defendants are dismissed without prejudice and with leave to amend to make plausible allegations of personal jurisdiction over the Foreign Defendants.

- Defendants' motion to dismiss the complaint for lack of Article III standing is denied.

- Defendants' motion to dismiss Count I (antitrust) as alleged by plaintiff FrontPoint is denied as alleged against the defendants who served on the SIBOR panel (Australia and New Zealand Banking Group, Bank of America N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., BNP Paribas, Citibank N.A., Credit Suisse AG, DBS Bank Ltd, Deutsche Bank AG, The Hongkong and

31

Shanghai Banking Corporation Ltd., ING Bank N.V., JPMorgan Chase Bank, N.A., Oversea-Chinese Banking Corporation Ltd, The Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, and the United Overseas Bank Ltd.), but is granted with respect to all other defendants, for failure to sufficiently allege their involvement in the conspiracy. FrontPoint is granted leave to amend to make plausible allegations showing the non-panel defendants' involvement in the alleged antitrust conspiracy.

- Defendants' motion to dismiss Count I (antitrust) as alleged by plaintiff Sonterra is granted, for failure to establish any connection between defendants' conduct and its alleged injury. Sonterra's antitrust claim, based on an alleged conspiracy to manipulate SIBOR and/or SOR, is dismissed without prejudice and with leave to amend to make plausible allegations showing that defendants' alleged manipulation of SIBOR and/or SOR impacted the price of the currency exchange forwards that Sonterra traded in. Plausible allegations showing this connection are likely to make Sonterra an efficient enforcer.

- Defendants' motion to dismiss Counts II and III (RICO and RICO conspiracy) is granted. Counts II and III are dismissed without prejudice and with leave to amend to make plausible allegations showing sufficient domestic conduct to support an extraterritorial application of RICO.

- Defendants Deutsche Bank and Citibank's motion to dismiss Count IV (Frontpoint's claim for breach of the covenant of good faith and fair dealing) is granted. Count IV is dismissed without prejudice and with leave to amend to make plausible allegations supporting the claim.

32

- Defendants' motion to dismiss Count V (unjust enrichment) is granted as a matter of law. Count V is dismissed with prejudice and without leave to amend.

The clerk shall terminate the motion (Dkt. No. 144). Plaintiffs shall file a second amended complaint by September 18, 2017. Defendants shall answer or move by October 18, 2017.

SO ORDERED.

Dated:     August 8, 2017
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge