

March 23, 2018

**VIA ECF**
The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **FrontPoint Asian Event Driven Fund, Ltd., et al v. Citibank, N.A. et al,
No. 16-cv-05263-AKH**

Dear Judge Hellerstein:

      We write in response to Defendants' March 14, 2018 letter ("Defs. Ltr.") submitting *Charles Schwab Corp. v. Bank of Am. Corp.*, No. 16-1189-cv, 2018 WL 1022541 (2d Cir. Feb. 23, 2018) ("*Schwab*") as supplemental authority in support of their pending motions to dismiss Plaintiffs' Second Amended Class Action Complaint [ECF No. 237] ("Complaint" or "¶ __").

      *Schwab* does not support Defendants' arguments on personal jurisdiction. Correctly applied to the sustained antitrust conspiracy and claims alleged in this case, *Schwab* fully supports jurisdiction over each of the Defendants. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017 WL 3600425, at *10 (S.D.N.Y. Aug. 18, 2017) (finding plausible conspiracy to manipulate SIBOR and SOR among panel members). Faced with this reality, Defendants ask the Court to ignore Plaintiffs' allegations that Defendants' price-fixed sales of SIBOR- and SOR-based derivatives in the United States were the means through which Defendants achieved their "profit-driven" conspiracy and purposefully availed themselves of the benefits and privileges of doing business in the forum. Defendants' denials must be rejected at the pleading stage.

      The Complaint also establishes causation as to each claim by alleging transactions in derivatives that incorporated SIBOR and SOR as components of price. Defendants' attempt to analogize the *Schwab* plaintiffs' claims for fixed-rate securities that *did not* incorporate LIBOR to those here is inapposite. Two judges in this district have already rejected Defendants' identical causation arguments regarding foreign exchange ("FX") forwards and futures contracts.[1] This Court should do the same.

---

[1] *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, 277 F. Supp. 3d 521, 546-47 (S.D.N.Y. 2017) ("*Sonterra*") (rejecting argument that FX forwards and futures contracts do not incorporate LIBOR); *Sullivan v. Barclays* PLC, No. 13-CV-2811 (PKC), 2017 WL 685570, at *9-10 (S.D.N.Y. Feb. 21, 2017) ("*Sullivan*") (same for Euribor).

**I.   *Schwab* confirms that Defendants purposefully availed themselves of the forum by selling price-fixed SIBOR- and SOR-based derivatives in the United States.**

*Schwab* vacated Judge Buchwald's decision in the USD LIBOR multidistrict litigation to dismiss several California plaintiffs' state law claims for lack of personal jurisdiction.[2] Plaintiffs there alleged a "reputation-driven" conspiracy in which a group of multinational banks (including some Defendants here) conspired to suppress LIBOR by misrepresenting their cost of borrowing "to project an image of financial stability" during the financial crisis. *Id.* at *2; *see also In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 6243526, at *45-48 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") (describing the "reputation-driven" suppression of USD LIBOR). This allegedly caused the *Schwab* plaintiffs to receive lower returns on LIBOR-based securities purchased in California, where they sued defendants for violations of the Securities Exchange Act and asserted a number of claims arising under California state law. *Id.* at *3-4.

The Second Circuit proceeded to analyze personal jurisdiction claim-by-claim, focusing on: (a) the elements of each claim asserted by plaintiffs; (b) defendants' contacts with California, and (c) the relationship of those contacts to the claims asserted. *Id.* at *6 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341 (2d Cir. 2016)).

For instance, for plaintiffs' claims that were based on direct transactions in California, *e.g.*, unjust enrichment and breach of the implied covenant of good faith and fair dealing, the *Schwab* Court held that plaintiffs had established personal jurisdiction over each defendant that sold plaintiffs LIBOR-based financial instruments in California. *Id.* at *6 ("Allegations of billions of dollars in transactions in California easily make out a prima facie showing of personal jurisdiction for claims *relating to* those transactions.") (emphasis added).[3]

In contrast, for plaintiffs' claim that defendants had committed fraud *solely* through their daily false LIBOR submissions to the BBA in London, the Court held that defendants' sales and marketing of LIBOR-based financial instruments in California was not "suit-related" conduct because "California transactions did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions." *Id.* at *7. Simply stated, all the suit-related conduct underlying plaintiffs' fraud claim (*i.e.*, defendants' false submissions to the BBA) took place overseas.

Just as defendants' California transactions in *Schwab* provided jurisdiction for unjust enrichment and contract claims related to those transactions, Defendants' domestic SIBOR- and SOR-based derivatives transactions here establish personal jurisdiction for Plaintiffs' Sherman Act,

---

[2] A separate appeal concerning the dismissal of federal antitrust claims for lack of personal jurisdiction is pending before the Court. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 17-1569-cv (2d Cir.).

