UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

FRONTPOINT ASIAN EVENT DRIVEN FUND, L.P., and
SONTERRA CAPITAL MASTER FUND, LTD., on behalf
of themselves and all others similarly situated,,

        Plaintiffs,

 v.

CITIBANK, N.A., CITIGROUP INC., BANK OF
AMERICA CORPORATION, BANK OF AMERICA,
N.A., JPMORGAN CHASE & CO., JPMORGAN CHASE
BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC,
THE ROYAL BANK OF SCOTLAND GROUP PLC, RBS
SECURITIES JAPAN LIMITED, UBS AG, UBS
SECURITIES JAPAN CO. LTD., ING GROEP N.V., ING
BANK N.V., ING CAPITAL MARKETS LLC, BNP
PARIBAS, S.A., BNP PARIBAS NORTH AMERICA,
INC., BNP PARIBAS SECURITIES CORP., BNP
PARIBAS PRIME BROKERAGE, INC., OVERSEA-
CHINESE BANKING CORPORATION LTD.,
BARCLAYS PLC, BARCLAYS BANK PLC,
BARCLAYS CAPITAL INC., DEUTSCHE BANK AG,
CREDIT AGRICOLE CORPORATE AND INVESTMENT
BANK, CREDIT AGRICOLE S.A., CREDIT SUISSE
GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE
INTERNATIONAL, STANDARD CHARTERED
BANK, STANDARD CHARTERED PLC, DBS BANK
LTD., DBS GROUP HOLDINGS LTD, DBS VICKERS
SECURITIES (USA) INC., UNITED OVERSEAS BANK
LIMITED, UOB GLOBAL CAPITAL, LLC, AUSTRALIA
AND NEW ZEALAND BANKING GROUP, LTD., ANZ
SECURITIES, INC., THE BANK OF TOKYO-
MITSUBISHI UFJ, LTD., THE HONGKONG AND
SHANGHAI BANKING CORPORATION LIMITED,
HSBC BANK USA, N.A., HSBC HOLDINGS PLC, HSBC
NORTH AMERICA HOLDINGS INC., HSBC USA INC.,
MACQUARIE BANK LTD., MACQUARIE GROUP
LTD., COMMERZBANK AG, AND JOHN DOES NOS.
1-50,

        Defendants.

------------------------------------------------------------------- X

**OPINION AND ORDER**
**GRANTING IN PART AND**
**DENYING IN PART**
**DEFENDANTS' MOTIONS**
**TO DISMISS**

16 Civ. 5263 (AKH)

'C SDNY
..OCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/4/18

ALVIN K. HELLERSTEIN, U.S.D.J.:

FrontPoint Asian Event Driven Fund, Ltd. ("FrontPoint") and Sonterra Capital Master Fund, Ltd. ("Sonterra"), filed this action on August 1, 2016, and the First Amended Complaint ("FAC") on October 31, 2016, *see* Dkt. No. 119, against 46 corporate defendants. The FAC alleges that the defendants conspired to manipulate two interest rate benchmarks, Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate ("SOR"), in violation of the Sherman Act, *see* 15 U.S.C. § 1, *et seq.* (Count I), the Racketeer Influenced and Corrupt Organizations Act, *see* 18 U.S.C. § 1961, *et. seq* (Count II, III), and in breach of the implied covenant of good faith and fair dealing (Count IV).[1]

Defendants moved to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(1), (6), *see* Dkt. No. 144, identifying a range of jurisdictional and substantive deficiencies, including failure to make plausible allegations of personal jurisdiction over the foreign defendants and failure to state plausible claims for relief. On August 18, 2017, I issued an Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *see* Dkt. No. 225; *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ("*SIBOR I*"), ruling on the issues raised by defendants and providing Plaintiffs with leave to amend with instructions to cure the deficiencies. Plaintiffs filed their Second Amended Complaint ("SAC") on September 18, 2017. *See* Dkt. No. 230.

Pending now before the Court is defendants' motion to dismiss the SAC, *see* Dkt. No. 238, which identifies a range of jurisdictional and substantive deficiencies that defendants argue were not cured by the SAC. I heard oral argument on the motions on April 12, 2018. *See* Dkt. No. 282.

---

[1] Count V (Unjust Enrichment) was dismissed in *SIBOR I. See infra.*

# SECOND AMENDED COMPLAINT

This is an action against 46 corporate defendants, comprising parents, subsidiaries, and affiliates of 20 international banking institutions who participated in the rate-setting process of three interest rate benchmarks, USD SIBOR, SGD SIBOR, and SOR. The SIBOR benchmark rate represents "the cost of borrowing funds in the Singapore market and reflects the average competitive rate of interest charged on interbank loans denominated in U.S. Dollars ("USD SIBOR") and Singapore dollars ("SGD SIBOR")" (together "SIBOR"). SAC at ¶ 163. These rates are collected and calculated daily by a trade group, Association of Banks in Singapore ("ABS"), comprising banks that submit to a panel each day "the interest rate at which it could borrow U.S. and Singapore dollars in the interbanks market" (collectively "Panel Members"). ¶ 164. Thomson Reuters, alleged to be an agent of ABS, gathers the quotes submitted by the Panel Members, applies a set formula, dropping a number of the highest and lowest quotes and averaging the remainder, and disseminates daily the resulting average rate to subscribers in the United States and other countries. SOR, the third benchmark rate, also represents the cost of borrowing Singapore dollars, but is calculated differently; it is based on the prices of foreign exchange swaps, transactions where parties agree to exchange Singapore dollars for U.S. dollars on a future date. ¶165. For at least part of the Class Period, SOR was calculated based on the volume-weighted average price of such swap transactions. *Id.* In total, 19 defendants are alleged to have been Panel Members, 17 defendants on the SIBOR Panel[2] and 15 (largely overlapping)

---

[2] The defendants alleged to be on the SIBOR panel are: Australia and New Zealand Banking Group, Bank of America N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd., BNP Paribas, Citibank N.A., Credit Suisse AG, DBS Bank Ltd, Deutsche Bank AG, The Hongkong and Shanghai Banking Corporation Ltd., ING Bank N.V., JPMorgan Chase Bank N.A., Oversea-Chinese Banking Corporation Ltd, The Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, United Overseas Bank Ltd., and Credit Agricole CIB *See* ¶ 161. Defendant ING Bank N.V. submitted a declaration stating that neither it nor its subsidiary made rate submissions to the ABS. *See* Dkt. No. 161 ¶ 6. On a motion to dismiss, I accept as true all well pleaded facts.

defendants on the SOR Panel.[3] *See* Appendix A.  Two defendants (Barclays Bank PLC and Commerzbank AG) are alleged to be members of the SOR Panel but not the SIBOR panel.

