# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P., on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>-against-<br><br>CITIBANK, N.A., BANK OF AMERICA, N.A., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, UBS AG, BNP PARIBAS, S.A., OVERSEA-CHINESE BANKING CORPORATION LTD., DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, STANDARD CHARTERED BANK, DBS BANK LTD., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, AND JOHN DOES NOS. 1-50<br>            Defendants. | Docket No. 16-cv-05263 (AKH)<br>ECF Case |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED'S MOTION FOR RECONSIDERATION OR, ALTERNATIVELY, CERTIFICATION FOR <u>INTERLOCUTORY APPEAL</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii
PRELIMINARY STATEMENT ................................................................................................... 1
ARGUMENT ................................................................................................................................. 3
    I.    The Court Should Deny HBAP's Motion for Reconsideration. ........................................... 3
        A. The Court Did Not "Fail[] to Consider Whether Plaintiffs Had Alleged That HBAP Shared An Objective That Was Directed at the United States." ....................................................... 3
        B. The Court Did Not "Fail[] to Consider Whether Such an Allegation Was Plausible." ........... 4
        C. The Court Rightly Concluded That the Assertion of Personal Jurisdiction over HBAP "Comport[s] with Fair Play and Substantial Justice." ............................................................ 8
    II.   HBAP's Alternative Request for Certification for Interlocutory Appeal Should Also Be Denied. ................................................................................................................................. 11
CONCLUSION ............................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) .................................................................................. 5

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012) ................................................................................................ 3

*Anwar v. Fairfield Greenwich Ltd.*,
164 F. Supp. 3d 558 (S.D.N.Y. 2016) ................................................................................ 3

*Asahi Metal Indus. Co. v. Superior Court of Calif., Solano City*,
480 U.S. 10 (1987) ........................................................................................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 6

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120 (2d Cir. 2002) ............................................................................................ 11

*Burger King v. Rudzewicz*,
471 U.S. 462 (1985) ................................................................................................ 2, 8, 10

*Century Pac., Inc. v. Hilton Hotels Corp.*,
574 F. Supp. 2d 369 (S.D.N.Y. 2008) .............................................................................. 12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ..................................................................................... 1, 5, 6, 7

*Fogarazzo v. Lehman Bros.*,
No. 03 CIV. 5194 (SAS), 2004 WL 1555136 (S.D.N.Y. July 9, 2004) ............................ 13

*Fortunata Liana IE v. Ageha Japanese Fusion, Inc.*,
No. 15-CV-63 (JGK) (SN), 2018 WL 4935785 (S.D.N.Y. Oct. 11, 2018) ........................ 3

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
16 Civ. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ................................. 9

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
16 Civ. 5263 (AKH), 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ............................*passim*

*Gucci Am., Inc. v. Weixing Li*,
135 F. Supp. 3d 87 (S.D.N.Y. 2015) .................................................................................. 10

*In re Adelphia Comms. Corp.*,
No. 07 Civ. 9999 (NRB), 2008 WL 361082 (S.D.N.Y. Feb. 11, 2008) .............................. 11

*In re Facebook, Inc., IPO Secs. & Derivative Litig.*,
43 F. Supp. 3d 369 (S.D.N.Y. 2014) ................................................................................... 3

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
13 Civ. 7789 (LGS), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ................................... 7

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
13 Civ. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................... 1

*In re Health Mgmt. Sys. Inc. Sec. Litig.*,
113 F. Supp. 2d 613 (S.D.N.Y. 2000) ................................................................................. 3

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ........................ 12

*In re Lloyd's Am. Tr. Fund Litig.*,
No. 96 CIV 1262 (RWS), 1997 WL 458739 (S.D.N.Y. Aug. 12, 1997) ........................... 13

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d. Cir. 2003) ................................................................................................ 6

*In re North Sea Brent Crude Oil Futures Litig.*,
12-md-02475 (ALC), 2017 WL 2535731 (S.D.N.Y. June 8, 2017) ................................ 1, 7

*In re Term Commodities Cotton Futures Litig.*,
No. 12 CIV. 5126 ALC KNF, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ................... 10

*In re Terrorist Attacks on September 11, 2001*,
No. 03-MD-1570 (GBD) (SN), 2018 WL 4133715 (S.D.N.Y. Aug. 30, 2018) ................... 3

