# EXHIBIT B

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Frontpoint and Sonterra lacked capacity to sue because they were dissolved when the initial complaint was filed. | "As the SAC acknowledges, FrontPoint and Sonterra no longer exist. (Compare SAC ¶¶ 81-82, with Complaint ¶¶ 18-19 and FAC ¶¶ 20-21.) Even though FrontPoint and Sonterra have been dissolved for years—a fact that Plaintiffs' counsel must have known—Plaintiffs' prior complaints repeatedly represented that each was an existing investment fund. (See Complaint ¶¶ 18-19; FAC ¶¶ 20-21.) In fact, FrontPoint and Sonterra were voluntarily dissolved in 2011 and 2012, respectively—years before this suit was filed—and do not exist in any legal capacity. (See Harris Aff't ¶¶ 27-28.)21 Because Plaintiffs do not exist, they lack the capacity to sue and the case must be dismissed. *Id.* ¶ 30." [ECF 243, p. 13] | "On July 5, 2016, this lawsuit began with the filing of the Class Action Complaint (Dkt. 4) (the "CAC"). The CAC represented that both FrontPoint and Sonterra existed. CAC ¶ 18 ("FrontPoint is an investment fund . . .") (emphasis added); *id.* at ¶ 19 (same as to Sonterra). Consistent with SIBOR II, the Complaint also removes all RICO claims, 2018 WL 4830087, at *9–10, and all claims against the Defendants previously determined not to have served on the SGD SIBOR panel. *Id.* at *11. Those representations were false. Neither FrontPoint nor Sonterra existed when the CAC was filed and by that time neither had existed for many years. FrontPoint and Sonterra had voluntarily dissolved on November 11, 2011 and December 28, 2012, respectively. SIBOR II, 2018 WL 4830087, at *11. The CAC did not mention FLH, nor did it reference any assignment of claims from FrontPoint or Sonterra to any other entity. *See generally* CAC." [pp. 5-6] | "The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint. See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |
| The complaint relies on impermissible group pleading. | "The SAC fails to cure this fundamental defect. The allegations Plaintiffs have added to the SAC do not explain, as they must, what "each and every defendant" supposedly did in service of the purported antitrust or RICO conspiracies. *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016); *see also Sullivan v. Barclays PLC*, 2017 WL 685570, at *35 (S.D.N.Y. Feb. 21, 2017) (dismissing a RICO claim against defendants for failure to allege with particularity "two acts of wire fraud" by each defendant); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG* ("CHF LIBOR"), 2017 WL 4250480, at *39 (S.D.N.Y. Sept. 25, 2017) (same)." [ECF 243, p. 17] | "The Complaint otherwise resorts to impermissible group pleading that is ambiguous both as to which Defendants the allegations relate and what benchmarks the purportedly traded products were based upon. See, e.g., TAC ¶ 70 (alleging "Defendants" traded in "foreign exchange and/or interest rate derivatives, including SIBOR-based derivatives"); *see also* Transcript of Oral Argument (Dkt. 213) at 46:12–15 ("THE COURT: It's a group pleading within a network of banks. It's a group pleading within a particular banking conglomerate. And it's a group pleading among the various conglomerates."). Such generalized allegations are insufficient to sustain Plaintiff's claim. See *In re Interest Rate Swaps Antitrust Litigation*, 2018 WL 2332069, at *15, 17 (S.D.N.Y. May 23, 2018) ("*IRS II*") ("[T]he PTAC's persistent claims as to the motivations or actions of 'the Dealer Defendants' as a general collective bloc, or generalized claims of parallel conduct, must also be set aside, like the similar claims in the SAC, as impermissible group pleading.")." [pp. 27-28] | "While the SAC does not allege which Panel Members on which dates colluded, I cannot at this stage of the litigation say that the SAC does not sufficiently allege common motive by the Panel Members as well as the existence of plus-factors to state an antitrust conspiracy. I also cannot distinguish between the SIBOR and SOR Panel Members in terms of the sufficiency of the conspiracy allegations against them. While the "Panel Members" in fact comprise two sets of defendants, the SIBOR Panel Members and the SOR Panel Members, the MAS findings refer to attempts to manipulate the submissions of both panels." (at *4). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| There are insufficient allegations that non-panel members participated in the conspiracy. | "As with the FAC, most Defendants appear nowhere in the text of the SAC other than in the section identifying the "Parties." (SAC ¶¶ 81-162.) For example, the SAC does not put forward a single new allegation regarding the participation of any non-panel bank Defendant in a SIBOR or SOR antitrust conspiracy.31 See SIBOR I, 2017 WL 3600425, at *16 (granting Plaintiffs "leave to amend to make plausible allegations showing the non-panel defendants' involvement in the alleged antitrust conspiracy"). At most, Plaintiffs merely allege that these entities are corporate affiliates of alleged SIBOR or SOR submitters, but "[t]he fact that two separate legal entities may have a corporate affiliation . . . does not alter th[e] pleading requirement" that Plaintiffs must allege specific facts as to each defendant. Zinc, 155 F. Supp. 3d at 384.33 Because the SAC lacks specific allegations about how Defendants not on the USD SIBOR, SGD SIBOR or SOR panels "conspired, with whom and for what purpose," id., Plaintiffs' claims against those Defendants should be dismissed." [ECF 243, pp. 17-18]. | "In SIBOR II, the Court dismissed the antitrust conspiracy claims against Defendants that were not alleged to have been participants on the SIBOR panel because "[t]here are no allegations that non-Panel Members communicated with Panel Members, or that non-Panel Members contributed to or participated in the conspiracy in some other way." 2018 WL 4830087, at *4. Defendants that previously submitted declarations stating that they did not transact in SIBOR- or SOR-based derivatives in the United States are DBS Bank, The Hongkong and Shanghai Banking Corporation Limited, UOB and OCBC. See CSAC ¶ 70 n.24 (acknowledging DBS Bank, The Hongkong and Shanghai Banking Corporation Limited and UOB declarations) and Dkt. 165 (OCBC declaration). Application of this principle should likewise result in the dismissal of three of the remaining Defendants, ANZ, CACIB, and RBS plc." [pp. 30-31] | "The antitrust claims remain as against the SIBOR Panel Members (Australia and New Zealand Banking Group, Bank of America N.A., The Bank of Tokyo-Mitsubishi UFJ Ltd., BNP Paribas, Citibank N.A., Credit Suisse AG, DBS Bank Ltd., Deutsche Bank AG, The Hongkong and Shanghai Banking Corporation Ltd., ING Bank N.V., JPMorgan Chase Bank N.A., Oversea-Chinese Banking Corporation Ltd., The Royal Bank of Scotland PLC, Standard Chartered Bank, UBS AG, United Overseas Bank Ltd., and Credit Agricole CIB)." (at *11). |
