# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P., MOON CAPITAL PARTNERS MASTER FUND LTD., and MOON CAPITAL MASTER FUND LTD., on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>-against-<br><br>CITIBANK, N.A., BANK OF AMERICA, N.A., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, UBS AG, BNP PARIBAS, S.A., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS BANK PLC, DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, STANDARD CHARTERED BANK, DBS BANK, LTD., ING BANK, N.V., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, COMMERZBANK AG, AND JOHN DOES NOS. 1-50<br><br>             Defendants. | Docket No. 16-cv-05263 (AKH)<br><br>ECF Case<br><br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

JURISDICTION AND VENUE .................................................................................. 7

PERSONAL JURISDICTION .................................................................................... 7

PARTIES .................................................................................................................. 36

FACTS ..................................................................................................................... 64

I. Background ......................................................................................................... 64

A.  SIBOR and SOR ............................................................................................. 64

B.  SIBOR- and SOR-based Derivatives ............................................................. 67

C.  The CFTC, FSA, and MAS Found that Defendants Manipulated SIBOR and SOR .................. 76

II. Economic Evidence that SIBOR and SOR were Artificial During the Class Period .................... 84

III. Plaintiffs Transacted in SIBOR- and SOR-based Derivatives at Artificial Prices that were
     Proximately Caused by Defendants' Manipulative Conduct ......................... 90

TRADE AND COMMERCE ..................................................................................... 92

CLASS ACTION ALLEGATIONS .......................................................................... 92

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT .................................. 94

CLAIMS FOR RELIEF ............................................................................................ 96

FIRST CLAIM FOR RELIEF .................................................................................. 96

SECOND CLAIM FOR RELIEF .............................................................................. 97

PRAYER FOR RELIEF ........................................................................................... 99

DEMAND FOR JURY TRIAL ............................................................................... 100

**TABLE OF EXHIBITS**

| Exhibit ("Ex.") Reference | Description |
|---|---|
| Ex. A | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013). |
| Ex. B | Financial Services Authority Final Notice to The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb. 6, 2013). |
| Ex. C | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) |
| Ex. D | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Deutsche Bank AG (Apr. 23, 2015) |
| Ex. E | Monetary Authority of Singapore, MAS Proposes Regulatory Framework for Financial Benchmarks and Annex (June 14, 2013). |
| Ex. F | Monetary Authority of Singapore, Reply to Parliamentary Question on Financial Benchmark (July 9, 2013). |
| Ex. G | Screenshots of Defendants' SIBOR- and SOR-based Derivatives Listings on Bloomberg Professional service, dated October 28, 2016. |
| Ex. H | A copy of the signature page, schedule, credit support annex, and Master Confirmation for Equity Swap and Bullet Swap Transactions pertaining to Plaintiff FrontPoint Asian Event Driven Fund, L.P.'s ("FrontPoint") ISDA Master Agreement with Defendant Deutsche Bank, dated January 20, 2010. |

| | |
|---|---|
| Ex. I | A copy of the signature page, schedule, and credit support annex of Plaintiff FrontPoint's ISDA Master Agreement with Defendant Citibank, N.A., dated August 25, 2009. |
| Ex. J | Blank form 2002 ISDA Master Agreement and Schedule |

Plaintiffs Fund Liquidation Holdings LLC ("FLH"), as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P. ("FrontPoint"), Moon Capital Partners Master Fund Ltd., and Moon Capital Master Fund Ltd. (collectively, "Plaintiffs") complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 89-167) for their violations of law as follows:[1]

## **INTRODUCTION**

1.      This case is about Defendants' unlawful conspiracy to increase the profitability of their derivatives trading in the United State through the manipulation of two related benchmark rates—the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate ("SOR"). At the same time that they were manipulating SIBOR and SOR, Defendants traded derivatives incorporating these tainted rates with investors located in the United States.

2.      Defendants are 19 multinational banks that operate in certain major financial centers around the world, including New York, Tokyo, Singapore, and London. Defendants are also horizontal competitors that deal in financial products priced, benchmarked, and/or settled based on SIBOR and SOR ("SIBOR- and SOR-based derivatives").

3.      Beginning on at least January 1, 2007 and continuing through at least December 31, 2011 ("Class Period"), Defendants agreed, combined and conspired to rig SIBOR and SOR to fix the prices of SIBOR- and SOR-based derivatives in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*, and the common law.

---

[1] Plaintiffs have not included claims that were dismissed without leave to amend by the Court's August 18, 2017 Order (ECF No. 225) and October 4, 2018 Order (ECF No. 302) in this Complaint. Those claims are preserved including for appeal. *See P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) ("We will not require a party, in an amended complaint, to replead a dismissed claim in order to preserve the right to appeal the dismissal when the court has not granted leave to amend"). Plaintiffs reserve their rights to reassert those claims should it become appropriate at a later time.

4.      Defendants were responsible for setting SIBOR and SOR during the Class Period through daily submissions that were supposed to represent the cost of borrowing funds in the Singapore market. Those submissions were used by Thomson Reuters to calculate the SIBOR and SOR rates on behalf of Defendants' trade group, the Association of Banks in Singapore ("ABS").

5.      Defendants manipulated SIBOR and SOR by making submissions that did not reflect the true cost of borrowing funds in Singapore to fix the prices of SIBOR- and SOR-based derivatives that they then sold to investors in the United States.

6.      The goal of Defendants' conspiracy was to increase the profitability (at the expense of their counterparties) of SIBOR-and SOR-based derivatives positions held in global financial centers, like New York, by causing investors, including in the United States, to be overcharged or underpaid in SIBOR- and SOR- based derivatives transactions. As alleged herein, Defendants only operate out of, and sell SIBOR- and SOR-based derivatives from offices in a few key global financial hubs, including in the United States. *See infra* ¶ 25. For example, at least 13 of the Defendants specifically identify New York or Stamford, Connecticut as one of the places where they trade derivatives products, including those based on SIBOR and SOR. *Id.*

7.      Defendants utilized traders, sales people, and facilities they intentionally set up in the United States to exploit the U.S. market and illegally increase the profitability of their SIBOR- and SOR-based derivatives positions by, *inter alia*, using licensed branches to manufacture SIBOR- and SOR-based derivatives in the forum, and then selling SIBOR- and SOR-based derivatives at artificial prices to Plaintiffs and the Class, profiting at their expense. Hundreds of billions of dollars in notional value of SIBOR- and SOR-based derivatives are traded each year in the United States.

2

8. Plaintiffs were harmed by Defendants' intentional, manipulative acts. Plaintiffs and FrontPoint entered into SIBOR- and SOR-based derivatives transactions directly with Defendants Deutsche Bank, Citibank, and UBS from within the United States at artificial prices caused by Defendants' unlawful manipulation and restraint of trade. As a consequence of Defendants' manipulation, Plaintiffs and FrontPoint were damaged when they were overcharged and/or underpaid in their transactions for SIBOR- and SOR-based derivatives. As FrontPoint's successor in interest, Plaintiff FLH is entitled to pursue an action to recovery FrontPoint's damages.

9. **Conspiracy to Manipulate SIBOR and SOR.**  In June 2013, the Monetary Authority of Singapore ("MAS"), Singapore's central bank and financial regulator, announced that it had uncovered a massive conspiracy by Defendants to rig SIBOR and SOR.

10. This conspiracy involved at least 133 traders employed by Defendants and spanned multiple years, from 2007 to 2011. MAS uncovered rare "smoking gun" evidence of anticompetitive conduct and found that traders from "several banks communicated with each other over electronic messaging about what rates they were going to submit . . . aiming to benefit their trading books."[2] These collusive communications involved "traders talking to traders, saying 'I need you to help me today, I need to fix low.'"[3] Singapore's Deputy Prime Minister confirmed that "the investigations found clear evidence of discussions and agreements to influence benchmark submissions" and that Defendants' own "managers were aware of attempts to inappropriately influence benchmark submissions."[4]

---

[2] Rachel Armstrong, *Bank Probes find Manipulation in Singapore's Offshore FX market – Source*, REUTERS (Jan. 27, 2013), *available at* http://www.reuters.com/article/us-singapore-probe-ndfs-idUSBRE90Q0IF20130128.

[3] *Id.*

[4] Ex. F at 2.

11.     Three quarters of the traders MAS identified were fired or forced to resign in the wake of its investigation.[5] For example, after MAS launched its inquiry, Defendant RBS suspended senior trader Chong Wen Kuang—"one of the bankers whose duties involved providing [SIBOR, SOR, and other] rate setters with input on where they should fix the benchmark"—for manipulating SOR to benefit the bank's trading positions.[6] Public reports indicate that traders employed by at least Defendants Citibank, UBS, and Commerzbank, were also fired.[7]

12.     As punishment for manipulating SIBOR and SOR, Defendants were forced to collectively deposit $9.6 billion—interest free—in additional capital with MAS for a full year, among other penalties and remedial measures. These massive interest-free deposits prevented the conspiracy from using these funds and stripped its profit-making potential. The penalties MAS imposed on each Defendant is indicated in the following table:

| Defendant Banks | Amount of Forced Deposit with MAS |
|---|---|
| ING Bank N.V.<br>The Royal Bank of Scotland PLC<br>UBS AG | **1 – 1.2 billion SGD**<br><br>*(approximately 800 – 960 million USD)* |
| Bank of America N.A.<br>BNP Paribas<br>Oversea-Chinese Banking Corporation Ltd. | **700 – 800 million SGD**<br><br>*(approximately 560 – 640 million USD)* |
| Barclays Bank PLC<br>Credit Agricole CIB<br>Credit Suisse AG<br>DBS Bank Ltd.<br>Deutsche Bank AG | **400 – 600 million SGD**<br><br>*(approximately 320 – 480 million USD)* |

[5] Martin Vaughan, *Singapore Censures 20 Banks Over Rates*, WALL STREET JOURNAL (June 15, 2013), *available at* http://www.wsj.com/articles/SB10001424127887323734304578545110537362372.

[6] Gavin Finch et al., *RBS Said to Suspend Trader Over Interest Rate Rigging*, BLOOMBERG NEWS (Oct. 4, 2012), *available at* http://www.bloomberg.com/news/articles/2012-10-05/rbs-said-to-suspend-trader-over-interest-rate-rigging.

[7] *See infra* ¶¶ 217-21.

| | |
|---|---|
| Standard Chartered Bank<br>United Overseas Bank Ltd | |
| Australia and New Zealand Banking Group Ltd.<br>Citibank N.A.<br>JPMorgan Chase Bank, N.A.<br>Bank of Tokyo-Mitsubishi UFJ, Ltd.<br>The Hongkong and Shanghai Banking Corporation<br>Ltd | **100 – 300 million SGD**<br><br>*(approximately 80 – 240 million USD)* |

13.     The amount imposed on each Defendant depended on the severity of their conduct. MAS considered three factors when arriving at the amount of these punitive deposits: the number of traders within the bank who manipulated the rates; the number of other banks with which the traders had colluded; and the frequency of the manipulative conduct.

14.     Other regulators have confirmed MAS's finding. For example, the U.S. Commodity Futures Trading Commission ("CFTC") found that Defendants Deutsche Bank, RBS, and UBS manipulated SIBOR and SOR, among other benchmark interest rates, during the Class Period, imposing a $1.825 billion penalty on these three banks for interbank offered rate ("IBOR") related misconduct.[8] The CFTC stated that when Deutsche Bank, RBS, and UBS manipulated SIBOR and SOR, they engaged in "similar misconduct" as was done in their manipulation of interbank rates for other currencies, including USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, Euribor, Yen-LIBOR, and Euroyen TIBOR.[9] This similar misconduct included making false rate submissions, colluding with traders at other panel banks, and coordinating with interdealer brokers in a conspiracy to manipulate these rates to profit on the banks' significant derivatives positions that were indexed to and therefore valued based on these IBOR rates.

---

[8] *See* Exs. A, C, and D.

[9] Ex. D at 3 n.3; Ex. A at 4 & n.3; Ex. C at 38 & n. 21.

15.     The U.K. Financial Services Authority ("FSA") also found direct evidence of anticompetitive conduct, identifying at least 34 written requests by RBS traders to manipulate SIBOR and SOR during the Class Period.[10] These findings are consistent with the pervasive manipulation described by RBS's former head of Asian delta trading, Jimmy Tan, who admitted that "rate manipulation was systemic at RBS and involved traders and managers across the company."[11] According to Tan, RBS's internal checks were so lax that "anyone at the bank could change LIBOR rates." Similarly, others told Bloomberg that "RBS derivatives traders and managers . . . regularly asked inputters to submit rates favorable to their trading positions" as part of Defendants' scheme to manipulate interbank offered rates.[12] Chats show that RBS's Stamford office participated in the manipulation of IBOR rates with traders located in Singapore, as Tan discussed manipulative conduct with Stamford, Connecticut-based David Pieri, head of RBS's North American Foreign Exchange forward desk. "Nice Libor. Our six-month fixing moved the entire fixing, hahahah," Tan wrote in an April 2, 2008 instant message to David Pieri and Neil Danziger.[13]

16.     These government settlements, factual findings, and admissions demonstrate that Defendants stopped competing during the Class Period and operated a secret cartel to manipulate SIBOR and SOR by, *inter alia*, submitting artificial interest rate quotes and engaging in manipulative trades, to maximize their own profits in SIBOR- and SOR-based derivatives at the expense of Plaintiffs and the Class (defined in ¶ 245).

---

[10] Ex. B at 14. The Financial Conduct Authority ("FCA") succeeded the Financial Services Authority in 2013.

[11] Vaughan et al., *RBS Managers Said to Condone Manipulation of Libor Rates*, BLOOMBERG NEWS (Sep. 25, 2012), *available at* http://www.bloomberg.com/news/articles/2012-09-24/rbs-managers-said-to-condone-manipulation-of-libor-rates.

[12] Finch et al., *supra* note 6.

[13] Andrea Tan, Gavin Finch, and Liam Vaughn, *RBS Instant Messages Show Rate-Setters Skewing Libor for Traders*, BLOOMBERG (Sep. 25, 2012).

17.     Given the persistent, pervasive, and secret nature of Defendants' multi-year conspiracy, as well as the negotiated nature of public settlements that have revealed evidence of this conspiracy to date, additional evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

19.     Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d). One or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial portion of the affected interstate trade and commerce described in this complaint was carried out in this district.

## PERSONAL JURISDICTION

20.     Each Defendant is subject to the jurisdiction of this Court because Defendants, *inter alia*: (i) carried out their conspiracy from within the United States by selling price-fixed derivatives to U.S. investors in the United States; (ii) consented to jurisdiction by negotiating International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreements agreeing to jurisdiction in this Court; (iii) received and transferred the illicit profits generated from the conspiracy via bank accounts in the United States; (iv) purposely availed themselves of the privilege of trading SIBOR- and SOR-based derivatives within the United States; (v) used U.S.

wires to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives; (vi) consented to jurisdiction by registering to do business in New York, Connecticut, and Pennsylvania; and (vii) conspired with U.S.-based persons and entities, including Defendants Citibank, Bank of America, and JPMorgan.

1. **Defendants Enacted Their Price-Fixing Conspiracy in the United States, with the Intent to Unlawfully Increase Profits on SIBOR- and SOR-Based Derivatives.**

21.     Defendants conspiracy could not have achieved its goal of higher profits on derivatives positions without the sale of SIBOR- and SOR-based derivatives. Had no SIBOR- and SOR-based derivatives ever been sold, Defendants would not have held any derivatives positions to benefit from their manipulation and their traders would not have been motivated to conspire to manipulate these two rates. SIBOR- and SOR-based derivatives therefore were the means through which Defendants extracted illicit profits from investors in the U.S. market by, for example, overcharging or underpaying them in those derivatives transactions.

22.     To establish and build up such SIBOR- and SOR-based derivatives positions on which each Defendant profited, each Defendant entered into SIBOR and SOR-based derivatives transactions with investors in the United States. Through their repeated manipulations of the rates, Defendants generated profits on the SIBOR- and SOR-based derivatives positions they held at those locations, including at the expense of their U.S. counterparties, by either (a) increasing the cost for investors to purchase SIBOR- and SOR-based derivatives, (b) suppressing the price that Defendants paid those investors when they sold SIBOR- and SOR-based derivatives, and (c) artificially increasing the amount of interest payments due to Defendants under those contracts.

23.     The profitability of Defendants conspiracy was directly proportional to the amount of SIBOR- and SOR-based derivative sales: the more SIBOR- and SOR-based

derivatives positions that each Defendant entered and held, the greater Defendants' financial motives to agree with one another and to take the risks of doing the unlawful manipulative acts involved in manipulating SIBOR, SOR, and SIBOR- and SOR-based derivatives prices.

24.     This profit motive was centralized in a small number of locations where Defendants manufactured, sold, and held SIBOR- and SOR-based derivatives positions, including the United States. As multi-national banks, Defendants transacted SIBOR- and SOR-based derivatives in global financial centers, including New York, London, Singapore and Tokyo.

25.     For example, publicly available documents show that for at least 14 of the Defendants in this action there are 4 or 5 major financial centers, including New York or nearby Stamford, Connecticut, that serve as these banks' hubs for their interest rate and/or foreign exchange derivatives operations:

| Defendant | Interest Rate and Foreign Exchange Derivatives Hubs |
|---|---|
| Australia and New Zealand Banking Group Limited | New York, Singapore, Sydney, London, Hong Kong |
| Barclays Bank plc | New York, London, Singapore, Tokyo |
| The Bank of Tokyo-Mitsubishi UFJ, Ltd. | New York, Tokyo, Singapore, London |
| Citibank | New York, London, Hong Kong, Singapore, Tokyo, Sidney |
| Crédit Agricole CIB | New York, London, Paris, Tokyo, Hong Kong |
| Credit Suisse AG | New York, Hong Kong, London and Zurich |
| Deutsche Bank AG | New York, Singapore, Tokyo, London, Frankfurt |

| HSBC | New York, London, Hong Kong |
|---|---|
| J.P. Morgan | New York, London, Tokyo, Hong Kong |
| Standard Chartered Bank | New York, London, Singapore, Dubai |
| The Royal Bank of Scotland plc | Stamford, Connecticut, London, Hong Kong, Singapore, Tokyo |
| UBS AG | Stamford, Connecticut, Zurich, Singapore |
| Commerzbank AG | New York, Singapore, Frankfurt, London |

26.     New York is one of these key financial centers and provides Defendants access to U.S. investors like Plaintiffs, FrontPoint, and the Class. Defendants established massive trading operations in New York and nearby Stamford, Connecticut (which also used Eastern Standard Time and provides access to the same client base) through which they developed, marketed, and sold price-fixed SIBOR- and SOR-based derivatives here to Plaintiffs and the Class to achieve their conspiracy's profit goal.

27.     Defendants agreed to manipulate SIBOR and SOR for the purpose of increasing the values of their SIBOR and SOR-based derivatives positions that they held with U.S. counterparties, including Plaintiffs, FrontPoint, and the Class. Defendants accomplished this through a series of steps.  First, Defendants registered to do business in this District with the New York State Department of Financial Services ("NYSDFS"), the Connecticut Department of Banking, and other regulators. This allowed them to set up large derivatives trading operations, including for SIBOR- and SOR-based derivatives, in the United States.

