**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P., MOON CAPITAL PARTNERS MASTER FUND LTD., and MOON CAPITAL MASTER FUND LTD., on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Docket No. 16-cv-05263 (AKH) |
| v. | |
| CITIBANK, N.A., BANK OF AMERICA, N.A., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, UBS AG, BNP PARIBAS, S.A., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS BANK PLC, DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, STANDARD CHARTERED BANK, DBS BANK LTD., ING BANK, N.V., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, COMMERZBANK AG, AND JOHN DOES NOS. 1-50, | |
| Defendants. | |

**REPRESENTATIVE PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF**
**APPROVAL OF ALL SETTLEMENTS**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

Question 1: Whether the settlement amounts are fair, given that the case settled before formal discovery. ................................................................................................................................ 4

Question 2: Whether a settlement class may be certified where the proposed class includes both buyers and sellers of SIBOR- and/or SOR-Based Derivatives and where some might have benefitted from the alleged five-year multibank conspiracy.................................................. 10

Question 3: Whether the volume-based distribution plan that Representative Plaintiffs proposed is appropriate. ....................................................................................................... 15

    A.    The Standard for Plans of Allocation ........................................................................ 15

    B.    The "Reasonable, Rational Basis" Underlying the Plan of Distribution Proposed Here ..................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ............................................................................. 20

*Bryant v. Potbelly Sandwich Works, LLC*,
  No 17-cv-7638, 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) ..................................... 20

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ..................................................................................... 11

*Frank v. Gaos*,
  139 S. Ct. 1041 (2019) .............................................................................................. 11

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
  No. 16-cv-5263-AKH, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ...................... 11

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
  991 F.3d 370 (2d Cir. 2021) ..................................................................................... 11

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-md-1775 (JG)(VVP), 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ............ 9

*In re Airline Ticket Comm'n Antitrust Litig.*,
  953 F. Supp. 280 (D. Minn. 1997) ............................................................................ 16

*In re Amaranth Natural Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) .............................................................................. 14

*In re Credit Default Swaps Antirust Litig.*,
  No. 13-md-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. April 26, 2016) .................. 16

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ..................................................................................... 12

*In re EVCI Career Colleges Holding Corp. Secs. Litig.*,
  No. 05 Civ. 10240(CM), 2007 WL 2230177 (S.D.N.Y. July 27, 2007) .................. 16

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  407 F. Supp. 3d 422 (S.D.N.Y. 2019) ...................................................................... 14

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  No. 13-cv-7789, 2015 WL 9952596 (S.D.N.Y. Dec. 15, 2015) .............................. 14

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  No. 13-cv-7789, 2017 WL 11598170 (S.D.N.Y. Sept. 8, 2017) .............................. 14

*In re Giant Interactive Group, Inc. Secs. Litig.*,
 279 F.R.D. 151 (S.D.N.Y. 2011)..................................................................... 16

*In re Global Crossing Sec. and ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004)..................................................................... 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 327 F.R.D. 483 (S.D.N.Y. 2018)............................................................... 15, 19

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 No. 11-md-2262, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................. 14

*In re Lloyd's Am. Trust Fund Litig.*,
 No. 96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ............ 19

*In re Natural Gas Commodities Litig.*,
 231 F.R.D. 171 (S.D.N.Y. 2005)........................................................ 3, 12, 13

*In re PaineWebber Ltd. Partnerships Litig.*,
 171 F.R.D. 104 (S.D.N.Y. 1997)........................................................... 15, 16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 330 F.R.D. 11 (S.D.N.Y. 2019)............................................................... 4, 15

*In re Sumitomo Copper Litig.*,
 182 F.R.D. 85 (S.D.N.Y. 1998)................................................................. 13

*In re Term Commodities Cotton Futures Litig.*,
 No. 12-CV-5126 (ALC)(KNF), 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022)................. 13, 14

*Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*,
 No. 18-cv-649-LJV-JJM, 2021 WL 3827733 (W.D.N.Y. Aug. 27, 2021) ............... 11

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
 262 F.3d 134 (2d Cir. 2001)..................................................................... 13

## Other Authorities

7B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE CIV. § 1797.2
 (3d ed. 2022) .......................................................................................... 11

William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed. 2021) ..................... 16

## INTRODUCTION

At the May 19, 2022 hearing on Representative Plaintiffs' motion for preliminary approval of their settlements with six Defendants (totaling **$64,458,000**), the Court asked questions concerning the adequacy of those settlements and the distribution plan that would allocate payments to class members. This brief addresses the Court's questions, while adding a crucial piece of new information: Representative Plaintiffs have also reached a global settlement with the remaining thirteen Defendants for $**91,000,000**.[1] Representative Plaintiffs are thus seeking approval of settlements that totally dispose of this action and provide a total of ***$155,458,000*** to class members—who, absent Representative Plaintiffs' undertaking this lawsuit and achieving this nine-figure settlement, would not receive a dime.

