# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P., MOON CAPITAL PARTNERS MASTER FUND LTD., and MOON CAPITAL MASTER FUND LTD., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-v.-<br><br>CITIBANK, N.A., BANK OF AMERICA, N.A., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, UBS AG, BNP PARIBAS, S.A., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS BANK PLC, DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, STANDARD CHARTERED BANK, DBS BANK LTD., ING BANK, N.V., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, COMMERZBANK AG, AND JOHN DOES NOS. 1-50,<br><br>Defendants. | Docket No. 16-cv-05263 (AKH) |

**DECLARATION OF VINCENT BRIGANTI IN SUPPORT OF REPRESENTATIVE PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT WITH DEFENDANTS AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BNP PARIBAS, S.A., COMMERZBANK AG, CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, DBS BANK LTD., MUFG BANK, LTD. (F/K/A THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.), OVERSEA-CHINESE BANKING CORPORATION LIMITED, THE ROYAL BANK OF SCOTLAND PLC (N/K/A NATWEST MARKETS PLC), STANDARD CHARTERED BANK, UBS AG, AND <u>UNITED OVERSEAS BANK LIMITED</u>**

Pursuant to 28 U.S.C. § 1746, I, Vincent Briganti, hereby declare as follows:

1.      I am the Chairman and a shareholder of the law firm Lowey Dannenberg, P.C., Plaintiffs' Counsel in the above-referenced Action ("Lowey" or "Plaintiffs' Counsel").[1]

2.      I submit this Declaration in connection with Representative Plaintiffs' Motion for Preliminary Approval of Class Action Settlements with Australia and New Zealand Banking Group, Ltd. ("ANZ"), Bank of America, N.A. ("BOA"), Barclays Bank PLC ("Barclays"), BNP Paribas, S.A. ("BNPP"), Commerzbank AG ("Commerzbank"), Crédit Agricole Corporate and Investment Bank ("CACIB"), DBS Bank Ltd. ("DBS"), MUFG Bank, Ltd. (f/k/a The Bank of Tokyo-Mitsubishi UFJ, Ltd.) ("MUFG"), Oversea-Chinese Banking Corporation Limited. ("OCBC"), The Royal Bank of Scotland plc (n/k/a NatWest Markets plc) ("RBS"), Standard Chartered Bank ("SCB"), UBS AG ("UBS"), and United Overseas Bank Limited ("UOB").[2]

3.      Annexed hereto are true and correct copies of the following documents:

| TABLE OF EXHIBITS | |
|---|---|
| Exhibit 1 | Stipulation and Agreement of Settlement with Settling Defendants dated May 27, 2022 (the "Settlement Agreement"). |
| Exhibit 2 | Amended Proposed Long Form notice. |
| Exhibit 3 | Amended Proposed Short Form notice. |
| Exhibit 4 | Amended Proof of Claim and Release form. |

## I.   Procedural History

4.      On May 13, 2022, Representative Plaintiffs submitted a motion seeking preliminary approval of the proposed class action settlements with Defendants (a) Citibank, N.A. and Citigroup Inc. ("Citi"), (b) JPMorgan Chase & Co. ("JPMorgan"), (c) The Hongkong and Shanghai Banking Corporation Limited ("HSBC"), (d) Credit Suisse AG ("Credit Suisse"), (e) Deutsche Bank AG

---

[1] All capitalized terms not defined herein have the same meaning as defined in the Settlement Agreement.

[2] ANZ, BOA, Barclays, BNPP, Commerzbank, CACIB, DBS, MUFG, OCBC, RBS, SCB, UBS and UOB are collectively referred to herein as the "Settling Defendants."

("Deutsche Bank"), and (f) ING Bank N.V. ("ING") (hereinafter, the "Prior Settlements").  ECF Nos. 471-479.[3]  The May 13 Motion included a detailed procedural history of the case.  *See* ECF No. 473 (the "May 13 Briganti Decl.") ¶¶ 4-23.  We incorporate the procedural history from the May 13 Briganti Decl. by reference in this Declaration.

## II.    Details of the Settlement Negotiations with Settling Defendants

5.    The negotiations with the Settling Defendants took place over several months starting in fall 2021 and continuing until the Agreement was executed on May 27, 2022.