[3] The Second Circuit applied the same reasoning whether a defendant dealt directly with a *Schwab* plaintiff or "indirectly," through a non-party broker-dealer affiliate or subsidiary. *See* 2018 WL 1022541, at *9 (holding that "an agency relationship . . . could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities").

RICO, and common law claims against that "profit-motivated" conspiracy. *See* ¶ 1 (alleging conspiracy "to increase the profitability of their derivatives trading in the United States"). Unlike the "reputation-based" conspiracy alleged in *Schwab*, where the goal of projecting financial soundness was achieved by making false LIBOR submissions in London, the "profit-motivated" conspiracy alleged here was not completed with the manipulation of SIBOR and SOR in Singapore. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *3-6 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") (contrasting the "reputation-based" conspiracy in *Schwab* with a "profit-motivated" conspiracy). Defendants could only achieve their conspiratorial goal of extracting higher (illegitimate) profits on their SIBOR- and SOR-based derivatives transactions by ripping off innocent investors like Plaintiffs and others similarly situated in the United States. *See Sonterra*, 277 F. Supp. 3d at 591-92 (explaining that transactions intended to benefit from the manipulation of a financial benchmark are suit-related contacts in a profit-driven conspiracy).

This Court already held that Plaintiffs alleged a plausible conspiracy to manipulate SIBOR and SOR. *See FrontPoint*, 2017 WL 3600425, at *10. In the context of this "profit motivated" conspiracy, Defendants' U.S. sales and marketing activities are "suit related" because they represent the means through which Defendants achieved their conspiratorial goal. *See Waldman*, 835 F.3d at 335 (explaining that "suit-related" conduct includes any "conduct that could have subjected [defendants] to liability" under the relevant statute). Defendants' derivatives positions, including in the United States, were the driving force behind the SIBOR and SOR manipulation, and the source of illicit profits. *See, e.g.*, ¶ 6; ¶ 25 (listing Defendants who operate interest rate and foreign exchange derivatives (including SIBOR- and SOR-based derivatives) trading "hubs" in the forum); ¶ 28 (providing examples of senior traders that UBS AG, Standard Chartered, HSBC, and Bank of Tokyo-Mitsubishi stationed in Stamford and New York to trade SIBOR- and SOR-based derivatives); ¶ 31 (HSBC regularly distributed marketing materials for SIBOR- and SOR-based derivatives to U.S. investors); ¶¶ 36-43 (describing how RBS, Deutsche Bank, and UBS task U.S-based employees with managing SIBOR- and SOR-based derivatives trading positions during New York hours); ¶¶ 73-74 (listing 13 Defendants that offer SIBOR- and SOR-based derivatives to investors in the U.S. market via the Bloomberg electronic trading platform). Plaintiffs' claims directly relate to those transactions because they resulted in a domestic injury to investors in the United States who were overcharged or underpaid as a result of Defendants' conspiracy. *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (holding that consumers suffer an "antitrust injury" when "because of a conspiracy, [they] must pay prices that no longer reflect ordinary market conditions").

Defendants' denials that their price-fixed sales and marketing of SIBOR- and SOR-based derivatives in the United States are relevant to the jurisdictional analysis must be rejected. *See* Defs. Ltr. at 3-4.[4] It is a fundamental principal of antitrust law that "[t]he character and effect of a conspiracy are not judged by dismembering it and viewing its separate parts, but only by looking it at as a whole." *United States v. Apple*, 791 F.3d 290, 319 (2d Cir. 2015) (quoting *Cont'l Ore Co. v. Union*

---

[4] *Schwab* further confirms that confining the jurisdictional analysis to the place where manipulation occurred without considering the location of the impacted trades is an "(erroneous) rationale." *See* 2018 WL 1022541, at *12.

*Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Recognizing this, Judge Stein held in *Sonterra* that the "front-end" of defendants' conspiracy (*i.e.*, the manipulation of SIBOR and SOR) cannot be viewed separately from the "back-end of the misconduct (profiting from that manipulation through transactions in [SIBOR- and SOR-based] derivatives)" when evaluating personal jurisdiction. 277 F. Supp. 3d at 591.