Manipulation of these rate-setting processes is central to the claims of this complaint. SIBOR and SOR are often used to price various types of derivatives, or financial products whose value is derived from a different asset, and changes in the SIBOR and SOR rates can, therefore, be to the detriment or benefit of those engaged in such derivative transactions.  According to the SAC, between 2007 and 2011, defendants conspired to manipulate SIBOR and SOR, or to submit to the panel rate quotes not reflecting the true cost of borrowing, with the purpose of profiting from this manipulation.  ¶¶ 3–5.  Plaintiffs allege that defendants submitted artificially high or low SIBOR and SOR rates so that the "derivative positions" of their traders, long (*i.e.* betting on an increase in price) or short (*i.e.*, betting on a decrease in price), would be benefited. ¶¶ 21–24.  The traders, located worldwide, would request that Panel Members submit rates favorable to their positions, ¶¶ 207–216, and the Panel Members are alleged to have obliged these requests, conspiring with fellow Panel Members to push the rates for their "collective financial benefit."  ¶ 167.

The SAC identifies at least four types of derivatives that incorporate either USD SIBOR, SGD SIBOR, or SOR—interest rate swaps, forward rate agreements, foreign exchange forwards, and foreign exchange swaps,  ¶¶ 177–198—and Plaintiffs allege that they traded some of these derivatives during the period when defendants distorted the rates.  ¶ 8.  First, Plaintiff FrontPoint alleges that it engaged in "U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR," specifically "at least 24 swap transactions, including based on

---

[3] The defendants alleged to be on the SOR panel are: Bank of America N.A., Citibank N.A., JPMorgan Chase Bank, N.A., Barclays Bank PLC, The Royal Bank of Scotland PLC, The Bank of Tokyo-Mitsubishi UFJ, Ltd., Commerzbank, Credit Agricole CIB, Credit Suisse AG, Deutsche Bank AG, The Hongkong and Shanghai Banking Corporation Ltd., Oversea-Chinese Banking Corporation Ltd., Standard Chartered Bank, UBS AG, and DBS Bank Ltd. *See* ¶ 162.

one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A." ¶ 229. A "swap transaction" allows two parties to exchange interest rate payment obligations on a principal amount. ¶ 177. Second, Plaintiff Sonterra alleges that it "engaged in U.S.-based transactions for SIBOR-based derivatives during the Class Period" with third-parties, specifically "USD/SGD foreign exchange forward transactions between September 2010 and August 2011." ¶ 230. A foreign exchange forward is an agreement to exchange one currency for another, ¶¶ 180–193, and USD/SGD foreign exchange forwards are alleged to be "priced using a formula that incorporates SOR and USD SIBOR as components of price." ¶ 231. The conduct forming the basis of Plaintiffs' claims thus occurred in two locations, in Singapore where Panel Members allegedly conspired and submitted manipulated rates, and in the United States where Plaintiffs allegedly traded U.S.-based SIBOR- and SOR-based derivatives that were priced on the manipulated rates.

According to the SAC, defendants also had substantial presence in the U.S., establishing trading operations for transacting derivatives, including SIBOR- and SOR-based derivatives. For example, the SAC alleges that 14 of the defendants had trading "hubs" in New York or Connecticut, ¶¶ 25–28, and that, according to a Federal Reserve Bank of New York survey, 13 "dealer defendants" traded SIBOR- and SOR-based derivatives in the U.S. ¶¶ 70–71. The SAC also alleges, attaching screenshots from "Bloomberg" terminals, that 13 defendants offered for sale SIBOR- and SOR-based derivatives in the United States. ¶¶ 73–75. These allegations do not specify which defendants engaged in such trading or offerings. The 46 corporate defendants comprise 20 banking institutions, as mentioned, and the SAC refers to defendants by their institutional names without specifying which affiliate or subsidiary engaged in the activity. For example, the SAC refers to "Barclays," instead of to one of the three individual Barclays defendants (Barclays Bank PLC, Barclays Capital Inc., Barclays PLC), in alleging that Barclays offered SIBOR-based derivatives on its Bloomberg Terminal. ¶ 74.

## I. Antitrust Claims

### 1. Antitrust Conspiracy

*SIBOR I* held that the FAC plausibly alleged an antitrust conspiracy against the Panel Members, noting that while "plaintiffs have failed to identify any specific interbank communications between or among defendants regarding the alleged manipulation . . . . plaintiffs need not allege this type of 'smoking gun' evidence to survive a motion to dismiss." *SIBOR I*, WL 3600425, at *10. Defendants request that I reconsider this holding with respect to the SAC. I decline to do so.

As I noted in *SIBOR I*, as a basis for finding the conspiracy allegations plausible against the Panel Members, various governmental "investigations and findings, while not direct or conclusive proof that a conspiracy existed, provide circumstantial evidence from which an inference of coordinated conduct may be shown." *Id.* For example, the Monetary Authority of Singapore (MAS), referring to the SIBOR and SOR rates and reviewing the period from 2007 until 2011, found "attempts [by traders] to inappropriately influence benchmark submissions" and failures on the part of senior management of the Panel banks "to institute robust rate submission controls and processes" to prevent such manipulations. *See* SAC at ¶ 10; Ex. F at 2. According to the MAS, "133 traders [participated] in attempts to inappropriately influence the submissions of financial benchmarks," *id.*, three-quarters of whom resigned or were asked to leave their positions over such misconduct, and the rest of which were otherwise disciplined, *see id.* at Ex. E. at 1. "[A]t the pleading stage, in order to overcome a motion to dismiss, [plaintiffs must] allege enough facts to support the inference that a conspiracy actually existed," and a court may draw such an inference from circumstantial facts where the plaintiff alleges "conscious parallelism" and "plus factors," including "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged

6

conspirators, and evidence of a high level of interfirm communications." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). That 133 traders attempted to manipulate SIBOR and SOR, and were disciplined for their infractions, sufficiently raises the specter of common motive to conspire, and satisfies the "plus-factors" to state a claim for antitrust conspiracy.