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
 732 F.3d 161 (2d Cir. 2013) ................................................................................................ 7

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996) ................................................................................................ 10

*Nypl v. JPMorgan Chase & Co.*,
No. 15 CIV. 9300 (LGS), 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ........................... 1

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp.*,
277 F. Supp. 3d 52 (S.D.N.Y. 2017) .................................................................................. 1, 6, 7, 8

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) ............................................................................................................ 6

**Rules**

Fed. R. Civ. P. 59(e) ............................................................................................................................ 3

Fed. R. Civ. P. 60(b) ........................................................................................................................... 3

U.S. Dist. Ct. Rules S.&E.D.N.Y., Civ. Rule 6.3 .......................................................................... 2, 3

Plaintiff Fund Liquidation Holdings LLC ("Plaintiff")[1] respectfully submits this memorandum of law in opposition to Defendant The Hongkong and Shanghai Banking Corporation Limited ("HBAP")'s October 18, 2018 Motion for Reconsideration or, Alternatively, for Certification for Interlocutory Appeal (ECF No. 304, the "Motion").

## PRELIMINARY STATEMENT

At least four opinions in this district have held, in line with the Second Circuit's recent decision in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), that defendants who conspire to manipulate a benchmark rate for profit are subject to specific personal jurisdiction in the United States for claims brought by U.S. investors affected by that misconduct.[2] *SIBOR II* is now the fifth. Unable to identify any intervening change in the law or new piece of evidence that would change the Court's reasoning, HBAP now claims the Court: (a) "overlooked" HBAP's assertions that it "has no staff here and no offices here" and does not trade SIBOR-based derivatives in the United States; and (b) incorrectly applied *Schwab's* conspiracy jurisdiction test because HBAP could not possibly have participated in the alleged conspiracy. *See* Motion at 1-2. HBAP is wrong, for at least the following reasons:

*First*, *SIBOR II*'s detailed analysis shows that the Court considered and rejected each factual and legal argument raised by HBAP and its co-conspirators in holding that each Defendant that participated in the conspiracy was subject to specific personal jurisdiction. The Court expressly included all SIBOR Panel Members in its finding, "**whether or not they themselves traded**

---

[1] In *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263 (AKH), 2018 WL 4830087, at *11 (S.D.N.Y. Oct. 4, 2018) ("*SIBOR II*") this Court granted leave to substitute Fund Liquidation Holdings LLC as Plaintiff. Accordingly, this brief refers to "Plaintiff" in the singular while *SIBOR II*, HBAP's motion, and the Second Amended Complaint all refer to "Plaintiffs" in the plural.

[2] *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2016 WL 5108131, at *6 (S.D.N.Y. Sept. 20, 2016); *In re North Sea Brent Crude Oil Futures Litig.*, 12-md-02475 (ALC), 2017 WL 2535731, at *10 (S.D.N.Y. June 8, 2017); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp.*, 277 F. Supp. 3d 521, 592 (S.D.N.Y. 2017); *Nypl v. JPMorgan Chase & Co.*, No. 15 CIV. 9300 (LGS), 2018 WL 1472506, at *4 (S.D.N.Y. Mar. 22, 2018).

1

*derivatives in the U.S.*," because "the object of the conspiracy" included fixing the prices of SIBOR-based derivatives in the United States. *See SIBOR II*, 2018 WL 4830087, at *8 (emphasis added).

*Second*, HBPA's attempt to challenge personal jurisdiction by relitigating the plausibility of the alleged conspiracy is meritless. This Court has repeatedly addressed, and repeatedly rejected, Defendants' argument that Plaintiff's alleged "trader-based" conspiracy is implausible because not all Defendants would benefit from all manipulations. The Court understood that "a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading." *SIBOR II*, 2018 WL 4830087, at *4.

*Finally*, the Court correctly concluded that exercising jurisdiction over HBAP, who has engaged in suit-related conduct directed at the United States by participating in the alleged conspiracy, "comport[s] with fair play and substantial justice." This is a low bar, easily cleared by a wealthy multinational bank that is alleged to have "significant financial and operational interconnectedness" between itself and HSBC's U.S. entities. Second Amended Complaint, ECF No. 237 ("SAC") ¶ 153. In this context, the Court did not err or "overlook" anything in stating that the Panel Members (including HBAP) "are alleged to have substantial presence in the U.S." *See* Motion at 8. Indeed, the law does not require any physical presence in the United States at all to support the exercise of specific jurisdiction. *See Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985). The only possible relevance of HBAP's "presence" or lack thereof in the United States is to evaluate the burden that would be imposed on HBAP by defending a lawsuit here—which, as the Court accurately noted, is minimal.