| SGB SIBOR submissions were made by Royal Bank of Scotland N.V., not RBS plc. | "Plaintiffs allege that The Royal Bank of Scotland plc was a member of the SIBOR and SOR panels (SAC ¶¶ 93-94), but SIBOR and SOR submissions during the Class Period were made by The Royal Bank of Scotland N.V. (See SAC Ex. B [FSA Final Notice to RBS) at ¶ 54 n.3.)" [ECF 243, p. 9 n.16] | "As set forth in Defendants' motion to dismiss the Second Amended Complaint, and as reflected in the 2013 FSA notice upon which FLH relies, all submissions to the SGD SIBOR panel by an RBS entity during the class period were made, not by Defendant RBS plc, but by The Royal Bank of Scotland N.V. ("RBS NV"), formerly known as ABN AMRO." [p. 31]. | "The Royal Bank of Scotland PLC is alleged to have been on the SIBOR panel." (at *1 n.2). "Antitrust claims remain as against the SIBOR Panel Members… [including] The Royal Bank of Scotland PLC." (at *11). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Plaintiff fails to allege an artifical benchmark rate that impacted the value of a transaction. | Here, Plaintiffs fail to plausibly allege that any of the relevant benchmarks— SGD SIBOR, USD SIBOR or SOR—was ever artificial, let alone artificial on a day when it could have impacted the value of one of Plaintiffs' vaguely alleged transactions. Thus, Plaintiffs do not plead any antitrust injury caused by Defendants' alleged conduct. <br> *** <br> Even if Plaintiffs could somehow show that USD SIBOR, SGD SIBOR or SOR was manipulated at some point in time, and that they transacted in instruments linked to these benchmarks, they have not plausibly alleged how they were harmed by any alleged manipulation. As several courts have explained, movements in benchmarks do not have obvious "winners" and "losers," because traders hold different positions on different days relative to the benchmark. Where, as here, the alleged manipulation was "varying in direction" (i.e., up or down depending on the alleged trading position), "'there may be some days when plaintiffs were actually helped rather than harmed, by the alleged artificiality, depending on their position in the market.'" *Total Gas*, 244 F. Supp. 3d at 416 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("LIBOR II"), 962 F. Supp. 2d 606, 621 (S.D.N.Y. 2013)). [ECF 243, p. 20] | Proof that a bank caused an artificial price one day will not determine whether it did so on another day." *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 11 MDL 2262, 2016 WL 1558504, at *9 (S.D.N.Y. Apr. 15, 2016). Thus, "named plaintiffs do not have class standing to bring claims on days on which they did not hold a relevant net position." *Id.*; *see also Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1093288, at *3 (S.D.N.Y. Mar. 10, 2017) (finding named plaintiff lacked class standing to bring claims of manipulation of Euroyen TIBOR, Yen LIBOR, and Euroyen TIBOR futures contracts for period when he "did not allege that he entered into any transactions with Defendants"). [pp. 39-40] | "I hold also that the allegations of a trader-based conspiracy are plausible. While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading. In such a conspiracy, where Panel Members communicate with one another, they can plan their trades around the anticipated rates, buying when low, selling when high, and circumventing the market risk confronting those not privy to foreshadowed rates. A trader-based conspiracy does not preclude the possibility of inter-bank communication, and, to the contrary, while traders may have been motivated by their own profits, they could not accomplish their goals to the extent desired without colluding with traders at other banks." (at *4). |
| Statements by MAS do not suggest that SIBOR or SOR were manipulated. | "Plaintiffs point to a handful of statements by regulators supposedly describing traders' 'attempts' to manipulate SIBOR or SOR (SAC ¶¶ 199-216), but many of these relate to benchmarks other than SIBOR and SOR, and none finds that those attempts ever actually affected SIBOR or SOR. Indeed, MAS expressly disclaimed any such finding. See *SIBOR I*, 2017 WL 3600425, at *2. Thus, the regulatory statements cited in the SAC are insufficient to show that Plaintiffs paid supracompetitive prices." [ECF 243, p. 20] | "The Complaint contains no allegations linking any bank to the alleged manipulation of SGD SIBOR. While the Complaint again relies on the MAS findings, those findings do not plausibly suggest that each bank manipulated or attempted to manipulate SGD SIBOR in particular, as opposed to having engaged in some other misconduct relative to one or more of the other benchmarks covered by the MAS investigation." [p. 10] | "As I noted in *SIBOR I*, as a basis for finding the conspiracy allegations plausible against the Panel Members, various governmental 'investigations and findings, while not direct or conclusive proof that a conspiracy existed, provide circumstantial evidence from which an inference of coordinated conduct may be shown." *Id.* For example, the Monetary Authority of Singapore (MAS), referring to the SIBOR and SOR rates and reviewing the period from 2007 until 2011, found "attempts [by traders] to inappropriately influence benchmark submissions" and failures on the part of senior management of the Panel banks "to institute robust rate submission controls and processes" to prevent such manipulations. *See* SAC at ¶ 10; Ex. F at 2. According to the MAS, "133 traders [participated] in attempts to inappropriately influence the submissions of financial benchmarks," *id.