28.     Defendants' trading operations in New York and the United States were so vast and so important to their overall bottom lines that many of the Defendants placed senior

managers in their branches in the forum to oversee their global and regional interest rate and foreign exchange derivatives operations. For example:

(a) <u>UBS AG</u>. During the Class Period from at least 2007-2009, UBS's Global Head of Foreign Exchange (FX) Derivatives John Meyer was located in Stamford, Connecticut.[14]

(b) <u>Standard Chartered Bank</u>. During the Class Period, Standard Chartered Bank's Head of Global Markets David Castle was located in New York.[15] Standard Chartered's Head of Trading, Mohammed Grimeh, was also located in New York during the Class Period.

(c) <u>HSBC</u>. Daniel Silber, HSBC's Head of Foreign Exchange and Metals, Americas, was located in New York during the Class Period.

(d) <u>Bank of Tokyo-Mitsubishi UFJ, Ltd</u>. During the Class Period, Naoto Hirota, who served as Bank of Tokyo-Mitsubishi UFJ, Ltd.'s General Manager of Global Markets Sales and Trading Division for the Americas, was located in New York.

29.     Next, Defendants developed SIBOR- and SOR-based derivatives to sell to customers in the United States. As discussed, derivatives are financial contracts in which the price or payment term is derived from another source. Here, that source is SIBOR and/or SOR. The Defendants serve as dealers of these products in the United States and create and set the terms by which customers can transact in these products with them. Recognizing that there was

---

[14] FEDERAL RESERVE BANK OF NEW YORK, The Foreign Exchange Committee: Annual Report 2006 at 83, https://www.newyorkfed.org/medialibrary/microsites/fxc/files/annualreports/fxcar06.pdf.

[15] *Id*.

market demand in the U.S. for derivatives linked to the Singapore Dollar, Defendants created

SIBOR- and SOR-based derivatives to sell to customers in the U.S. like Plaintiffs and the Class.

30.     Defendants then marketed and sold SIBOR-and SOR-based derivatives to U.S.

investors from their United States branches. Marketing was an essential aspect of Defendants'

conspiracy necessary for them to sell SIBOR- and SOR-based derivative products to U.S.

customers and amass the large trading positions required to profit from their scheme. Unlike in

other markets, there is no centralized marketplace where everyone goes to trade SIBOR- and

SOR-based derivatives. Thus, to identify and reach new counterparties Defendants took several

steps, including advertising their status as over-the-counter SIBOR- and SOR-based derivatives

dealers to customers in the United States through, *inter alia*, electronic platforms such as the

Bloomberg Terminal (*see infra* ¶¶ 74-77) and engaging in specific, targeted, marketing and sales

initiatives in the United States.

31.     One marketing method Defendants employed was to create promotional materials

advertising their broad array of derivative offerings which they then distributed to investors at

financial conferences and other industry forums and published on their websites. On December

1, 2011, for example, HSBC (the parent company of Defendant The Hongkong and Shanghai

Banking Corporation Limited) published an "Emerging Markets Currency Guide 2012," which

they touted as "an essential companion for investing, hedging, or simply transacting in Emerging

Market currencies."[16] In the guide, HSBC included a "Singapore Dollar" section that stated the

"following products are available: Spot FX[,] FX Forwards[,] FX options[, and] Cross-currency

swaps." As discussed *infra* Section I(B), FX Forwards are a SIBOR- and/or SOR-based

---

[16] HSBC, *HSBC's Emerging Markets Currency Guide 2012* (Dec. 2011),
https://www.hsbcnet.com/gbm/attachments/rise-of-the-rmb/currency-guide- 2012.pdf?WT.ac=CIBM
_gbm_pro_rmbrise_pbx01_On.

derivative. The HSBC guide later lists the phone numbers and email addresses of HSBC traders

and managers in New York that a customer could contact to purchase these products:

**New York**
**Daniel Silber**
**Head of Foreign Exchange and Metals, Americas**
+1 212 525 3365        daniel.silber@us.hsbc.com

**Robert Lynch**
**Head of Currency Strategy, Americas**
+1 212 525 3159        robert.lynch@us.hsbc.com

**Paul Mischenko**
**Head of FX Cash Trading, Americas**
+1 212 525 6454        paul.mischenko@us.hsbc.com

**Burt Sheaffer**
**Head of FX & Precious Metal Options, Americas**
+1 212 525 5725        burton.t.sheaffer@us.hsbc.com

## **FIGURE 1**

Numerous other Defendants published similar materials listing their derivative product offerings

and the contact information for traders in New York who were selling these derivatives.

32.     Defendants directed employees working in the United States like HSBC's

employees listed above to interact with U.S. investors concerning SIBOR- and SOR-based

derivatives, attract U.S. investors as customers for SIBOR- and SOR-based derivatives

transactions, take orders from U.S. customers to execute these derivatives, and otherwise assist

the Defendants in entering and booking with U.S. customers SIBOR and SOR derivatives

transactions.

33.     At the same time that Defendants traded SIBOR- and SOR-derivatives with U.S.

customers, Defendants were manipulating SIBOR and SOR, as detailed herein. The price of the

SIBOR- and SOR-based derivatives that U.S. investors traded with Defendants were tied directly

to these manipulated rates. Defendants' manipulative acts thus harmed Plaintiffs, FrontPoint, and

the Class, who paid too much to, or received too little from Defendants on their derivatives

instruments.

34.     After entering into SIBOR- and SOR-based derivative transactions with U.S. investors, Defendants ensured that they profited at the expense of their U.S. counterparties by continuously managing their SIBOR- and SOR-derivatives positions 24-hours a day via traders in their offices in financial centers like New York, London, and Singapore. Defendants' conspiracy to manipulate the prices of SIBOR- and SOR-based derivatives thus continued in New York and throughout the United States during New York business hours.

35.     Since trading hours in each of these markets do not necessarily overlap (*e.g.*, Singapore is 12 hours ahead of New York), Defendants transfer their entire trading operations, or "trading book," and/or delegate responsibility for trading to their employees in the market that is open. A bank's trading book consists of all its positions in certain financial instruments and commodities that are held with the intent to trade or to hedge. As a result of this structure, any SIBOR- and SOR-based derivatives positions that Defendants entered during Singapore hours would be transferred to Defendants' branches in New York, Stamford or other U.S. locations after Singapore markets closed.

36.     The CFTC, for example, revealed that Defendant "RBS's Yen derivatives trading books were traded 24 hours a day, from RBS trading desks in the United States, U.K., and Asia . . . [and] at the end of the trading day in Asia, [RBS] passed its Yen trading book first to London, then to Connecticut, and back to Asia when trading resumed in Asia."[17] Large banks like the Defendants customarily follow the same procedure for their trading books across all currencies and derivatives products, including for their SIBOR- and SOR-based derivatives positions.

37.     Transferring control of their trading book to personnel at their offices where active trading was occurring enabled Defendants, whose traders and submitters manipulated

---

[17] Ex. A at 7-8.

SIBOR, SOR, and numerous other benchmark rates, to maximize their profits on derivatives trading at the expense of their counterparties in these locations. In addition to their ability to access customers in all these markets, Defendants could continuously monitor their one set of derivatives positions vis-à-vis potential adverse market events and movements or expected movements in the SIBOR and SOR rates, helping to ensure that they profited on these positions.

38.     RBS's IBOR manipulation settlement with the CFTC reveals that, through 24-hour a day trading and its use of a rotating trading book, traders in RBS's Connecticut office participated in the conspiracy to sell price-fixed SIBOR- and SOR-based derivatives to U.S. investors. The CFTC found that RBS traders engaged in the same pervasive inter-office misconduct when manipulating SIBOR and SOR as they had when manipulating Yen and Swiss Franc LIBOR. The CFTC further found that RBS's misconduct in manipulating SIBOR, SOR, and numerous other benchmark rates occurred across RBS's key trading hubs, which included Connecticut, London, Singapore, and Tokyo.  RBS's Singapore- and Stamford-based traders were all managing one set of SIBOR- and SOR-based derivatives positions, and when manipulation occurred during Asian business hours, it continued during U.S. business hours when RBS's trading book was handed over to its Stamford, Connecticut office.

39.     According to the CFTC:

> Commencing in at least mid-2006 and continuing through 2010, RBS made hundreds of attempts to manipulate Yen and Swiss Franc LIBOR and, on numerous occasions, made false LIBOR submissions to benefit its derivatives and money market trading positions. At times, RBS also aided and abetted other panel banks' attempts to manipulate those same rates. This misconduct involved more than a dozen RBS derivatives and money market traders, one manager, and *multiple* offices around the world, including London, Singapore and Tokyo. Sometimes, RBS was successful in manipulating Yen and Swiss Franc LIBOR.

* * * *

Commencing in at least mid-2006, RBS, through the acts of its derivatives and money market traders and other employees located in London, Tokyo and Singapore, often attempted to manipulate the fixings of Yen and Swiss Franc LIBOR. On a number of those occasions, RBS made false LIBOR submissions in furtherance of its manipulative attempts, which at times were successful.[3] The RBS traders engaged in this manipulative conduct to profit on RBS's significant derivatives and money market trading positions that were indexed to and therefore valued based on Yen and Swiss Franc LIBOR. At times, RBS derivatives traders also colluded with traders at other panel banks and coordinated with interdealer brokers in attempts to manipulate Yen and Swiss Franc LIBOR.

**Footnote 3**: RBS traders engaged in similar misconduct in connection with the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offered Rate ("SOR"). Some SIBOR and SOR-related misconduct took place from May 2010 through August 2011, even as RBS was conducting its internal investigation.

* * * *

RBS's Yen derivatives trading books were traded 24 hours a day, from RBS trading desks in the United States, U.K., and Asia under the direction of Yen Manager and the Senior Yen Trader. The Senior Yen Trader generally managed the trading of short-term tenors of the Yen trading book, assisted by a Yen derivatives trader in Connecticut and Yen Trader 1 located in London. Yen Trader 1 also was the backup Yen LIBOR submitter. At the end of the trading day in Asia, RBS passed its Yen trading book first to London, then to Connecticut, and back to Asia when trading resumed in Asia.

During the same time frame [mid-2006 through late 2010], multiple RBS Yen traders and at least one manager attempted to manipulate LIBOR by making hundreds of requests of the Primary Submitter . . . At times, they were successful in manipulating Yen LIBOR.

Ex. A at 3-4, 7-8 (emphasis added).

40.    The UK FSA's Final Order against RBS for manipulating Yen and Swiss franc LIBOR confirms that RBS manipulated SIBOR and SOR, among other benchmark rates, and that traders at multiple offices, including in the United States, participated in the misconduct.

46. [RBS] Derivatives Traders often made requests to Primary Submitters with the goal of influencing RBS's JPY [Yen] and CHF LIBOR submissions between October 2006 and November 2010.

16

47. The Derivatives Traders were motivated by profit and sought to benefit their (and thus RBS's) derivatives trading positions by influencing the final benchmark LIBOR rates. The final benchmark rates affected the Derivatives Traders' payment obligations pursuant to the contracts underlying their derivatives transactions such that the Derivatives Traders stood to profit or avoid losses as a consequence of movements in the final benchmark rates resulting from RBS's submissions. On one occasion, one JPY Derivatives Trader boasted to another JPY Derivatives Trader "…*our 6m fixing move* [sic] *the entire fixing, hahaha.*"

48. Improper requests took place over a number of years, were widespread, and involved three benchmark rates and at least 21 Derivatives Traders and Primary Submitters located primarily in London and Tokyo but also in the *United States* and Singapore.

\* \* \* \*

54. Finally, it should be noted that Derivatives Traders outside the UK also made requests in relation to other benchmark rates. Specifically, at least 34 written requests were made with respect to SIBOR and SOR. The existence of SIBOR and SOR requests, which put at risk the integrity of those benchmark rates, demonstrates that the misconduct was not confined to the UK and was not related solely to LIBOR.

Ex. B at 11, 14 (emphasis added).

41.     As it did with other benchmark rates, RBS manipulated SIBOR and SOR to benefit the SIBOR and SOR derivatives positions it traded in the U.S. with U.S. investors like Plaintiffs, FrontPoint, and the Class. With RBS's trading book handed to traders in its Connecticut office after trading hours closed in Asia and London, and then back to Asia at the close of U.S. business hours, RBS's Connecticut-based derivatives traders were engaged in the profit-generating component of the conspiracy by trading price-fixed SIBOR and SOR-based derivatives with U.S. customers.

42.     Deutsche Bank and UBS likewise engaged in in-forum acts in furtherance of their conspiracy to manipulate SIBOR and SOR to fix the prices of SIBOR- and SOR-based derivatives they traded in the U.S. The CFTC found that Deutsche Bank's "systemic and

pervasive" misconduct in manipulating SIBOR, SOR, and other benchmark rates, occurred from

Deutsche Bank's New York office:

> Over [a] more than six-year period [2005-2011] and across currencies, Deutsche Bank's submitters routinely took into account other Deutsche Bank traders' derivatives positions, as well as their own cash and derivatives trading positions, when making the bank's LIBOR and Euribor submissions. On other occasions, Deutsche Bank aided and abetted other panel bank's attempts to manipulate Euribor and Yen LIBOR. The conduct of Deutsche Bank's submitters, traders, desk managers, and at least one senior manager was systemic and pervasive, occurring across multiple trading desks and offices, including London, Frankfurt, New York, Tokyo, and Singapore.[3]

> Senior desk managers in London Frankfurt, New York, and in the Deutsche Tokyo Subsidiary also made requests to benefit their own trading positions, facilitated the requests from their traders for beneficial submissions, and generally promoted the practice of inappropriately using benchmark interest rate submissions to help the traders increase profits and minimize losses on their and the desk's trading positions.

> **Footnote 3:** Deutsche Bank's misconduct extended beyond the LIBOR and Euribor benchmarks. Through its internal investigation, Deutsche Bank identified evidence of similar misconduct with respect to attempts to influence, and at times attempts to manipulate, other interest rate benchmarks, including, but not limited to, Singapore Interbank Offered Rate [SIBOR], Singapore Swap Offer Rate [SOR], and Tom/Next Indexed Swaps for the Swiss Franc.

Ex. D at 2-3.

43.    This and other government settlements have revealed the shocking scope of

Deutsche Bank's misconduct across its offices in New York, London, Tokyo, and Singapore.

For example, Deutsche Bank intentionally rearranged their trading operations to facilitate

manipulating benchmark rates, sitting traders next to submitters.  Deutsche Bank lied to auditors

and regulators about the bank's internal controls related to benchmark submissions. The bank

rewarded known manipulators like Christian Bittar with promotions and enormous bonuses.

Deutsche Bank's manipulation of SIBOR and SOR was, like its manipulations of Euribor and

Yen LIBOR, "systemic and pervasive, occurring across multiple trading desks and offices," including New York. Ex. D at 2, *see also infra* Section I(C).

44.     UBS derivatives traders in the bank's Stamford, Connecticut U.S. headquarters participated in the conspiracy to manipulate SIBOR, SOR, and other interest rates to benefit their SIBOR- and SOR-based derivatives positions. Ex. C at 38.  During the Class Period, UBS Stamford was one of UBS's global hubs (along with Singapore) where derivatives traders traded derivatives tied to SIBOR, SOR, and other rates.

> UBS made Trader-Submitters who worked in UBS's Investment Banking Division responsible for making all benchmark interest rate submissions that are subject to this Order . . . . [UBS's] Rates Division consisted of derivatives traders in London, Zurich, Tokyo, Connecticut and elsewhere, who traded derivatives products with a duration or maturity of more than a year . . . .
>
> The STIR [Short Term Interest Rate] and Rates desks [housed within UBS's Investment Banking division] were profit centers for UBS and generated significant income for UBS based on trading derivatives products, such as interest rate swaps whose value depended on LIBOR, Euribor, Euroyen TIBOR and other benchmark interest rates.  STIR also managed UBS's short-term cash positions and engaged in the money markets for each currency primarily through traders located in Connecticut, Zurich and Singapore. STIR was also responsible for hedging UBS's interest rate risk.

*Id*. at 8-9. The CFTC's UBS Order states:

> Numerous UBS derivatives traders attempted to manipulate the official fixings of LIBORs for currencies other than Yen, including Franc, Sterling and Euro, and other benchmark interest rates, including Euribor, to benefit their derivatives trading positions.[21]
>
> **Footnote 21:** Through its internal investigations, UBS identified evidence of similar misconduct involving submissions for at least Hong Kong Interbank Offered Rate ("HIBOR"), the Singapore Interbank Offered Rate ("SIBOR"), the Singapore Swap Offer Rate ("SOR") and the Australian Bank Bill Swap Rate ("BBSW").

*Id*. at 38 & n. 21.

45.     This and other government settlements demonstrate that UBS's manipulation of benchmark rates, including SIBOR and SOR, was systemic and pervasive across *all* IBOR currencies, and that UBS managers and traders located in Stamford, Connecticut directed and carried out the misconduct. In its non-prosecution agreement with the DOJ, UBS admitted that at certain times during the Class Period, a Stamford-based Group Treasury senior manager directed UBS submitters to submit artificial submissions for all LIBOR currencies.[18] UBS's Group Treasury section is the part of UBS AG that monitors and oversees the financial resources of the entire bank, including the bank's liquidity and funding. UBS further admitted that "derivatives traders in Stamford made requests for favorable Dollar LIBOR submissions to the UBS Dollar LIBOR submitters on the derivatives trading desk in Zurich," stating "[w]e need 3mo libor set low."[19] These admissions show that U.S.-based employees at UBS were actively participating in the conspiracy to rig numerous benchmark rates, including SIBOR- and SOR, to profit on their derivatives positions tied to these rates.

### 2. Defendants Consented to Jurisdiction Through ISDA Master Agreements.

46.     The International Swaps and Derivatives Association (ISDA) is a trade association formed by dealer banks, including many of the Defendants. ISDA determines and promulgates industry-standard form contracts that facilitate trading between derivatives market participants. One such contract is an ISDA Master Agreement. An ISDA Master Agreement is a standard form agreement with 14 sections, designed so that parties who intend to enter into a series of over-the-counter derivative transactions can improve efficiency by agreeing in advance on certain terms that will apply in every trade. There are two main form ISDA Master

---

[18]  United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) at 42.

[19] *Id*. at 48-49.

Agreements: the 1992 form and 2002 form. The relevant portions of each agreement are referenced below where applicable.

47.     A Schedule and Credit Support Annex are typically executed along with the ISDA Master Agreement. The Schedule to the ISDA Master Agreement allows the parties to tailor the terms of the ISDA Master Agreement to suit their own requirements or circumstances.  The Credit Support Annex defines the terms of posting collateral under the ISDA Master Agreement to mitigate counterparty credit risk.

48.     The terms specified in the ISDA Master Agreement, Schedule, and Credit Support Annex are incorporated into and apply in each subsequent transaction entered into by the parties. This is codified by Section 1 of the ISDA Master Agreement, which provides that "[a]ll Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement'), and the parties would not otherwise enter into any Transactions."

49.     Section 2 of the ISDA Master Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to other provisions of this Agreement," including that "[e]ach obligation . . .  is subject to (1) the condition precedent that no Event of Default or Potential Events of Default . . . has occurred and is continuing." Section 4 further obliges each party to "comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party."