Representative Plaintiffs understood the Court to have three primary questions about the settlements: (1) whether the settlement amounts are fair, given that the case settled before formal discovery (*see* May 19, 2022 Hearing Tr. at 12:7-9); (2) whether a settlement class may be certified where the proposed class includes both buyers and sellers of SIBOR- and/or SOR-Based Derivatives and some might have benefitted from the alleged five-year multibank conspiracy (*see* May 19, 2022 Hearing Tr. at 14:21-24, 33:1-17); and, relatedly, (3) whether the volume-based distribution plan that Representative Plaintiffs developed in consultation with their industry experts and economists is appropriate (*see* May 19, 2022 Hearing Tr. at 15:20-22, 16:18-19, 18:6-9). Each question is answered in detail below, but in short:

(1) Even without formal discovery, Representative Plaintiffs conducted an extensive, multifaceted investigation over the last six years regarding the SIBOR- and/or SOR-Based Derivatives market and the claims, defenses, and potential damages in this litigation.

---

[1] Representative Plaintiffs have contemporaneously filed a separate brief in support of preliminary approval of this settlement.

- *Damages*: Reviewing years' worth of trading data from Reuters, Bank for International Settlements ("BIS") Triennial Surveys, and the Federal Reserve Bank of New York's U.S. based market surveys, Representative Plaintiffs' experienced econometric modeling experts calculated a total damages range of between $389 million and $560 million. This means that the $155,458,000 in settlement proceeds represents 28% to 43% of total class-wide damages, assuming Representative Plaintiffs successfully litigated this case through trial. That is a substantial recovery exceeding the recovery estimates in settlements in similarly situated "IBOR" cases prosecuted in this District.

- *Experience in Similar Cases*:  Representative Plaintiffs were also able to draw on their counsel's experience in other cases in this District that mirror this one in virtually every detail: financial services antitrust class actions against many of the same banks, alleging exactly the same types of schemes to manipulate benchmark rates to which the defendant banks were contributors for the benefit of the banks' own derivatives trading positions. Here the "IBOR" benchmarks are SIBOR and SOR; the other cases include Yen LIBOR/Euroyen TIBOR, Euribor, Swiss Franc LIBOR, Pound Sterling LIBOR, and the Australian Dollar rate BBSW. Settlements in the other IBOR cases are a compelling measure of the fairness of the settlements here. Accounting for the differing sizes of the relevant markets, ***the settlements in this action are at least five times larger than those approved in any of those cases***.

- *Evaluation of Claims and Defenses*: Representative Plaintiffs were informed by their knowledge of the state of the law on all the relevant issues in this case, through the prior rulings in this case from this Court and the Second Circuit, through the similar cases described above, and through their lengthy experience in antitrust litigation generally: antitrust conspiracy, antitrust injury, efficient enforcer, subject matter jurisdiction, personal jurisdiction, and more.

2

- *Arms-Length Negotiations*: Months' worth of arms-length negotiations with Defendants' skilled and experienced counsel gave Representative Plaintiffs a complete picture of the risks of continued litigation and the benefits of settlement. Through those negotiations, Representative Plaintiffs also secured valuable cooperation from each Defendant, to be provided upon granting of preliminary approval. That cooperation will include transaction-level SIBOR- and/or SOR-Based Derivatives data, counterparty information, documents and data produced to governmental authorities, and risk reports.

In short, Representative Plaintiffs have used every available resource to ensure that these negotiated settlements are more than fair. They are outstanding, and we are proud of them.

(2) Courts in this District have a long history of certifying settlement classes in financial product price manipulation cases—including the other benchmark cases mentioned above—that include both buyers and sellers. Questions regarding the impact of the alleged manipulation on class members' particular transactions are merits issues that need not be addressed for class certification purposes. Indeed, class definitions that attempt to limit class members to only those who necessarily suffered losses as a result of the Defendants' alleged misconduct have been rejected as an impermissible dive into the merits of the plaintiffs' complaint. *See In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 183 (S.D.N.Y. 2005) (certifying a class including "investors in a diversity of positions with respect to the natural gas futures contract market, including purchasers and sellers, speculators and 'hedgers,'" and rejecting attempt to limit class to those "who suffered losses as a result of Defendants' manipulation."). This Court will be in very good company certifying the proposed settlement class of "All Persons (including both natural persons and entities) who purchased, sold, held, traded, or otherwise had any interest in SIBOR- and/or SOR-Based Derivatives during the Class Period."

(3) The volume-based Distribution Plan that Representative Plaintiffs developed in consultation with experienced leading economists strikes the appropriate balance between efficiency and adequacy. It treats class members fairly by considering their individual trading volumes and the types of instruments they traded, while remaining efficient to administer, with reduced costs to the Settlement Funds. Plaintiffs' Counsel and their experts drew on their extensive experience in creating plans of allocation for similarly large and complex financial product cases to create a plan that they are confident will work well and reflects the realities of the relevant market and the intricacies of the alleged conspiracy. Similar volume-based plans of allocation have been approved many times in this District, and this case should be no exception. The law requires only that a plan of allocation have a "reasonable, rational basis," particularly when, as here, it is created by "experienced and competent class counsel." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (S.D.N.Y. 2019) ("*Payment Card*"). The Distribution Plan here amply satisfies that permissive standard.