6.    Following initial phone calls with the Settling Defendants' counsel in fall 2021, Lowey engaged in lengthy negotiations with the Settling Defendants' counsel over the material terms of a settlement, including the amount of the settlement consideration, the scope of the cooperation to be provided by the Settling Defendants, the scope of the releases, and the circumstances under which the Parties would have the right to terminate a settlement.

7.    During the course of the negotiations, Lowey and the Settling Defendants each presented their views on the strengths and weaknesses of the claims and defenses, as well as the Settling Defendants' litigation exposure. Throughout the negotiations, the Settling Defendants' counsel argued that the Settling Defendants were not liable for the claims asserted against them in the Action, and maintained that the Settling Defendants had good and meritorious defenses to the claims brought against them in the Action.

8.    On May 27, 2022, several months of negotiations culminated with Lowey and respective counsel for each Settling Defendant executing the Settlement Agreement.  *See* Ex. 1. The Settlement provides that the Settling Defendants will pay $91,000,000 to settle claims against

---

[3] Unless otherwise noted, all docket citations are to the docket in this Action, Docket No. 16-cv-05263 (AKH) (S.D.N.Y.).

them.  *Id*. § 1(JJ).  In addition, Settling Defendants will provide cooperation that would be triggered by the entry of an order preliminarily approving the Settlement.  *Id*. § 4.

9.     The Settlement Class defined in the Settlement Agreement is identical to the class defined in the Prior Settlements:

> All Persons (including both natural persons and entities) who purchased, sold, held, traded, or otherwise had any interest in SIBOR- and/or SOR-Based Derivatives during the Class Period.  Excluded from the Settlement Class are the Defendants and any parent, subsidiary, affiliate or agent of any Defendant or any co-conspirator whether or not named as a Defendant, and the United States Government.

*Compare* Ex. 1 § 1(F) *with* May 13 Briganti Decl. Exs. 1 and 2 (Citi and JPM Agreements) § 1(G); Exs. 3-6 (HSBC, Credit Suisse, Deutsche Bank, and ING Agreements) § 1(F).

10.     If approved, the Settlement provides that "the Releasing Parties finally and forever release and discharge from and covenant not to sue the Released Parties" for the Released Claims, and "the Releasing Parties shall forever be enjoined from prosecuting in any forum any Released Claim against any of the Released Parties and the Releasing Parties agree and covenant not to sue any of the Released Parties on the basis of any Released Claims or to assist any third party in prosecuting any Released Claims against any Released Party." *See* Ex. 1 § 12.

11.     The Settlement involves a structure and terms that are common in class action settlements in this District, including a confidential Supplemental Agreement that provides Settling Defendants collectively a qualified right to terminate their Settlement in the event that the volume of SIBOR- and/or SOR-Based Derivatives transacted by Class Members who timely exercise their right to request exclusion from the Settlement Class exceeds a certain percentage. *See* Ex. 1 § 23.

12.     In the event that the Settlement is terminated pursuant to the terms of the Settlement Agreement, any amount paid by the Settling Defendants into an Escrow Account, less any

reasonable costs incurred for notice and claims administration up to $1,750,000 will be returned to the Settling Defendants within 10 business days of termination.  *Id.* §§ 9(B), 14(D).

13.     Plaintiffs' Counsel believes that there are at least hundreds, if not thousands, of geographically dispersed persons and entities that fall within the Settlement Class definition.  This belief is based on data from the Federal Reserve Bank of New York, which shows that hundreds of billions of dollars in notional value of SIBOR- and SOR-Based Derivatives were traded within the United States from 2007 through 2011.  *See* Fourth Amended Complaint, ECF No. 437, ¶¶ 71-73 (citing, *inter alia*, 2007 and 2010 surveys by the Federal Reserve Bank of New York).

14.     Class Members that do not request exclusion from the Settlement Class and submit a valid claim will receive a *pro rata* share of the Net Settlement Fund, based on the notional amount of their SIBOR- and/or SOR-Based Derivatives transactions and adjusted by certain factors as described in the proposed Distribution Plan.  *See* Distribution Plan, May 13 Briganti Decl, Ex. 11, ¶¶ 1-2.

15.     Plaintiffs' Counsel intends to seek attorneys' fees of no more than one-third of the common fund created by the Settlement and reimbursement of its expenses and costs incurred in litigating this Action, and for interest on such attorneys' fees and litigation expenses and costs at the same rate as the earnings in the Settlement Fund, accruing from the inception of the Settlement Fund until the attorneys' fees and litigation expenses and costs are paid.  *See* Ex. 2 at 29.