The Second Circuit's consideration of defendants' trading activity in *Schwab* confirms the soundness of Judge Stein's reasoning and the reasoning of three other judges in this district who have likewise recognized that "[w]here the goal of the manipulation is to profit from transacting in a product, the places where those transactions occur (not just the places where the manipulation took place) are jurisdictionally relevant." *Sonterra*, 277 F. Supp. 3d at 591 (citing *Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940)); *see also In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 1268267, at *5 (S.D.N.Y. Mar. 31, 2016) ("*Forex*") (concluding that defendants' "extensive U.S.-based FX operations" and "substantial FX business here" established jurisdiction where the goal of the conspiracy was to manipulate FX benchmark rates for profit); *In re North Sea Brent Crude Oil Futures Litig.*, 2017 WL 2525731, at *7 (S.D.N.Y. June 8, 2017) ("*Brent Crude*") (finding futures positions on NYMEX "that could have benefited from the alleged manipulative activity" sufficient for jurisdiction where defendant allegedly manipulated benchmark "to benefit their [Brent crude oil] derivatives positions"); *LIBOR VI*, 2016 WL 7378980, at *4 (sales in the forum are jurisdictionally relevant for profit-driven conspiracy).

Defendants' attempt to limit the jurisdictional analysis only to their transactions with Plaintiffs must be rejected. *See* Defs. Ltr. at 5. Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). Accordingly, it is Defendant's "affiliation with the State," not their contacts with Plaintiffs there that matter. *Id.* at 1122 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *see also Keeton*, 465 U.S. at 780 (holding defendant purposefully availed itself of jurisdiction in New Hampshire for libel claims by circulating a magazine there even though plaintiff resided in New York).[5] Here, Defendants themselves established contacts with the forum, applying for banking licenses (¶¶ 7, 27, 79), opening branches in the United States (¶¶ 28, 79, 94, 98, 106, 113, 115, 119, 120-21, 124, 131, 133, 139-40, 145, 151, 158), and employing hundreds of traders (¶¶ 28, 34, 41-44, 107, 115, 119, 123, 132, 135, 146), to market and sell price-fixed SIBOR- and SOR-based derivatives to U.S. investors. ¶¶ 94, 98, 107, 116, 119-20, 125, 134-35, 140, 146-47. These contacts demonstrate that Defendants "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being hailed into court there" to account for the domestic injuries their conspiracy caused to SIBOR- and SOR-based derivatives investors in the United States. *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013).

---

[5] Though not required for this Court to exercise jurisdiction, a transaction with a Plaintiff may "enhance defendant's contacts with the forum." *See Keeton*, 465 U.S. at 780. This further supports jurisdiction over Deutsche Bank. ¶ 55.

The Supreme Court has consistently held that personal jurisdiction exists over defendants who "'reach out beyond' their State and into another" to "'deliberately exploi[t]' a market in the forum State." *Walden*, 465 U.S. at 1122 (citations omitted). This Court should reach the same conclusion: that personal jurisdiction is appropriate over each Defendant that exploited the SIBOR- and SOR-based derivatives market in the United States as part of the same "profit-driven" conspiracy. *See Schwab*, 2018 WL 1022541, at *6 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (finding purposeful availment where defendant "sold 'at least one counterfeit Chloé bag to a New Yorker'")).

## II. *Schwab* establishes conspiracy jurisdiction over Defendants that manipulated SIBOR and SOR in furtherance of the alleged profit-driven conspiracy.

*Schwab* also holds that specific personal jurisdiction exists over all Defendants based on their acts in furtherance of the same "profit-driven" conspiracy. *See* 2018 WL 1022541, at *9. Adopting the test used by the Fourth Circuit, the *Schwab* Court endorsed a "conspiracy theory" of jurisdiction where a plaintiff alleges: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).

The Complaint here easily satisfies each element of this standard. The Court has already determined that "Plaintiffs plausibly alleged the existence of a conspiracy to manipulate SIBOR and SOR" among all Defendants who served on the SIBOR panel. *FrontPoint*, 2017 WL 3600425, at *10. The Complaint alleges that the aim of this conspiracy was to extract unlawful trading profits from SIBOR- and SOR-based derivatives positions in the United States. ¶¶ 6-7, 21-25. Accordingly, any act in furtherance of that goal in or directed at the forum is a jurisdictionally relevant contact. *See Sonterra*, 277 F. Supp. 3d at 591 ("The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant."). This includes Defendants' SIBOR- and SOR-based derivatives transactions with U.S. investors, which were necessary to achieve their conspiracy in the United States. *See generally* ¶¶ 1, 6-7, 21-80, 229. Defendants' "overt acts" of marketing and selling price-fixed derivatives in the forum to profit from their conspiracy subjects each co-conspirator that helped manipulate the prices of those derivatives by making false submissions or entering transactions that manipulated SIBOR and/or SOR to personal jurisdiction here. ¶¶ 21-82, 229.