The plausibility of the conspiracy allegations is further buttressed by various regulatory settlements referenced in the SAC, which give context to the manipulations alleged to have occurred here. *See* SAC at ¶¶ 9–16, 199–207. The CFTC, in a settlement with the Royal Bank of Scotland[4] ("RBS") regarding a benchmark manipulation scheme, found that RBS traders "often attempted to manipulate the fixings of Yen and Swiss Franc LIBOR" in order "to profit RBS's significant derivatives and money market positions that were indexed to and therefore valued based on Yen and Swiss Franc LIBOR." SAC, Ex. A at 3–4. According to the CFTC, RBS traders engaged in similar misconduct in connection with SIBOR and SOR. *Id.* at 4 n.3; *see also* Ex. B at ¶¶ 48, 54 (Final Notice of English Financial Services Authority to RBS referencing manipulation of SIBOR and SOR rates); Ex. C at 38 n.21 (CFTC settlement with UBS referencing manipulation of SIBOR and SOR rates); Ex. D at 3 n.3 (CFTC settlement with Deutsche Bank referencing manipulation of SIBOR and SOR rates). In light of the MAS findings, read in context of related regulatory settlements, I cannot at this pleadings stage of the litigation find that the allegations do not plausibly allege an antitrust conspiracy.

I recognize that other district courts have reached a contrary conclusion, ruling that a "trader-based" conspiracy is not plausible. Judge Buchwald, for example, distinguishes between a trader-based conspiracy and a "suppression-" or "reputation-based" conspiracy, and finds only the latter plausible. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262

---

[4] Specifically, Royal Bank of Scotland plc and RBS Securities Japan Limited.

(NRB), 2016 WL 7378980, at *2 (S.D.N.Y. Dec. 20, 2016) (*LIBOR VI*). In a suppression- or reputation-based conspiracy, panel banks conspire to suppress (not inflate) rates with the purpose of signaling to the financial markets the banks' collective health, or good reputation, as measured by lower interest rates. This conspiracy is not motivated by profiting from derivative-based trading, and the participants all have the identical motivation to suppress rates. By contrast, in a trader-based conspiracy, where traders request that affiliates submit rates favorable to their derivative positions, the Panel Members submitting the rates have no consistent motivation to manipulate the rates upward or downward. The value of a given manipulation to an individual Panel Member depends on the derivative position held by their affiliate trader, a position likely to be inconsistent with positions held by other Panel Members at any point in time.

According to Judge Buchwald, allegations of a trader-based conspiracy are implausible for two reasons. First, only intra-bank collusion makes sense if traders are alleged to have communicated with rate-submitting affiliate companies within the same banking group. To state a claim for antitrust relief, however, the complaint must allege inter-bank collusion, or collusion between and among independent banking entities. *See LIBOR VI*, 2016 WL 7378980 at *3. Second, Panel Members likely differ in their respective trading positions, some wishing an upward manipulation and some a downward manipulation. Such inconsistent positions, Judge Buchwald reasons, makes an inter-bank trader-based conspiracy difficult to accomplish. *See id.* ("If, as plaintiffs suggest, the conspiracy were profit-motivated, it would have required all of the sixteen panel banks to have made a parallel decision to be net borrowers of money over the suppression period in the LIBOR-based lending market."). Judge Stein has similarly rejected the plausibility of trader-based conspiracies. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 55 (S.D.N.Y. 2017) ("[T]he simpler explanation is that the banks may have been independently engaging in intra-defendant manipulation by submitting false CHF

8

LIBOR quotes through requests from their own traders to those in the same bank who submit the quote to the BBA.").

Other district courts, however, have found trader-based conspiracies plausible, and I find so as well. In *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016), for example, defendants participated in setting a benchmark rate (ISDAfix), and the complaint alleged (as here) that the "the Defendant Banks manipulated daily ISDAfix rates to benefit their own trading positions." 175 F. Supp. 3d 44 at 51. In finding the conspiracy allegations plausible, Judge Furman rejected defendants' argument that a "conspiracy to move ISDAfix 'makes no economic or logical sense' unless the Defendant Banks' positions 'were aligned throughout the putative class period.'" *Id.* at 55 (quoting Defendants' Mem. Law). Judge Furman held that the allegations of the complaint that "[t]here were more profits to be earned for Defendants in maintaining the shared ability to manipulate ISDAfix over the long term than there were to be lost due to a divergence of interest on any particular day," *id.* (quoting the Amended Complaint), were plausible. I hold also that the allegations of a trader-based conspiracy are plausible. While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading. In such a conspiracy, where Panel Members communicate with one another, they can plan their trades around the anticipated rates, buying when low, selling when high, and circumventing the market risk confronting those not privy to foreshadowed rates. A trader-based conspiracy does not preclude the possibility of inter-bank communication, and, to the contrary, while traders may have been motivated by their own profits, they could not accomplish their goals to the extent desired without colluding with traders at other banks.

The scale and breadth of the alleged conspiracy further supports the conclusion that it included inter-bank communications. The MAS implicated traders across Panel Member banks,

and the regulatory settlements repeatedly refer to communications among traders at different banks. The MAS, for example, penalized each bank according to "the numbers of traders within the bank who attempted to inappropriately influence benchmarks, whether traders from other banks were involved, and the number of times these attempts occurred." SAC, Ex. E at 1. The CFTC, in the context of the manipulation of the LIBOR benchmark, likewise found that "RBS derivatives traders also colluded with traders at other panel banks and coordinated with interdealers brokers in attempts to manipulate" the benchmark. *See* Ex. A at 4; *see also* Ex. C. at 2 ("UBS, through certain derivatives traders, also colluded with traders at other banks and coordinated with interdealer brokers in its attempts to manipulate Yen LIBOR and Euroyen TIBOR."). While the SAC does not allege which Panel Members on which dates colluded, I cannot at this stage of the litigation say that the SAC does not sufficiently allege common motive by the Panel Members as well as the existence of plus-factors to state an antitrust conspiracy. I also cannot distinguish between the SIBOR and SOR Panel Members in terms of the sufficiency of the conspiracy allegations against them. While the "Panel Members" in fact comprise two sets of defendants, the SIBOR Panel Members and the SOR Panel Members, the MAS findings refer to attempts to manipulate the submissions of both panels.