Having failed to meet Local Rule 6.3's exacting standard, HBAP's motion for reconsideration should be denied. The Court should also deny HBAP's alternative request to certify this issue for interlocutory appeal, as HBAP has failed to identify any exceptional circumstances justifying this extraordinary and disfavored form of relief. HBAP has already had three bites at the apple—one in

Defendants' initial motion to dismiss, a second on reconsideration of that decision, and a third in moving to dismiss the SAC. It is not entitled to a fourth.

## ARGUMENT

### I. The Court Should Deny HBAP's Motion for Reconsideration.

Reconsideration "of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Anwar v. Fairfield Greenwich Ltd.*, 164 F. Supp. 3d 558, 560 (S.D.N.Y. 2016) (citing *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). Courts therefore evaluate motions for reconsideration under Local Civil Rule 6.3 and Federal Rules of Civil Procedure 59(e) or 60(b) using the same "strict standard," and they "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked" in reaching its decision. *Fortunata Liana IE v. Ageha Japanese Fusion, Inc.*, No. 15-CV-63 (JGK) (SN), 2018 WL 4935785, at *1 (S.D.N.Y. Oct. 11, 2018) (quoting *Analytial Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)). Alternatively, a court may grant reconsideration in situations where it is warranted by an "intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-1570 (GBD) (SN), 2018 WL 4133715, at *2 (S.D.N.Y. Aug. 30, 2018) (quoting *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014)). HBAP does not come close to satisfying any of these requirements.

#### A. The Court Did Not "Fail[] to Consider Whether Plaintiffs Had Alleged That HBAP Shared An Objective That Was Directed at the United States."

This Court found that Plaintiff had alleged "a trader-based conspiracy where Panel Members conspired to manipulate rates (in Singapore) with the purpose of profiting from trading derivatives (*in the United States and elsewhere*.)" *SIBOR II*, 2018 WL 4830087, at *3 (emphasis added). And indeed, the SAC says just that. SAC ¶ 6 ("Defendants' goal was to increase the profitability of their SIBOR- and SOR-based derivatives positions held in global financial centers worldwide, like New

3

York. … Defendants only sell these derivatives from offices in *a few global financial hubs, including in the United States*.") (emphasis added); *id.* ¶ 24 ("This profit motive was centralized in *a small number of locations* where Defendants manufactured, sold, and held SIBOR- and SOR-based derivatives positions, *including the United States*.") (emphasis added). Nowhere does Plaintiff state that only some Defendants conspired to increase the profitability of positions held in New York, while others conspired to increase the profitability of positions held elsewhere. All the Defendants, which includes HBAP, are alleged to have been part of the same conspiracy with the same goals across multiple locations, including the United States. HBAP's assertion that "there is and can be no allegation that HBAP shared that purpose [of affecting derivatives trades in the United States]" (Motion at 13) is simply wrong on its face. There *is* such an allegation, and the Court was fully aware of it.

### B. The Court Did Not "Fail[] to Consider Whether Such an Allegation Was Plausible."

This is the real heart of HBAP's argument: that the Court erred in finding that HBAP could ever have conspired to profit from trading manipulated derivatives in the U.S. if it does not trade in the U.S. itself. *See* Motion at 2. HBAP repackages the same motive-based arguments Defendants raised during the last motion to dismiss, claiming that the alleged conspiracy is implausible (and thus the exercise of specific jurisdiction inappropriate) because HBAP could not have possibly had the "intent to affect the U.S.-based derivatives positions of other Panel Members" or "shared the objective" of affecting derivatives prices in the United States. *See id.* at 10-11.