*, three-quarters of whom resigned or were asked to leave their positions over such misconduct, and the rest of which were otherwise disciplined, *see id.* at Ex. E. at 1." (at *3). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| The Court rejected Plaintiff's economic evidence in *SIBOR I*. | "But the Court has already rejected this "so-called 'economic evidence'" as insufficient and "irrelevant," *SIBOR I*, 2017 WL 3600425, at *11, and Plaintiffs offer no basis to alter this ruling. Plaintiffs once again put forward a perfunctory analysis of the spread "between SGD SIBOR and SOR" over a ten-year period and make conclusory assertions that this specious analysis somehow shows "when prices were artificial." [ECF 243, p. 21] | "Plaintiff refers to SGD SIBOR in Paragraphs 141, 155, 156, 157, 185–89, 197, and 202 of the Complaint. Five of these paragraphs (TAC ¶¶ 185–89) discuss "economic evidence" that the Court rejected in SIBOR I, 2017 WL 3600425, at *11. The others introduce USD and SGD SIBOR (TAC ¶ 141), allege the relationship between SGD SIBOR and interest rate swaps and forward rate agreements (id. ¶¶ 155–57), describe FrontPoint's alleged trading in SGD SIBOR-based swaps with two defendants (id. ¶ 197), and describe the putative class (id. ¶ 202)." [p. 25 n.19] | "In *SIBOR I*, I held, following *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016), that an antitrust injury was sufficiently alleged with respect to the FAC. The SAC is materially no different, and I hold that an antitrust injury has similarly been properly alleged." (at *5). |
| Plaintiffs fail to allege a link between their FX instruments and SGD SIBOR. | As this Court previously explained, in order to "satisf[y] the proximate cause inquiry" that is part of the efficient enforcer analysis, a plaintiff must "allege[] that it traded in derivatives whose price was directly impacted by the [relevant] rate." *SIBOR I*, 2017 WL 3600425, at *12 (emphasis added). Once again, Sonterra has not done so. As an initial matter, because its FX Forwards are, at most, alleged to have been influenced by USD SIBOR and SOR (see, e.g., SAC ¶ 188), Sonterra cannot possibly be an efficient enforcer with respect to claims of alleged SGD SIBOR manipulation, which involve an entirely different currency and benchmark. [ECF 243, pp. 25-26] | In SIBOR I, this Court held that Sonterra had failed to allege "the foreign exchange forward contracts [it] entered into incorporated SIBOR and SOR as a component of price.2017 WL 3600425, at *12. In SIBOR II, the Court left the question unresolved, finding it moot because it held Sonterra lacked antitrust standing because it was not an efficient enforcer. 2018 WL 4830087, at *5 n.7. [p. 41 n.31] *** Even if FLH's claims otherwise could survive this motion, Plaintiff would lack class standing to assert claims for time periods that FrontPoint did not assign to FLH or trade in. Nor would it have class standing to assert claims based on FX instruments — instruments that FrontPoint did not transact in and that the prior complaints admitted are not based on or priced by reference to SGD SIBOR. [p. 38] | FrontPoint alleges that it engaged in "U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR during the Class Period," specifically "at least 24 swap transactions, including based on one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A." ¶ 229. Such allegations, as I held in *SIBOR I*, are sufficient to make FrontPoint an efficient enforcer with respect to its antitrust claims." (at *5). *SIBOR I* dismissed Sonterra's antitrust claims since it failed adequately to allege that foreign exchange forwards incorporate USD SIBOR and SOR. The SAC attempts to cure this deficiency, and district courts have found similar allegations sufficient. *See, e.g., Sullivan*, 2017 WL 685570, at *9. Whether Sonterra has sufficiently cured this deficiency is a moot question, since I hold that Sonterra lacks antitrust standing because it is not an efficient enforcer. (at *5 n.7). |
| There is no direct evidence of a conspiracy to manipulate SGD SIBOR. | The Court correctly held that Plaintiffs have not identified any direct evidence of conspiracy. *SIBOR I*, 2017 WL 3600425, at *10. [ECF 243, p. 36] | There must be "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement," as the pleading requires "allegations plausibly suggesting (not merely consistent with) agreement." Id. at 556–57. Here, be cause there is no direct evidence of conspiracy, see SIBOR II, 2018 WL 4830087 at *2; SIBOR I, 2017 WL 3600425, at *10, FLH must plausibly allege "[c]ircumstances" that "reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement," *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). [pp. 25-26]. | "*SIBOR I* held that the FAC plausibly alleged an antitrust conspiracy against the Panel Members, noting that while "plaintiffs have failed to identify any specific interbank communications between or among defendants regarding the alleged manipulation…. plaintiffs need not allege this type of 'smoking gun' evidence to survive a motion to dismiss." SIBOR I, WL 3600425, at * 10. Defendants request that I reconsider this holding with respect to the SAC. I decline to do so." (at *2). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Plaintiff does not plausibly allege parallel conduct. | "Therefore, to survive a motion to dismiss, Plaintiffs must plausibly plead parallel conduct and the requisite "plus factors" that "lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137. Although the Court found that Plaintiffs alleged "a plus factor," the Court did not find—and the SAC fails to allege—any parallel conduct. That alone should end the inquiry. Without pleading facts showing that Defendants acted in parallel—i.e., that they did the same thing at the same time - any discussion of plus factors is academic. Put simply, no direct evidence and no parallel conduct means there is no plausibly alleged conspiracy. See *CHF LIBOR*, 2017 WL 4250480, at *20 (holding that, in a case without allegations of parallel conduct, "an antitrust claim can stand only against those defendants as to whom the Complaint offers some specific, individual showing of [rate] manipulation through collusion with third parties")." [ECF 243, pp. 36-37] | "Here, because there is no direct evidence of conspiracy, see SIBOR II, 2018 WL 4830087 at *2; SIBOR I, 2017 WL 3600425, at *10, FLH must plausibly allege "[c]ircumstances" that "reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement," *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). This requires plausibly alleging "parallel conduct" along with "plus factors" that "lead to an inference of conspiracy." *Mayor & City Council of Baltimore, Maryland v. Citigroup, Inc.