50.     The parties to each ISDA Master Agreement are required to make certain elections, such as which law will govern their agreement, where collateral for transactions should

be wired, and who should be notified of any default event. These choices are typically reflected in the Schedule to the ISDA Master Agreement and the Credit Support Annex.

51.     The parties are also given the option to designate themselves as a "Multibranch Party" under Section 10 of the ISDA Master Agreement. Multibranch Parties are considered to act as a single entity for the purposes of a derivatives transactions and "may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule." Consistent with this single entity concept, Section 10(a) further provides that: "each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place or booking office or jurisdiction of incorporation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office."

52.     Section 13 of the ISDA Master Agreement requires parties to agree in advance on the substantive law that will govern their agreement and which forum will have jurisdiction to hear any disputes. There are two standard options for choice of law: the laws of the State of New York or English law. The parties typically indicate their selection in Part 4 of the Schedule attached to their ISDA Master Agreement or in an attached appendix. If New York law is selected to govern, then under Section 13(b) of the ISDA Master Agreement, the parties irrevocably submit to the "non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City." If English law is designated in the Schedule, the parties submit to the jurisdiction of the English courts.

53.     Section 13 of the 2002 ISDA Master Agreement states in relevant part:

**13.        Governing Law and Jurisdiction**

22

(a) *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i) submits:—

(1) if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2) if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii) agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

54.     **Deutsche Bank, AG.** Deutsche Bank AG entered an ISDA Master Agreement with Plaintiff FLH's predecessor in interest FrontPoint on January 20, 2010.[20] That ISDA Master Agreement was the same 2002 form ISDA whose provisions are cited above. A blank 2002 form ISDA is attached as Exhibit J to this Complaint. Section 13 of the 2002 ISDA Master Agreement that Deutsche Bank AG and FrontPoint entered provided that:

---

[20] FrontPoint's executed ISDA Master Agreement with Deutsche Bank AG is attached as Exhibit H.  Pursuant to industry standard practice, the document contains only the first and last pages of the Master Agreement, the Schedule, and the Credit Support Annex, because parties do not keep the middle pages of the form as all ISDA Master Agreements are standardized. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 526 B.R. 481, 487 n.4 (S.D.N.Y. 2014), as corrected (Dec. 29, 2014), *aff'd sub nom*. *In re Lehman Bros. Holdings, Inc.*, 645 F. App'x 6 (2d Cir. 2016) ("The signed Swap Agreement contains only the first and last page of ISDA's standard agreement, with signatures. The parties agree that this was common industry practice, and indicates that the middle pages of ISDA's standard agreement constituted part of the contract. [ ] We therefore treat the entire ISDA agreement as part of the Swap Agreement.").

This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b) Jurisdiction. With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i) submits:—
(2) if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

55.     In the Schedule attached to that ISDA Master Agreement, Deutsche Bank AG and FrontPoint agreed that New York Law would govern their agreement.[21] Pursuant to Section 13 of the ISDA Master Agreement, this election of New York law meant that FrontPoint and Deutsche Bank AG "irrevocably submit[ted]" to the "jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City" with respect to "any suit, action, or proceedings relating to any dispute arising out of or in connection with" its ISDA Master Agreement.[22]

56.     After executing its ISDA Master Agreement with Deutsche Bank AG on January 10, 2010, FrontPoint subsequently entered into at least 22 swap transactions directly with Deutsche Bank AG between February 11, 2010 and May 27, 2010. These transactions occurred during the period that MAS found that Deutsche Bank and the other Defendants were manipulating SIBOR and SOR. FrontPoint's swap transactions with Deutsche Bank were priced based on these rates.

57.     Pursuant to Section 1 of their ISDA Master Agreement, each of these transactions were incorporated into and formed a single agreement with the ISDA Master Agreement. Thus, a

---

[21] Exhibit H at 13.

[22] *See id.*

breach of any transaction's terms was also a breach of the ISDA Master Agreement between FrontPoint and Deutsche Bank AG. FrontPoint's claims arising out of these violations, including the manipulation of SIBOR and SOR, are therefore related to this ISDA Master Agreement and this Court has jurisdiction over Deutsche Bank AG as a result.

58.     Deutsche Bank also appointed its New York branch, at 60 Wall Street, New York, NY 10005, as its process agent. Deutsche Bank AG designated itself a "Multibranch Party" in its ISDA Master Agreement with FrontPoint, stating that it may act through its offices in "New York, London, Tokyo, Paris, Singapore, [and] Brussels," among others. Thus, all of FrontPoint's transactions with Deutsche Bank, regardless of where they were entered into or executed, or deemed to be with Deutsche Bank AG's head office.

59.     **Citibank, N.A.** FrontPoint executed its ISDA Master Agreement with Defendant Citibank, N.A. on August 25, 2009. That ISDA Master Agreement was a 1992 Form ISDA Master Agreement which had the same relevant provisions cited above. As explained above, Section 13 of that ISDA Master Agreement provided that:

> This Agreement will be governed by and construed in accordance with the law specified in the Schedule.
>
> (b) Jurisdiction. With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—
>
> (i) submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York;

60.     In the Schedule attached to that ISDA Master Agreement, Citibank, N.A. and FrontPoint agreed that New York Law would govern their agreement. Ex. I at 13. Pursuant to

Section 13 of the ISDA Master Agreement, this election of New York law meant that FrontPoint and Citibank, N.A. "irrevocably submit[ted]" to the "jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City" with respect to "any suit, action, or proceedings relating to any dispute arising out of or in connection with" its ISDA Master Agreement. *See id*.

61.     After executing its ISDA Master Agreement with Citibank, N.A. on August 25, 2009, FrontPoint subsequently entered into swap transactions directly with Citibank, N.A.

62.      Pursuant to Section 1 of their ISDA Master Agreement, each of these transactions were incorporated into and formed a single agreement with the ISDA Master Agreement. Thus a breach of any of the transaction's terms was also a breach of the ISDA Master Agreement between FrontPoint and Citibank, N.A. FrontPoint's claims arising out of these violations, including the manipulation of SIBOR and SOR, are related to this ISDA Master Agreement and this Court has jurisdiction over Citibank, N.A. as a result.[23]

### 3.  The Profits of Defendants' Conspiracy Were Generated and Transferred Within the United States.

63.     All of the damages at issue in this case occurred within the United States. The monetary gains that Defendants realized from their conspiracy, *e.g.*, as a result of artificially higher payments made by Plaintiffs, FrontPoint, and the Class, were transferred to Defendants in the United States in payments made to their U.S. bank accounts. Moreover, each transaction that Defendants executed with Plaintiffs, FrontPoint, or Class members had several steps. Each of

---

[23] In its August 18, 2015 Order, ECF No. 225, the Court sustained Plaintiff's claims against the Citibank defendants. Citibank, N.A.'s consent to jurisdiction via its ISDA Master Agreement is not relevant to the issues in this case, and the ISDA Master Agreement is discussed and attached to this complaint as an example of the application of an ISDA Master Agreement.

those steps, from the initial sales contact, to the posting of collateral, and payment at settlement, occurred within the United States.

64.     For example, in the first step of an over-the-counter derivatives transaction, the customer will typically contact the derivatives dealer by phone or using an electronic chat platform (such as those available through the Bloomberg or Reuters trading platforms) to discuss the terms of a proposed trade. U.S. investors will typically contact the local branch of a multinational bank, *e.g.*, Deutsche Bank New York, UBS Stamford, etc., where traders are available during U.S. business hours.

65.     After agreeing on the transaction details, the customer will then communicate transactions details, including payment instructions to a "custodian bank," which holds assets, including cash, derivatives, and other financial instruments, on its behalf.

66.     The custodian bank will then use the assets in its client's account to carry out the payment instructions and settle the trade with that dealer's agent banks. Customers that engage in transactions across multiple currencies, *e.g.*, Singapore and U.S. Dollars, will typically have a separate sub-account with their custodian bank in the home country of each currency. Transactions are then settled by transferring assets denominated in each currency from the appropriate local sub-account.

67.     This account structure means that each Defendant's U.S. customers, *i.e.*, Plaintiffs and Class members, were injured as a result of the SIBOR and SOR manipulation from within the United States when they: (a) paid too much for SIBOR- and SOR-based derivatives, and transferred an artificially higher amount of U.S. Dollars from their dollar-denominated, U.S.-based custodian accounts to Defendants' dollar-denominated accounts in the United States; or (b) received too little from Defendants in the United States when they sold SIBOR- and SOR-based

derivatives to a Defendant and that Defendant transferred an artificially lower amount of U.S. dollars from its dollar-denominated, U.S.-based account to its customer's domestic, U.S. dollar custodian account.

68.     For example, under the terms of its ISDA Master Agreement with FrontPoint, Deutsche Bank AG required FrontPoint to transfer cash and collateral to New York-based Deutsche Bank AG accounts:

(I)   **Addresses for Transfers.**

Party A:     For Cash: DBAG NY, ABA: 026003780, Ref: A / C#  [to be provided]

For Eligible Collateral:

**Fed Eligible Settlements:**
Bk of NYC/Cust/604000
Acct: Deutsche Bank AG CMV Group

**DTC Eligible Settlements:**
DTC# 901
A/c# 604000
Acct: Deutsche Bank AG CMV Group

**Euroclear Settlements:**
Euroclear # 10104
Ref: Acct: Deutsche Bank AG CMV Group 604000

**Canadian Settlements:**
Royal Bank of Canada
BIC Code: ROYCCAT2
Acct: Bank of New York, Brussels
Ref: Acct: Deutsche Bank AG CMV Group 604000

Party B:     **To be advised.**

**FIGURE 2**

69.     Following each transaction, the dealer will send the customer a receipt, known as a trade confirmation. The trade confirmation specifies the material terms of the deal, including its effective date, how payments will be calculated, and when payments are due. Confirmations are typically sent to the customer electronically for execution after the trade is entered so that they can verify and agree to the trade's terms, though details may also be recorded in electronic chats or emails. As described in ¶ 57 above, each trade confirmation is incorporated into and forms a

single agreement with the ISDA Master Agreement, Schedule, Credit Support Annex, and any other appendices or supporting documents.

70.     This "single agreement" characteristic is significant as a dealer and customer will often execute dozens or hundreds of trades, if not more, pursuant to a single ISDA Master Agreement, which can stay in effect for years, and cover a variety of OTC derivatives products. When FrontPoint entered into its SIBOR-based swap transactions with Deutsche Bank at artificial prices, FrontPoint transferred funds to Deutsche Bank's New York accounts listed above. U.S. investors like members of the Class did the same. Therefore, FrontPoint's damages, like all the damages complained of in this case, occurred in the forum.

### 4. Each Defendant Purposefully Availed Itself of the Privilege of Trading SIBOR- and SOR-Based Derivatives with U.S. Investors.

71.     Defendants Citibank, Bank of America, Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, RBS, Standard Chartered, and UBS purposefully availed themselves of the privilege and benefit of trading foreign exchange and/or interest rate derivatives, including SIBOR- and SOR-based derivatives, in the United States throughout the Class Period.[24] Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market. This survey measures the "turnover," or volume of transactions, in foreign exchange and interest rate derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from dealers located within the United States and transactions that are located within the United States. Dealers located outside of the United

---

[24] *See* The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2007) at 16-17 (hereinafter "Federal Reserve Bank of New York 2007 Survey") at 16-17; The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2010, THE FEDERAL RESERVE BANK OF NEW YORK (Apr. 2010) at 17-18 (hereinafter "Federal Reserve Bank of New York 2010 Survey").

States report their figures to the central bank where they are located. The survey measures and reports the turnover of Singapore dollar-denominated derivatives (*i.e.* SIBOR- and SOR-based derivatives) traded by these 13 dealer Defendants in the United States. While the Federal Reserve Bank of New York's survey only lists these 13 Defendants as dealers, additional Defendants conced that they transacted in SIBOR- and SOR-based derivatives in the United States during the Class Period.[25]

72.    Defendants Bank of America, Bank of Tokyo-Mitsubishi, BNP Paribas, Barclays Capital, Citigroup, Commerzbank, Credit Suisse Group, Deutsche Bank, HSBC, JPMorgan Chase, RBS, Standard Chartered Bank, and UBS, directly or through their affiliates, each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including transactions priced, benchmarked, and/or settled based on SIBOR and SOR, from within the United States.[26]

73.    The Bank of International Settlements reported in 2008 that persons outside of Singapore accounted for approximately 45% of all trading of Singapore Dollars, including spot and over-the-counter SIBOR- and SOR-based derivatives and that 35% of this trading occurred

---

[25] In response to Plaintiffs' First Amended Complaint, ECF No. 119, which relied on the same New York Federal Reserve Survey, only 8 of the 46 Defendants denied that they transacted in SIBOR- and/or SOR-based derivatives in the United States. *See* Declaration of Cheuk-Man Derek Ng, ECF No. 159, at 4 (Hongkong Shanghai Banking Corporation Ltd.); Declaration of Mark Chambers, ECF No. 160 (HSBC Holdings plc); Declaration of William Gougherty, ECF No. 166, at 2 (The Royal Bank of Scotland Group plc); Declaration of Beh Ean Lim, ECF No. 171, at 2 (United Overseas Bank Limited and UOB Global Capital, LLC); Declaration of Goh Peng Fong, ECF No. 173 at 2 (DBS Holdings Ltd.); and Declaration of Debbie Lam Thuan Meng, ECF No. 174, at 3 (DBS Bank and DBS Vickers Securities (USA) Inc.). At a minimum, Plaintiffs require jurisdictional discovery to test these averments, and Defendants' contrary evidence cannot be considered before Plaintiffs have chance to test it through discovery and an evidentiary hearing.  *See Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013).

[26] *See* Federal Reserve Bank of New York 2010 at 16-17, 22, 25-27; Federal Reserve Bank of New York 2007 Survey at 16-17, 21, 24-26.

outside of Singapore.[27] In 2007, approximately $28 billion in notional value of SIBOR- and SOR-based derivatives were traded in the United States.[28] By 2010, that number increased to approximately $543 billion.[29] As of June 2013, there was approximately $1.6 trillion in outstanding derivatives contracts tied to either SIBOR or SOR worldwide.[30] As volumes in the trading of SIBOR- and SOR-based derivatives increased and trading became more centralized in financial hubs outside Singapore like New York throughout the Class Period, Defendants' motive for manipulating SIBOR and SOR in order to fix the prices of SIBOR- and SOR-based derivatives that they sold to U.S. investors like Plaintiffs, FrontPoint, and the Class became stronger.

74.     Defendants further targeted and sold SIBOR- and SOR-based derivatives to customers in the United States through the Bloomberg Professional service, commonly referred to as the Bloomberg Terminal. The Bloomberg Terminal is a computer system and subscription service through which users can monitor financial market data and place trades on an electronic trading platform. As of 2013, there were over 315,000 worldwide subscriptions to Bloomberg Terminal, with a large number of those located in the United States. The Bloomberg Terminal is not publicly available and can only be accessed by subscribers who pay fees to access the services—*i.e.* typically banks, hedge funds, and sophisticated investors like Plaintiffs and FrontPoint. Defendants know that subscribers to the Bloomberg Terminal are located in New

---

[27] Yosuke Tsuyuguchi & Philip Wooldridge, Bank for International Settlements: Monetary and Economic Department, *BIS Working Papers No. 252 – The Evolution of Trading Activity in Asian Foreign Exchange Markets* (May 2008) at 22-23, http://www.bis.org/publ/work252.pdf.

[28] *See* Federal Reserve Bank of New York 2007 Survey at 25-26.

[29] *See* Federal Reserve Bank of New York 2010 Survey at 26-27.

[30] Rachel Armstrong, *Banks slow to revive Singapore trading desks after rate-fixing cull*, REUTERS (June 25, 2013), *available at* http://www.reuters.com/article/us-singapore-rates-idUSBRE95O1GF20130625.

York and other financial hubs because they transact with counterparties at these locations through the Bloomberg Terminal.

75.    Bloomberg Terminal subscriptions are concentrated in financial centers like New York because of the types of customers that use the service. Defendants know this and purposefully target customers in New York and other financial centers by offering SIBOR- and SOR-based derivatives for sale on Bloomberg's platform. Data available on Bloomberg Terminal confirms that at least the following Defendants directly or through their affiliates are dealers offering SIBOR- and SOR-based derivatives for sale in the U.S. to U.S. investors through the Bloomberg Terminal: JPMorgan, Citibank, UBS, Deutsche Bank, Credit Suisse, Barclays, Credit Agricole CIB, BNP Paribas, Standard Chartered Bank, HSBC, ANZ, Commerzbank, and OCBC. These 13 Defendants marketed their SIBOR-and SOR-based derivatives products on Bloomberg on behalf of the whole company (*i.e.*, not any one specific subsidiary). For example, as demonstrated in the following screenshot, Barclays' SIBOR- and SOR-based derivatives offerings on Bloomberg are listed as being sold by "Barclays." Attached as Exhibit G to the complaint are screenshots of all 13 Defendants' dealer pages listing SIBOR- and SOR-based

derivatives for sale on Bloomberg.[31]



**FIGURE 3**

76.     Certain Defendants identify these quotes as executable, represented by the letter "Y" (yes) in the column labeled "Exec." This means that an interested counterparty can actually buy or sell SIBOR- and/or SOR-based derivatives at the quoted price with a click directly from the Bloomberg Terminal.

77.     By targeting and selling SIBOR- and SOR-based derivatives to U.S. counterparties and employing derivatives traders in their New York and Connecticut branches that traded SIBOR- and SOR-based derivatives from within the United States, Defendants purposefully availed themselves of this District.

**5.  Defendants Utilized United States Wires in Furtherance of the Conspiracy.**

78.     Defendants are subject to the jurisdiction of this Court because they used U.S. domestic and interstate wires to accomplish their fixing and manipulation of SIBOR, SOR, and

---

[31] These Defendants list themselves on the Bloomberg Terminal for the sale of SIBOR- and SOR-base derivatives as "ANZ Bank," "Barclays," "BNP Paribas," "Citigroup," "Commerzbank," "Credit Agricole CIB," "Credit Suisse," "Deutsche Bank," "HSBC," "JP Morgan Chase," "OCBC Bank," "Standard Chartered Bank," and "UBS Investment Bank."

the prices of SIBOR- and SOR-based derivatives. Defendants knowingly aimed their false SIBOR and SOR submissions to Thomson Reuters, which is located in the United States, and published the SIBOR and SOR fixes along with these false submissions and confirmations for collusive transactions intended to impact SIBOR and SOR to investors in the United States, using U.S. wires, through Bloomberg and other financial services platforms. Each business day, Thomson Reuters transmitted all of the SIBOR contributor panel banks' individual SIBOR and SOR submissions and the final averaged SIBOR and SOR rates to three data centers for worldwide publication, including one such data center in Hauppauge, New York.