## ARGUMENT

Question 1: Whether the settlement amounts are fair, given that the case settled before formal discovery.

Representative Plaintiffs drew on a wealth of experience, independent investigation and research, expert resources, and information gained during confidential settlement negotiations to assess the fairness of the settlements—far exceeding the standard of "whether the parties had adequate information about their claims." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004).

Plaintiffs' Counsel are the preeminent attorneys in the field of benchmark interest rate manipulation litigation, serving as lead or co-lead counsel in at least seven class actions (including

this one) bringing antitrust and/or Commodity Exchange Act claims against financial institutions for the manipulation of global benchmark interest rates. *See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD) (S.D.N.Y, and *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 15-cv-5844 (GBD) (S.D.N.Y.) (involving London Interbank Offered Rate ("LIBOR") for Japanese Yen ("Yen-LIBOR) and the Tokyo Interbank Offered Rate ("Euroyen TIBOR")); *Sullivan v. Barclays plc*, No. 13-cv-2811 (PKC) (S.D.N.Y.) (involving Euro Interbank Offered Rate ("Euribor")); *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 16-cv-06496 (LAK) (S.D.N.Y.) (involving the Australian Bank Bill Swap Rate ("BBSW")); *Sonterra Capital Master Fund Ltd., et al. v. Credit Suisse Group AG, et al.*, No.: 1:15-cv-00871 (SHS) (S.D.N.Y.) (involving Swiss Franc LIBOR); *Sonterra Capital Master Fund Ltd., et al. v. Barclays Bank PLC, et al.*, No. 15-cv-03538 (VSB) (S.D.N.Y.) (involving Sterling LIBOR).  Briganti Decl. ¶¶ 22, 41. In these and other large, complex financial product class actions, Plaintiffs' Counsel represents highly sophisticated clients such as the California State Teachers Retirement System and the Treasurer of the Commonwealth of Pennsylvania. Briganti Decl. ¶ 41.

This deep experience in the field gave Plaintiffs' Counsel two distinct advantages. It allowed them to compare the settlements here with those achieved in other factually and legally similar cases, while taking into account differences in market size. And it provided them with a solid knowledge base about how best to conduct their investigation—where to find and how to analyze the best trading data, which experts to engage, and what methodologies to use to estimate damages.

Plaintiffs' Counsel built onto that experience in undertaking its pre-complaint investigation.  They reviewed disclosures from the Monetary Authority of Singapore relating to the alleged manipulation of SIBOR and SOR and correlated that information with other research

they had gathered from reviewing U.S. and non-U.S. regulatory orders and settlements involving several Defendants.   Briganti Decl. ¶ 33.   A number of these additional regulatory orders specifically identified or alleged misconduct in the SIBOR and SOR market by certain Defendants. Based on this early research, Plaintiffs' Counsel developed an understanding that the same methods and techniques that had been involved in the manipulation of benchmarks such as Yen-LIBOR, Euroyen TIBOR, Euribor, and others, were likely used with respect to SIBOR and SOR. Briganti Decl. ¶¶ 33-35.

In the Yen-LIBOR/Euroyen TIBOR and Euribor cases, Plaintiffs' Counsel had already begun to amass a truly gigantic discovery record—20 terabytes of data in Yen alone, including vast amounts of transaction data as well as intra- and inter-bank communications. While of course the specific documents received could not be used in this action, they gave Plaintiffs' Counsel a great deal of transferable insight into how benchmark manipulation worked in practice, where the most helpful data can be found, the likely range of classwide damages, and more. Briganti Decl. ¶¶ 29-30.   In addition, litigating such similar cases against many of the same banks and counsel that are Defendants here gave Plaintiffs' Counsel a uniquely clear view of the litigation strengths and risks in this case. Representative Plaintiffs were able to see multiple judges' reactions to the legal arguments Defendants raised regarding subject matter jurisdiction, personal jurisdiction, and the merits of Representative Plaintiffs' pleadings; got a preview into how Defendants litigate discovery (aggressively, with ample use of foreign blocking statutes and data privacy laws); had the experience of going up to the Second Circuit and back on a subject matter jurisdiction issue in the Yen LIBOR/Euroyen TIBOR litigation and analyzing how that impacted this case; and saw the main areas of attack that Defendants used on the class certification models that Plaintiffs' experts put forth. Briganti Decl. ¶¶ 31-32.   The depth and specificity of this experience put

Plaintiffs' Counsel in a truly superior position when it came time to evaluate the fairness of these settlements.