16.     Representative Plaintiffs may also make an application for Incentive Awards for their efforts in prosecuting this Action as class representatives on behalf of the Settlement Class not to exceed $500,000.  *Id.* at 29.

**III.    Assessment of the Potential Damages and Value of the Recovery**

17.    If approved, this Settlement and the Prior Settlements will recover a total of **$155,458,000** on behalf of the Settlement Class and completely resolve the Action before the Court.

18.    At the outset and throughout the litigation, Plaintiffs' Counsel consulted with a range of experts that assisted with evaluating the size of the SIBOR and/or SOR-Based Derivatives market.    Based on an analysis performed by Representative Plaintiffs' experts, who are experienced in developing econometric models for financial markets, Plaintiffs' Counsel estimated the potential damages caused by Defendants' alleged misconduct.

19.    The experts gathered publicly available derivatives trading volume data from various sources, including Reuters, the Federal Reserve Bank of New York's U.S. based market surveys, and Bank for International Settlements ("BIS") Triennial Surveys.    The BIS Triennial Surveys are among the most comprehensive source of information on the size and structure of global foreign exchange and OTC derivative markets and are commonly used by economics experts in estimating market size and class-wide impact arising from interest rate manipulations. The experts analyzed the relevant SIBOR- and/or SOR-Based Derivatives data to determine the size of the affected market, controlling for factors including the volume of interdealer market transaction, which were less likely to have been affected by manipulated rates because the counterparties to the transactions would have included defendants, the time to maturity for certain instruments, and the issue of data completeness, particularly given that the BIS Triennial Survey occurs every three years.

20.    Based on their extensive analysis and knowledge of other cases including *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.,* No. 14-cv-7126 (S.D.N.Y.) ("ISDAfix") and *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11-md-2262 ("U.S. Dollar LIBOR"

or "USD LIBOR"), these experts selected and applied a quantum of damages percentage in a range that was consistent with other research and information they reviewed concerning market manipulation to develop the damages range used by Plaintiffs' Counsel,  Consequently, Plaintiffs' Counsel's conservative estimate is that Defendants' alleged manipulation caused between $389 million and $560 million in damages to the Settlement Class. Therefore, the total recovery in this Action on behalf of the Settlement Class in this case represents between 28% and 43% of the estimated total damages.

21.     The consideration that the Defendants have agreed to pay in this Action is within the range of that which may be found to be fair, reasonable, and adequate at final approval. Recoveries in other benchmark rates (known as "IBOR") litigation provide a metric against which the Settlements in this Action may be measured.

22.     Plaintiffs' Counsel serves as lead or co-lead counsel in at least seven class actions (including this one) bringing antitrust and/or Commodity Exchange Act claims against financial institutions for the manipulation of global benchmark interest rates, including *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD) (S.D.N.Y), and *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 15-cv-5844 (GBD) (involving London Interbank Offered Rate ("LIBOR") for Japanese Yen ("Yen-LIBOR) and the Tokyo Interbank Offered Rate ("Euroyen TIBOR")); *Sullivan v. Barclays plc,* No. 13-cv-2811 (PKC) (S.D.N.Y.) (involving Euro Interbank Offered Rate ("Euribor")); *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 16-cv-06496 (LAK) (S.D.N.Y.) (involving the Australian Bank Bill Swap Rate ("BBSW")); *Sonterra Capital Master Fund Ltd., et al. v. Credit Suisse Group AG, et al.*, No.: 1:15-cv-00871 (SHS) (S.D.N.Y.) (involving Swiss Franc LIBOR); *Sonterra Capital Master Fund Ltd., et al. v. Barclays Bank PLC, et al.*, No. 15-cv-03538 (VSB) (involving Sterling LIBOR).

23.     Based on information provided by their experts and other data, Plaintiffs' Counsel estimated the Yen-LIBOR/Euroyen TIBOR market was at least 10-20 times larger than the market for SIBOR- and/or SOR-Based Derivatives, and the Euribor market at least 30 times larger.

24.     In addition, Plaintiffs' Counsel are involved in or follow other "IBOR" and financial manipulation cases, including litigation related to the manipulation of over-the-counter ("OTC") financial instruments priced based on U.S. Dollar LIBOR, a market that is approximately 100 times larger than the SIBOR- and/or SOR-Based Derivatives market.