## III. *Schwab* supports exercising jurisdiction over Defendants based on the "effects test."

*Schwab*'s application of the "effects test" likewise supports jurisdiction over all Defendants here. "The 'effects test' theory of personal jurisdiction is typically invoked where 'the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." 2018 WL 1022541, at *10 (quoting *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)). Exercising

jurisdiction in that circumstance "may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Here, the Complaint alleges that Defendants "expressly aimed" their misconduct at the United States because they intended to maximize the profitability of SIBOR- and SOR-based derivatives positions in the forum. ¶¶ 21-79. Courts in this district have repeatedly held that, where "profiting from transactions in the forum was part of the motivation for defendants' manipulation," these allegations satisfy the "effects test." *Sonterra*, 277 F. Supp. 3d 594 n.35; *see also Brent Crude*, 2017 WL 2535731, at *11 (holding "effects test" satisfied by allegations that defendant "intended effects of its alleged conduct [abroad] to be felt in the United States, particularly on NYMEX, where its employees executed trades"); *Forex*, 2016 WL 1268267 at *6 (finding allegations of large FX positions in United States sufficient to create an inference that defendants "expressly aimed" their profit-driven manipulation of foreign benchmark at the forum).

Defendants interpretation of *Schwab*'s "effects test" analysis ignores the nature of the "profit-motivated" conspiracy in this case. *See* Defs. Ltr. at 5. Plaintiffs here allege that their injuries are the intended consequence of Defendants' conspiracy to increase profits by fixing SIBOR- and SOR-based derivatives prices in the United States. ¶¶ 1, 6, 11, 21-25. This is very different from the "reputation-driven" conspiracy alleged in *Schwab*, where plaintiffs claimed jurisdiction was appropriate under the "effects test" because it was merely "foreseeable" that manipulating LIBOR was "*likely* to reach an economy as large as California's." 2018 WL 1022541 at *10 (emphasis added). Here, Defendants' intent to benefit their SIBOR- and SOR-based trading positions in the United States far exceeds mere "foreseeability" because "defendants are aware of where they transact . . . and thus where counterparties would be harmed" as a result. *See Sonterra*, 277 F. Supp. 3d 594 n.35 (citing *Waldman*, 835 F.3d at 338). Thus, the effects of Defendants' conspiracy in the United States were not the result of "mere untargeted negligence" but conduct "expressly aimed" here to benefit their derivatives positions in the United States. *See Calder*, 465 U.S. at 789.

**IV.   *Schwab* does not support dismissing claims for SIBOR- and SOR-based FX forwards and swaps.**

In *Schwab*, plaintiffs brought common law fraud claims for two types of securities: floating-rate instruments, which incorporated LIBOR, and fixed-rate instruments, which did not. *See* 2018 WL 1022541, at *13. As to the fixed-rate instruments, plaintiffs alleged that they were defrauded when defendants' suppression of LIBOR caused floating-rate instruments to offer relatively poor returns, leading them to purchase more fixed-rate debt instruments than they otherwise would have. *Id.* The Court held that these claims were beyond the scope of common law fraud because there was no "reason to expect" that plaintiffs would rely on LIBOR (and thus be harmed by the alleged "reputation-based conspiracy") when purchasing securities that did not incorporate that rate. *Id.*

The Complaint here, in contrast, alleges that Plaintiffs only transacted in derivatives that incorporated SIBOR and SOR as components of price. ¶¶ 176-98 (describing SIBOR- and SOR-based derivatives). For example, the Singapore dollar FX forwards that Plaintiff Sonterra transacted

are priced using an industry standard formula that incorporates SIBOR and SOR. ¶¶ 185-87. This results in a direct relationship between SIBOR, SOR, and the prices of Singapore dollar FX forwards, which is confirmed by empirical evidence (¶¶ 188-90), in addition to statements made by Defendants' traders (¶ 191), and findings by the CFTC. ¶ 192. Thus, Sonterra was directly harmed when Defendants manipulated SIBOR and SOR because that misconduct caused Sonterra to pay more or receive less than it should have on its FX forward transactions. ¶¶ 230-34.[6]

Defendants' attack on this direct pricing relationship is simply a denial of the allegations in the Complaint and finds no support in *Schwab*, which addressed different claims, for different types of instruments, that are not at issue in this case. *See* Defs. Ltr. at 6 (claiming that "SIBOR and SOR were not directly incorporated into the terms of these instruments"); *see also* Pl. Merits Opp. at 16, 24-25. Two other courts in this district have already rejected identical causation arguments (made by many of the same Defendants) regarding FX futures, forwards, and swaps in other benchmark rate manipulation cases. *See Sonterra,* 277 F. Supp. 3d at 546-48; *Sullivan*, 2017 WL 685570, at *9-10. This Court should reach the same conclusion here.

        Respectfully submitted,

        /s/ Vincent Briganti
        Vincent Briganti
        Lowey Dannenberg P.C.
        44 South Broadway, Suite 1100
        White Plains, NY 10601

        *Counsel for Plaintiffs*

---

[6] FX swaps were affected in identical fashion by Defendants' manipulation because an FX swap is simply an FX forward coupled with a spot transaction. ¶¶ 194-98.