Finally, although I have found that the SAC plausibly alleges an antitrust conspiracy against Panel Members, the SAC does not sufficiently allege how non-Panel Members were involved in that conspiracy. There are no allegations that non-Panel Members communicated with Panel Members, or that non-Panel Members contributed to or participated in the conspiracy in some other way. [5] Instead, the allegations against these defendants are only that they traded SIBOR- and SOR-based derivatives in the United States with parties other than plaintiffs. But

---

[5] This is true of Deutsche Bank, RBS, and UBS as well. While the government settlements with these defendants mention generally that SIBOR and SOR manipulation requests were made, they do not describe any details about which affiliates made such requests, or when and how such requests were made.

such trading, even if adequately alleged,[6] is an innocent activity if not connected to the Panel Members' conspiracy. With respect to the FAC, *SIBOR I* dismissed non-Panel Members since "plaintiffs have not shown how [non-Panel] defendants' involvement in SIBOR-based derivatives trading – as opposed to involvement in the SIBOR rate submission process – was part of the conspiracy." *SIBOR I*, 2017 WL 3600425, at *11. The SAC, in this regard, fares no better, and fails to connect with non-conclusory allegations the trading by non-Panel Members to the manipulation of rates.

## 2. Antitrust Standing

"To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). That is, a plaintiff suffering an antitrust injury "must also demonstrate that it is a suitable plaintiff, i.e., an 'efficient enforcer' of the antitrust laws." *Id.* at 157–58 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).

### a. Antitrust Injury

In *SIBOR I*, I held, following *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016), that an antitrust injury was sufficiently alleged with respect to the FAC. The SAC is materially no different, and I hold that an antitrust injury has similarly been properly alleged.

### b. Efficient Enforcer

"The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and

---

[6] Defendants raise various issues with the sufficiency of the allegations that defendants traded SIBOR- and SOR-based securities in the U.S., including that the SAC improperly engages in group-pleading. Because I find that such U.S.-based trading does not alone implicate non-Panel Members in the conspiracy I do not address these other infirmities.

(4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury. Built into the analysis is an assessment of the 'chain of causation' between the violation and the injury." *Gelboim*, 823 F.3d at 772 (internal citations omitted).

### i. Plaintiff FrontPoint

FrontPoint alleges that it engaged in "U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR during the Class Period," specifically "at least 24 swap transactions, including based on one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A." ¶ 229. Such allegations, as I held in *SIBOR I*, are sufficient to make FrontPoint an efficient enforcer with respect to its antitrust claims.

Defendants seek the Court's clarification, however, noting that there are three benchmark rates at issue in this case—SGD SIBOR, USD SIBOR, and SOR—and that FrontPoint transacted in derivatives that incorporated only one of them, SGD SIBOR. Defendants argue, and ask the Court to clarify, that FrontPoint is not an efficient enforcer with respect to the two benchmark rates not incorporated into its swap transactions, USD SIBOR and SOR.

I agree with Defendants. The SAC contains no allegations describing an arithmetical relationship among USD SIBOR, SGD SIBOR, and SOR. In fact, to the contrary, the SAC indicates that USD SIBOR and SGD SIBOR represent interest rates for two distinct currencies, and that SGD SIBOR and SOR are calculated by different methods. To be an efficient enforcer with respect to rates not incorporated in the swap transactions it traded in, FrontPoint must allege a relationship between these rates, showing how a conspiracy to manipulate one of these rates affects the others. The SAC has not done so, and I therefore find that FrontPoint has no standing to bring its antitrust claims against the (two) SOR-only Panel Members, or against the SIBOR Panel Members with respect to SOR or USD SIBOR.

### c. *Plaintiff Sonterra*

Plaintiff Sonterra alleges that it transacted "in USD/SGD foreign exchange forward transactions between September 2010 and August 2011," *see* ¶ 230, and that such derivatives incorporate USD SIBOR and SOR rates into their pricing. *See* ¶¶ 180–193. Sonterra, however, did not enter into transactions directly with any of the defendants. It alleges only that it bought and sold derivatives to and from third parties, and that such derivatives incorporated benchmark rates manipulated by defendants. That Sonterra did not trade directly with any defendants is sufficient reason to dismiss Sonterra's antitrust claims.[7]

The issue regarding Sonterra is whether "umbrella standing," or standing for a consumer who deals with non-defendants and alleges injury by virtue of the defendants' conspiracy, *see Gelboim*, 823 F.3d at, 778, is sufficient to confer antitrust conspiracy. Many district courts in this circuit have considered this issue in similar contexts, and held that a plaintiff who trades with non-defendants derivatives incorporating an allegedly manipulated rate is not an efficient enforcer. *See e.g., In re Platinum,* 2017 WL 1169626, at *22 ("Examining the remaining efficient enforcers factors lends additional support to the Court's ultimate conclusion that, as in *LIBOR VI,* it is appropriate to draw a line between persons who transacted directly with Defendants and those who did not."); *Sullivan,* 2017 WL 685570, at *15 (same). I agree, and hold that Sonterra's transactions with third-parties are insufficient to give it antitrust standing to sue the defendant Panel Members. Sonterra's trading decision is an "independent decision" breaking "the chain of causation between defendants' actions and a plaintiff's injury." *LIBOR VI,* 2016 WL 7378980, at *16. Furthermore, "[c]onferring antitrust standing on those plaintiffs

---

[7] *SIBOR I* dismissed Sonterra's antitrust claims since it failed adequately to allege that foreign exchange forwards incorporate USD SIBOR and SOR. The SAC attempts to cure this deficiency, and district courts have found similar allegations sufficient. *See e.g., Sullivan,* 2017 WL 685570, at *9. Whether Sonterra has sufficiently cured this deficiency is a moot question, since I hold that Sonterra lacks antitrust standing because it is not an efficient enforcer.

who did not transact directly with defendants would open the door to highly speculative and difficult to calculate damages that would far exceed the wrongful profit made or harm caused by defendants." *Sonterra*, 277 F. Supp. 3d at 559. The antitrust claims by Sonterra are therefore dismissed.