But the Court understood, and accurately summarized, the way the alleged conspiracy works: "While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading. … [T]hey can plan their trades around the anticipated rates, buying when low, selling when high, and circumventing the market risk

4

confronting those not privy to foreshadowed rates." *SIBOR II*, 2018 WL 4830087, at *4. Put differently, the Court found it plausible that, as Plaintiff alleged, Panel Members might conspire to benefit other Panel Members' trades in a location where they had no trades themselves, in anticipation of receiving the same assistance from other Panel Members on their own trades elsewhere in the future, and in exchange for the benefit of inside knowledge on where the rates would be set.

The Court rightly distinguished this type of alleged conspiracy from the reputation-based conspiracies at issue in cases like *Schwab* where the alleged conspiracy did not aim to earn profits over time, but rather to present a unified image of financial stability. *See SIBOR II*, 2018 WL 4830087, at *8-*9 (discussing *Schwab,* 883 F.3d 68). In trader-based conspiracies like that alleged here, "[t]here were more profits to be earned for Defendants in maintaining the shared ability to manipulate [the relevant benchmark rate] over the long term than there were to be lost due to a divergence of interest on any particular day." *SIBOR II*, 2018 WL 4830087, at *4 (quoting *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016)). To be part of that long-term profit plan, HBAP needed to work towards the shared goal of affecting other Panel members' derivatives positions in the United States.

This Court has rejected Defendants' objections to the plausibility of Plaintiff's alleged conspiracy over and over: the first motion to dismiss, the second motion to dismiss, Defendants' motion for reconsideration of the Court's decision on the first motion to dismiss, and now yet again. For example, at oral argument on Defendants' second motion to dismiss, the Court stated:

> I pointed out the illogic of it [of Defendants participating in a conspiracy that did not necessarily benefit their own trades on any given day] to [Plaintiff's counsel], and he came back with what I think is a pretty good answer. Not all the banks have to benefit each time as long as they can sort of sequentially benefit. And those that have benefited by a lower price can be more active at a particular time, and those who benefit on a different day can be more active on that particular day.

Transcript of Apr. 12, 2018 Hearing at 22:24-23:9 (ECF No. 282). Defendants' counsel argued that this fuller explanation of the conspiracy is not spelled out in the complaint, and the Court replied,

5

"We've never had that exactitude in federal pleading." *Id.* at 23:19-20. In short, the Court did not "overlook" anything in *SIBOR II*. Instead, it read all the allegations in the Second Amended Complaint, drew reasonable inferences from them in Plaintiff's favor (as the law requires),[3] and found them plausible. And once there are plausible allegations that HBAP shared the conspiratorial objective of affecting derivatives transactions in the United States, HBAP is properly subject to personal jurisdiction in the United States as a co-conspirator. *See Schwab*, 883 F.3d at 87 (conspiracy jurisdiction established where plaintiff alleges existence of conspiracy, defendant's participation in conspiracy, and "a co-conspirator's overt acts in furtherance of the conspiracy [that have] sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state").

The law does not require that the conspiracy's *sole* objective, or even the most important objective, be to cause harm in the United States.[4] *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d. Cir. 2003) (holding that agreeing to fix the price of products sold worldwide gives rise to personal jurisdiction in the U.S. if the U.S. market was *one of the places* targeted by the conspiracy). HBAP itself concedes that conspiracies may have multiple objectives. *See* Motion at 13 (citing cases). And as set forth above, HBAP is alleged to have shared the conspiratorial objective of affecting derivatives trades in the "United States and elsewhere." *SIBOR II*, 2018 WL 4830087, at *8.

---

[3] *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] HBAP's reliance on *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 340 (2d Cir. 2016) in support of this argument is misplaced. *See* Motion at 13. *Waldman* did not address conspiracy-based personal jurisdiction (nor could it) because it predates *Schnab*, the first Second Circuit case to do so. Instead, it considered whether there was personal jurisdiction over the perpetrators of terrorist attacks in Israel that killed and injured multiple people, including but not limited to United States citizens. 835 F.3d at 337. The *Waldman* court held that the fact that U.S. citizens were victims of these foreign attacks was not sufficient to provide specific jurisdiction in the United States because it did not "sufficiently connect[]" the attacks to the forum. *Id.* at 340. Unlike *Waldman*, this Court has already held that Plaintiff sufficiently connects Defendants' conspiracy to manipulate SIBOR to the United States by alleging "'suit-related conduct' *in the United States*, namely the trading of SIBOR-based derivatives in the U.S. between FrontPoint and certain Panel Members." *SIBOR II*, 2018 WL 4830087, at *8 (emphasis added). Moreover, as Judge Stein explained, because the putative class consists only of members who engaged in SIBOR-based derivatives transactions within the U.S., the United States is the "nucleus of the harm" alleged and easily satisfies *Waldman*. *See Sonterra*, 277 F. Supp. 3d at 594-95.