*, 709 F.3d 129, 136– 37 (2d Cir. 2013). . .FLH alleges that the "common motive" for Defendants to conspire to manipulate SGD SIBOR was to "fix[] their collective positions." TAC ¶ 151. However, it is not plausible that Non-Counterparty Defendants would have entered a supposed trader-based conspiracy from which they could not have profited. . . Plaintiff has suggested no other plausible motive for them to conspire to manipulate SGD SIBOR." [pp. 25-26] | "I hold also that the allegations of a trader-based conspiracy are plausible. While the derivative positions of Panel Members may differ on a given day, a subset of the Panel may benefit from a given manipulation, and the remainder may wait for their winning day to come, being privy to the knowledge of where the rates are heading." (at *4). |
| Plaintiffs failed to identify interfirm communications regarding the conspiracy. | "As this Court recognized, Plaintiffs fail "to identify any specific interbank communications between or among defendants regarding the alleged manipulation." *SIBOR I*, 2017 WL 3600425, at *10. [ECF 243, p. 37] | "In SIBOR II, the Court dismissed the antitrust conspiracy claims against Defendants that were not alleged to have been participants on the SIBOR panel because "[t]here are no allegations that non-Panel Members communicated with Panel Members, or that non-Panel Members contributed to or participated in the conspiracy in some other way." 2018 WL 4830087, at *4. Application of this principle should likewise result in the dismissal of three of the remaining Defendants, ANZ, CACIB, and RBS plc." [pp. 30-31] | "*SIBOR I* held that the FAC plausibly alleged an antitrust conspiracy against the Panel Members, noting that while 'plaintiffs have failed to identify any specific interbank communications between or among defendants regarding the alleged manipulation….plaintiffs need not allege this type of 'smoking gun' evidence to survive a motion to dismiss." *SIBOR I*, WL 3600425, at * 10. Defendants request that I reconsider this holding with respect to the SAC. I decline to do so." (at *2). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Plaintiff fails to connect the ISDA agreements to the relevant transactions. | "Indeed, FrontPoint does not attach (or even quote from) the trade confirmations of the transactions, even though it acknowledges that dealers "send the customer a receipt, known as a trade confirmation" that "specifies the material terms of the deal" for every swap transaction. (SAC ¶ 68.) Similarly, FrontPoint has failed to allege—as this Court held it must—"the rights it enjoyed under the contracts" and "how defendants' conduct had 'the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *SIBOR I*, 2017 WL 3600425, at *15 (quoting *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014)). All that FrontPoint has done is add general allegations concerning its ISDA Master Agreements with Deutsche Bank AG and Citibank N.A. (see SAC ¶¶ 55-56, 60-61), but those contracts disclose nothing about FrontPoint's alleged SIBOR-linked transactions. See *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 624-25 (S.D.N.Y. 2013)." [ECF 243, p. 49] | "Despite the Court's prior ruling that FrontPoint had "failed to allege any specific facts regarding the individual contracts," including the "dates of those transactions, who the counterparties were, the value of the swap, or any of the terms and conditions," *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *15 (S.D.N.Y. Aug. 18, 2017) ("*SIBOR I*"), and the Court's instruction that FLH allege the specifics of the alleged assignment, Tr. at 48:2–5, FrontPoint and FLH have never set out the details of the trades that FrontPoint allegedly entered into with Deutsche Bank and Citibank. (See, e.g., TAC ¶ 55 ("After executing its ISDA Master Agreement with Deutsche Bank AG on January 10, 2010, FrontPoint subsequently entered into at least 22 swap transactions directly with Deutsche Bank AG between February 11, 2010 and May 27, 2010.")) FLH's failure to present anything connecting the alleged assignment to the trades alleged in the Complaint means that FLH has failed to establish standing to assert FrontPoint's antitrust claims." [p. 17] | "*SIBOR I* dismissed Plaintiff FrontPoint's contract claim with leave to amend for failure to plead with sufficient specificity the dates, counterparties, and terms and conditions of the transactions it engaged in. The SAC has cured these deficiencies." (at *10). |
| The Class Period should be narrowed to the brief period in which the relevant trading occurred. | "Additionally, Plaintiffs' standing, and any resultant class period, should be narrowed to the relatively brief period in which their allegedly relevant trading took place: January to May 2010 for SIBOR-based swaps, as allegedly traded by FrontPoint (SAC ¶ 229); and September 2010 to August 2011 for USD/SGD foreign exchange forward transactions, as allegedly entered into by Sonterra (SAC ¶ 230). See Laydon III, 2017 WL 1093288, at *3 (dismissing class claims for a time period where plaintiff did "not allege that he entered into any transactions with Defendants during th[at] . . . period")." [ECF 243, p. 51 n.75] | "The claims against ANZ and CACIB should be dismissed because neither was a member of the SGD SIBOR panel during the relevant time from January to May 2010 when FrontPoint allegedly traded SGD SIBOR-based derivatives (the "FrontPoint Trading Period"). See Decl. of B. James Maddigan ¶¶ 11-12 (ANZ); Decl. of G. Kim ¶ 9 (CACIB)." [p. 31] | The Court did not limit the Class Period. |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| The Court lacks personal jurisdiction over Defendants that did not trade SGD SIBOR derivatives. | "In the SAC, Plaintiffs' claim that the alleged in-forum effects of Foreign