79.    Defendants' restraints of trade, intentional false reporting, manipulation and agreements to fix SIBOR and SOR and manipulate the prices of SIBOR- and SOR-based derivatives had direct, substantial, and foreseeable effects on commerce in the United States, and on the SIBOR- and SOR-based derivatives in which Plaintiffs and members of the Class transacted during the Class Period. As discussed, U.S. market participants traded trillions of dollars in SIBOR- and SOR-based derivatives during the Class Period. Defendants, as SIBOR contributor banks and sophisticated market participants, knew that SIBOR and SOR were disseminated by Thomson Reuters and other financial information services in the United States. Defendants also knew that SIBOR and SOR were used in the United States to price, benchmark and/or settle SIBOR- and SOR-based derivatives purchased, sold, or owned here because they offered these products and used these rates to price their own positions with investors like Plaintiffs, FrontPoint, and the Class. For these reasons, Defendants intended that making false SIBOR and SOR submissions to the ABS and engaging in collusive transactions that would manipulate SOR would distort SIBOR and SOR away from their competitive prices and would (and did) have direct, intentional, substantial, and reasonably foreseeable effects in the United

States. This included the intentional, direct effect of manipulating to artificial levels the prices of SIBOR- and SOR-based derivatives contracts transacted in the United States.

### 6. Defendants Consented to Jurisdiction by Registering to Do Business in This District.

80.     Defendants The Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Agricole CIB, Credit Suisse AG, Deutsche Bank AG, ING Bank, N.V., The Oversea-Chinese Banking Corporation Ltd., Standard Chartered Bank, United Overseas Bank Ltd., and The Royal Bank of Scotland plc, consented to personal jurisdiction, or otherwise purposely availed themselves of this forum, by registering their New York branches and/or representative or agency offices with the NYSDFS under New York Banking Law § 200-b. To benefit from the advantages of transacting business in this forum, these Defendants registered with the NYSDFS, which confers privileges and benefits and binds these entities to the same judicial constraints as domestic corporations.[32] New York Banking Law § 200-b provides that by so registering, these Defendants consent to the personal jurisdiction of this Court. The Bank of Tokyo-Mitsubishi, Barclays, BNP Paribas, Commerzbank AG, Credit Agricole CIB, Credit Suisse, Deutsche Bank, ING Bank, N.V., The Oversea-Chinese Banking Corporation Ltd., Standard Chartered, United Overseas Bank Ltd., and RBS promoted the legitimacy of their businesses by registering to do business in New York and have therefore consented to jurisdiction within this district or otherwise purposefully availed themselves of the forum. Defendants RBS and UBS consented to personal jurisdiction in the United States by registering with the Connecticut Department of Banking under Section 36a-428g of the Connecticut General Statutes. In addition, Barclays Bank plc, The Royal Bank of Scotland plc,

---

[32] *See Vera v. Republic of Cuba*, No. 12-cv-1596, 2015 U.S. Dist. LEXIS 32846 (S.D.N.Y. Mar. 17, 2015).

and UBS AG registered to do business in Pennsylvania pursuant to 15 Pa.C.S.A § 4124. By

registering pursuant to 15 Pa.C.S.A § 4124, these Defendants likewise consented to personal

jurisdiction in Pennsylvania courts.

7. **Defendants Conspired with U.S. Persons and Entities to Manipulate SIBOR, SOR, and the Prices of SIBOR and SOR-Based Derivatives.**

81.     Defendants are subject to personal jurisdiction by virtue of participating in a

conspiracy with U.S.-based persons and entities who manipulated SIBOR, SOR and the prices of

SIBOR- and SOR-based derivatives from within the United States. MAS found that U.S.

Defendants Bank of America, N.A., Citibank, N.A., and JPMorgan Chase Bank, N.A. conspired

with the other Defendants to manipulate SIBOR and SOR. By conspiring with U.S.-based

entities, the Defendants knowingly and purposefully directed their conduct at the United States

and are further subject to the jurisdiction of this Court.


## PARTIES

82.     Plaintiff FLH is a Delaware limited liability company with its principal place of

business in Massachusetts.

83.     FrontPoint was an investment fund with its principal place of business in

Greenwich, Connecticut during the Class Period.

84.     FrontPoint ceased operations and dissolved on November 11, 2011. Prior to its

dissolution, on July 13, 2011, FrontPoint unconditionally and irrevocably transferred all claims

arising out of its SIBOR- and SOR-based derivatives transactions to Plaintiff in exchange for

valuable consideration, pursuant to the terms of a valid Asset Purchase Agreement ("APA").

85.     The APA transferred all rights, title, and ownership associated with these claims

to Plaintiff and granted Plaintiff an irrevocable power of attorney coupled with an interest, giving

Plaintiff the right to take any steps it deemed reasonable and necessary to maximize the value of

the assets Plaintiff acquired from FrontPoint pursuant to the APA. These rights include, without

limitation, the power of Plaintiff to participate in and initiate lawsuits in FrontPoint's name,

place, and stead for claims related to its SIBOR- and SOR-based derivatives transactions.[33] The

APA further provides that Plaintiff's power to act pursuant to the APA may not be terminated or

revoked at any time by FrontPoint and survives FrontPoint's dissolution.

86.     Plaintiff exercised its rights and powers under the APA to initiate this action and

bring claims related to the at least 24 swap transactions, including based on one-month SIBOR,

that FrontPoint entered within the United States during the Class Period directly with Defendants

Deutsche Bank AG and Citibank, N.A. These transactions occurred at artificial prices

proximately caused by Defendants' unlawful manipulation of SIBOR and the restraints of trade

alleged herein. FrontPoint was damaged as a result of Defendants' manipulative conduct when it

was overcharged and/or underpaid in these SIBOR-based derivatives transactions.

87.     Plaintiff Moon Capital Partners Master Fund Ltd. ("Moon Capital Partners") is an

investment fund with its principal place of business in New York. Moon Capital Partners entered

into an SGD FX forward transaction with Defendant UBS AG on February 16, 2009 agreeing to

purchase SGD 3,155,878 on August 19, 2009. This SGD FX forward was priced based on USD

SIBOR and SOR. *See* ¶¶ 187-200. Moon Capital Partners transacted with UBS AG at an

artificial price and was overcharged and/or underpaid in this FX forward transaction as a direct

and proximate result of Defendants' unlawful manipulation of SIBOR and SOR and the

restraints of trade alleged herein.

---

[33] After reviewing the APA, this Court concluded that "the document[] appear[s] to show a full assignment of rights to FLH, which therefore has the capacity to sue here," and granted leave to file this amended complaint, with Fund Liquidation Holdings as Plaintiff.  ECF No. 302 at 24 (Oct. 4, 2018 Order).

88. Plaintiff Moon Capital Master Fund Ltd ("Moon Capital Master"), is a Cayman Islands limited corporation with its principal place of business in New York. Moon Capital Master entered into an SGD FX forward transaction with Defendant UBS AG on February 16, 2009, agreeing to purchase SGD 12,063,122 on August 19, 2009. This SGD FX forward was priced based on USD SIBOR and SOR. *See* ¶¶ 187-200. Moon Capital Master transacted with UBS AG at an artificial price and was overcharged and/or underpaid in this FX forward transaction as a direct and proximate result of Defendants' unlawful manipulation of SIBOR and SOR and the restrains of trade alleged herein.

### A. <u>Citibank,</u>

89. Citigroup Inc. ("Citigroup") is a Delaware corporation with its headquarters at 399 Park Avenue, New York, New York 10043.

90. Defendant Citibank, N.A is a federally-chartered national banking association incorporated in South Dakota and a wholly-owned subsidiary of Citigroup. Citibank, N.A. maintains an office at 399 Park Avenue, New York, New York 10043. Citibank N.A. is provisionally registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[34] MAS found that Citibank, N.A. manipulated SIBOR and SOR. Citibank, N.A. was a member of the SIBOR and SOR panels during the Class Period.

91. Collectively, Citigroup, Inc. and Citibank, N.A. are referred to as "Citibank."

### B. <u>Bank of America</u>

92. Bank of America Corporation is incorporated in Delaware and headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of America Corporation operates

---

[34] 17 C.F.R. § 1.3 (2016).

an investment banking division located at Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036.

93.      Defendant Bank of America, N.A. is a federally-chartered national banking association headquartered at 101 South Tyron Street, Charlotte, North Carolina 28255. Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corporation. Bank of America operates an office at the Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036. Bank of America, N.A. is a provisionally registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account." MAS found that Bank of America, N.A. manipulated SIBOR and SOR. Bank of America, N.A. was a member of the SIBOR and SOR panels during the Class Period.

94.      Collectively, Bank of America Corporation, and Bank of America, N.A., are referred to as "Bank of America."

C.      **JPMorgan**

95.      JPMorgan Chase & Co. is a Delaware corporation with its headquarters located at 270 Park Avenue, New York, New York 10017. JPMorgan Chase & Co. provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services. Its U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[35] JPMorgan Chase & Co. is registered with the Board of Governors of the Federal Reserve System.

---

[35] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (JPMorgan participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

96.     Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association headquartered at 270 Park Avenue, New York, New York 10017. JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of J.P. Morgan Chase & Co. JPMorgan Chase Bank, N.A. is a provisionally registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[36] MAS found that JPMorgan Chase Bank, N.A. manipulated SIBOR and SOR. JPMorgan Chase Bank, N.A. was a member of the SIBOR and SOR panels during the Class Period.

97.     Collectively, JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to as "JPMorgan."

**D.      The Royal Bank of Scotland**

98.     The Royal Bank of Scotland Group plc is a registered bank holding company headquartered in the United Kingdom. According to The Royal Bank of Scotland Group plc's 2013 U.S. Resolution Plan, the Group made 20% of its income for the 2012 year in the United States.

99.     Defendant The Royal Bank of Scotland plc, a direct subsidiary of The Royal Bank of Scotland Group plc, is a banking and financial services company headquartered in the United Kingdom. During the Class Period, The Royal Bank of Scotland plc maintained a branch at 340 Madison Avenue, New York, NY 10173. RBS's New York branch was licensed, supervised, and regulated by the NYSDFS to do business in this state. The Royal Bank of Scotland plc also had a branch located at 600 Washington Boulevard, Stamford, CT 06901. The Royal Bank of Scotland plc is regulated by the Board of Governors of the Federal Reserve System. The Royal Bank of

---

[36] *See supra* note 34.

Scotland plc is registered with CFTC as a provisionally-registered swap dealer, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[37] The Royal Bank of Scotland plc is an approved Swap Firm and National Futures Association Member. The Royal Bank of Scotland's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps.[38]

100.    The Royal Bank of Scotland plc was a member of the SIBOR and SOR panels during the Class Period. MAS found that The Royal Bank of Scotland plc manipulated SIBOR and SOR.

101.    RBS Securities Japan Limited ("RBS Japan") is a wholly-owned subsidiary of The Royal Bank of Scotland plc that functions as a broker-dealer in addition to having market operations. In their settlement with the CFTC, The Royal Bank of Scotland plc and RBS Japan both admitted to successfully manipulating SIBOR and SOR, along with several other benchmark interest rates.[39]

102.    Collectively, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, and RBS Japan are referred to as "RBS."

**E.    UBS**

103.    Defendant UBS AG ("UBS") is a banking and financial services company headquartered in Switzerland. UBS provides investment banking, asset management, and wealth management services for private, corporate, and institutional clients worldwide. MAS found that

---

[37] *Id.*

[38] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (RBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[39] *See* Ex. A at 3-4 & n.3.

UBS manipulated SIBOR and SOR. UBS was a member of the SIBOR and SOR panels during the Class Period.

104.    UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its headquarters in New York and Stamford, Connecticut. UBS is registered with the Office of the Comptroller of the Currency ("OCC") and is licensed and supervised by the Board of Governors of the Federal Reserve System. UBS is registered with the CFTC as a provisionally-registered swap dealer, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[40] UBS is an approved Swap Firm and National Futures Association Member. UBS's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, and foreign exchange swaps.[41] During the class period, UBS maintained foreign exchange ("FX") trading desks in three locations: Stamford, Singapore, and Zurich.[42]

105.    UBS filed a Resolution Plan with the Federal Reserve in 2014 in which it acknowledged that it is a global institution with the majority of its operations located in Switzerland, the United Kingdom, and the United States.[43] UBS's shares are registered as Global Registered Shares on the New York Stock Exchange ("NYSE").

106.    UBS Securities Japan Co. Ltd., the successor company to UBS Securities Japan, Ltd. (collectively, "UBS Japan"), is one of UBS's wholly-owned subsidiaries that engages in

---

[40] *See supra* note 34.

[41] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (UBS participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[42] *Report: Foreign Exchange Trading at UBS AG: Investigation Conducted by FINMA,* Swiss Financial Market Supervisory Authority FINMA (Nov. 12, 2014) at 7, https://www.finma.ch/en/~/media/finma/dokumente/dokumentencenter/8news/20141112-ubs-fx-bericht.pdf?la=en.

[43] *2014 UBS US Resolution Plan - Public Section*, UBS AG (July 2014) at 4.

investment banking and broker-dealer operations. UBS Securities Japan Co. Ltd. admitted and acknowledged that it is responsible for the acts of its predecessor company's officers and employees. In their settlement with the CFTC, UBS AG and UBS Securities Japan Co., Ltd. both admitted to manipulating submissions for SIBOR and SOR, among other rates.[44]

F.   **ING**

107.   ING Groep N.V. is a holding company organized under the laws of The Netherlands. ING Groep N.V. offers banking, insurance, and investment management service worldwide. The American Depositary Receipts ("ADRs") for ING Groep N.V. are listed on the NYSE.

108.   Defendant ING Bank N.V. ("ING"), is a global financial services company headquartered in Amsterdam, The Netherlands. ING has over €1.2 trillion in consolidated assets worldwide. ING maintains a bank representative office at 1325 Avenue of the Americas, New York, New York 10019, which is regulated by the Board of Governors of the Federal Reserve System and the NYSDFS. MAS found that ING manipulated SIBOR and SOR. During the Class Period, ING was a member of the SOR panel.

109.   ING Capital Markets LLC is a corporation with its principal place of business in New York, New York. ING Capital Markets LLC "is the U.S. swap dealer subsidiary of ING Bank N.V," according to ING Financial Holdings Corporation's General Counsel and Managing Director.[45]  ING Capital Markets LLC is a provisionally-registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[46] ING Capital Markets LLC is an

---

[44] *See* Ex. C at 38 n. 21.

[45] Comment of Marcy S. Cohen Regarding Proposed Rule 76 FR 27802 (Feb. 19, 2013).

[46] See *supra* note 34.

approved Swap Firm and National Futures Association Member. ING Capital Markets LLC

trades interest rate swaps, equity swaps, CDS, FX, options and commodities on a global basis,

including from within this district.

110.     Collectively, ING Groep, N.V., ING Bank N.V., and ING Capital Markets LLC

are referred to as ING.

G.     **BNP Paribas**

111.     Defendant BNP Paribas, S.A. is one of the world's largest global banking

organizations, with its headquarters in Paris. During the Class Period, BNP Paribas, S.A. was a

member of the SIBOR and SOR panels. MAS found that BNP Paribas, S.A. manipulated SIBOR

and SOR.

112.     BNP Paribas, S.A., maintains a branch at 787 Seventh Avenue, New York, New

York 10019. BNP Paribas, S.A.'s New York branch, which serves as the headquarters of BNP

Paribas's U.S. operations, is licensed, supervised, and regulated to do business in this state by the

NYSDFS. BNP Paribas, S.A. is also regulated by the Board of Governors of the Federal Reserve

System. BNP Paribas considers its New York Branch to be a "material entity" within the United

States.[47] BNP Paribas, S.A.  is a provisionally registered swap dealer with the CFTC, and as

such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an

ordinary course of business for its own account."[48] BNP Paribas, S.A. is an approved Swap Firm

and National Futures Association Member.

113.     BNP Paribas, S.A. has significant retail operations in the U.S., and offers

corporate and investment banking services to clients in New York through its Global Equities

---

[47] *Public Section, BNP Paribas 165(d) Resolution Plan*, BNP PARIBAS (July 1, 2013) at 4.

[48] *See supra* note 34.

and Commodity Derivatives division, among others.[49] BNP Paribas, S.A., together with its subsidiaries, employs approximately 15,000 people in the U.S. and maintains locations in nine states.[50] According to its 2013 U.S. Resolution Plan, BNP Paribas, S.A. is "a global player in the derivatives markets" and "actively trades in derivatives . . . including swaps, forwards, futures, and options."[51] BNP Paribas, S.A.'s U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[52]

114.    BNP Paribas North America, Inc. is a Delaware corporation headquartered at 787 7th Avenue, New York, New York 10019. BNP Paribas North America Inc. provides corporate, investment banking, and securities brokerage activities and is a subsidiary of BNP Paribas S.A.

115.    BNP Paribas Securities Corp. is a financial services firm incorporated in Delaware with its principal place of business in New York, New York. BNP Paribas Securities Corp. "underwrites, trades and markets a vast array of global and domestic fixed income and equity products."[53] BNP Paribas Securities Corp. is a wholly-owned subsidiary of BNP Paribas North America, Inc. BNP Paribas Securities Corp. is registered as a broker-dealer with FINRA, the Securities and Exchange Commission ("SEC") and as a futures commission merchant with the CFTC. BNP Paribas Securities Corp. is also a clearing member of the Chicago Mercantile Exchange ("CME") and an approved Swap Firm and National Futures Association Member.

---

[49] *Public Section, BNP Paribas 165(d) Resolution Plan*, BNP PARIBAS (July 1, 2013) at 2.

[50] *Id*.

[51] *Id*. at 7.

[52] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (BNP Paribas participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

[53] *About BNP Paribas*, *available at* https://group.bnpparibas/en/news/bnp-paribas-securities-corp-establishes-institutional-sales-operation-san-francisco-1.

116.    BNP Paribas Prime Brokerage, Inc. is a Delaware corporation with its principal place of business in New York, New York. BNP Prime Brokerage, Inc, provides brokerage and futures commission merchant services in the U.S., Europe, and Asia.[54] Its brokerage services include financing solutions such as equity and portfolio swaps.[55] BNP Paribas Prime Brokerage, Inc. is a wholly-owned subsidiary of BNP Paribas North America, Inc. BNP Paribas Prime Brokerage, Inc. is registered as a futures commission merchant with the CFTC. BNP Paribas Prime Brokerage, Inc. is registered as a broker-dealer with FINRA.

117.    Collectively, BNP Paribas, S.A., BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Paribas Prime Brokerage, Inc., are referred to as "BNP Paribas."

### H.    Oversea-Chinese Banking Corporation

118.    Defendant The Oversea-Chinese Banking Corporation Ltd. ("OCBC") is a banking and financial services organization headquartered in Singapore. As of October 2013, OCBC is the second largest financial services group in Southeast Asia by assets.[56] MAS found that OCBC manipulated SIBOR and SOR. OCBC was a member of the SIBOR and SOR panels during the Class Period.

119.    OCBC maintains a NYSDFS-regulated agency office at 1700 Broadway, New York, New York 10019. OCBC is also regulated by the Board of Governors of the Federal Reserve System. As of September 30, 2014, OCBC's New York branch held $12.1 billion in total assets.[57]

---

[54] *Company Overview of BNP Paribas Prime Brokerage, Inc.,* BLOOMBERG, *available at* http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=69090707.