Prior to beginning settlement negotiations in this Action with JPMorgan in 2017, Plaintiffs' Counsel had achieved $58 million in settlements from two defendants in the Yen-LIBOR/Euroyen TIBOR litigation, and $139 million from two defendants in Euribor.  Briganti Decl. ¶ 37. Plaintiffs' Counsel understood that the market for financial derivatives priced in the United States based on SIBOR and SOR was about 10-20 times smaller than the market for Yen-LIBOR/Euroyen TIBOR and 30 times smaller than the market for Euribor.  Briganti Decl. ¶¶ 23, 26.  As a result, these early settlements provided a valuable barometer against which Plaintiffs' Counsel could measure the fairness of settlement proposals in this Action.  As settlement negotiations continued in this Action, the available information that Plaintiffs' Counsel could use to benchmark the reasonableness of the settlements in this Action expanded.  To date, the Yen-LIBOR/Euroyen TIBOR litigation has recovered $307 million for class members in that case, while class members in the Euribor litigation have or will benefit from settlements totaling $546.5 million.  Briganti Decl. ¶ 25.  Additionally, Plaintiffs' Counsel were well aware that attorneys leading the litigation related to the manipulation of over-the-counter ("OTC") financial instruments priced based on U.S. Dollar LIBOR, a market that is approximately 100 times larger than the SIBOR market, recovered $590 million on behalf of class members.  *See* Memorandum of Law, at 3, *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (S.D.N.Y. July 9, 2021), ECF No. 3294. Comparing the settlement value in proportion to the respective market size (*i.e.*, the settlement recovery per notional value of the market), ***the settlements in this Action are 5-10 times larger than the recoveries to date in Yen-LIBOR/Euroyen TIBOR, 9.5 times greater than the recoveries to date in Euribor, and 26 times larger than the recoveries to date in***

**USD LIBOR.**  Briganti Decl. ¶¶ 25-26. Plaintiffs' Counsel therefore felt entirely comfortable presenting these settlements to their clients and to the Court and believe that it is an excellent recovery for the proposed settlement class.

Plaintiffs' Counsel consulted with a range of experts that assisted with evaluating the size of the SIBOR and/or SOR-Based derivatives market and the strength of Representative Plaintiffs' claims.  Briganti Decl. ¶ 18.  In addition, Plaintiffs' Counsel engaged financial experts to help analyze the potential damages in the Action.  These experts used their extensive experience in analyzing benchmark interest rate markets and data from the BIS Triennial Surveys to determine the share of the SIBOR market that transacted through the United States.  Briganti Decl. ¶ 19.  The BIS Triennial Surveys are among the most comprehensive source of information on the size and structure of global foreign exchange and OTC derivative markets and are commonly used by economics experts in estimating market size and class-wide impact arising from interest rate manipulations.  In performing their analyses, the experts controlled for factors including volume of interdealer market transaction, which were less likely to have been affected by manipulated rates because the counterparties to the transactions would have included Defendants, the time to maturity for certain instruments, and the issue of data completeness, particularly given that the BIS Triennial Survey occurs every three years.  *Id.* Then, based on their extensive analysis and knowledge of other similar cases including ISDAfix[2] and U.S. Dollar LIBOR, these experts selected and applied a quantum of damages percentage in a range that was consistent with other research and information they reviewed concerning market manipulation to develop the damages range used by Plaintiffs' Counsel.

---

[2] *See Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.,* No. 14-cv-7126 (S.D.N.Y.).

The Settlement was the product of extensive, arms-length negotiations by skilled and experienced counsel on both sides, giving rise to a presumption of procedural fairness. *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775 (JG)(VVP), 2009 WL 3077396, at *7 (E.D.N.Y. Sept. 25, 2009). Over the course of months, counsel spent many hours extensively debating the case's factual and legal strengths and weaknesses. Briganti Decl. ¶¶ 36. Representative Plaintiffs were well informed regarding the Court's decisions on Defendants' motions to dismiss, the Second Circuit's opinion remanding the case and the associated petitions for rehearing and certiorari, and government settlements involving these and other benchmarks. Briganti Decl. ¶¶ 27, 36, 39. Notwithstanding the Settlements, Defendants deny any liability or wrongdoing, maintain that they have good and meritorious defenses to Representative Plaintiffs' claims, and that Representative Plaintiffs have no damages whatsoever. Briganti Decl. ¶ 36. Absent the Settlements, if Defendants were to prevail in the litigation, the class would receive nothing.

A particularly important aspect of these negotiations involved the settlement cooperation that each Defendant has agreed to provide upon granting of preliminary approval. Categories of documents to be provided include: transaction-level SIBOR- and/or SOR-Based Derivatives data, counterparty information, documents and data produced to governmental authorities, risk reports, and more. Briganti Decl. ¶ 38. With this wealth of information, Representative Plaintiffs will be able to make any adjustments to the Distribution Plan that might be necessary in advance of the fairness hearing[3], and provide appropriate notice to the class. This valuable information provides yet another safeguard for the class's best interests and adds substantial value to the settlement.

---

[3] Any changes to the Distribution Plan will be posted promptly to the settlement website so that putative class members will have this information readily available. Both the long form and short form notices direct putative class members to the settlement website for updates in advance of the final approval hearing.