25.     To date, the Yen-LIBOR/Euroyen TIBOR litigation has recovered $307 million for class members in that case, while class members in the Euribor litigation have or will benefit from settlements totaling $546.5 million.  In the U.S. Dollar LIBOR litigation, $590 million has been recovered on behalf of a class that transacted in over-the-counter ("OTC") financial instruments.

26.     Taking into account the differing sizes of the markets, Plaintiffs' Counsel estimate that the total recovery in this Action is 5-10 times larger than the recovery to date in Yen-LIBOR/Euroyen TIBOR, 9.5 times greater than the recovery to date in Euribor, and 26 times larger than the recovery to date in USD LIBOR on a settlement recovery per notional value of the market basis.

## IV.     The Settlement Negotiations Were Well Informed and Conducted at Arm's-Length

27.     This Settlement and the Prior Settlements were not the product of collusion. Defendants are each represented by skilled counsel from top law firms with extensive experience in antitrust and class action cases. Before any financial numbers were discussed in the settlement negotiations and before any demand or counter-offer was ever made, I was well informed about the legal risks, factual uncertainties, potential damages, and other aspects of the strengths and weaknesses of Representative Plaintiffs' claims against the Settling Defendants.

28.     Even without formal discovery, Representative Plaintiffs conducted an extensive, multifaceted investigation over the last six years regarding the SIBOR- and/or SOR-Based Derivatives market and the claims, defenses, and potential damages in this litigation.

29.     Plaintiffs' Counsel's experience in litigating IBOR cases provided insight as to how to best conduct their investigation to prosecute the action, include the likely sources of information and trading data, reputable and effective experts to engage, and options available to estimate damages in the market.

30.     In the Yen-LIBOR/Euroyen TIBOR and Euribor cases, Plaintiffs' Counsel had a substantial discovery record (including 20 terabytes of data in Yen alone) of transaction data, intra-bank and inter-bank communications. While the specific documents received could not be and were not used in this Action, attorneys nonetheless obtained insights about benchmark manipulation generally that could be easily applied to conduct an investigation in this Action, including where to find relevant data and information, how manipulations were effected, and how to assess the potential range of classwide damages.

31.     In addition, during the course of these other cases, Representative Plaintiffs were able to see multiple judges' reactions to the legal arguments Defendants raised regarding subject matter jurisdiction, personal jurisdiction, and the merits of Representative Plaintiffs' pleadings; got a preview into how Defendants litigate discovery (aggressively, with ample use of foreign blocking statutes and data privacy laws); had the experience of going up to the Second Circuit and back on a subject matter jurisdiction issue in the Yen LIBOR/Euroyen TIBOR litigation and analyzing how that impacted this case; and saw the main areas of attack that Defendants used on the class certification models that plaintiffs' experts put forth.

32.     For cases where settlements had been reached, Plaintiffs' Counsel's IBOR litigation experience provided a valuable context through which to assess the value of this Action and what would constitute a reasonable settlement range.

33.     In addition to this knowledge acquired based on their experience in other cases, Plaintiffs' Counsel undertook an extensive pre-complaint investigation.  Attorneys reviewed the disclosures from the Monetary Authority of Singapore relating to the alleged manipulation of SIBOR and SOR and correlated that information with other research gathered through their review of regulatory orders and settlements by, among others, the U.S. Commodity Futures Trading Commission ("CFTC"), and the U.K. Financial Services Authority ("FSA") involving several defendants.  The regulatory settlements and orders, in some instances, specifically identified or alleged misconduct relating to SIBOR and SOR by certain Defendants.

34.     Plaintiffs' Counsel also extensively reviewed and analyzed publicly available information relating to the conduct alleged in Plaintiffs' complaints; expert and industry research regarding SIBOR, SOR, and the SIBOR- and/or SOR-Based Derivatives; and prior decisions of courts deciding related legal issues in other benchmark litigation cases.

35.     From this research and its prior experience, Plaintiffs' Counsel believed that the same or similar methods and techniques of benchmarks manipulation were being applied in the SIBOR- and/or SOR-Based Derivatives market.