## II. Personal Jurisdiction

Of the 46 defendants, 29 are "Foreign Defendants" not subject to general jurisdiction in the U.S., including most of the Panel Members.[8] These defendants move to dismiss for lack of personal jurisdiction. I deny the motion with respect to the Foreign Defendants who are also Panel Members, and grant it as to the remaining Foreign Defendants.

### a. Applicable Law

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir.2006). This prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloé v. Queen Bee of Beverly Hills*, LLC, 616 F.3d 158, 163 (2d Cir.2010) (brackets omitted). Federal courts must satisfy three requirements in order to exercise personal jurisdiction over an entity: (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising

---

[8] The Foreign Defendants are: Australia and New Zealand Banking Group, Ltd.; Barclays plc; Barclays Bank plc; BNP Paribas, S.A.; Crédit Agricole Corporate and Investment Bank; Crédit Agricole S.A.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse International; Commerzbank AG; DBS Bank Ltd.; DBS Group Holdings Ltd; Deutsche Bank AG; HSBC Holdings plc; ING Groep N.V.; ING Bank N.V.; Macquarie Bank Ltd.; Macquarie Group Ltd.; The Royal Bank of Scotland plc; The Royal Bank of Scotland Group plc; RBS Securities Japan Limited; Standard Chartered Bank; Standard Chartered PLC; The Bank of Tokyo-Mitsubishi UFJ, Ltd.; The Hong Kong and Shanghai Banking Corporation Limited; The Oversea-Chinese Banking Corporation Ltd.; UBS AG, UBS Securities Japan Co. Ltd.; and United Overseas Bank Limited.

The following summarizes the composition of the 46 defendants, divided along two axes:

|  | Panel Member (SIBOR + SOR) | Non-Panel Member |
|---|---|---|
| Foreign Defendants | 16 | 13 |
| Non-Foreign Defendants | 3 | 14 |

personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012); Fed. R. Civ. P. 4(k).

The Clayton Act provides for nationwide service of process of a corporation for any action under the antitrust laws. *See* 15 U.S.C. § 22. Where a civil action arises under a federal law that provides for nationwide service of process, the relevant geographic area for assessing minimum contacts is the United States as a whole, not just New York. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207 (2d Cir. 2003) (assuming that Section 12 of the Clayton Act permits a minimum contacts analysis that "looks to a corporation's contacts with the United States as a whole to determine if the federal court's exercise of personal jurisdiction comports with due process."); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014); *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at *40 (S.D.N.Y. Mar. 28, 2017) (collecting cases).

Moreover, under Fed. R. Civ. P. 4(k)(2), "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." "Rule 4(k)(2) now allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and laws.'" *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (quoting Rule 4(k)(2)).

The constitutional analysis under the Due Process Clause consists of two components, minimum contacts and reasonableness. First, courts "evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the

15

claim arises out of, or relates to, the defendant's contacts with the forum—i.e., specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (internal quotations marks and citation omitted). Single acts of commercial activity, when forming the basis of a plaintiff's claims, can satisfy the constitutional requirements of Due Process. *See, e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("[B]y offering bags for sale to New York consumers on the Queen Bee website and by selling bags—including at least one counterfeit Chloé bag—to New York consumers, Ubaldelli has purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.") (internal quotation marks omitted).

Second, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id.* (internal quotation marks and citations omitted). The Supreme Court has set forth five factors in considering the reasonableness of the forum. "A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987).

Finally, the forum contacts of a member of a conspiracy may be imputed to co-conspirators where a plaintiff alleges that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the

conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).

### b. There is Specific Jurisdiction over Panel Members, Foreign or Not

With respect to the FAC, in *SIBOR I*, I granted the Foreign Defendants' motion to dismiss for lack of personal jurisdiction, holding that the Foreign Defendants (a) had not "consented" to jurisdiction by registering branches to do business in New York, and (b) had not engaged in "suit-related conduct" in the United States, *see Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). Merely trading SIBOR- and SOR-based derivatives in the United States, I held, could not be a basis for jurisdiction since "Plaintiffs fail to allege which defendants entered into which derivative contracts, how these trades were collusive, or how they related to the alleged fixing of the SIBOR and SOR rates." *SIBOR I*, 2017 WL 3600425, at *6. I held also that conspiracy jurisdiction was unavailable since the FAC had not alleged that any defendant committed any act from within the United States in furtherance of the conspiracy.

With respect to the SAC, however, I find that FrontPoint has adequately alleged "suit-related conduct" in the United States, namely the trading of SIBOR-based derivatives in the U.S. between FrontPoint and certain Panel Members.[9] "[T]he jurisdictional relevance of an act depends on the goal of the conspiracy," *LIBOR VI*, 2016 WL 7378980, at *4, and here, as discussed, the SAC alleges a trader-based conspiracy where Panel Members conspired to manipulate rates (in Singapore) with the purpose of profiting from trading derivatives (in the United States and elsewhere). The SAC alleges that FrontPoint engaged in "U.S.-based swap transactions" directly with two Panel Members, defendants Deutsche Bank AG and Citibank, N.A, *see* ¶ 229, during the time in which the Panel Members conspired to manipulate SIBOR.

---

[9] At this stage of the proceedings, and for the purposes of personal jurisdiction, I consider only the allegations relevant to Plaintiffs' individual, non-class claims. *See Beach v. Citigroup Alternative Investments LLC*, No. 12 CIV. 7717 PKC, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014).