6

HBAP's citations to other cases with "allegations that the defendant itself was engaged in relevant trading, and therefore, had the ability to profit from trading in the United States," are unavailing. *See* Motion at 15 (citing *Sonterra*, 277 F. Supp. 3d at 594); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016); *In re North Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *10). Of course direct trades in the United States are one basis to find jurisdiction over a defendant, but they are not the *only* way. The Court's point in citing to such cases was to support its finding of personal jurisdiction over those co-conspirators (*e.g.*, Deutsche Bank) that did trade in the United States directly with FrontPoint. *See SIBOR II*, 2018 WL 4830087, at *8. These transactions were the "suit-related conduct" that satisfied the "minimum contacts" prong of the classic two-part personal jurisdiction test: evidence that "the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *SIBOR II* at *7 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)). But only *one* co-conspirator—not all of them—needs to engage in such conduct to meet the requirements for conspiracy jurisdiction set forth in *Schwab*. *See* 883 F.3d at 87 (requiring only "*a* co-conspirator's overt acts in furtherance of the conspiracy [that have] sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state") (emphasis added).

Finally, HBAP insists repeatedly on the fact that some district courts have disagreed with this Court's conclusion that trader-based conspiracies are plausible. *See* Motion at 3, 15, 19. This is true enough, but it is equally true that other district courts have found such conspiracies plausible. The Court in *SIBOR II* discussed this disagreement at length, comparing and contrasting Judge Buchwald's and Judge Stein's decisions rejecting trader-based conspiracies with Judge Furman's decision accepting them. *See SIBOR II*, 2018 WL 4830087, at *3-*4. The existence of other opinions reaching the same result as this Court further demonstrates that this Court did not "overlook" any material fact or controlling law, or make a "clear error." There is no obvious mistake justifying reconsideration; there

7

are simply differing points of view. This Court has considered both sides of the debate and taken a reasoned position, and HBAP has offered no good reason why that position should be changed.

### C. The Court Rightly Concluded That the Assertion of Personal Jurisdiction over HBAP "Comport[s] with Fair Play and Substantial Justice."

Here, HBAP objects to the Court's conclusion that asserting personal jurisdiction over the foreign Defendants comports with "fair play and substantial justice" because, among other things, the Panel Members "are alleged to have substantial presence in the U.S." *SIBOR II*, 2018 WL 4830087, at *9; Motion at 8. HBAP states that "HBAP is not alleged to have any 'presence' in the United States whatsoever and affirmatively submitted an uncontested declaration that it lacks any such presence." Motion at 8. Once again, HBAP misses the mark.

First off, the Supreme Court has made it clear that defendants may establish the necessary minimum contacts with the forum even if they never "*physically* enter the forum State." *See Burger King*, 471 U.S. at 476. In other words, a defendant need not necessarily have *any* presence—"substantial" or otherwise—in the United States to support the exercise of specific jurisdiction. *See also Sonterra*, 277 F. Supp. 3d at 592 ("Where the goal of the manipulation is to profit wrongfully from transacting in a product, the places where those transactions occur (not just the places where the price manipulation took place) are jurisdictionally relevant."). Even if HBAP were correct that "HBAP is not alleged to have any 'presence' in the United States whatsoever," that would have no bearing on whether HBAP was subject to specific personal jurisdiction for claims related to SIBOR manipulation.

But the Court did not overlook anything. There is no reason whatsoever to suspect that the Court failed to review HBAP's declaration, or somehow confused HBAP with other HSBC entities. On the contrary, the Court cited to another entity's declaration (indicating that the Court read the declarations). *See SIBOR II*, 2018 WL 4830087, at *1 n.2. And the Court has always been mindful of the distinctions between the various corporate entities, taking Plaintiff to task for attempting to group them together. *See, e.g. FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263 (AKH),

8

2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017) ("[P]laintiffs may not refer to affiliated defendants by a conclusory collective name unless plaintiffs adequately allege that the conduct of one affiliate is attributable to another."). The reasonable conclusion, then, is that when the Court stated that "Defendants are alleged to have substantial presence in the U.S.," it was relying on specific allegations as to each individual Defendant.