Defendants' conduct could confer personal jurisdiction because they reflect that the Foreign Defendants purposefully directed the alleged foreign manipulation at the U.S., by using their U.S. operations to further their foreign conspiracy. Specifically, Plaintiffs allege that Foreign Defendants purposefully targeted the United States because: (i) some Foreign Defendants traded in SIBOR- and SOR-based instruments in New York or the United States (SAC ¶¶ 21-33); (ii) Foreign Defendants knew that Thomson Reuters would publish SIBOR and SOR in the United States (SAC ¶¶ 77-78); and (iii) certain Foreign Defendants registered their U.S. branches with certain state regulators (SAC ¶¶ 27, 79)." [ECF 239, p. 23] | "While SIBOR II held that the CSAC sufficiently alleged conspiracy jurisdiction over Foreign Defendants even where they did not trade in the United States, the Complaint, as now limited to claims based on a conspiracy to manipulate SGD SIBOR, does not support such a finding. The Court's conclusion in SIBOR II was based primarily on a "plus factor" derived from the findings of the MAS, which had investigated alleged manipulation of USD SIBOR, SGD SIBOR, and SOR generally and did not make any findings of successful manipulation or existence of any conspiracy, let alone a conspiracy to manipulate SGD SIBOR. Because the investigation findings do not plausibly suggest that each bank manipulated or attempted to manipulate SGD SIBOR (as opposed to misconduct related to one of the other benchmarks covered), the findings do not make it plausible that these Defendants conspired to manipulate SGD SIBOR generally, let alone in the United States." [at p. 35] | "FrontPoint's contacts, furthermore, can form the basis of specific jurisdiction not only for the two defendants who traded with Plaintiff (i.e., Deutsche Bank and Citibank) but also for all the Panel Member defendants who participated in the conspiracy. The Panel's conspiracy was collectively to profit from the manipulation of SIBOR, including allowing individual members to trade and profit with unknowing victims. Deutsche Bank's and Citibank's trading with FrontPoint were acts in furtherance of the conspiracy, and therefore can be the basis for jurisdiction over all members of the conspiracy, whether or not they themselves traded derivatives in the U.S. Cf SAC ¶ 70 n.24." (at *8) |
| Conspiracy jurisdiction would be inconsistent with due process here. | "The Second Circuit has long held that a co-conspirator's conduct may be imputed to a defendant for jurisdictional purposes only if, consistent with traditional agency principles, the defendant directed and controlled the agent's in-forum tortious conduct and knew about and benefited from those contacts. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1341 n.11, 1343 (2d Cir. 1972) (rejecting theory that defendant's participation in a conspiracy where a purported co-conspirator committed acts in the relevant forum demonstrates jurisdiction and suggesting that relationship of control by senior partner over more junior attorney acting in forum might result in jurisdiction), abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010); Bertha Bldg. Corp. v. Nat'l Theatres Corp., 248 F.2d 833, 836 (2d Cir. 1957). Without the direction and control inherent in a traditional agency relationship, the alleged agent's actions are the mere "unilateral activity of . . . a third person," insufficient to confer personal jurisdiction over the defendant. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984)." [ECF 239, p. 25] | "Even if FLH had plausibly alleged participation by the Non-Counterparty Foreign Defendants in a conspiracy to manipulate SGD SIBOR, that would not be enough to establish jurisdiction over them. Over forty years ago, Chief Judge Friendly in Leasco Data Processing Equipment Corp. v. Maxwell established that, for conspiracy-based jurisdiction to comport with due process, a plaintiff must establish, consistent with traditional agency principles, that the defendant directed and controlled the alleged co-conspirator's in-forum tortious conduct and knew about and benefitted from those contacts. 468 F.2d 1326, 1341 n.11, 1343 (2d Cir. 1972), abrogated on other grounds by Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010). The Second Circuit's subsequent decisions confirmed that principle. See Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981) ("[A] showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.")." [p. 36] | "FrontPoint's contacts, furthermore, can form the basis of specific jurisdiction not only for the two defendants who traded with Plaintiff (i.e., Deutsche Bank and Citibank) but also for all the Panel Member defendants who participated in the conspiracy. The Panel's conspiracy was collectively to profit from the manipulation of SIBOR, including allowing individual members to trade and profit with unknowing victims. Deutsche Bank's and Citibank's trading with FrontPoint were acts in furtherance of the conspiracy, and therefore can be the basis for jurisdiction over all members of the conspiracy, whether or not they themselves traded derivatives in the U.S. Cf SAC ¶ 70 n.24." (at *8) & "Having found that the Panel Members "purposefully availed [themselves] of the privilege of doing business in the forum and could foresee being haled into court there," the second requirement, that the assertion of personal jurisdiction would "comport with fair play and substantial justice," Licci, 732 F.3d at 170, is readily met. The Panel Members are some of the world's largest financial institutions, and are alleged to have substantial presence in the U.S. There is little burden in requiring them to answer the allegations that they entered into collusive transactions in the U.S." (at * 9) |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Conspiracy jurisdiction requires an agency relationship. | "As federal courts have increasingly observed, requiring a showing that each defendant engaged in suit-related conduct in the forum — whether personally or through an agent under its control — sufficient to purposefully avail itself of the forum is the only approach consistent with due process. *Walden*, 134 S. Ct. at 1122 (noting that it is the "contacts that the defendant himself creates