[55] *Id.*

[56] *U.S. Resolution Plan, Section 1: Public Section*, OVERSEA-CHINESE BANKING CORPORATION LIMITED (Dec. 31, 2013), https://www.federalreserve.gov/bankinforeg/resolution-plans/oversea-chinese-bking-3g-20131231.pdf.

[57] *Structure Data for the U.S. Offices of Foreign Banking Organizations*, THE FEDERAL RESERVE BOARD, *available at* http://www.federalreserve.gov/releases/iba/201409/bycntry.htm.

## I.  **Barclays**

120.    Barclays PLC is a global financial services company headquartered and incorporated in England. The ADRs for Barclays PLC are listed on the NYSE.

121.    Defendant Barclays Bank PLC maintains a branch at 745 Seventh Avenue New York, New York 10019. Barclays Bank PLC's New York branch has been licensed, supervised, and regulated by the NYSDFS to do business in this state since 1963. Barclays Bank PLC's New York branch has over 500 employees and more than $36 billion in total assets.[58] Barclays Bank PLC is also regulated by the Board of Governors of the Federal Reserve System and the Florida Office of Financial Regulation. Barclays Bank PLC is a provisionally registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[59] MAS found that Barclays Bank PLC manipulated SIBOR and SOR. During the Class Period, Barclays Bank PLC was a member of the SOR panel.

122.    Barclays Capital Inc. ("BCI"), a wholly-owned subsidiary of Barclays PLC, is a financial services firm incorporated in Connecticut that offers advisory, brokerage, and banking services. BCI maintains its headquarters at 745 Seventh Avenue New York, New York 10019. BCI's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[60] BCI is a clearing firm on the CME, the Chicago Board of Trade ("CBOT"),

---

[58] NYSDFS Consent Order under New York Banking Law § 44 against Barclays Bank PLC and Barclays Bank PLC, New York Branch (Nov. 17, 2015) at 1.

[59] *See supra* note 34.

[60] See Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (BCI participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction").

the New York Mercantile Exchange ("NYMEX"), and the Commodity Exchange, Inc.

("COMEX"). BCI is registered with the CFTC as a Futures Commission Merchant, an Exempt

Foreign Agent, a Commodity Pool Operator, and Commodity Trading Advisor. Barclays Capital

Inc. is registered with FINRA as a broker-dealer. In its 2013 U.S. Resolution Plan, Barclays PLC

identified Barclays Bank PLC's New York branch and Barclays Capital Inc. as material entities

within the U.S.[61]

123.    Collectively, Barclays PLC, Barclays Bank PLC, and BCI are referred to as

"Barclays."

**J.    Deutsche Bank**

124.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services

company headquartered in Frankfurt, Germany. MAS found that Deutsche Bank manipulated

SIBOR and SOR. Deutsche Bank was a member of the SIBOR and SOR panels during the Class

Period.

125.    Deutsche Bank's U.S. headquarters is in New York. Its New York branch is

located at 60 Wall Street, New York, New York 10005. Deutsche Bank considers its New York

branch to be a "material entity" within the United States.[62] Deutsche Bank AG's New York

branch is licensed, supervised, and regulated by the NYSDFS to do business in this state.

Deutsche Bank is also registered with the Board of Governors of the Federal Reserve System.

Deutsche Bank AG's New York branch has more than 1,700 employees and total assets

exceeding $152 billion. Deutsche Bank is a provisionally registered swap dealer with the CFTC,

and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties

---

[61] Resolution Plan - Public Section, BARCLAYS PLC (Oct. 2013) at 6, available at
https://www.federalreserve.gov/bankinforeg/resolution-plans/barclays-plc-1g-20131001.pdf.

[62] *Resolution Plan July 2014 Submission, Section 1: Public Section*, DEUTSCHE BANK AG (July 1, 2014) at 4.

as an ordinary course of business for its own account."[63] Deutsche Bank is an approved Swap Firm and National Futures Association Member. Deutsche Bank's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[64] In its settlement with the CFTC, Deutsche Bank admitted to manipulating SIBOR and SOR, in addition to Yen-LIBOR, USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, and EURIBOR.[65]

### K.     Credit Agricole CIB

126.    Crédit Agricole S.A. is a financial services company headquartered and incorporated in France. Crédit Agricole S.A. owns a 97.8% interest in Defendant Crédit Agricole Corporate and Investment Bank ("Credit Agricole CIB"), which Crédit Agricole S.A. considers its only business line that has a significant presence in the United States.[66] Crédit Agricole S.A. lists Crédit Agricole CIB's New York branch as a "material entity" in the United States.[67] Crédit Agricole S.A.'s "core business lines" that it conducts from within the United States include Crédit Agricole CIB New York Branch's Global Markets Division, which sells and trades certain debt instruments and derivatives, including interest rates and foreign exchange.[68]

127.    Crédit Agricole CIB's New York branch is located in this district at 1301 Avenue of the Americas New York, New York 10019. Crédit Agricole CIB's New York branch is licensed, supervised, and regulated by the NYSDFS. Crédit Agricole CIB is a provisionally

---

[63] *See supra* note 34.

[64] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Deutsche Bank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[65] CFTC Deutsche Bank Order at 2-3 & n.3.

[66] U.S. Resolution Plan Public Section, CRÉDIT AGRICOLE S.A. (Dec. 27, 2013) at 1-2.

[67] *Id.* at 4.

[68] *Id*.

registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[69] Crédit Agricole CIB is an approved Swap Firm and National Futures Association Member. Crédit Agricole CIB is also regulated by the Board of Governors of the Federal Reserve System. MAS found that Crédit Agricole CIB manipulated SIBOR and SOR. During the Class Period, Crédit Agricole CIB was a member of the SIBOR and SOR panels.

128.    Collectively, Credit Agricole CIB and Credit Agricole S.A. are referred to as "Credit Agricole."

**L.      Credit Suisse**

129.    Credit Suisse Group AG is a Swiss banking and financial services company incorporated in Switzerland. Credit Suisse Group provides a broad range of services to individual and corporate clients, such as investment banking, private banking, and asset management. Of its six primary offices, one is located at 11 Madison Avenue, New York, New York 10010. Together with its subsidiaries, Credit Suisse Group employs over 8,000 people in the United States, 7,840 of which are in New York.[70]

130.    Defendant Credit Suisse AG, a wholly-owned subsidiary of Credit Suisse Group, maintains a branch office at 11 Madison Avenue, New York 10010. Credit Suisse AG is licensed, supervised, and regulated by the NYSDFS to do business in this state. Credit Suisse AG is also licensed and supervised by the Board of Governors of the Federal Reserve System. MAS found that Credit Suisse AG manipulated SIBOR and SOR. Credit Suisse was a member of the SIBOR and SOR panels during the Class Period.

---

[69] *See supra* note 34.

[70] Decl. of Pierre Schreiber in Support of Credit Suisse Group AG's Mot. to Dismiss, *In re: Libor-Based Financial Instruments Litigation*, 11-cv-2262, No. 765 (S.D.N.Y. Nov. 6, 2014).

131.    In 2013, Credit Suisse ranked first in overall fixed income trading in the United States with the largest market share of all dealers.[71] Credit Suisse's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps.[72] Credit Suisse's Investment Banking Department houses its Rate Products Team, which is a global market maker in cash and derivatives markets and a primary dealer in the United States, trading, *inter alia*, interest rate swaps and options and other risk management structures and forms.

132.    In Credit Suisse's Form 20-F filed annually with the SEC, Credit Suisse lists numerous securities that are listed on the NYSE and other U.S. exchanges. Credit Suisse also operates in the United States through direct and indirect subsidiaries, including Credit Suisse Holdings (USA), Inc., Credit Suisse (USA), Inc., Credit Suisse Securities (USA), Inc., Credit Suisse Securities (USA) LLC and Credit Suisse International. All have offices in New York. Credit Suisse's wholly-owned subsidiary, Credit Suisse Securities (USA) LLC ("CSSU"), is headquartered in New York. During the Class Period, CSSU was a Clearing Firm on several of the CME Group's Exchanges, including the CME, NYMEX, Chicago Board of Trade ("CBOT"), and Commodities Exchange Inc. ("COMEX").

133.    Credit Suisse International is a UK company and wholly-owned subsidiary of Credit Suisse AG and Credit Suisse Group AG. Credit Suisse International, "a global market leader in over-the-counter derivative products," is the "principal swap dealing entity' for Credit

---

[71] *See* GREENWICH ASSOCIATES, *2013 Greenwich Leaders: U.S. Fixed Income* (July 24, 2013) at 1, *available at* https://www.greenwich.com/fixed-income-fx-cmds/2013-greenwich-leaders-us-fixed-income.

[72] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Credit Suisse Group participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

Suisse Group.[73] Credit Suisse International is a provisionally-registered swap dealer with the

CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with

counterparties as an ordinary course of business for its own account."[74] Credit Suisse

International is an approved Swap Firm and National Futures Association Member. In its 2015

U.S. Resolution Plan, Credit Suisse Group AG stated that, until 2015, Credit Suisse International

handled all of the Group's U.S. derivatives business as well as its Singapore-based Asia Pacific

derivatives businesses.[75]

134.     Collectively, Credit Suisse Group, Credit Suisse AG, and Credit Suisse

International are referred to as "Credit Suisse."

### M.     <u>Standard Chartered</u>

135.     Standard Chartered plc is an international banking and financial services company

headquartered in London, England.

136.     Defendant Standard Chartered Bank is an international bank headquartered in

London, England. Standard Chartered Bank is a wholly owned subsidiary of Standard Chartered

plc. MAS found that Standard Chartered Bank manipulated SIBOR and SOR. Standard

Chartered Bank was a member of the SIBOR and SOR panels during the Class Period.

137.     Standard Chartered Bank maintains a branch at 1095 Avenue of the Americas,

New York, New York 10036. Standard Chartered Bank's New York branch is licensed,

supervised, and regulated by the NYSDFS to do business in this state. Standard Chartered

Bank's New York branch is also regulated by the Board of Governors of the Federal Reserve

---

[73] *Annual Report 2012*, CREDIT SUISSE INTERNATIONAL (2012) at 2, 7, available at https://www.credit-suisse.com/media/ib/docs/investment-banking/financial-regulatory/international/csi-annual-report-2012.pdf.

[74] *See supra* note 34.

[75] *Credit Suisse Global Recovery and Resolution Plan, Chapter 1 – Public Section*, CREDIT SUISSE GROUP AG (June 2015) at 1-21, *available at* https://www.fdic.gov/regulations/reform/resplans/plans/creditsuisse-165-1507.pdf

System and the Federal Reserve Bank of New York. Standard Chartered Bank is a provisionally-registered swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[76] Standard Chartered Bank is an approved Swap Firm and National Futures Association Member.

138.    Standard Chartered plc considers its New York branch to be a "material entity" within the United States.[77] Standard Chartered Bank's New York branch offers banking services to corporate and institutional clients in the Americas who have trade or investment links with markets in Asia, Africa, and the Middle East.[78] Standard Chartered Bank maintains offices in New York, California, Florida, and Texas and has 1,200 employees in the United States. Standard Chartered Bank's U.S.-based dealers trade in the over-the-counter foreign exchange market.[79] Standard Chartered Bank's Financial Markets division, which offers derivative products to its customers, is located in this district.

139.    Collectively, Standard Chartered plc and Standard Chartered Bank are referred to as "Standard Chartered."

**N.    DBS Bank**

140.    DBS Group Holdings Limited is an investment holding company headquartered in Singapore. Defendant DBS Bank Ltd. is a multinational banking and financial services company headquartered in Singapore. DBS Bank Ltd. is a wholly-owned subsidiary of DBS Group Holdings Limited and is the largest banking group incorporated in southeast Asia by total

---

[76] *See supra* note 34.

[77] 2013 US Resolution Plan Section I – Public Section, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK, STANDARD CHARTERED BANK NEW YORK BRANCH (Dec. 19, 2013) at 1, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/standard-chartered-bk-3g-20131231.pdf.

[78] *Id.*

[79] *See* Federal Reserve Bank of New York 2010 Survey at 13, 17-18 (Standard Chartered participated in the survey as a foreign exchange dealer).

assets.[80] DBS Bank Ltd. maintains a U.S. branch at 725 S. Figueroa Street, Los Angeles,

California. DBS Bank's U.S. branch is regulated by the Board of Governors of the Federal

Reserve, the FDIC, and the California Department of Business Oversight. MAS found that DBS

Bank Ltd. manipulated SIBOR and SOR. DBS Bank Ltd. was a member of the SIBOR and SOR

panels during the Class Period.

141.    DBS Vickers Securities (USA) Inc. is a Delaware corporation with its principal

place of business at 777 3rd Avenue, New York, New York, 10017. DBS Vickers Securities is the

securities and derivatives arm of DBS Group and offers a broad range of financial services,

including derivatives trading.[81] DBS Vickers Securities (USA) Inc. is a subsidiary of DBS

Vickers Securities Holdings PTE Ltd., a Singapore company, which in turn is wholly-owned by

Defendant DBS Bank Ltd.[82] DBS Vickers Securities (USA) Inc. is regulated by the Financial

Industry Regulator Authority (FINRA).

142.    Collectively, DBS Bank Ltd. and DBS Vickers Securities (USA) Inc. are referred

to as "DBS Bank."

**O.    United Overseas Bank Limited**

143.    Defendant United Overseas Bank Limited is a multinational banking organization

headquartered in Singapore and has more than 500 offices in 19 countries and territories

throughout Asia, Europe, and North America. United Overseas Bank Limited maintains Agency

offices in both New York and Los Angeles, with over 50 employees in the United States. United

Overseas Bank Limited's NYSDFS-regulated New York Agency office is at 592 Fifth Avenue,

---

[80] *U.S. Resolution Plan, Section 1: Public Section*, DBS BANK LTD. (Dec. 31, 2013) at 2.

[81] *About DBS Vickers Securities*, *available at* https://www.dbs.com/newsroom/print-news.page?newsId=i0bk3q1y&locale=en.

[82] *Resolution Plan, Section 1: Public Section*, DBS BANK LTD. (Dec. 31, 2013) at 1, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/dbs-bk-3g-20131231.pdf.

New York, NY 10036. According to its 2013 U.S. Resolution Plan, United Overseas Bank Limited's New York Agency office held approximately $5 billion dollars in assets as of December 31, 2012.[83] In its 2013 U.S. Resolution Plan, United Overseas Bank Limited stated that it engages in derivatives activity in the United States, including "interest rate and currency swaps in connection with its commercial lending operations in its two agency offices [in New York and Los Angeles]."[84] MAS found that United Overseas Bank Limited manipulated SIBOR and SOR. United Overseas Bank Limited was a member of the SIBOR panel during the Class Period.

144.    UOB Global Capital, LLC is an asset management company that maintains its headquarters at 592 Fifth Avenue, New York, NY. UOB Global Capital, LLC operates as a subsidiary of United Overseas Bank Limited and is the global asset management affiliate of the UOB group, offering a range of both U.S. and Asian fixed income and equity products to its customers in the United States and around the world[85] UOB Global Capital states that it "brings UOB's Asian regional investment strengths to clients outside that region who are seeking exposure there."[86]

145.    Collectively, United Overseas Bank Limited and UOB Global Capital, LLC are referred to as "UOB."

P.    **Australia and New Zealand Banking Group**

---

[83] *UOB U.S. Resolution Plan, Public Section*, UNITED OVERSEAS BANK LIMITED (Dec. 31, 2013) at 2.

[84] *Id*. at 7.

[85] UOB Global Capital, LLC "is backed by the resources of the UOB Group. UOB has acted as co-investor in a number of UOBGC's investment fund and products, providing seed capital and demonstrating the Group's commitment to its investment management business." *UOB Global Capital – History*, *available at* http://www.uobglobal.com/history/.

[86] *Id*.; *UOB Global Capital – Capabilities*, *available at* http://www.uobglobal.com/capabilities/.

146.    Defendant Australia and New Zealand Banking Group Ltd. is headquartered in Melbourne, Australia and is the fourth-largest bank in Australia and among the top twenty largest banks in the world.[87] MAS found that Australia and New Zealand Banking Group Ltd. manipulated SIBOR and SOR. Australia and New Zealand Banking Group Ltd. was a member of the SIBOR panel during the Class Period.

147.    Australia and New Zealand Banking Group Ltd. maintains a licensed branch at 277 Park Avenue, New York, New York 10172. ANZ's New York branch is registered as a Foreign Banking Organization with the U.S. Office of the Comptroller of Currency ("OCC") and regulated by the Federal Reserve Bank of New York. Australia and New Zealand Banking Group Ltd.  is also regulated by the Board of Governors of the Federal Reserve System. Australia and New Zealand Banking Group Ltd. has operated its New York branch since December 1968.

148.    Australia and New Zealand Banking Group Ltd.  provides corporate and investment banking services and international trade finance from its New York branch, including foreign exchange, currency options, and credit and interest rate derivatives.[88] Australia and New Zealand Banking Group Ltd. considers its New York branch to be an "extension" of the bank in the United States.[89] According to the Federal Reserve Board, Australia and New Zealand Banking Group Ltd.'s New York branch held $17.7 billion in assets as of September 30, 2014.[90] Australia and New Zealand Banking Group Ltd.'s ADRs are listed on the NYSE. Australia and New Zealand Banking Group Ltd. is provisionally registered as a swap dealer with the CFTC,

---

[87] *2015 Annual Report*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD (2015) at 1.

[88] *Public Section of 2013 § 165(d) Tailored Resolution Plan*, AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD., (Dec. 31, 2013) at 3, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/australia-new-zealand-bking-3g-20131231.pdf.

[89] *Id.* at 2.

[90] *Structure Data for the U.S. Offices of Foreign Banking Organizations*, THE FEDERAL RESERVE BOARD, *available at* http://www.federalreserve.gov/releases/iba/201409/bycntry.htm.

and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[91] Australia and New Zealand Banking Group Ltd. is an approved Swap Firm and National Futures Association Member.

149.    ANZ Securities, Inc. is an investment banking corporation incorporated in New York and headquartered at 277 Park Avenue, New York, NY.  ANZ Securities, Inc., a wholly-owned subsidiary of Australia and New Zealand Banking Group Ltd., provides a range of services to its customers, including "export finance, structured finance, corporate banking, currency options and structured credit derivatives."[92] Through ANZ Securities, Inc., Australia and New Zealand Banking Group Ltd.'s New York-based team supports trade and investment flows between clients in America with Australia, New Zealand and Asia. ANZ Securities, Inc. is registered with FINRA as a broker dealer.

150.    Collectively, Australia and New Zealand Banking Group Ltd. and ANZ Securities, Inc. are referred to as "ANZ."

151.    When transacting with counterparties in this District, ANZ regularly designates New York law as the governing law and agrees that the courts of this District have jurisdiction. ANZ's Trade Terms for U.S.-based counterparties include an addendum titled "State of New York, United States of America as Governing Jurisdiction" that applies "where New York, New York, United States of America is the Governing Jurisdiction (being the city and the state in the United States of America in which the Customer's ANZ Office is located)."

Q.    **The Bank of Tokyo–Mitsubishi**

---

[91] *See supra* note 34.

[92] *Company Overview of ANZ Securities, Inc.*, BLOOMBERG, *available at* http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=33377552.