Question 2: Whether a settlement class may be certified where the proposed class includes both buyers and sellers of SIBOR- and/or SOR-Based Derivatives and where some might have benefitted from the alleged five-year multibank conspiracy.

Courts in this District routinely certify settlement classes in cases like this one, alleging banks manipulated benchmark rates to benefit their own derivatives trading positions at the expense of counterparties. *See, e.g.*, *Sullivan v. Barclays PLC et al.*, No. 1:13-cv-02811, (S.D.N.Y.), ECF Nos. 424, 498 (the Euribor litigation, Judge Castel—settlement finally approved); *Laydon v. Mizuho Bank, Ltd. et al.*, No. 1:12-cv-03419 (S.D.N.Y.), ECF Nos. 720, 838, 891, 1013, 1014 (the Yen LIBOR litigation, Judge Daniels—settlement finally approved); *Alaska Elec. Pension Fund v. Bank of Am. Corp. et al.*, No. 1:14-cv-07126 (S.D.N.Y.), ECF Nos. 648-57, 738 (the ISDAfix litigation, Judge Furman—settlement finally approved); *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 1:16-cv-06496 (S.D.N.Y.), ECF Nos. 460, 517-22, 542, 544 (the BBSW litigation, Judge Kaplan—settlement class conditionally certified and settlement awaiting final fairness hearing).[4] Each of those cases alleged the same "multidirectional" type of manipulation alleged here, and in each case, the settlement class included both buyers and sellers of the relevant derivatives throughout the class period. These judges observed the same benefits to settlement that this Court expressed at the May 19 hearing in choosing to approve the settlements before them. *See* May 19 Hearing Tr. at 35:16-22 ("Clearly there is risk and complexity in this

---

[4] "[The Settlement Class means] All Persons who purchased, sold, held, traded or otherwise had any interest in Euribor Products from June 1, 2005 through and including March 31, 2011 . . ." *Sullivan*, No. 1:13-cv-02811, ECF Nos. 424, 498. "The Settlement Class is defined as All Persons who purchased, sold, held, traded, or otherwise had any interest in Euroyen-Based Derivatives during the period from January 1, 2006 through June 30, 2011 . . ." *Laydon*, No. 1:12-cv-03419, ECF Nos. 720, 838, 891, 1013, 1014. "Settlement Class defined as follows: All Persons or entities who entered into, received or made payments on, settled, terminated, transacted in, or held an ISDAfix Instrument during the Settlement Class Period . . ." *Alaska Elec. Pension Fund*, No. 1:14-cv-07126, ECF Nos. 648-57, 738. "[The Settlement Class means] All Persons (including both natural persons and entities) who purchased, acquired, sold, held, traded, or otherwise had any interest in BBSW-Based Derivatives during the period January 1, 2003 through August 16, 2016 . . ." *Dennis*, No. 1:16-cv-06496, ECF Nos. 460, 517-22, 542, 544.

case; clearly the costs of continuing litigation are enormous; clearly there's interest in quieting this issue, given the number of banks and their importance in the international banking business; and clearly there's importance in putting behind us this embarrassment of fixing interbank interest rates."); *see also, e.g.* § 1797.2 Settlement, Voluntary Dismissal, or Compromise of Class Actions—Settlement Classes, 7B FED. PRAC. & PROC. CIV. § 1797.2 (3d ed.) ("[S]ettlement classes offer the opportunity to resolve the litigation more efficiently and economically, allowing for the earlier termination of the suit.").

To approve these Settlements, the Court need not reach any merits questions regarding the alleged net damages definitively suffered by any individual Class members across the SIBOR- and/or SOR-Based Derivatives they may have traded during the Class Period—the very questions that Representative Plaintiffs and Defendants have mutually agreed to avoid by entering these settlements. Representative Plaintiffs need establish only two elements for approval of the Settlements: subject matter jurisdiction, *see Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019), and the *Grinnell* factors based on the Rule 23 analysis applicable to litigation classes. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

Here, the Court has already determined that Representative Plaintiffs' alleged injuries sufficed to establish Article III standing, *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263-AKH, 2017 WL 3600425, at *9 (S.D.N.Y. Aug. 18, 2017), and the Second Circuit confirmed that the Court's subject matter jurisdiction "is clear." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 393 (2d Cir. 2021). No further analysis of Representative Plaintiffs' alleged damages is required. *See Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*, No. 18-cv-649-LJV-JJM, 2021 WL 3827733, at *5 (W.D.N.Y. Aug. 27, 2021) ("The proposed settlement is a compromise between the parties that does not resolve their dispute

but instead disposes of it. And the question of whether members of the proposed class have standing does not turn on who is correct about the merits of the case. After all, it is possible for a plaintiff to have standing but eventually lose."); *see also In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d 677, 689 (2d Cir. 2009) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (alteration omitted) (quoting *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265 (1946)).