36.     When settlement negotiations with Defendants began, Plaintiffs' Counsel understanding of the case continued to develop.  Over the course of months, counsel spent many hours extensively debating the case's factual and legal strengths and weaknesses.  Negotiations included discussions regarding the Court's decisions on Defendants' motions to dismiss, the Second Circuit's opinion remanding the case and the associated petitions for rehearing and

certiorari, and government settlements involving these and other benchmarks. At all times throughout the negotiations, Defendants denied any liability or wrongdoing and maintained that they had good and meritorious defenses to Plaintiffs' claims.

37.     When settlement discussions turned to the amount of consideration, Plaintiffs' Counsel were well-aware that the early two settlements in the Yen-LIBOR/Euroyen TIBOR litigation recovered $58 million and the first two defendants to settle in the Euribor litigation agreed to pay $139 million.  These settlements provided another data point to consider during the course of settlement negotiations.

38.     In addition to negotiating the monetary component, Plaintiffs' Counsel understood the importance of getting access to cooperation materials that could assist with the prosecution of the case, issuances of notice, and validating any distribution plan.  Consequently, Plaintiffs' Counsel negotiated that upon preliminary approval, each Defendant would provide certain categories of documents, which may include among other information: transaction-level SIBOR- and/or SOR-Based Derivatives data, counterparty information, documents and data produced to governmental authorities, risk reports.

39.     I was personally involved in all aspects of the settlement negotiations on behalf of Representative Plaintiffs. Representative Plaintiffs engaged in hard-fought and principled negotiations with Defendants using the information gathered from the extensive investigation, industry and expert analysis, and information shared by Defendants during the settlement discussion.

40.     After carefully weighing the risks and potential outcomes of continued prosecution of the Settling Defendants against the immediate benefit that the Settlements would provide to the

Settlement Class, Representative Plaintiffs and Plaintiffs' Counsel concluded the Settlements were in the best interest of the Settlement Class.

41.     Lowey has significant experience litigating complex class actions involving benchmark manipulation claims brought under the Sherman Act and the Commodity Exchange Act.  *See* Lowey Firm Resume, May 13 Briganti Decl. Ex. 12.  At the time this Settlement was negotiated, my firm and I were experienced in prosecuting class action lawsuits brought under the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq*., the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq*., and the common law.  We have obtained landmark settlements on behalf of some of the nation's largest pension funds and institutional investors. Lowey's numerous highly sophisticated clients include the California State Teachers Retirement System and the Treasurer of the Commonwealth of Pennsylvania.

42.     I have over twenty-five years of experience in successfully developing and leading the prosecution of benchmark rate antitrust, commodity manipulation, and federal securities litigation matters.  This experience includes cases in which my firm and I have successfully prosecuted, as court-appointed lead or co-lead counsel or individual plaintiff's counsel, what were at the time the first, second, third, and fourth largest class action recoveries under the CEA.[4]

43.     In this case, Lowey has diligently represented the interests of the Class in the Action.  The firm's attorneys investigated and brought the Action.  Lowey preserved the statute of limitations.  As described above, Lowey negotiated the Settlement and the Prior Settlements.  The

---

[4] *See In re Sumitomo Copper Litigation*, Master File No. 96 CV 4854 (S.D.N.Y.) (Pollack, J.) ($149 million settlement); *Hershey v. Pacific Investment Management Corp.*, Case No. 05-C-4681 (RAG) (N.D. Ill.) ($118.75 million settlement); *In re Natural Gas Commodity Litigation*, Master File No. 03 CV 6186 (S.D.N.Y.) (Marrero, J.) ($101 million settlement); and *In re Amaranth Natural Gas Commodities Litigation*, Master File No. 07 Civ. 6377 (S.D.N.Y) (Scheindlin, J.) ($77.1 million settlement).

firm has performed all of the necessary work to prosecute this litigation for over 5½ years, including successfully taking issues up on appeal to the Second Circuit and defending that result in the Supreme Court of the United States.

**V.     Notice Plan**

44.     As previously proposed, Plaintiffs' Counsel recommend that A.B. Data, Ltd. (A.B. Data) be appointed as the Settlement Administrator in this Action based on its experience, institutional knowledge, and price competitiveness.  A.B. Data developed the proposed Notice Plan in coordination with Plaintiffs' Counsel.  *See* ECF No. 473-7.  The proposed Notice Plan is consistent with notice plans that courts have repeatedly approved in prior benchmark manipulation cases and other complex class action settlements.  *Id.* ¶ 15.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 27, 2022
White Plains, New York                         */s/ Vincent Briganti*
                                                                     Vincent Briganti