Such U.S. based trading—between FrontPoint and a Panel Member—is plausibly alleged to have been collusive and related to the alleged fixing of the rates, and can therefore support the exercise of personal jurisdiction. "Where the goal of the manipulation is to profit wrongfully from transacting in a product, the places where those transactions occur (not just the places where the price manipulation took place) are jurisdictionally relevant." *Sonterra*, 277 F. Supp. 3d at 592. *But see Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *44 (S.D.N.Y. Feb. 21, 2017) (finding no personal jurisdiction where defendants traded with plaintiffs "since the presence of U.S. victims alone does not make out jurisdiction, and plaintiffs' allegations concerning defendants' misconduct does not allege a United States nexus to UBS's Euribor manipulation").

FrontPoint's contacts, furthermore, can form the basis of specific jurisdiction not only for the two defendants who traded with Plaintiff (*i.e.*, Deutsche Bank and Citibank) but also for all the Panel Member defendants who participated in the conspiracy. The Panel's conspiracy was collectively to profit from the manipulation of SIBOR, including allowing individual members to trade and profit with unknowing victims. Deutsche Bank's and Citibank's trading with FrontPoint were acts in furtherance of the conspiracy, and therefore can be the basis for jurisdiction over all members of the conspiracy, whether or not they themselves traded derivatives in the U.S. *Cf.* SAC ¶ 70 n.24.

My holding that Plaintiffs' U.S.-based transactions are sufficient to confer jurisdiction over all Panel Members is also not inconsistent with the Second Circuit's holding in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018). In *Schwab*, plaintiffs purchased billions of dollars in debt securities in California, and alleged that they received lower returns because defendants manipulated the LIBOR rate by submitting artificially low rates in London. The court noted, in holding that there was no personal jurisdiction over defendants with respect to plaintiffs' fraud claims, that "sales in California do not alone create personal jurisdiction for

18

claims premised solely on Defendants' false LIBOR submissions in London." *Schwab*, 883 F.3d at 83. The court reasoned that the "California transactions did not cause Defendants' false LIBOR submissions . . . nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions." *Id.* Rejecting plaintiffs' argument that that the conspiracy included the purpose "to earn a profit," the court noted that "nowhere in Schwab's complaint are there allegations that Defendants undertook such [California] sales as part of the alleged conspiracy." *Id.* at 87; *see also LIBOR VI*, 2016 WL 7378980, at *9 ("[S]ales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy.").

The deficiencies noted in *Schwab*, however, are absent in the trader-based conspiracy alleged here. *Schwab* and *LIBOR VI* regarded a reputation- or suppression-based conspiracy where defendants' purpose was, not to profit by trading derivatives, but "to project an image of financial stability to investors" by "understating their true borrowing costs." *Schwab*, 883 F.3d. at 78. But where the complaint plausibly alleges a profit-motive, as here, the U.S.-based trading is properly alleged to have been a part of the conspiracy and to be related to the overseas manipulation. Such U.S.-based trading, when alleged to be the object of the conspiracy, can support the exercise of personal jurisdiction. *See e.g.*, *Sonterra*, 277 F. Supp. 3d at 592; *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016).

Having found that the Panel Members "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court there," the second requirement, that the assertion of personal jurisdiction would "comport with fair play and substantial justice," *Licci*, 732 F.3d at 170, is readily met. The Panel Members are some of the world's largest financial institutions, and are alleged to have substantial presence in the U.S.

There is little burden in requiring them to answer the allegations that they entered into collusive transactions in the U.S.

Finally, whereas there is jurisdiction over the Foreign Defendants who are Panel Members, there is no jurisdiction over the Foreign Defendants who are not Panel Members. There are no plausible allegations that non-Panel Members, Foreign or not, were involved in the conspiracy, *see supra*, and the mere fact that non-Panel Members traded SIBOR- and SOR-based derivatives in the United States cannot alone support jurisdiction. Such U.S. based trading, as discussed above, is an innocent activity if not connected to the Panel Members' conspiracy.

### III. Venue

Under Section 12 of the Clayton Act, antitrust claims may be brought in the judicial district where a corporation is an "inhabitant" or "may be found or transacts business." 15 U.S.C. § 22. The "Venue Defendants"[10] argue that they are neither inhabitants of the Southern District of New York, nor do they transact business in the Southern District of New York, and that venue therefore is not proper. If venue is not proper under the Clayton Act, plaintiffs may not take advantage of the Clayton Act's nationwide service of process. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005) (holding that the Clayton Act's nationwide service of process applies only where the Clayton Act's venue provision, as opposed to 28 U.S.C. § 1391, is satisfied). Of the 15 Venue Defendants only three are Panel Members.[11] *See* Appendix A. The venue argument is moot as to non-Panel Members.

While venue may be improper under the Clayton Act, as the Venue Defendants' argue, venue is proper under 28 U.S.C. § 1391(c)(3), which provides that "a defendant not resident in

---

[10] The Venue Defendants are: RBS Group PLC, RBS PLC, RBS Securities Japan Limited, UBS Japan, ING Groep, ING Bank, Barclays PLC, Credit Agricole S.A., Credit Suisse Group AG, Credit Suisse International, Standard Chartered PLC, DBS Holdings Ltd., The Hongkong and Shanghai Banking Corp. Limited, HSBC Holdings plc, and Macquarie Group Ltd.

[11] These are: The Hongkong and Shanghai Banking Co. Ltd., ING Bank N.V., and The Royal Bank of Scotland PLC.

the United States may be sued in any judicial district." 28 U.S.C. § 1391(c)(3). The Venue Defendants are all Foreign Defendants, and by defendants' own admission not subject to any state's courts of general jurisdiction. With respect to the Foreign Defendants, thus, Plaintiffs may advantage of the nationwide service of process of Fed. R. Civ. P. 4(k)(2), and the venue provisions of § 1391, and need not rely on the Clayton Act.