In fact, HBAP *concedes* that the SAC does make specific allegations pertaining to HBAP's activities in the United States. *See* Motion at 17 ("Plaintiffs do allege that HBAP engages in a limited number of arms-length financial transactions with entities in the United States"). Paragraph 153 of the SAC alleges:

> HSBC Holdings plc identifies The Hongkong and Shanghai Banking Corporation Limited as a non-U.S. material entity because it is highly connected with HSBC Group's U.S. operations. Further, there is "significant" financial and operational interconnectedness between Defendant The Hongkong and Shanghai Banking Corporation Limited and HSBC's U.S. entities. For example, The Hongkong and Shanghai Banking Corporation Limited is provided an uncommitted line of credit from certain HSBC entities in the U.S., and holds uninsured deposits from HSBC's U.S. entities as well. The Hongkong and Shanghai Banking Corporation Limited also "enters into back-to-back derivatives trades with HSBC Bank USA, N.A. in order to transfer market risk arising from the activities of certain business lines within HSBC Bank USA, N.A." to other non-U.S. HSBC entities. The Hongkong and Shanghai Banking Corporation Limited "also provides operational support to HSBC's material entities within the U.S., and receives operational support from these U.S. material entities in return."

HBAP writes off these allegations as unrelated to the specific conduct at issue in this action and therefore insufficient on their own to support a finding of personal jurisdiction. *See* Motion at 17. But HBAP misses the point. HBAP's participation in a conspiracy to fix prices "in the United States and elsewhere" is the "suit-related conduct" that subjects it to specific personal jurisdiction here. *SIBOR II*, 2018 WL 4830087, at *8. HBAP's interconnectedness with HSBC's U.S. affiliates is relevant to the *second* prong of the jurisdictional analysis: reasonableness—*i.e.*, whether the assertion of jurisdiction "comports with fair play and substantial justice." One of the factors courts take into account in "considering the reasonableness of the forum" is "the burden on the defendant." *See SIBOR*

9

*II* at *7 (quoting *Asahi Metal Indus. Co. v. Superior Court of Calif., Solano City*, 480 U.S. 102, 113 (1987)). There is a substantial difference in the burden imposed on "a fly-by-night operation that would be wholly unable to defend itself in this case" and has never had any contact with the United States, and that imposed on a wealthy multinational bank that regularly does business abroad, including with its U.S. affiliates, and is already represented by a prominent New York law firm. *See In re Term Commodities Cotton Futures Litig.*, No. 12 CIV. 5126 ALC KNF, 2013 WL 9815198, at *30 (S.D.N.Y. Dec. 20, 2013) (burden of litigating in U.S. "not insurmountable" for an entity that "trades and markets commodities on an international level"); *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 100 (S.D.N.Y. 2015) (defendants' representation by "New York law firms who are already deeply involved in this litigation" mitigates burden). HBAP falls into the latter category, and it was in this context that the Court rightly concluded that there was "little burden" in asking HBAP to defend this lawsuit in this forum.

HBAP of course argues strenuously to the contrary, insisting that it would suffer "substantial and irreparable prejudice" from being forced to litigate this action in New York. Motion at 18. But where, as here, the minimum contacts/purposeful availment prong of the personal jurisdiction test is satisfied, a defendant seeking to avoid the exercise of jurisdiction on reasonableness grounds faces an uphill climb. The defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996) (quoting *Burger King*, 471 U.S. at 477).

HBAP's complaints that "all of its relevant witnesses and information would come from Asia—most likely from Singapore" fall far short of this standard. Motion at 18. As the Second Circuit pointed out sixteen years ago, and is even truer today, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129–30 (2d Cir. 2002). It makes little difference, for purposes of gathering and producing electronic documents, whether the data at issue is located in

10

Singapore or Scarsdale. HBAP imagines a variety of discovery-related horribles—that a witness would have to travel from Singapore to the United States to be deposed, that Plaintiff would seek discovery from it that would implicate Singaporean bank secrecy law, that this Court would compel HBAP to provide that discovery, and that HBAP might be subject to criminal penalties as a result. HBAP of course does not know that any *one* of these events would actually transpire, much less all of them. But if they did, HBAP surely has the resources to accommodate a witness's travel from Singapore, and this Court is perfectly capable of addressing any Singaporean law issues if and when they arise and of reaching a fair result.