with the forum State" that matter) (emphasis in original); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) (declining to "adopt the application of conspiracy jurisdiction" because "there is no doctrinal support for 'conspiracy jurisdiction'" and "it is highly unlikely that any concept of conspiracy jurisdiction survived the Supreme Court's ruling in *Walden v. Fiore*"); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) ("The rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine."). Where, as here, Plaintiffs fail to allege that Foreign Defendants exercised direction and control over their alleged co-conspirator's tortious in-forum acts, due process bars imputing such contacts to Foreign Defendants." [ECF 239, pp. 25-26] | "The Supreme Court's decisions in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and *Walden v. Fiore*, 571 U.S. 277 (2014), made clear that to establish jurisdiction, a plaintiff must show that each defendant engaged in suit-related conduct in the forum, either personally or through an agent under its control.27 Federal courts across the country have increasingly recognized that conspiracy jurisdiction requires a plaintiff to allege the foreign defendant had forum suit-related conduct and would benefit from such conduct. See, e.g., *In re Platinum & Palladium Antitrust Litigation*, 2017 WL 1169626, at *48 (S.D.N.Y. Mar. 28, 2017); *In re North Sea Brent Crude Oil Futures Litigation*, 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017) ("an agency relationship is required to uphold jurisdiction based on a conspiracy theory"). Indeed, this Court in *SIBOR I* recognized this very trend, observing that federal courts "have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute," 2017 WL 3600425, at *8, which itself requires allegations of knowledge, direction, benefit, and control to establish jurisdiction on a theory of conspiracy." [pp. 36-37] | "FrontPoint's contacts, furthermore, can form the basis of specific jurisdiction not only for the two defendants who traded with Plaintiff (i.e., Deutsche Bank and Citibank) but also for all the Panel Member defendants who participated in the conspiracy. The Panel's conspiracy was collectively to profit from the manipulation of SIBOR, including allowing individual members to trade and profit with unknowing victims. Deutsche Bank's and Citibank's trading with FrontPoint were acts in furtherance of the conspiracy, and therefore can be the basis for jurisdiction over all members of the conspiracy, whether or not they themselves traded derivatives in the U.S." Cf SAC~70 n.24. (at *8). |
| The allegations in the operative complaint fail to comport with NY's long-arm statute. | "Plaintiffs' SAC is deficient under New York's long-arm statute for the same two reasons as their FAC. First, to rely on New York's long-arm statute to impute contacts, Plaintiffs must, at a minimum, allege that an overt act occurred in the New York, which they have once again failed to do. See supra Part I.30 Second, Plaintiffs must allege that the Foreign Defendants exercised direction or control over an in-forum co-conspirator in relation to the alleged in-forum activity. Likewise, Plaintiffs again make no effort to plausibly allege the required direction or control. Each of these failings is fatal to Plaintiffs' reliance on New York's long-arm statute." [ECF 239, pp. 26-27] | "The New York long-arm statute and Rules 4(k)(1) and (2) also require allegations of knowledge, benefit, direction, and control to establish jurisdiction through conspiracy. See, e.g., *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d at 805 (describing requirements under New York long-arm statute); *Biz2Credit, Inc. v. Kula*r, 2015 WL 2445076, at *8 (S.D.N.Y. May 21, 2015) (same); *In re Aluminum Warehousing Antitrust Litigation*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) (rejecting conspiracy theory of jurisdiction under 4(k)(1)(C) and 4(k)(2)). Because those allegations are absent from the Complaint, the Complaint does not establish personal jurisdiction over any of the Non-Counterparty Foreign Defendants." [p. 38] | The Court found conspiracy jurisdiction over SIBOR Panel Members (at *7-9). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| The APA failed to assign the relevant claims. | "First, the APAs never assigned the type of cause of action asserted here. FrontPoint's APA defines "Claims" to include only recoveries in a "securities class action lawsuit," and expressly excludes any "state or federal common law claim" and any "non-securities related claim." (Horn Decl. Ex. 35 Art. II.) A "securities class action lawsuit" refers to a lawsuit based on alleged violations of the securities laws. Indeed, courts routinely distinguish between securities claims and the antitrust, RICO, and common law claims asserted in this case. Here, FrontPoint asserts no securities claims, only antitrust, RICO, and common law claims not assigned by FrontPoint's APA. The failure to assign relevant claims is apparent in both FrontPoint's and Sonterra's APAs, each of which limit the class of defendants to issuers of securities, which Defendants here are not. Under the APAs, "Defendants" and "Potential Defendants" include only "Issuers" and parties "related to" Issuers. (Horn Decl. Ex. 34 Art. II, Ex. 35 Art. II.) "Issuers" are defined as "the issuer[s] of any Included Securities and any of the successors or assigns of any such issuer." (Id.) This terminology confirms that the APAs were intended to deal with securities law litigation against issuers of securities—not litigation where, as here, none of the Defendants allegedly issued the relevant instruments. Plaintiffs do not sue over any securities issued by any Defendant." [ECF 289, pp. 8-9] | "Far from including language that would evidence an assignment of antitrust claims, the APA defines "Claims" to include only recoveries in a "securities class action lawsuit," expressly excluding any "non-securities related claim." APA, Art. II (definition of "Existing Claims" and "Future Claims"). That the transfer of rights to FLH is restricted to "securities class action lawsuit[s]" (which is not a defined term) is confirmed elsewhere in the APA. For example, the APA limits the class of potential defendants to