152.    Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-Mitsubishi") is a Japanese commercial bank that provides deposits, loans, insurance agency, and securities investment trusts for individuals and businesses. MAS found that The Bank of Tokyo-Mitsubishi UFJ, Ltd. manipulated SIBOR and SOR. During the Class Period, the Bank of Tokyo-Mitsubishi was a member of the SIBOR and SOR panels.

153.    Bank of Tokyo-Mitsubishi maintains a branch at 1251 Avenue of the Americas, New York, New York 10020-1104, as well as branches in Chicago and Los Angeles. Bank of Tokyo-Mitsubishi has maintained "a presence in New York since 1880." The Bank of Tokyo-Mitsubishi's New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Bank of Tokyo-Mitsubishi is also regulated by the Board of Governors of the Federal Reserve System and the National Futures Association.  Bank of Tokyo-Mitsubishi is provisionally registered as a swap dealer with the CFTC, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[93] Bank of Tokyo-Mitsubishi is an approved Swap Firm and National Futures Association Member.

154.    As of March 31, 2014, Bank of Tokyo-Mitsubishi had $134 billion in total assets and 2,135 full-time employees at its New York branch.[94]  One of the New York branch's "core business lines" is its Global Markets Division for the Americas, which transacts in financial market products and is responsible for market risk control management, hedge income management, and liquidity risk control.[95] Bank of Tokyo-Mitsubishi's New York Branch's other

---

[93] *See supra* note 34.

[94] *Public Mitsubishi UFJ Financial Group, Inc. Resolution Plan,* MITSUBISHI FINANCIAL GROUP INC. (July 1, 2014) at 5-6, *available at* http://www.federalreserve.gov/bankinforeg/resolution-plans/mitsubishi-fin-3g-20141231.pdf.

[95] *Id*. at 10.

core business line is the U.S. Corporate Banking Division, which transacts in foreign exchange and derivatives products.[96]

### R.    The Hongkong and Shanghai Banking Corporation Limited

155.    Defendant The Hongkong and Shanghai Banking Corporation Limited is a wholly-owned subsidiary of HSBC Holdings plc. The Hongkong and Shanghai Banking Corporation is incorporated in Hong Kong and is HSBC Group's principal banking subsidiary in the Asia-Pacific region, including in Singapore.[97] MAS found that The Hongkong and Shanghai Banking Corporation Limited manipulated SIBOR and SOR. During the Class Period, Defendant The Hongkong and Shanghai Banking Corporation Limited was a member of the SIBOR and SOR panels.

156.    HSBC Holdings plc identifies The Hongkong and Shanghai Banking Corporation Limited as a non-U.S. material entity because it is highly connected with HSBC Group's U.S. operations.[98] Further, there is "significant" financial and operational interconnectedness between Defendant The Hongkong and Shanghai Banking Corporation Limited and HSBC's U.S. entities.[99] For example, The Hongkong and Shanghai Banking Corporation Limited is provided an uncommitted line of credit from certain HSBC entities in the U.S., and holds uninsured deposits from HSBC's U.S. entities as well.[100] The Hongkong and Shanghai Banking Corporation Limited also "enters into back-to-back derivatives trades with HSBC Bank USA, N.A. in order to transfer market risk arising from the activities of certain business lines within

---

[96] *Id.*

[97] *Id.* at 6.

[98] *Id.* at 5-6.

[99] *US Resolution Plans Section I – Public Section,* HSBC HOLDINGS PLC, HSBC BANK USA, NATIONAL ASSOCIATION (Dec. 31, 2015) at 49.

[100] *Id.*

HSBC Bank USA, N.A." to other non-U.S. HSBC entities.[101] The Hongkong and Shanghai Banking Corporation Limited "also provides operational support to HSBC's material entities within the U.S., and receives operational support from these U.S. material entities in return."[102]

157.    Defendant The Hongkong and Shanghai Banking Corporation Limited's parent company, HSBC Holdings plc, is a British public limited company with its principal place of business in London. HSBC Holdings plc is the parent company of one of the world's largest banking and financial services groups, with subsidiaries providing services in 75 countries and territories and approximately 16,000 employees in the United States. HSBC Holdings plc owns 100% of the equity and voting interests in HSBC North America Holdings Inc., HSBC Bank (U.S.A.), N.A., and HSBC USA Inc.  HSBC Holdings plc and its subsidiaries' "core business lines" within the United States include its Global Markets-Rates Division, which transacts in interest rate swaps and other derivatives. HSBC's U.S.-based dealers trade in the over-the-counter foreign exchange and derivatives markets, which includes interest rate swaps, forward rate agreements, and foreign exchange swaps.[103] HSBC Holdings plc's ADRs are listed on the NYSE.

158.    In its 2013 U.S. Resolution Plan filed with the U.S. Federal Reserve Board, HSBC Holdings plc identified six U.S. material entities: HSBC North America Holdings Inc.; HSBC USA Inc.; HSBC Bank USA, National Association; HSBC Securities USA, Inc.; HSBC Technology & Services (USA) Inc.; and HSBC Finance Corporation.[104]

---

[101] *Id.*

[102] *Id.*

[103] *See* Federal Reserve Bank of New York 2010 Survey at 13, 17-18 (HSBC participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer).

[104] *US Resolution Plan Section I – Public Section*, HSBC HOLDINGS PLC, HSBC BANK USA, NATIONAL ASSOCIATION (July 1, 2013) at 5-6, *available at* https://www.federalreserve.gov/bankinforeg/resolution-plans/hsbc-2g-20130701.pdf.

159.    HSBC North America Holdings Inc. is a Delaware corporation and the top level holding company for HSBC Holding plc's operations in the U.S. Its principal place of business is located at 452 Fifth Avenue, New York, NY 10018.

160.    HSBC USA Inc. is a Maryland corporation and an intermediate level holding company for HSBC Holdings plc's operations in the U.S. Its principal subsidiary is HSBC Bank USA, N.A.

161.    HSBC Bank USA, N.A. is HSBC Holdings plc's principal U.S. banking subsidiary and is a national banking association chartered by the OCC, with 253 branches in the U.S. and 22 representative offices in the U.S., including 165 branches in the State of New York. Its main office is in McLean, Virginia, and its principal executive offices are located at 452 Fifth Avenue, New York, NY. Its domestic operations are located primarily in the State of New York. HSBC Bank USA, N.A. has total assets of $183.1 billion as of December 31, 2015 and serves 2.4 million customers through its retail banking and wealth management, commercial banking, private banking, asset management, and global banking and markets segments. HSBC Bank USA, N.A. is subject to regulation by the OCC, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau and the Federal Reserve System. HSBC Bank USA, N.A. is registered with the CFTC as a provisionally registered swap dealer, and as such, "makes a market in swaps" and/or "regularly enters into swaps with counterparties as an ordinary course of business for its own account."[105] HSBC Bank USA, N.A. is an approved Swap Firm and National Futures Association Member.

---

[105] *See supra* note 34.

162.     Collectively, HSBC Holdings plc, HSBC Bank USA N.A., HSBC USA Inc., HSBC North America Holdings, Inc., and The Hongkong and Shanghai Banking Corporation Limited are referred to as "HSBC."

**S.     Commerzbank**

163.     Defendant Commerzbank AG ("Commerzbank") is a global banking and financial services company headquartered in Germany with total assets exceeding $670 billion.

164.     Commerzbank maintains a branch at 225 Liberty Street, New York, New York 10281. Commerzbank's New York branch is licensed, supervised, and regulated by the NYSDFS to do business in this state. Commerzbank is also regulated by the Board of Governors of the Federal Reserve System. In its 2013 U.S. Resolution Plan, Commerzbank listed its New York branch as a "material entity" within the U.S.[106] According to the Federal Reserve, Commerzbank's New York branch held $5.4 billion in total assets of September 30, 2014.[107]

165.     Commerzank was a member of the SOR panel during the Class Period. MAS found that Commerzbank manipulated SIBOR and SOR.

166.     Commerzbank's U.S. operations include its Corporates & Markets business units, which "provide[] a broad range of products and services including: Equity Markets & Commodities, Fixed Income & Commodities . . . Corporate Finance and Credit Portfolio Management."[108] Commerzbank engages in transactions for "credit derivatives, interest rate products, electronic FX trading . . . cash equities, commodities, [and] equity derivatives" from within the U.S.[109] Commerzbank's U.S.-based dealers trade in the over-the-counter foreign

---

[106] *Section 1: Public Section - US Resolution Plan*, COMMERZBANK AG  (2013) at 3.

[107] *Structure Data for the U.S. Offices of Foreign Banking Organizations*, THE FEDERAL RESERVE BOARD, available at http://www.federalreserve.gov/releases/iba/201409/bycntry.htm.

[108] *Id*. at 3.

[109] *See id*. at 5-6.

exchange and derivatives markets, including interest rate swaps, forward rate agreements, foreign exchange swaps, and currency swaps.[110] Commerzbank is an approved Swap Firm and National Futures Association Member.

167.    John Doe Defendants Nos. 1-50 are other entities or persons, including banks, derivatives traders, and other co-conspirators whose identities are currently unknown to Plaintiffs. The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade and manipulation of SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives.

168.    **SIBOR Panel.** At least the following bank Defendants served as SIBOR panel banks during the Class Period: (i) Australia and New Zealand Banking Group; (ii) Bank of America N.A.; (iii) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (iv) BNP Paribas, S.A.; (v) Citibank N.A.; (vi) Credit Suisse AG; (vii) DBS Bank Ltd.; (viii) Deutsche Bank AG; (ix) The Hongkong and Shanghai Banking Corporation Ltd.; (x) JPMorgan Chase Bank, N.A.; (xi) Oversea-Chinese Banking Corporation Ltd.; (xii) The Royal Bank of Scotland plc; (xiii) Standard Chartered Bank; (xiv) UBS AG; (xv) United Overseas Bank Ltd; and (xvi) Credit Agricole CIB . The defendants that served on the SIBOR panel are collectively referred herein as the "SIBOR Contributor Defendants."

169.    **SOR Panel.** At least the following bank Defendants contributed to the calculation of SOR during the Class Period: (i) Bank of America N.A.; (ii) Citibank N.A.; (iii) JPMorgan Chase Bank, N.A.; (iv) Barclays Bank PLC; (v) The Royal Bank of Scotland PLC; (vi) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (vii) Commerzbank AG; (viii) Credit Agricole CIB; (ix) Credit

---

[110] *See* Federal Reserve Bank of New York 2007 Survey at 12, 16-17 (Commerzbank participated in the survey as both a foreign exchange dealer and an interest rate derivatives dealer, requiring transactions to be reported "on the basis of the location of the dealer agreeing to conduct the transaction.").

Suisse AG; (x) Deutsche Bank AG; (xi) The Hongkong and Shanghai Banking Corporation Ltd.;

(xii) Oversea-Chinese Banking Corporation Ltd.; (xiii) Standard Chartered Bank; (xiv) UBS AG;

(xv) ING Bank, N.V.; (xvi) and DBS Bank Ltd.  The Defendants that contributed to the

determination of SOR are collectively referred herein as the "SOR Contributor Defendants."

## FACTS

### I. Background

#### A. **SIBOR and SOR**

170.    SIBOR is a benchmark interest rate that represents the cost of borrowing funds in

the Singapore market and reflects the average competitive rate of interest charged on interbank

loans denominated in U.S. dollars ("USD SIBOR") or Singapore dollars ("SGD SIBOR").

Thomson Reuters calculates USD SIBOR and SGD SIBOR on behalf of ABS using interest rate

quotes submitted by as many as 16 panel banks that reflect the rate at which they could borrow

U.S. dollars or Singapore dollars, respectively, as of 11 A.M. Singapore time. In addition to

being used as a benchmark for pricing interbank loans, various derivative instruments are priced,

benchmarked, and/or settled based on SIBOR.

171.    Prior to 11:00 AM Singapore time every business day, each participating bank

submits the interest rate at which it could borrow U.S. and Singapore dollars in the interbank

market for four different maturities, also known as tenors: one, three, six, and twelve-month.

Thomson Reuters, as agent for the ABS, collects and calculates the SIBOR fixes for each tenor

by averaging the middle 50% of submissions. The daily SIBOR rates are then published,

distributed, and disseminated throughout the United States by Thomson Reuters via U.S. wires

where they are used to price, benchmark, and/or settle billions of dollars of SIBOR-based

derivatives traded in the United States.

172.     SOR also represents the cost of borrowing Singapore dollars, but does so based on transactions in foreign exchange swaps—interest rate derivatives that function like a loan—in which two parties agree to exchange Singapore dollars for U.S. dollars on some future date at a price that reflects the current cost of Singapore dollars plus interest. *See infra* ¶¶ 187-200 (discussing foreign exchange forwards). For at least part of the Class Period, SOR was calculated based on submissions from the SOR Contributor Defendants that were supposed to reflect the actual transaction prices of SGD foreign exchange swaps in the market. Thomson Reuters calculates SOR on behalf of ABS based on the volume-weighted average price of swap transactions entered between 7:30 A.M and 4:30 P.M. Singapore time. Many Singapore dollar interest rate and basis swaps are fixed on six-month SOR. Moon Capital Partners' and Moon Capital Master' foreign exchange forwards were fixed based on SOR.

173.     Trillions of dollars of SIBOR- and SOR-based derivatives, which incorporate each rate, respectively, as a component of price, were traded within the United States during the Class Period. Between 2007 and 2010, the U.S. market for these derivatives experienced dramatic growth.

174.     Capitalizing on this increase in trade, Defendants, who maintain offices and/or conduct business in this District,[111] colluded to rig SIBOR and SOR by, *inter alia*, collusively making false SIBOR and SOR submissions and entering into collusive transactions directly in the swap market, thereby fixing the prices of SIBOR- and SOR-based derivatives traded in the U.S. during the Class Period at artificial levels for their collective financial benefit.

---

[111] *See supra* ¶¶ 89-167.

175.     Each of these Defendant banks were members of the SIBOR panel and/or SOR

panel during the Class Period,[112] giving the conspiracy substantial control over SIBOR and SOR

submissions and, therefore, direct control over the daily SIBOR and SOR fixes published in the

United States and relied on by the U.S. market.

176.     The SIBOR-setting process—a *process created by Defendants* through their own

trade association, the ABS—was governed by rules established to prevent collusion and ensure

that SIBOR reflected the average competitive market rate for Singapore dollars. Defendants

corrupted the SIBOR-setting process by violating the rules they established and agreed to follow.

The ABS SIBOR rules were as follows:

a)     Contributor Banks will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting the interbank offers in reasonable market size, just prior to 11:00 AM Singapore time.

b)     The rates shall be for deposits in Singapore Dollars for such maturities and according to the agreed conventions.

c)     Each Contributor Bank shall **contribute their rates without reference to rates contributed by other Contributor Banks**. (emphasis added)

d)     The rates shall be for deposits: (1) in reasonable market size; (2) that are simple and unsecured; and (3) governed by the laws of Singapore, where the parties are subject to the jurisdiction of the courts of Singapore.

e)     Maturity dates for the deposits shall be subject to the ISDA Modified Following Business Day Convention.

f)     The rates shall be contributed up to five decimal places.

177.     Three key principles governed the SIBOR-setting process: each panel bank was to

independently exercise good faith judgment and submit an interest rate based on its own expert

---

[112] *See supra* ¶¶ 168-69.

knowledge of market conditions; the daily submissions of each bank were to remain confidential until after SIBOR was finally computed and published; and all Defendants' individual submissions were to be published along with the final daily rate and would be transparent on an *ex post* basis.

178.    These rules, had they not been circumvented in concert by the SIBOR Contributor Defendants, would have operated as safeguards to ensure that SIBOR submissions constituted a competitive market rate. But Defendants violated the rules and systematically made false daily SIBOR submissions to alter the fixing, and thereby affect the prices of SIBOR-based derivatives for their own financial benefit to the detriment of Plaintiffs and the Class. Defendants also routinely made manipulative requests to influence the rate.

179.    Although SIBOR was jointly set, Defendants remained horizontal competitors in the sale of SIBOR-based derivatives. Defendants abused their position as contributor panel banks and corrupted the SIBOR-setting process, turning a joint process into an anticompetitive, collusive enterprise to increase Defendants' profits at the expense of Plaintiffs and the Class.

180.    Defendants had a common motive to conspire to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives. By coordinating their false SIBOR and SOR submissions and acting as a trading bloc and engaging in collusive swap trades to alter the SOR fixing, Defendants could bend SIBOR and SOR to their will, fixing SIBOR- and SOR-based derivatives prices at levels that financially benefited their collective positions at the expense of Plaintiffs and the Class.

**B.  SIBOR- and SOR-based Derivatives**

181.    Trillions of dollars of SIBOR- and SOR-based derivatives were traded within the United States during the Class Period. *See supra* ¶ 73. United States-based trading in SIBOR- and SOR-based derivatives increased dramatically between 2007 and 2010 as Singapore eased

decades of tight monetary and capital restrictions, allowing non-resident financial entities to transact freely in SIBOR- and SOR-based swaps, options, and derivatives, including with other non-resident foreign entities.[113] After signing a free trade agreement with the U.S. in 2004, Singapore also began to issue full licenses to foreign banks to do business in Singapore and conducted further deregulation of its banking market.[114] By 2008, Singapore had issued full service banking licenses to 24 foreign banks, including nearly all of the Defendants.[115] The Singapore Exchange ("SGX") also launched a clearing facility for Singapore Dollar interest rate swaps in 2010, followed in 2012 by expanded clearing services for nondeliverable forwards ("NDFs") in several Asian currencies.[116] As a result of these changes, Singapore was Asia's second-largest financial center after Tokyo and the world's third-largest foreign exchange market by the end of the Class Period in 2011.[117]

182.    Defendants capitalized on Singapore's rise as a global financial center and reaped large profits during the Class Period as they transacted in increasingly-higher volumes of SIBOR- and SOR-based derivatives. For example, Citibank, which lists Singapore as a "key hub" of its global business, posted strong 2009 profits in its Global Markets FX division after introducing a global FX forwards and options electronic trading platform in Singapore that allowed traders access to "the unparalleled depth and width of liquidity within Citi's FX price

---

[113] Ong Chong Tee, *Singapore's Policy of Non-Internationalisation of the Singapore Dollar and the Asian Dollar Market*, BIS Papers No. 15 (2003), *available at* http://www.bis.org/publ/bppdf/bispap15l.pdf.

[114] EUL-SOO PANG, THE U.S.-SINGAPORE FREE TRADE AGREEMENT: AN AMERICAN PERSPECTIVE ON POWER, TRADE, AND SECURITY IN THE ASIA PACIFIC (2011, Institute of Southeast Asian Studies, Singapore) at 80.

[115] *See id.* at 79; *see also* U.S. Department of State, 2008 Investment Climate Statement – Singapore, *available at* http://2001-2009.state.gov/e/eeb/ifd/2008/101008.htm.

[116] Adil Siddiqui, *Singapore's SGX, the new home for Asian NDF's*, FINANCE MAGNATE (July 27, 2011), *available at* http://www.financemagnates.com/forex/analysis/singapores-sgx-the-new-home-for-asian-ndfs/.