Nor does the Rule 23 analysis pose an obstacle to certification of the Settlement Class as currently defined. In *In re Natural Gas Commodities Litig.*, Judge Marrero certified a litigation class of "all investors who purchased or sold NYMEX natural gas futures" (which included "investors in a diversity of positions with respect to the natural gas futures contract market, including purchasers and sellers, speculators and 'hedgers'") for purposes of pursuing claims that defendants engaged in false reporting and other manipulative conduct to distort prices in the natural gas futures market. 231 F.R.D. at 183. Over defendants' objections, the court explained that the presence of purchasers and sellers in the same class posed no conflict because both categories of claimants would maintain "a shared interest in compiling the historical data required to demonstrate price artificiality and have the same interest in proving price artificiality." *Id.* at 183. The *impact* that that price artificiality would have had on any class member's individual transactions—whether negative, positive, or nonexistent—was a merits question to be addressed at trial. Indeed, Judge Marrero *sua sponte* struck the limiting clause "'who suffered losses by reason of Defendants' manipulation" from the definition of the class he certified, reasoning that "it would be nearly impossible to determine who satisfies this second condition of class

12

membership without impermissibly inquiring into the merits of Plaintiffs' complaint." *Id.* at 180. So too here.

Judge Marrero grounded his *Natural Gas* analysis in the Second Circuit's holding in *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001). Although the class in *Sumitomo* was defined to include only purchasers of the allegedly manipulated copper futures contracts, defendants opposed class certification in part on the rationale that many members of the purchaser class were also sellers of copper futures during the same period of manipulation. *See In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91-92 (S.D.N.Y. 1998) ("Global points to an alleged conflict between a trader who initiated a position and another who closed a position on the same trading day. Under those circumstances, two plaintiffs will want to prove that the opposite occurred on the same day—the purchasers will need to demonstrate that the price of copper futures was artificially high, and the seller will want to prove that the price on that day was not being manipulated."). The district court nonetheless certified the litigation class, finding the damages merits question to be amenable to class-wide resolution, *id.* at 92, and the Second Circuit subsequently denied defendants' petition for leave to appeal the certification. 262 F.3d at 137.

Courts in this District continue to rely on *Natural Gas* and its application of the Second Circuit's holding in *Sumitomo* to certify classes that include both buyers and sellers of the same financial product. Recently, Judge Carter certified a class of investors alleging "episodic" manipulation of cotton futures prices, despite the fact that the class definition necessarily included "traders with diverging economic interests, namely long traders, short traders, and hedgers." *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126 (ALC)(KNF), 2022 WL 485005, at *5 (S.D.N.Y. Feb. 17, 2022). The court explained that neither the potential of conflict resulting from this "economic diversity," nor even the possibility of "uninjured class members" implicated the

13

Rule 23 factors; rather, this all "goes to the calculation of damages," a separate inquiry. *Id.* (citing *Natural Gas*, 231 F.R.D. at 180). *See also In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) (holding that "[c]ourts have consistently certified classes that include both purchasers and sellers of any contract relating to a specific underlying commodity during the class period[]," and rejecting defendants' argument that profit-motivated conflicts between each class member's trading positions precluded class certification).

Notably, even courts that have declined to certify Rule 23(b)(3) litigation classes due to the presence of differently situated traders have nonetheless been willing to certify *settlement* classes of this kind. Two relatively recent examples in this District are Judge Schofield in *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (S.D.N.Y.) ("*FX*") and Judge Buchwald in the USD LIBOR litigation, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (S.D.N.Y.) ("*USD LIBOR*". *Compare FX*, 407 F. Supp. 3d 422, 436 (S.D.N.Y. 2019) (denying Rule 23(b)(3) litigation class certification where "individualized inquiry would be necessary" to determine the locations, types of trades, and liquidity providers of each class member's trades) *with FX*, 2015 WL 9952596 (S.D.N.Y. Dec. 15, 2015) *and FX,* 2017 WL 11598170 (S.D.N.Y. Sept. 8, 2017) (both certifying settlement classes without regard to these differences among class members); *compare USD LIBOR,* 299 F. Supp. 3d 430 (S.D.N.Y. 2018) (denying Rule 23(b)(3) litigation class certification for exchange-traded plaintiffs because, *inter alia*, of the need for "highly individualized" damages analysis) *with USD LIBOR*, No. 11-md-2262 (S.D.N.Y. Sept. 17, 2020), ECF Nos. 3175-80  (certifying settlement class of exchange plaintiffs.)

In short, the Court can have every confidence that it is acting well within the bounds of established precedent in certifying a settlement class here consisting of all traders in SIBOR- and

SOR-based derivatives during the class period, regardless of differences among their individual trading positions.

Question 3: Whether the volume-based Distribution Plan that Representative Plaintiffs proposed is appropriate.

The volume-based plan Representative Plaintiffs propose easily meets the "reasonable, rational basis" standard for plans of allocation. It is based on counsel's extensive experience preparing plans of allocation in similarly large and complex benchmark manipulation cases, informed by expert analysis, and strikes the appropriate balance between efficiency of administration and adjustments for individual class members' trading.