## IV. RICO Claims

The SAC alleges two RICO claims, pursuant to 18 U.S.C. § 1962(c) (conducting a RICO enterprise), and § 1962(d) (conspiracy to conduct an enterprise). According to the SAC, defendants engaged in domestic RICO predicate acts, specifically domestic wire fraud, *see* 18 U.S.C. § 1343; SAC at ¶ 265, by, among other things, directing Thomson Reuters to disseminate SIBOR and SOR rates in the U.S., and trading in the U.S. SIBOR- and SOR-based derivatives. Defendants move to dismiss these claims for failing sufficiently to allege domestic conduct to overcome the presumption against extraterritorial application of the RICO statute. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."). *SIBOR I* dismissed the RICO claims on this basis, and I grant the motion here as well.

Like other district courts that have considered substantively similar allegations, I find that the RICO claims are impermissibly extraterritorial as the alleged conspiracy and manipulations occurred almost entirely abroad. *See, e.g., Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419 GBD, 2015 WL 1515487, at *8 (S.D.N.Y. Mar. 31, 2015) (discounting the fact that Thomson Reuters disseminated rates in the U.S.); *Sullivan*, 2017 WL 685570, at *33 (finding the RICO claims impermissible extraterritorial even where plaintiffs' trading occurred in the U.S.). The SAC plausibly alleges a trader-based conspiracy having the goal of profiting in the U.S. and

21

elsewhere. The scheme however was not based in the U.S., and cannot support a RICO claim. *See Sonterra*, 277 F. Supp. 3d at 582. ("That the alleged goal of the conspiracy was to increase *worldwide* profits, including profits generated in the United States, cannot render 'domestic' a scheme that was otherwise centered abroad.").[12] The RICO claims (Count II and III) are dismissed.[13]

## V. Breach of Implied Covenant of Good Faith and Fair Dealing

*SIBOR I* dismissed Plaintiff FrontPoint's contract claim with leave to amend for failure to plead with sufficient specificity the dates, counterparties, and terms and conditions of the transactions it engaged in. The SAC has cured these deficiencies.

The SAC alleges that:

- Deutsche Bank and Citibank entered into an International Swaps and Derivatives Association ("ISDA") Master Agreement, on January 20, 2010 and August 25, 2009 respectively.

- The ISDA Master Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation." ¶ 48.

- FrontPoint entered into 22 swaps with Deutsche Bank between February 11, 2010 and May 27, 2010, and these swaps were incorporated into the 2010 ISDA Master Agreement between FrontPoint and Detusche Bank. ¶¶ 53–55.

---

[12] There is no issue with the extraterritorial application of the antitrust claims, as discussed in *SIBOR I*. *See* Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a; *Sonterra*, 277 F. Supp. 3d at 568 (rejecting extraterritorial objection with respect to the antitrust claims).

[13] Since I dismiss the RICO claims on extraterritorial grounds, I do not discuss other potential infirmities with the RICO claims, for example whether the wire fraud allegations satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). *See Sullivan*, 2017 WL 685570, at *35 (finding the requisite particularity lacking).

- "[A]fter executing its ISDA Master Agreement with Citibank, N.A. on August 25, 2009, FrontPoint subsequently entered into swap transactions directly with Citibank, N.S." ¶ 60.

- "FrontPoint entered into at least 24 swap transactions, including based on one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A." ¶ 229.

The breach of the implied covenant of good faith claim has been plausibly alleged by Plaintiff FrontPoint.[14] The SAC alleges that FrontPoint entered into an ISDA Master Agreement with Deutsche Bank and Citibank, and that, pursuant to these contracts, FrontPoint engaged in 24 swaps incorporating SGD SIBOR between the four-month period, January 2010 to May 2010. Such contracts, requiring that "[e]ach party will make each payment or delivery specified in each Confirmation," contain an implied covenant that the rates upon which the trades are premised are non-manipulated rates, or rates that are accurate reflections of market conditions. By alleging that Deutsche Bank and Citibank manipulated SGD SIBOR while engaging in 24 swap transactions, the SAC has sufficiently alleged that these defendants did not in good faith fulfill their obligations under the ISDA Master Agreements. *See ISDAFix*, 175 F. Supp. 3d at 63 (finding plausible claims for breach of the implied covenant of ISDA Master Agreements where defendants were alleged to have manipulated rates incorporated into the transactions).

## VI. Capacity to Sue

Defendants argue that neither FrontPoint nor Sonterra have the capacity to sue since they are dissolved entities who were not in existence when this action was filed. FrontPoint was a fund formed on August 5, 2009 under Cayman Islands law and was voluntarily dissolved on

---

[14] There are no allegations that Plaintiff Sonterra entered into contracts with any defendant.

November 11, 2011; Sonterra was a fund formed on May 22, 2008 under Cayman Islands law and was voluntarily dissolved on December 28, 2012.

Plaintiffs respond that FrontPoint and Sonterra assigned their interests and right to sue to an entity, Fund Liquidation Holdings ("FLH"), who is willing and able to prosecute this suit. Sonterra argues that it entered into an Asset Purchase Agreement ("APA") with FLH on August 3, 2012, and FrontPoint argues that it did so with FLH on July 13, 2011. The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complalint. *See* Fed. R. Civ. P. 17(a)(3). I grant the request.

## CONCLUSION

For the reasons state above, defendants' motions are granted in part and denied in part, as follows:

I. **Antitrust Claims**

    a. The antitrust claim (Count I) is dismissed without leave to amend as against the defendants who were not SIBOR Panel Members (ANZ Securities Inc., Bank of America Corporation, Barclays Bank PLC, Barclays Capital Inc., Barclays PLC, BNP Barnibas North America Inc., BNP Barnibas Prime Brokerage Inc., BNP Barnibas Securities Corporation, Citigroup Inc., Commerzbank AG, Credit Agricole A.S., Credit Suisse Group AG, Credit Suisse International, DBS Group Holdings LTD, DBS Vickers Securities (USA) Inc., HSBC Bank USA N.A., HSBC Holdings PLC, HSBC North America Holdings Inc., HSBC USA Inc., ING Capital Markets LLC, ING Groep N.V., JP Morgan Chase & Co., Macquarie Bank LTD, Macquarie LTD, RBS Securities Japan Limited, The Royal Bank of Scotland Group PLC,

Standard Chartered PLC, UBS Securities Japan Co. LTD, and UOB Global Capital LLC).