In short, the Court correctly found that there is no significant "burden" on HBAP that violates "traditional notions of fair play and substantial justice."

## II. HBAP's Alternative Request for Certification for Interlocutory Appeal Should Also Be Denied.

As a throwaway argument at the end of its brief, HBAP asks this Court, in the alternative, to certify *SIBOR II* for interlocutory appeal. "[I]nterlocutory appeals are strongly disfavored in federal practice. Movants cannot invoke the appellate process as a vehicle to provide early review of difficult rulings in hard cases. Only exceptional circumstances will justify a departure from the basic policy of avoiding appellate review until a final decision on the merits." *In re Adelphia Comms. Corp.*, No. 07 Civ. 9999 (NRB), 2008 WL 361082, at *1 (S.D.N.Y. Feb. 11, 2008) (internal citations and quotation marks omitted). No such "exceptional circumstance" exists here, and HBAP's request should be denied.

First, a question certified for interlocutory appeal "must refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Century Pac, Inc. v. Hilton Hotels Corp.*, 574 F. Supp. 2d 369, 371 (S.D.N.Y. 2008) (internal quotations omitted). HBAP's proposed question, "whether allegations of a foreign-based conspiracy involving some U.S. actors are sufficient to establish a prima facie case of personal jurisdiction over a foreign company not alleged to have otherwise directed its conduct at the forum" (Motion at 3), is a mixed question of law

11

and fact, requiring the court to analyze what exactly Plaintiff alleged and apply the law to those particular facts. Though HBAP frames the question in terms of jurisdiction, its real focus is the Court's determination on the merits that the alleged conspiracy is plausible. This is a fact-intensive inquiry that necessitates study of the complaint as a whole. Such mixed questions are inappropriate for interlocutory appeal. *See id.* at 371-72 (citing cases).

Second, the issue of "what type of conspiracy allegations, if any, are sufficient to establish personal jurisdiction" (Motion at 19) is already pending before the Second Circuit. An appeal has been taken from Judge Buchwald's decision in *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016), which held (among other things) that the alleged trader-based conspiracy was implausible and declined to find personal jurisdiction based on such allegations. *Id.* at *3, *12. The case has been fully briefed and awaits oral argument. *See generally In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 17-2413 (2d Cir. Aug. 3, 2017). For HBAP to bring an interlocutory appeal on the same (or at least closely related) issue serves no purpose and wastes the resources of the parties and the court.

Third, contrary to HBAP's assertion, an interlocutory appeal would not "materially advance the litigation." *See* Motion at 19. HBAP argues that "[i]f decided in favor of HBAP, an appeal would 'terminate the action' as to it," *id.*, but ignores the reality that litigation would continue unchanged as between the remainder of the parties. No resources would be saved by anyone other than HBAP itself. Indeed, in the *Lloyds* case cited by HBAP, Judge Sweet drew precisely this distinction between appeals like HBAP's that "might result in only a partial dismissal of the overall litigation," and those that would result in a complete dismissal, such that "there is no risk that the Court of Appeals will be burdened with subsequent appeals." *In re Lloyd's Am. Tr. Fund Litig.*, No. 96 CIV 1262 (RWS), 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997); *see also, e.g., Fogarazzo v. Lehman Bros.*, No. 03 CIV. 5194 (SAS), 2004

WL 1555136, at *2 (S.D.N.Y. July 9, 2004) (interlocutory appeal affecting only one defendant "would only delay the ultimate resolution of the case").

## CONCLUSION

For all the above reasons, Plaintiff respectfully requests that HBAP's motion for reconsideration or certification for interlocutory appeal be denied in its entirety.

Dated: November 1, 2018

Respectfully submitted,

LOWEY DANNENBERG, P.C.

/s/ Vincent Briganti
Vincent Briganti
Geoffrey M. Horn
Peter St. Phillip
Margaret C. MacLean
Christian P. Levis
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com
mmaclean@lowey.com
clevis@lowey.com

13