issuers of securities: "Defendants" and "Potential Defendants" include only "Issuers" — defined as "the issuer[s] of any Included Securities and any of the successors or assigns of any such issuer" and parties "related to" Issuers. APA, Art. II (definition of "Defendants" or "Potential Defendants")." [p. 15] | "Defendants argue that neither FrontPoint nor Sonterra have the capacity to sue since they are dissolved entities who were not in existence when this action was filed. FrontPoint was a fund formed on August 5, 2009 under Cayman Islands law and was voluntarily dissolved on November 11, 2011; Sonterra was a fund formed on May 22, 2008 under Cayman Islands law and was voluntarily dissolved on December 28, 2012. Plaintiffs respond that FrontPoint and Sonterra assigned their interests and right to sue to an entity, Fund Liquidation Holdings ("FLH"), who is willing and able to prosecute this suit. Sonterra argues that it entered into an Asset Purchase Agreement ("APA") with FLH on August 3, 2012, and FrontPoint argues that it did so with FLH on July 13, 2011. The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| The APA failed to assign the financial instruments at issue here. | "[ . . . ] Plaintiffs have failed to demonstrate that the instruments at issue in this litigation were among the securities that Plaintiffs transferred any rights to under the APAs.12 To assign "Recovery Rights" with respect to particular securities, the APAs required FrontPoint and Sonterra to provide FLH with the associated "Trade Data." (See Horn Decl. Ex. 34, Ex. 35 Art. II.)13 If the Trade Data did not include the instruments on which FLH purports to sue, the Recovery Rights to those instruments were not assigned under the APAs. Plaintiffs have provided information for only a single Sonterra transaction with a non-defendant, purportedly from the Trade Data (Horn Decl. Ex. 36), and they have provided no Trade Data whatsoever for any FrontPoint transactions." [ECF 289, pp. 9-10] | "FLH's own allegations confirm that the antitrust claims it asserts here are not among the claims transferred to it. Not only are FLH's claims not brought under the securities laws, but none of the financial instruments that were allegedly manipulated is a security, as that term is ordinarily understood. TAC ¶¶ 154–66 (discussing interest rate swaps, forward rate agreements, foreign exchange forwards, and foreign exchange swaps). The Complaint never describes these products as securities, and courts have declined to recognize them as such. See, e.g., *S.E.C. v. Rorech*, 673 F. Supp. 2d 217, 224 (S.D.N.Y. 2009) (LIBOR-based interest rate swaps are not "security based" swaps under federal law); *Lehman Brothers Commercial Corp. v. Minmetals International Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (under New York law, interest rate swaps are not securities, and foreign exchange transactions are not securities if they involve no physical exchange of underlying foreign currencies). Nor does FLH allege that any Defendant "issued" any of the relevant financial instruments. Instead, it alleges that two of the Defendants were counterparties to swaps with FrontPoint (see TAC ¶ 223), and the remaining Defendants contributed to a benchmark incorporated into FrontPoint's transactions with third parties." [p. 16] | "Defendants argue that neither FrontPoint nor Sonterra have the capacity to sue since they are dissolved entities who were not in existence when this action was filed. FrontPoint was a fund formed on August 5, 2009 under Cayman Islands law and was voluntarily dissolved on November 11, 2011; Sonterra was a fund formed on May 22, 2008 under Cayman Islands law and was voluntarily dissolved on December 28, 2012.<br><br>Plaintiffs respond that FrontPoint and Sonterra assigned their interests and right to sue to an entity, Fund Liquidation Holdings ("FLH"), who is willing and able to prosecute this suit. Sonterra argues that it entered into an Asset Purchase Agreement ("APA") with FLH on August 3, 2012, and FrontPoint argues that it did so with FLH on July 13, 2011. The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint. See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |
| The APAs are void as champertous. | "Even if Plaintiffs granted FLH rights to sue, such an arrangement would be void as champertous. Both APAs are governed by New York law. (See Horn Decl. Ex. 34 § 6.6, Ex. 35 § 6.6.) Under N.Y. Judiciary Law § 489,14 an assignment of a claim is void if it is made with the intent and for the primary purpose of bringing an action. See *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 170-71 (2016) (assignment found champertous where plaintiffs' sole purpose in acquiring the notes at issue was bringing litigation).15 If Plaintiffs' interpretation of the APAs is correct, the APAs would do precisely that. The only assets purportedly transferred by the APAs are the rights to recover on Plaintiffs' Claims. FLH did not receive the underlying financial instruments as part of the assignment and has not claimed to do anything with the "Recovery Rights" other than commence lawsuits.16 Thus, dismissal is warranted because, under Plaintiffs' own interpretation of the APAs, the purported assignment's alleged purpose was to bring litigation and FLH is not the real party-in-interest." [ECF 289, pp. 10-11] | "Even if the APA had transferred to FLH the right to bring this lawsuit (and, again, it did not), such an arrangement would be void as champertous under N.Y. Judiciary Law § 489 because it would have been made with the intent and for the purpose of bringing an action or proceeding. Under New York law, which governs the APA, see APA § 6.6, an assignment of a claim is void if it is made with the intent and for the primary purpose of bringing litigation. See N.Y. Judiciary Law § 489. Courts in New York have found arrangements such as this one — where the assignment was for litigation and the named plaintiff was not the real party in interest — to violate this prohibition. See, e.g., *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 170–71 (2016); *see also Refac International, Ltd. v. Lotus Development Corp.