[117] Pang, *supra* note 114 at 79.

stream."[118] The Singapore electronic platform "helped Citi generate a 60 percent year-on-year growth in FX volume."[119] Defendant Credit Suisse significantly expanded its FX team in Singapore in 2010, stating that Singapore and "Asia Pacific represents one of the biggest growth opportunities in our roadmap to become a top-global FX provider."[120]

183.   There are many different types of SIBOR- and SOR-based derivatives, including, *inter alia*, over-the-counter instruments (which are traded directly between counterparties and not listed on a public exchange) such as interest rate swaps, forward rate agreements, and foreign exchange swaps and forwards.

### 1.   Interest Rate Swaps

184.   Interest rate swaps ("swaps") are the most common type of interest rate derivatives. They are traded over-the-counter and allow two counterparties to exchange interest rate payment obligations on an agreed upon "notional" or principal amount. There are several types of interest rate swaps. For example, in the most common "plain vanilla" swap, the parties will typically agree to a "fixed-for-floating" exchange, in which one party will make payments based on a variable price or rate in exchange for receiving fixed interest rate payments (*e.g.*, 0.5%) for the same notional amount. Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate. For example, one party can agree to make payments equal to the return on a certain stock or index (*e.g.*, $1,000,000 of IBM common stock), in exchange for receiving interest payments based on a variable interest rate (*e.g.*, SGD SIBOR) for the same notional amount.

---

[118] *Citi's Operation in Singapore Post Strong Profits for Financial Year 2009* (May 26, 2010)*, available at* http://www.citigroup.com/citi/news/2010/100527b.htm.

[119] *Id.*

[120] *Credit Suisse Expands FX Team in Asia Pacific*, CREDIT SUISSE (June 25, 2010), *available at* https://www.credit-suisse.com/us/en/about-us/media/news/articles/media-releases/2010/06/en/41531.html.

185.   Payments under a swap contract are due at regular intervals (*e.g.*, every month) for the duration of the agreement. Each time a payment is due, the amounts owed by the two parties are netted against each other. Only the party with the larger obligation will make a payment. For example, assume Party A enters into a swap contract with Party B and agrees to make payments every six months to Party B equal to the return on $1,000,000 of IBM stock. In exchange, Party B agrees to make payments to Party A every six months based on six-month SGD SIBOR for the same $1,000,000 principal amount. On each "fixing" or "reset" date, if six-month SGD SIBOR is greater than percentage return on IBM stock, Party B has the larger obligation and will make a payment to Party A. However, if IBM stock returns more on a percentage basis than six-month SGD SIBOR, Party A has the larger obligation and will make a payment to Party B. As a result, SGD SIBOR determines the value of a SGD SIBOR-based swap by determining the amount paid or received by each party.

## 2.   Forward Rate Agreement

186.   A forward rate agreement ("FRA") is an interest rate forward contract. The contract sets a rate of interest to be paid or received on an obligation beginning at a future start date. FRAs, also known as single period swaps, function like interest rate swaps in that they only have one reset date. The contract will determine the interest rate to be used along with the termination date and notional value. Similar to an interest rate swap, on the settlement date, the party with the larger obligation makes an interest rate payment equal to the difference between the fixed and floating rate. For example, assume Party A enters into a FRA with Party B in which Party A will receive 0.5% interest on $10,000,000 Singapore dollars. In return, Party B will receive six-month SGD SIBOR, determined one year in the future, on the same underlying amount. If, after one-year, six-month SGD-SIBOR is higher than 0.5% (*e.g.*, 0.6%), Party A

must pay Party B the difference in interest (*i.e.*, 0.1%), on the underlying $10,000,000 SGD. If six-month SGD-SIBOR is lower than 0.5%, Party B must pay Party A the difference in interest.

### 3.   Foreign Exchange Forwards

187.   Most foreign exchange transactions are "spot" transactions or simply an agreement to exchange one currency (*e.g.*, Singapore dollars) for another currency (*e.g.*, U.S. dollars) at the current exchange rate.

188.   The two currencies involved in a spot transaction are known as a "currency pair." Each currency is identified by reference to its "ISO 4217" code, a three-letter abbreviation established by International Standards Organization. The ISO 4217 code for U.S. dollars is "USD"; the code for Singapore dollars is "SGD." Members of a currency pair are separated by a slash such that a currency pair consisting of the U.S. dollar and Singapore dollar is represented as "USD/SGD".

189.   The first currency listed in each currency pair is called the "base" currency. The second is called the "term" or "counter" currency. Prices for each currency pair are quoted to the fourth decimal place (*i.e.*, 0.0001), also known as a "pip" or "tick," and reflect the amount of the term currency necessary to buy one unit of the base currency.  For example, on September 28, 2010, the last spot exchange rate for the USD/SGD currency pair reported by Bloomberg was 1.3167, indicating that it cost 1.3167 Singapore dollars to buy 1 U.S. dollar.

190.    Spot transactions are completed immediately and typically "settle," *i.e.*, payment is made and the currency purchased is delivered, within two business days. This quick turnaround makes spot transactions appropriate for short-term currency needs.

191.   For transactions with longer timetables, investors will typically enter a foreign exchange forward. A foreign exchange forward, also known as a currency forward agreement, is

a derivative that provides for the purchase or sale of one currency (*e.g.*, SGD) in terms of another (*e.g.*, USD) on some future date (*e.g.*, 90 days from now) at a price agreed upon today. For example, on February 16, 2009, Moon Capital Partners entered a USD/SGD foreign exchange forward in which it agreed to sell SGD 3,155,878 on August 19, 2009 for $2,073,642. Moon Capital Master also entered a USD/SGD foreign exchange forward on February 16, 2009, in which it agreed to sell SGD 12,063,122 for $7,962,352 on August 19, 2009.

192.   The cost of buying or selling currency pursuant to a foreign exchange forward is derived from the current spot price of the relevant currency pair using an industry standard formula, which is displayed in Figure 4 below. This formula adjusts the spot price of the currency pair being traded to account for the interest costs and benefits associated with purchasing and carrying the currency pair over the duration of the agreement.

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d / 360)]}{1 + [\text{Rbase} \times (d / 360)]} \right)$$

**FIGURE 4**

193.   This interest rate adjustment is carried out using three variables: (a) "Rterm," which represents the rate of interest charged to borrow the term currency; (b) "Rbase," which represents the rate of interest earned by depositing the base currency; and (c) the number of days until settlement, which is represented by the variable "d."

194.   Derivatives traders, including Defendants—as indicated in a paper by Defendant OCBC—use SIBOR and SOR rates for the "Rterm" and "Rbase" components of this formula when pricing a USD/SGD foreign exchange forward because these benchmarks are presumed to

represent the current rate at which funds can be borrowed or lent in the Singapore market. *See* ¶ 204, *infra*.

195.   The application of this formula can be demonstrated using data available from Bloomberg to calculate the future price of buying U.S. dollars under a one-month (30 day) Singapore dollar foreign exchange forward using the SIBOR and SOR rates. For example, as referenced above, last spot exchange rate for the USD/SGD currency pair reported by Bloomberg on September 28, 2010 was 1.3167. That same day, the one-month SOR rate (the "Rterm" variable) was 0.25719% and the one-month USD SIBOR rate (the "Rbase" variable) was 0.26306%. The duration of the agreement "d" is 30 days.

196.   Plugging these values into Figure 4 to solve for the future price of U.S. dollars in a one-month Singapore dollar foreign exchange forward yields 1.3166 Singapore dollars:

$$1.3166 = 1.3167 * \frac{1+[(\frac{0.25719}{100}) * (\frac{30}{360})]}{1+[(\frac{0.26306}{100}) * (\frac{30}{360})]}$$

**FIGURE 5**

197.   These results are confirmed by Bloomberg, which also reported 1.3166 as the cost of a one-month Singapore dollar foreign exchange forward on September 28, 2010.

198.   This relationship between interest rates and currency prices is well established in the foreign exchange markets, where investors rely upon short term interest rates like SIBOR and SOR to price and settle forward transactions every day.  As the global head of foreign exchange cash trading at Defendant HSBC explained, "[i]nterest rates are a key driver of the

forex forwards market.  The market needs an interest rate yield curve to be able to value currencies over time."[121]

199.   Consistent with the statements of HSBC's global head of foreign exchange cash trading, the CFTC found in its "IBOR" manipulation settlement with Defendant RBS, that foreign exchange forwards prices are directly impacted by IBOR rates for the relevant currencies because they are priced based on those rates.[122]

200.   Given the direct mathematical relationship between USD SIBOR, SOR and the prices of Singapore dollar foreign exchange forwards demonstrated above, Defendants' manipulation of those rates caused the prices of Singapore dollar foreign exchange forwards to be artificial during the Class Period. Plaintiffs Moon Capital Partners and Moon Capital Master, along with other Class members who transacted in those products during the Class period, were accordingly overcharged or underpaid in their transactions and harmed as a result of Defendants conspiracy to manipulate SIBOR and SOR.

### 4.    Foreign Exchange Swaps

201.   This same mathematical pricing relationship also applies to foreign exchange swaps. A foreign exchange swap contract can be thought of as akin to a repurchase or "repo" agreement, where one borrows or lends one currency on a temporary basis collateralized with an equivalent value of another currency. The value of a foreign exchange swap reflects the interest rate differential between the two currencies involved in swap.

---

[121] *See* Michael Watt, *Rates Volatility Buoys Hopes for Currency Forwards Desk*, RISK.NET, http://www.risk.net/risk-magazine/feature/2284442/rates-volatility-buoys-hopes-for-currency-forwards-desks (July 30, 2013).

[122] *See* Ex. A at 6 ("RBS Yen and Swiss Franc derivatives traders traded various derivatives instruments that were priced based on Yen or Swiss Franc LIBOR. These products included interest rate swaps, Forward Rate Agreements, foreign exchange forward [and others].").

202.   There are two components to a foreign exchange swap transaction: (1) a spot transaction to buy or sell a fixed quantity of the base currency; and (2) a foreign exchange forward, used to offset that transaction (*i.e.*, to sell or buy back the currency involved in the initial spot transaction) on some future date.

203.   The foreign exchange forward component of a foreign exchange swap is priced using the same formula depicted in Figure 4 above. In a USD/SGD foreign exchange swap transaction, this calculation involves USD SIBOR and SOR.

204.   This is confirmed by Figure 6 below, which was taken from a paper published by Defendant OCBC. Figure 6 shows how Defendants, like OCBC, calculate the "USD/SGD Forward Rate"—the same price calculated in ¶ 192—in the context of a foreign exchange swap transaction. Significantly, Figure 6 shows that this calculation uses USD SIBOR and SOR to determine the number of "Swap Points" (i.e., the difference between the "USD/SGD Spot Rate" and the forward rate) using same components referenced in Figure 4 above.



**FIGURE 6**

205.    Given the direct mathematical relationship between USD SIBOR, SOR and the prices of Singapore dollar foreign exchange swaps, Defendants' manipulation of those rates caused the prices of Singapore dollar foreign exchange swaps to be artificial during the Class Period. Class members who transacted in those products during the Class Period, were accordingly overcharged or underpaid in their transactions and harmed as a result of Defendants conspiracy to manipulate SIBOR and SOR.

### C.    The CFTC, FSA, and MAS Found that Defendants Manipulated SIBOR and SOR

206.    Multiple government investigations conducted by the MAS, CFTC, and the FSA revealed Defendants' agreement to illegally manipulate SIBOR and SOR.

207.    **MAS' Findings**. MAS uncovered a widespread conspiracy in which 133 of Defendants' traders sought to manipulate both SIBOR and SOR.

208.    As punishment for their manipulative conduct, MAS forced all of the Defendants to make massive interest-free deposits of between 100 million and 1.2 billion Singapore dollars each, or 9.6 billion U.S. dollars collectively, preventing the conspiracy from using these funds (and stripping its profit-making potential) for a full year.[123]

209.    The amount that each Defendant was required to deposit depended on the severity of its misconduct. MAS considered three factors when calculating the amount of these punitive deposits: "the number of traders within the bank who attempted to inappropriately influence the benchmarks, the number of banks with which the traders had collaborated, and the number of times these attempts occurred."[124] The penalties MAS imposed on each Defendant is indicated in the following table:

---

[123] Ex. E at Annex. Defendant Commerzbank was not required to place a deposit with MAS.

[124] *Id.*

| Defendant Banks | Amount of Forced Deposit with MAS |
|---|---|
| ING Bank N.V.<br>The Royal Bank of Scotland PLC<br>UBS AG | **1 – 1.2 billion SGD**<br><br>*(approximately 800 – 960 million USD)* |
| Bank of America N.A.<br>BNP Paribas<br>Oversea-Chinese Banking Corporation Ltd. | **700 – 800 million SGD**<br><br>*(approximately 560 – 640 million USD)* |
| Barclays Bank PLC<br>Credit Agricole CIB<br>Credit Suisse AG<br>DBS Bank Ltd.<br>Deutsche Bank AG<br>Standard Chartered Bank<br>United Overseas Bank Ltd | **400 – 600 million SGD**<br><br>*(approximately 320 – 480 million USD)* |
| Australia and New Zealand Banking Group Ltd.<br>Citibank N.A.<br>JPMorgan Chase Bank, N.A.<br>Bank of Tokyo-Mitsubishi UFJ, Ltd.<br>The Hongkong and Shanghai Banking Corporation Ltd | **100 – 300 million SGD**<br><br>*(approximately 80 – 240 million USD)* |

210.    MAS also censured all of the Defendants and prescribed remedial measures to correct the deficiencies in their rate-setting procedures, overall governance, risk management, internal controls, and surveillance systems identified by its investigation, appointing an independent monitor at each bank to ensure compliance with these new procedures.[125]

211.    MAS referred some cases of manipulation to the Singapore Commercial Affairs Department and the Singapore Attorney-General's Chambers for criminal prosecution, and

---

[125] *Id.*

introduced new legislation making manipulation of any financial benchmark punishable by additional criminal penalties and civil sanctions.

212.   U.S. and U.K. regulators confirmed MAS' findings that Defendants manipulated SIBOR and SOR during the Class Period. The CFTC specifically found that Defendants Deutsche Bank, RBS, and UBS all manipulated SIBOR and SOR during the Class Period and engaged in "similar misconduct" to the methods these Defendants used to manipulate other financial benchmarks, including USD LIBOR, Sterling LIBOR, Swiss Franc LIBOR, Euribor, Yen-LIBOR, and Euroyen TIBOR.[126] Specifically, the CFTC found that:

> (a) **Deutsche Bank** engaged in systemic and pervasive misconduct directed at
> manipulating these international financial benchmark rates over a six-year period,
> including manipulating SIBOR.[127]
>
> (b) **UBS** derivatives traders manipulated the official fixings of LIBORs for
> multiple currencies, including SIBOR, SOR, Yen LIBOR, Swiss Franc LIBOR,
> Sterling LIBOR, and Euro LIBOR.[128] The CFTC noted that UBS's manipulative
> misconduct for SIBOR and SOR was "similar" to that found in UBS's
> manipulation of other interbank offered rates.[129]
>
> (c) **RBS** derivatives and money market traders manipulated SIBOR and SOR
> from May 2010 – August 2011, even as RBS was being investigated for (and

---

[126] *See* Ex. C at 59; Ex. D at 43; Ex. A at 39.

[127] *See* Ex. D at 1, 3 n.3.

[128] *See* Ex. C at 38.

[129] *Id.*

conducting its own internal investigation related to) manipulating other interbank offered rates.[130]

213.    As a result of their manipulation of multiple interbank offered rates, Deutsche Bank, RBS, and UBS collectively paid nearly $2 billion in fines as part of their settlement agreements with the CFTC.

214.    In addition, the FSA found that RBS traders made at least 34 written requests to manipulate SIBOR and SOR:[131]

> 48. Improper requests took place over a number of years, were widespread, and involved three benchmark rates and at least 21 Derivatives Traders and Primary Submitters located primarily in London and Tokyo but also in the United States and Singapore.
>
> * * * *
>
> 54. Finally, it should be noted that Derivatives Traders outside the UK also made requests in relation to other benchmark rates. Specifically, at least 34 written requests were made with respect to SIBOR and SOR.[3] The existence of SIBOR and SOR requests, which put at risk the integrity of those benchmark rates, demonstrates that the misconduct was not confined to the UK and was not related solely to LIBOR.

FSA RBS Final Notice at 11, 14.  These findings are consistent with the pervasive manipulation described by RBS's former Singapore-based head of Asian delta trading, Jimmy Tan, who admitted that "rate manipulation was *systemic* at RBS and involved traders and managers across the company."[132] Tan was fired by RBS for manipulating other interbank offered rates.[133] Similarly, others told Bloomberg News that "RBS derivatives traders and managers . . . regularly

---

[130] *See* Ex. A at 4 n.3.

[131]  *See* Ex. B.

[132] Vaughan et al., *supra* note 11.

[133] *Former RBS trader saw Libor fixing as 'cartel' – report*, REUTERS (Sep. 26, 2012), *available at* http://www.reuters.com/article/singapore-libor-idUSL4E8KQ3B220120926.

asked inputters to submit rates favorable to their trading positions" as part of Defendants scheme to manipulate interbank offered rates.[134]

215.    Multiple Defendants' SIBOR and SOR derivative traders were fired or faced disciplinary action for manipulating SIBOR, SOR, and foreign exchange rates in the wake of the investigations by MAS, the CFTC, and the FSA. For example, RBS senior trader Chong Wen Kuang was fired for rigging SOR to "benefit his own trading position."[135]

> Royal Bank of Scotland Group PLC (RBS) suspended a trader for trying to rig the Singapore dollar swap offer rate [SOR], indicating employees may have sought to manipulate more than just LIBOR . . . .
>
> Senior trader Chong Wen Kuang was put on leave earlier this year for trying to rig the interest rate to benefit his trading position, said the people who asked not to be identified because the bank is probing his actions.
>
> Chong was identified . . . as one of the bankers whose duties involved providing rate setters with input on where they should fix the benchmark on any given day[.]
>
> RBS derivatives traders and managers, some still employed by the bank, regularly asked inputters to submit rates favorable to their trading positions, people with knowledge of the lender's probe said last week.

In his lawsuit against RBS for wrongful termination, Tan named other high-level RBS "managers who acted in the same way . . . includ[ing] Robert Brennan, now Singapore-based head of treasury markets for Asia, and Kevin Liddy, the London-based global head of short-term interest rate trading. The practice was well-known to senior managers including Scott Nygaard, global head of RBS's treasury markets in London; Todd

---

[134] Finch et al., *supra* note 6 (emphasis added).