### A.  The Standard for Plans of Allocation

While litigants at trial must prove damages by a preponderance of the evidence, a plan of allocation "need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Payment Card*, 330 F.R.D. at 29. Like the settlement of which it is a part, "it must be fair and adequate" (*id.* at 40), but need not be perfect.  Indeed, a perfect plan of allocation may not be possible:

> [I]n [ ] a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision. To determine precisely the distribution of the settlement fund among the myriad claimants in such a class would require counsel or the district court to weigh the strengths and weaknesses of the claims of each class member and would be an almost impossible task.

*In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd sub nom., In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997); *accord In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018). This challenge is particularly acute in antitrust cases, where damages "are rarely susceptible of the kind

of concrete, detailed proof of injury which is available in other contexts." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. April 26, 2016).

Taking on the "almost impossible task" of weighing each class member's claims has real costs in time and money—costs that are ultimately borne by injured class members themselves, who must wait longer to receive their payments out of a reduced settlement fund.  For this reason, "the goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." William B. Rubenstein, 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed. 2021). "Efficiency and administrability" in a plan of distribution are not just nice features to have; they are "requirements." *See In re PaineWebber*, 171 F.R.D. at 133; *see also In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997) (rejecting objections to distribution plan on grounds that "the cost of undertaking these steps [requested by objectors] would be exorbitant and a waste of settlement funds."). That is why courts place such great weight on the recommendations of experienced counsel (alongside their experts) in evaluating plans of distribution. *See, e.g., In re EVCI Career Colleges Holding Corp. Secs. Litig.*, No. 05 Civ. 10240(CM), 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) ("[I]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel."); *In re Giant Interactive Group, Inc. Secs. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) (approving plan of allocation "devised by experienced and estimable class counsel"). Counsel's experience in administering past settlements teaches them what works and what doesn't, how much different methods are likely to cost and how long they will take, and how best to balance accuracy and efficiency. To give just one example, the distribution plan in the Yen-LIBOR litigation takes advantage of the robust discovery record there to craft a sophisticated damages model with daily artificiality metrics. However, administering such a model takes time and we

16

have been administering that plan for three years now, as compared to just a few months for volume-based plans such as *GSE Bonds*. *See* Motion to Approve Distribution of the Net Settlement Fund, *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1703 (S.D.N.Y. Dec. 3, 2020), ECF No. 446 (filed less than six months following final approval of the settlements); Order Approving Distribution of the Net Settlement Fund, *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1703, (S.D.N.Y. Apr. 23, 2021), ECF No. 451 (approving distribution of net settlement fund less than a year after final approval of the settlements).

### B. The "Reasonable, Rational Basis" Underlying the Plan of Distribution Proposed Here

The proposed Distribution Plan here easily meets the permissive standard described above. It will be simple for class members to participate in and efficient to administer; it treats all class members fairly and equitably; it accounts for differences in individuals' trading volumes and instruments without undertaking additional, unnecessary analyses that add cost; and it is designed by highly experienced counsel assisted by equally highly experienced experts.

As described in Representative Plaintiffs' earlier briefing but reproduced here for the Court's convenience, the plan works as follows: To receive a portion of the Net Settlement Fund, Class Members will submit a Proof of Claim and Release form ("Claim Form"). The Claim Form is straight-forward and simple, only requiring a claimant to provide background information and readily accessible data about their SIBOR- and/or SOR-Based Derivatives transactions, including the transaction type, trade date, applicable SIBOR or SOR rate, and notional (face) value of the transaction. *See* Briganti Decl., Ex. 4. This information is comparable to the information requested in other benchmark litigation cases.[5]

---

[5] *See* Proof of Claim and Release Form, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126, (S.D.N.Y.), ECF No. 512-3 (claim form requiring submission of, *inter alia*, transactions entered into, received or made payments on, settled, terminated, transacted in, or held during the Settlement Class Period).

Substantively, the Distribution Plan allocates the Net Settlement Fund *pro rata* to Authorized Claimants based on an estimate of the impact of Defendants' alleged manipulation on SIBOR- and/or SOR-Based Derivatives.  ECF No. 473-11.  In particular, it calculates for each SIBOR and/or SOR-Based Derivatives transaction a "Transaction Notional Amount," which is a score that reflects the interest rate impact of the alleged manipulation on the SIBOR and/or SOR-Based Derivatives. If all other factors are held constant, claimants with a higher trading volume can expect a proportionally higher Transaction Notional Amount. Further, SIBOR and/or SOR-Based Derivatives transactions that include multiple interest payments based on the notional value of the transaction (*e.g.*, interest rate swaps) will have higher Transaction Notional Amounts than SIBOR and/or SOR-Based Derivatives transactions that have the same notional value but are based on fewer interest rate payments.  An Authorized Claimant's Transaction Notional Amounts for all of its eligible SIBOR and/or SOR-Based Derivatives transactions will be summed together (the "Transaction Claim Amount") and divided by the sum of all calculated Transaction Claim Amounts to determine the Authorized Claimants *pro rata* fraction, which will then be multiplied against the Net Settlement Funds to determine the Authorized Claimant's payment amount.