    **b.** The antitrust claims remain as against the SIBOR Panel Members (Australia and New Zealand Banking Group, Bank of America N.A., The Bank of Tokyo-Mitsubishi UFJ Ltd., BNP Paribas, Citibank N.A., Credit Suisse AG, DBS Bank Ltd, Deutsche Bank AG, The Hongkong and Shanghai Banking Corporation Ltd., ING Bank N.V., JPMorgan Chase Bank N.A., Oversea-Chinese Banking Corporation Ltd, The Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, United Overseas Bank Ltd., and Credit Agricole CIB).

    **c.** The antitrust claims, as alleged by Plaintiff Sonterra, are dismissed without leave to amend. Since no claims for relief remain as to Sonterra, Sonterra's complaint is dismissed entirely. *See* Dkt. No. Dkt. No. 30.

## II.    Personal Jurisdiction

    **a.** The Foreign Defendants who did not serve on the SIBOR Panel are dismissed without leave to amend for lack of personal jurisdiction (Barclays Bank PLC, Barclays PLC, Commerzbank AG, Credit Agricole S.A., Credit Suisse Group AG, Credit Suisse International, DBS Group Holdings LTD, HSBC Holdings PLC, ING Groep N.V., Macquarie Bank LTD., Macquarie LTD, RBS Securities Japan Limited, The Royal Bank of Scotland Group PLC, Standard Chartered PLC, and UBS Securities Japan Co. LTD).

## III.    RICO Claims

    **a.** Count II (RICO) and Count III (RICO conspiracy) are dismissed without leave to amend.

**IV.    Breach of Implied Covenant of Good Faith and Fair Dealing**

    **a.** The motion to dismiss Count IV (breach of the covenant of good faith and fair dealing) for failure to state a claim is denied.

**V.    Real Party in Interest**

    **a.** Plaintiffs are granted leave to amend to substitute the real party in interest and allege the assignments of interest.

The clerk shall terminate the motion (Dkt. No. 238). Plaintiffs shall file a third amended complaint to amend the caption, and reflect the rulings in this opinion, by October 25, 2018. Defendants remaining in this case shall file their answers or otherwise respond by November 15, 2018. The parties shall appear for a status conference on November 28, 2018, at 2:30 P.M.

    SO ORDERED.

Dated:    October ___, 2018
           New York, New York

                             ALVIN K. HELLERSTEIN
                             United States District Judge

| | Banking Groups | 46 Corporate Defendants |
|---|---|---|
| 1 | Australia and New Zealand Banking Group | ANZ Securities, Inc.<br>Australia and New Zealand Banking Group LTD (SIBOR) (FD) |
| 2 | Bank of America | Bank of America Corporation<br>Bank of America N.A. (SIBOR/SOR) |
| 3 | Barclays | Barclays Bank PLC (SOR) (FD)<br>Barclays Capital Inc.<br>Barclays PLC (FD) (V) |
| 4 | BNP Paribas | BNP Barnibas North America Inc.<br>BNP Barnibas Prime Brokerage Inc.<br>BNP Barnibas Securities Corporation<br>BNP Barnibas S.A. (SIBOR) (FD) |
| 5 | Citibank | Citibank, N.A. (SIBOR/SOR)<br>Citigroup Inc. |
| 6 | Commerzbank | Commerzbank AG (SOR) (FD) |
| 7 | Credit Agricole | Credit Agricole Corporate and Investment Bank (SIBOR/SOR) (FD)<br>Credit Agricole S.A. (FD) (V) |
| 8 | Credit Suisse | Credit Suisse AG (SIBOR/SOR) (FD)<br>Credit Suisse Group AG (FD) (V)<br>Credit Suisse International (FD) (V) |
| 9 | DBS | DBS Bank LTD. (SIBOR/SOR) (FD)<br>DBS Group Holdings LTD. (FD) (V)<br>DBS Vickers Securities (USA) Inc. |
| 10 | Deutsche Bank | Deutsche Bank AG (SIBOR/SOR) (FD) |
| | | |

---

[15] Key: "SIBOR"= SIBOR Panel Member; "SOR" = SOR Panel Member; "FD" = Foreign Defendant; "V" = Venue Defendant.

| | | |
|---|---|---|
| 11 | **HSBC** | HSBC Bank USA N.A.<br>HSBC Holdings PLC **(FD) (V)**<br>HSBC North America Holdings Inc.<br>HSBC USA Inc.<br>The Hongkong and Shanghai Banking Co. Ltd. **(SIBOR/SOR) (FD) (V)** |
| 12 | **ING Bank** | ING Bank N.V. **(SIBOR) (FD) (V)**<br>ING Capital Markets LLC<br>ING Groep N.V. **(FD) (V)** |
| 13 | **JPMorgan Chase** | JP Morgan Chase & Co.<br>JPMorgan Chase Bank N.A. **(SIBOR/SOR)** |
| 14 | **Macquarie** | Macquarie Bank LTD. **(FD)**<br>Macquarie Group LTD. **(FD) (V)** |
| 15 | **Oversea-Chinese Banking Corporation** | Oversea-Chinese Banking Corporation LTD. **(SIBOR) (FD)** |
| 16 | **The Royal Bank of Scotland** | RBS Securities Japan Limited **(FD) (V)**<br>The Royal Bank of Scotland Group PLC **(FD) (V)**<br>The Royal Bank of Scotland PLC **(SIBOR/SOR) (FD) (V)** |
| 17 | **Standard Chartered Bank** | Standard Chartered Bank **(SIBOR/SOR) (FD)**<br>Standard Chartered PLC **(FD) (V)** |
| 18 | **The Bank of Tokyo-Mitsubishi UFJ** | The Bank of Tokyo Mitsubishi UFJ LTD. **(SIBOR/SOR) (FD)** |
| 19 | **UBS** | UBS AG **(SIBOR/SOR) (FD)**<br>UBS Securities Japan Co. LTD. **(FD) (V)** |
| 20 | **United Overseas Bank** | United Overseas Bank Limited **(SIBOR/SOR) (FD)**<br>UOB Global Capital LLC |