*, 131 F.R.D. 56, 57–58 (S.D.N.Y. 1990) (assignment "nothing but a hunting license"). Here, the only items purportedly transferred to FLH are the proceeds of FrontPoint's Claims. FLH did not receive the underlying financial instruments, nor has it used the rights transferred to it by the APA to do anything other than bring a series of lawsuits. In addition, the relatively low purchase price listed in the APA, *see* APA Schedule II (allocating $1,000 of purchase price to FrontPoint's claims), suggests speculation on litigation and falls below the champerty statute's safe harbor. *See* N.Y. Judiciary Law § 489(2)". [pp. 20 n.15] | "Defendants argue that neither FrontPoint nor Sonterra have the capacity to sue since they are dissolved entities who were not in existence when this action was filed. FrontPoint was a fund formed on August 5, 2009 under Cayman Islands law and was voluntarily dissolved on November 11, 2011; Sonterra was a fund formed on May 22, 2008 under Cayman Islands law and was voluntarily dissolved on December 28, 2012.<br><br>Plaintiffs respond that FrontPoint and Sonterra assigned their interests and right to sue to an entity, Fund Liquidation Holdings ("FLH"), who is willing and able to prosecute this suit. Sonterra argues that it entered into an Asset Purchase Agreement ("APA") with FLH on August 3, 2012, and FrontPoint argues that it did so with FLH on July 13, 2011. The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint. See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |

| Description of Argument | Motion to Dismiss the Second Amended Complaint & Defendants' Reply Brief (Docket Nos. 239 [Personal Jurisdiction], 243 [Subject Matter Jurisdiction & Failure to State A Claim], and 289 [Reply]) | Motion to Dismiss the Third Amended Complaint (Docket No. 319) | Court's Ruling on Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 302) |
|---|---|---|---|
| Substitution under Rule 17(a)(3) is not available because this case was a nullity from the beginning. | "While Rule 17(a)(3) generally allows for substitution of a party-in-interest for a party that assigned its claims, the Second Circuit has made clear that substitution is not proper in cases, like this one, where every claim asserted by every plaintiff was assigned before the suit was filed. *Valdin*, 651 F. App'x at 7.17 Here, if Plaintiffs' interpretation of the APAs were accepted, FrontPoint assigned its claims on July 13, 2011 (Horn Decl. Ex. 35) and Sonterra assigned its claims on August 3, 2012 (Horn Decl. Ex. 34), years before this suit was first filed in 2016. Accordingly, FLH cannot be substituted because Plaintiffs lacked standing from the outset and the entire case was "a nullity from the beginning." *Valdin*, 651 F. App'x at 7." [ECF 289, pp. 11-12] | "Nor can Rule 17(a)(3) — relied upon by the Court in granting FrontPoint leave to substitute FLH as the plaintiff, see 2018 WL 4830087, at *11 — save FLH's claims. The rule allows an action to proceed "as if it had been originally commenced by the real party in interest," Fed. R. Civ. P. 17(a)(3), and may allow the substituted party's claims to relate back for statute of limitations purposes. *See Cortlandt Street Recovery Corp.*, 790 F.3d at 421. But Rule 17(a)(3) may not be used to remedy a standing deficiency where, as here, the earlier-filed complaint was a legal nullity because the original plaintiff lacked standing as to all of its claims." [pp. 21-22] | "Defendants argue that neither FrontPoint nor Sonterra have the capacity to sue since they are dissolved entities who were not in existence when this action was filed. FrontPoint was a fund formed on August 5, 2009 under Cayman Islands law and was voluntarily dissolved on November 11, 2011; Sonterra was a fund formed on May 22, 2008 under Cayman Islands law and was voluntarily dissolved on December 28, 2012. Plaintiffs respond that FrontPoint and Sonterra assigned their interests and right to sue to an entity, Fund Liquidation Holdings ("FLH"), who is willing and able to prosecute this suit. Sonterra argues that it entered into an Asset Purchase Agreement ("APA") with FLH on August 3, 2012, and FrontPoint argues that it did so with FLH on July 13, 2011. The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint. See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |
| The language of the APA allows FLH to recover proceeds from certain actions, not to initiate cases. | "The APAs provide for the transfer of rights to participate in any recovery secured by others in certain class actions, but do not confer the right to initiate any litigation (or transfer the underlying instrument that might carry further rights). The APAs instead transfer "Assets" consisting solely of "Recovery Rights" arising out of certain "Claims." *** Importantly, "Claims" in the APAs are distinct from "Cases," which are defined in the APAs to refer to "any lawsuit . . . filed or pursued in connection with [a] Claim." (Horn Decl. Ex. 34 Art. II, Ex. 35 Art. II.) In other words, "Cases" are the suits themselves, while "Claims" are assertions of a right to benefit from any recovery in "Cases." FLH's enumerated powers as "Buyer" under the APAs do not include the power to initiate or prosecute "Cases." The opposition points to no language in the APAs that says FLH can file "Cases" or "bring suit." The APAs' other references to "Cases" (Horn Decl. Ex. 34 Art. II, Ex. 35 Art. II) show that the parties knew how to describe initiation of lawsuits and did not give FLH that power." [ECF 289, p. 5] | "FLH's claim to have standing to bring FrontPoint's antitrust claims is equally flawed. Federal common law requires an assignment of antitrust claims to contain clear and unmistakable language authorizing the assignment of such claims. The APA does not come close to meeting that standard, because the APA neither mentions antitrust claims nor assigns "all" claims. In fact, the APA's plain language makes clear FLH received only the right to recover proceeds from certain "securities class actions," which courts have interpreted to exclude antitrust claims like those asserted here." [p. 10] | "The documents appear to show a full assignment of rights to FLH, which therefore has the capacity to sue here. Plaintiffs seek leave to substitute FLH as the plaintiff in a third amended complaint. See Fed. R. Civ. P. 17(a)(3). I grant the request." (at *11). |