[135] *Id.*

Morakis, the Singapore-based head of trading for emerging markets, and Lee Knight, the Tokyo-based chief operating officer of global trading."[136]

216.     Defendants' manipulation extended beyond SIBOR and SOR to other benchmark rates, including the rate-setting process for NDFs involving the Indonesian rupiah, Malaysian ringgit and Vietnamese dong, according to evidence uncovered during MAS' investigation and the Defendants' own internal probes. *Reuters* reported on January 27, 2013 that "as bank officials pored over documents and communications, they came across evidence that raised alarm bells over activities in the NDF markets as well, spurring an extension of the [SIBOR and SOR] reviews to those markets[.]"[137]

217.     The roughly 100 of Defendants' traders who were fired in the wake of MAS' review constituted a sizeable portion of Singapore's trading community, further evidence of the massive scope of the conspiracy. *Reuters* reported that "UBS AG, which received one of the stiffest penalties from MAS, saw most of its Singapore rates and NDF traders depart during the investigation."[138] *Reuters* also noted that Singapore, "[t]he world's fourth largest foreign exchange centre is still reeling from the [MAS] crackdown, which has left volumes flowing through banks' once vibrant interest rate and emerging market currency trading desks a long way below pre-scandal levels."[139]

218.     Two high-level UBS managers, Mukesh Kumar Chhaganlal, UBS's co-head of macro-trading for emerging markets, and Prashant Miripuri, an executive director, were fired for

---

[136] *Id*.

[137] Armstrong, *supra* note 2.

[138] Rachel Armstrong, *Banks Slow to Revive Singapore Trading Desks*, REUTERS (June 25, 2013), http://www.reuters.com/article/us-singapore-rates/banks-slow-to-revive-singapore-trading-desks-after-rate-fixing-cull-idUSBRE95O1GF20130625.

[139] *Id*.

their roles in manipulating SIBOR, SOR, and foreign exchange rates.[140] Both Chhaganlal and Miripuri engaged in "serious misconduct," according to UBS.[141]

219.    A Macquarie Bank trader was fired for "inappropriately collaborating with staff at other banks" to rig SIBOR, SOR, and foreign exchange rates.[142] The MAS investigated this trader and subsequently confirmed that he had "committed breaches."[143]

220.    ANZ Bank clawed back the bonuses of two of its SIBOR and SOR derivative traders for rate manipulation and engaging in "inappropriate electronic communications and unacceptable behavior."[144] ANZ Bank also admitted that numerous other traders had engaged in inappropriate behavior with respect to SIBOR, SOR, and foreign exchange rates.[145] ANZ was required by the MAS to conduct an internal review as it was a contributor to SOR and other rates.[146]

221.    Commerzbank trader Eugene Wong Ming-Wey was fired in January 2013 for manipulating foreign exchange forward rates after Commerzbank discovered a chat conversation from during the Class Period in which Ming-Wey discussed his manipulation with traders from

---

[140] Andrea Tan, *UBS Says Singapore Traders Fired for Serious Misconduct,* BLOOMBERG NEWS (April 2, 2013), available at http://www.bloomberg.com/news/articles/2013-04-02/ubs-says-singapore-traders-fired-for-serious-misconduct-i2zn75zm.

[141] *Id.*

[142] John Kehoe, *Macquarie trader sacked, ANZ reclaims bonuses after scandal*, FINANCIAL REVIEW (June 17, 2013), *available at* http://www.afr.com/business/banking-and-finance/financial-services/macquarie-trader-sacked-anz-reclaims-bonuses-after-scandal-20130615-jhoa3#ixzz4CEohSVSS.

[143] *Id.*

[144] *Id.*

[145] *See id.*

[146] *Id.*

other banks.[147] These conversations showed Wong soliciting other traders' opinions and asking for rates to move in a certain direction, according to Commerzbank.[148]

222.    In March 2010, Deutsche Bank transferred Christian Bittar, one of the most notorious manipulators of IBOR rates, to Deutsche Bank's Singapore office to serve as Global Manager of Money Market Derivatives.[149] At Deutsche Bank, Money Market traders traded derivative products referenced to benchmark interest rates to generate additional profit for Deutsche Bank. Bittar, who had previously been a trader and then promoted to manage Deutsche Bank's London Money Market Derivatives desk, was so successful at manipulating IBOR rates for Deutsche Bank that he was given a £90 million individual performance bonus (roughly $136 million) in 2008. Bittar pleaded guilty to conspiracy charges related to the manipulation of the Euro Interbank Offered Rate. He was subsequently sentenced to more than five years and prison and ordered to pay £3.3 million in fines and costs.[150]

223.    Bittar's promotion during the Class Period to be the Singapore-based global head of Deutsche Bank's Money Market Derivatives division demonstrates Deutsche Bank's pervasive culture of misconduct that extended to manipulation of SIBOR, SOR. The Statement of Facts accompanying DOJ's Deferred Prosecution Agreement with Deutsche Bank Government revealed that Deutsche Bank intentionally rearranged their trading operations to

---

[147] Andrea Tan, *Commerzbank Sued by Trader Fired Over Rate Probe in Singapore*, BLOOMBERG NEWS (July 7, 2015), *available at* http://www.bloomberg.com/news/articles/2015-07-08/commerzbank-sued-by-trader-fired-over-rate-probe-in-singapore.

[148] *Id.*

[149] Ex. D at 9; *see also* Christian Bittar v. The Financial Conduct Authority, 2015 UKUT 0602 (TCC) (Nov. 10, 2015).

[150] Franz Wild, *Ex-Traders Bittar, Moyoussef Get Combined 13 Years in Jail*, BLOOMBERG NEWS (July 19, 2018), *available at*, https://www.bloomberg.com/news/articles/2018-07-19/former-traders-sentenced-to-combined-13-years-in-euribor-case.

facilitate manipulative conduct, sitting traders next to submitters.[151]  Deutsche Bank lied to auditors and regulators about the bank's internal controls related to benchmark submissions.[152] The bank rewarded known manipulators like Christian Bittar with promotions and enormous bonuses.[153]

## II.   Economic Evidence that SIBOR and SOR were Artificial During the Class Period

224.   To estimate when prices were artificial in the SIBOR- and SOR- based derivatives market during the Class Period, Plaintiffs analyzed the relationship between SOR and SGD SIBOR for the one, three, and six-month tenors. This analysis measured the "spread," *i.e.*, the difference, between SGD SIBOR and SOR for the same tenors (for example by comparing one-month SGD SIBOR to one-month SOR) during the ten-year period of January 1, 2003 through December 31, 2012.

225.   SGD SIBOR and SOR should be very similar during this time period because both rates are supposed to represent the cost of borrowing the same currency, Singapore dollars, in the Singapore market, and accordingly should be affected in the same way by the same macroeconomic events. For example, to the extent the global financial crisis in 2008 caused SGD SIBOR to increase as credit tightened in Singapore, SOR should also have increased at the same time to reflect the same increase in the cost to borrow Singapore dollars.

226.   This expectation of very small differences between SGD SIBOR and SOR is consistent with the "law of one price," an economics concept which recognizes that for tradeable products, like Singapore dollars, trade should keep prices the same across markets because

---

[151] United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division, Deferred Prosecution Agreement and Appendix A Statement of Facts with Deutsche Bank AG (Apr. 23, 2015) at 16.

[152] The Federal Financial Supervisory Authority, BaFin, Audit report for the IBOR special audit by Ernst & Young against Deutsche Bank AG (May 11, 2015) at 14.

[153] *Id*. at 7, 19.

traders will not be willing to buy or sell the same product at vastly different prices. For example, assume the cost of borrowing Singapore dollars through deposits—the price reflected by SGD SIBOR—increased substantially relative to the cost of borrowing Singapore dollars through foreign exchange swaps—the price reflected by SOR. In that scenario, rational borrowers would save money by borrowing Singapore dollars through foreign exchange swap transactions instead of taking deposits. This should result in a decreased demand for Singapore dollar deposits and a corresponding reduction in the amount of interest charged on deposits as lenders seek to attract more borrowers away from the cheaper foreign exchange swap market.

227.    The same relationship also holds in reverse, as skyrocketing foreign exchange swap rates should cause market participants to borrow Singapore dollars through other means, like deposits, causing the rates charged in swap transactions to come down. Thus, under the "law of one price" SGD SIBOR and SOR should not deviate dramatically from each other because trade in the deposit and foreign exchange swap market should keep the cost of borrowing Singapore dollars in Singapore relatively consistent.

228.    The expectation that SGD SIBOR and SOR exhibit a close relationship is confirmed by a 2010 report from Defendant Credit Suisse, which observed that historically "SIBOR and the SOR track each other closely[.]"[154] The following chart from the same report further demonstrates that, prior to the beginning of the Class Period, 6-month SOR and 6-month SGD SIBOR were almost identical. Consistent with the manipulation alleged in this complaint, six-month SOR and six-month SGD SIBOR began to diverge pronouncedly around the start of the Class Period.

---

[154] Credit Suisse, *A Primer on Interest Rates* (Apr. 28, 2010).



Source: the BLOOMBERG PROFESSIONAL™ service, Credit Suisse

**FIGURE 7**

229.    In conducting their own analysis, Plaintiffs calculated the spread between SOR and SIBOR for the period between January 1, 2003 and December 31, 2012 by subtracting one tenor of SIBOR from the same tenor of SOR. For example, Figure 8 on the next page depicts the spread between one-month SOR and one-month SIBOR:



**FIGURE 8**

230.    Prior to the start of the Class Period, between January 1, 2003 and December 31,

2006 (the "pre-Class Period"), the average spread between one-month SOR and one-month

SIBOR was positive. However, once the Class Period starts, the average spread between one-

month SOR and one-month SIBOR changes direction and becomes negative. This change in the

spread is indicative of manipulative conduct during the Class Period because, absent

manipulation, the spread between one-month SOR and one-month SIBOR should maintain the

same relationship.

231.    This change in the spread between one-month SOR and one-month SIBOR also

coincides with an increase in variability, which further indicates that both SIBOR and SOR were

manipulated to artificial levels during the Class Period. For example, while the average spread

between one-month SOR and one-month SIBOR occupied a relatively tight range during the pre-

Class Period, Figure 8 indicates that during 2008, the spread increased to almost 130 basis points, or 1.3%, more than 2.6 times greater than the spread between one-month SOR and one-month SIBOR at any point during the pre-Class Period. This relationship existed late into the Class Period as during 2011, one-month SOR and one-month SIBOR were as much as 1% apart, more than twice as wide as any point before the Class Period started.

232.    A similar pattern exists in the three-month tenor. For example, Figure 9 below shows the spread between three-month SOR and three-month SIBOR, and indicates that the average spread between three-month SOR and three-month SIBOR during the pre-Class Period was positive. However, during the Class Period, the average spread between three-month SOR and three-month SIBOR becomes negative. As with the one-month tenor, this change is indicative of manipulative conduct because, absent manipulation, three-month SIBOR and three-month SOR should maintain the same relationship that existed during the pre-Class Period.



**FIGURE 9**

233.   This change in the spread between three-month SOR and three-month SIBOR also coincides with an increase in variability, which further indicates that both SIBOR and SOR were manipulated to artificial levels during the Class Period. For example, during the Class Period, the spread between three-month SOR and three-month SIBOR reached almost 110 basis points, or 1.10%. This is more than 2.5 times greater than the spread between three-month SOR and three-month SIBOR at any time during the pre-Class Period.

234.   The average spread between six-month SOR and six-month SIBOR also changes with the start of the Class Period, and consistent with manipulative conduct, grows increasingly positive until reaching a peak in 2009. Figure 10 below demonstrates that beginning in 2009, the spread between six-month SOR and six-month SIBOR increases to more than 110 basis points,

or 1.1%. The spread remains positive throughout the rest of the year, slowly decreasing until turning negative in 2010.



**FIGURE 10**

235.    Figure 10 further shows that by late-2011, the spread between six-month SOR and six-month SIBOR peaks in the opposite direction, reaching negative 1.49% at its lowest point. This high degree of variability in the cost of borrowing Singapore dollars is consistent with manipulation during the Class Period.

### III.    Plaintiffs Transacted in SIBOR- and SOR-based Derivatives at Artificial Prices that were Proximately Caused by Defendants' Manipulative Conduct

236.    FrontPoint engaged in U.S.-based swap transactions that were priced, settled, and benchmarked based on SIBOR during the Class Period at artificial prices proximately caused by

the Defendants' manipulative conduct. Specifically, FrontPoint entered into at least 24 swap transactions, including based on one-month SGD SIBOR, between January 2010 and May 2010 directly with Defendants Deutsche Bank AG and Citibank, N.A. This period coincides with dates when the CFTC found that Defendants, including FrontPoint's counterparty Deutsche Bank, were actively manipulating SIBOR. As a result of Defendants' manipulation of SIBOR, FrontPoint paid more for or received less on its SIBOR-based swap transactions with Defendants Deutsche Bank AG and Citibank, N.A..

237.    Plaintiffs Moon Capital Partners and Moon Capital Master engaged in U.S.-based transactions for SIBOR- and SOR-based derivatives during the Class Period. Specifically, Moon Capital Partners and Moon Capital Master each engaged in a USD/SGD foreign exchange forward transaction with Defendant UBS on February 16, 2009. *See supra* ¶¶ 87-88.

238.    USD/SGD foreign exchange forwards are priced using a formula that incorporates SOR and USD SIBOR as components of price. *See supra* ¶¶ 187-200.

239.    USD/SGD foreign exchange forwards are also one half of a foreign exchange swap trade, the same financial instrument Defendants used to manipulate the SOR fixing through collusive transactions.

240.    Defendants manipulation of SIBOR and SOR, including their use of false SIBOR and SOR submissions and collusive foreign exchange swap transactions,[155] caused the prices of USD/SGD foreign exchange forwards to be artificial during the Class Period. As a result, Plaintiffs Moon Capital Partners and Moon Capital Master were injured in their USD/SGD

---

[155] *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 1241533, at *6-7 (S.D.N.Y. Mar. 28, 2016) (finding that Defendants' acts of collusive trading to manipulate ISDAfix violated the antitrust laws).

foreign exchange forward transactions with Defendant UBS because they paid more for or received less than they should have for these SIBOR- and SOR-based derivatives.

## TRADE AND COMMERCE

241.    Beginning on at least January 1, 2007 and continuing at least until December 31, 2011, Defendants engaged in a continuing contract, combination, or conspiracy in restraint of trade in violation of the Sherman Act.

242.    During the Class Period, Defendants sold substantial quantities of SIBOR- and SOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced SIBOR- and SOR-based derivatives.

243.    The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

244.    During the Class Period, the Defendants' conduct and their co-conspirator's conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

245.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and as representative of the following Class:[156]

> All persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled based on SIBOR and/or SOR at any time from at least January 1, 2007 through December 31, 2011 (the "Class").

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries and co-conspirators, whether or not named in this complaint, and the United States government.

---

[156] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

246.    The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least thousands of geographically-dispersed Class members transacted in SIBOR- and SOR-based derivatives worth trillions of dollars during the Class Period.

247.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

248.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

249.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

a. whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives in violation of the Sherman Act;

b. the identity of the participants in the conspiracy;

c. the duration of the conspiracy;

d. the character and nature of the acts performed by the Defendants in furtherance of their conspiracy;

93

e. whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

f. whether Defendants' unlawful acts violate RICO;

g. the appropriate measure of damages sustained by Plaintiffs and Class members.

250.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

251.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

252.    The applicable statute of limitations relating to the claims for relief alleged in herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

253.    The secret nature of Defendants' conspiracy—which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives—was

intentionally self-concealing. This concealment-through-secrecy prevented Plaintiffs from uncovering their unlawful conduct.

254.    Defendants used affirmative acts of concealment to hide their violations of law from Plaintiffs and the Class, including: (1) Defendants knowingly submitted (or caused to be submitted) SIBOR and SOR quotes that were false, misleading, or inaccurate because they were manipulative, based in whole or in part on impermissible and illegitimate factors, such as the rate that would financially benefit Defendants' SIBOR-based derivatives positions and/or the SIBOR-based derivatives positions of their coconspirators; (2) Defendants implicitly represented that their SIBOR submissions were a reliable and truthful assessment of, and only of, each Defendant's competitive market borrowing costs; (3) Defendants used secret, collusive trades in the swap market to manipulate SOR and the prices of SOR-based derivatives. Due to the ABS's status as a trade organization, Defendants were themselves representing through these submission rules that their submissions would be in compliance with their own guidelines.

255.    Many, if not all, of these affirmative acts of concealment were also inherently self-concealing and could not be detected by Plaintiffs or other members of the Class. Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other Members of the Class.

256.    As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time of public disclosures reporting the manipulation of SIBOR and SOR and the prices of SIBOR- and SOR-based derivatives. Plaintiffs thus assert the tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted. Defendants

are also equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)

### (Against all Defendants)

257.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

258.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

259.    During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of SIBOR and SOR and the prices of SIBOR- and SOR-based derivatives, by conspiring to, *inter alia*, make false SIBOR submissions to the ABS designed to artificially suppress, inflate, maintain, or otherwise alter SIBOR, and, acting as a trading bloc, engaged in secret, collusive trades in the swap market to manipulate SOR.

260.    This conspiracy to manipulate the prices of SIBOR- and SOR-based derivatives caused both Plaintiffs and members of the Class to be overcharged and underpaid in their SIBOR- and SOR-based derivatives transactions. Plaintiffs and members of the Class also were deprived of the ability to accurately price SIBOR- and SOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of SIBOR- and SOR-based derivatives by reference to an accurate SIBOR and SOR. Plaintiffs and members of the

Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts in furtherance of the conspiracy.

261. The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the SIBOR- and SOR-based derivatives market. There is no legitimate business justification for, nor pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible procompetitive benefits are pre-textual or could have been achieved by less restrictive means.

262. As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

263. Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

264. Plaintiffs and members of the class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## **SECOND CLAIM FOR RELIEF**

### **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

### **(Against Defendants Deutsche Bank, Citibank, and UBS)**

265. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

266. To the extent required this claim is pled in the alternative to Plaintiffs' fifth claim for relief in accordance with FED. R. CIV. P. 8(d) and other applicable law.

267.   Plaintiff FrontPoint entered into binding and enforceable contracts with Defendants Deutsche Bank AG and Citibank, N.A. in connection with transactions for SIBOR-based derivatives.

268.   Plaintiffs Moon Capital Partners and Moon Capital Master into binding and enforceable contracts with Defendant UBS AG in connection with transactions for SIBOR- and SOR-based derivatives.

269.   Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

270.   Defendants Deutsche Bank, Citibank, and UBS breached their duty to Plaintiffs and, without reasonable basis and with improper motive, acted in bad faith by, among other things, (a) intentionally making false SIBOR submissions to the ABS for the express purpose of generating illicit profits from its SIBOR-based derivatives; and (b) conspiring with other Defendants to manipulate SIBOR, SOR, and the prices of SIBOR- and SOR-based derivatives.

271.   As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiffs and similarly situated members of the Class have been damaged as alleged herein in an amount to be proven at trial.

*       *       *

## PRAYER FOR RELIEF

Plaintiffs demands relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D.      That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court order Defendants to disgorge their ill-gotten for restitution to Plaintiffs and the Class;

H.      That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

I.      That the Court award Plaintiffs and Class prejudgment interest at the maximum rate allowable by law; and

J.      That the Court directs such further relief as it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a jury trial as to all issues triable by a jury.

Dated:  October 25, 2021
          White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG, P.C.

/s/ Vincent Briganti
Vincent Briganti
Christian P. Levis
Margaret MacLean
Roland R. St. Louis, III
Charles Kopel
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email:  vbriganti@lowey.com
       clevis@lowey.com
       mmaclean@lowey.com
       rstlouis@lowey.com
       ckopel@lowey.com

*Counsel for Plaintiffs*