This volume-based approach is very similar to plans of distribution that have been approved in this District in other similarly large and complex antitrust cases involving financial products, such as *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.* (*ISDAFix*), No. 14-cv-7126 (S.D.N.Y.); *In re London Silver Fixing, Ltd. Antitrust Litig. (Silver)*, Nos. 14-md-2573, 14-mc-2573 (S.D.N.Y.); *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig. (Gold)*, Nos. 14-md-2548, 14-mc-2548 (S.D.N.Y.); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-cv-2830 (S.D.N.Y.); and *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1703

(S.D.N.Y.).[6]  Indeed, most plans of allocations rely on volume in whole or in part; it is the relatively

rare case that can reasonably include a more complex metric like artificiality.  Though some plans

of distribution do perform a netting analysis to account for different positions a trader may have

taken in the affected derivatives during the class period, this analysis is not mandatory.  Indeed,

even Judge Buchwald in the USD LIBOR litigation, who expressed concern over the "questions

of netting and absorption [that] loom large over the amount of damages that any plaintiff may

ultimately recover," ultimately approved a simpler pro rata plan of distribution without netting.  *In*

*re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. at 494, 496 ("[T]he Plans of

Distribution and the pro rata means of allocation they contemplate strike a reasonable balance

between precision and efficiency.").

        To take another example, in *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS),

2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002), ultimate determination of a class member's

damages would have depended on "detailed analysis of what was done with each Name's funds."

2002 WL 31663577, at *21, *aff'd sub nom. Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d

Cir. Aug. 20, 2003).  Judge Sweet considered that it was "inappropriate to assume…that liability

has been shown or that Plaintiffs have 'lost' anything," and approved a simple volume-based plan

of allocation over objection. *Id.* at *19. Requiring parties to go through the costly discovery process

---

[6] Plan of Distribution, *ISDAFix*, ECF No. 602-1; Plan of Distribution, *ISDAFix*, ECF No. 681-1; Final Judgments and Orders of Dismissal at ¶ 16, *ISDAFix*, ECF Nos. 648-57 (approving plan of distribution as fair, reasonable, and adequate); Final Judgment and Order of Dismissal at ¶ 15, *ISDAFix*, ECF No. 738 (same); Distribution Plan, *Silver*, ECF No. 451-5; Final Approval Order, *Silver*, ECF No. 536 (approving plan of distribution as fair, reasonable, and adequate); Plan of Allocation for the Third Settlement Agreement, *Gold,* ECF No. 610-3; Updated Plan of Allocation for Deutsche Bank and HSBC Settlements, *Gold,* ECF No. 610-4; Order Regarding Notice of a Revised Plan of Allocation, *Gold,* ECF No. 624 at ¶ 4 (preliminarily approving updated Plan of Allocation and Plan of Allocation for a subsequent settlement, with final approval to follow at or after the Fairness Hearing); Distribution Plan, *MGBs*, ECF No. 211-7; Final Approval Orders of Settlements, *MGBs*, ECF Nos. 270-71 (approving plan of distribution as fair, reasonable, and adequate); Plan of Distribution, *GSE Bonds*, ECF No. 281-4; Judgments Approving Class Action Settlements, *GSE Bonds*, ECF Nos. 436-39 (approving the settlements as, "in all respects, fair, reasonable, and adequate").

to obtain the data needed to perform a more sophisticated netting-type analysis would have the undesirable effect of discouraging early settlements—indeed, in many cases (like this one), the prospect of avoiding discovery is a major factor incentivizing the parties to settle. *See, e.g., Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474-75 (S.D.N.Y. 2013) (noting that courts encourage early settlements as they provide immediate relief to class members and allow the judicial system to reallocate its limited resources elsewhere); *Bryant v. Potbelly Sandwich Works, LLC*, No 17-cv-7638, 2020 WL 563804, at *2 (S.D.N.Y. Feb. 4, 2020) (avoiding "[d]iscovery, trial witness and expert depositions" and "pre-trial motion practice," as well as trial itself, weighed in favor of settlement).  As described above, Plaintiffs' Counsel have served as lead counsel in many similar benchmark manipulation litigations. They have extensive experience in fashioning plans of allocation that are appropriate to the unique circumstances of each litigation's facts, available data, and procedural posture.

Representative Plaintiffs are confident that the plan they propose provides a fair and efficient method of distributing settlement proceeds to class members. Representative Plaintiffs respectfully request that the settlements and the associated Distribution Plan be preliminarily approved so that notice to class members may commence.

Dated: May 27, 2022
White Plains, New York

**LOWEY DANNENBERG, P.C.**

By: */s/ Vincent Briganti*
Vincent Briganti
Geoffrey M. Horn
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
vbriganti@lowey.com
ghorn@lowey.com

*Counsel for Representative Plaintiffs and the Proposed Class*

20