# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FUND LIQUIDATION HOLDINGS LLC, as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund L.P., MOON CAPITAL PARTNERS MASTER FUND LTD., and MOON CAPITAL MASTER FUND LTD., on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CITIBANK, N.A., BANK OF AMERICA, N.A., JPMORGAN CHASE BANK, N.A., THE ROYAL BANK OF SCOTLAND PLC, UBS AG, BNP PARIBAS, S.A., OVERSEA-CHINESE BANKING CORPORATION LTD., BARCLAYS BANK PLC, DEUTSCHE BANK AG, CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, CREDIT SUISSE AG, STANDARD CHARTERED BANK, DBS BANK LTD., ING BANK, N.V., UNITED OVERSEAS BANK LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, COMMERZBANK AG, AND JOHN DOES NOS. 1-50,

Defendants.

Docket No. 16-cv-05263 (AKH)

**REPRESENTATIVE PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS WITH CITIBANK, N.A., CITIGROUP INC., JPMORGAN CHASE & CO., AND JPMORGAN CHASE BANK, N.A., CREDIT SUISSE AG, DEUTSCHE BANK AG, THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, ING BANK N.V., AUSTRALIA AND NEW ZEALAND BANKING GROUP, LTD., BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BNP PARIBAS, S.A., COMMERZBANK AG, CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK, MUFG BANK, LTD. (F/K/A THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.), OVERSEA-CHINESE BANKING CORPORATION LIMITED, THE ROYAL BANK OF SCOTLAND PLC (N/K/A NATWEST MARKETS PLC), STANDARD CHARTERED BANK, UBS AG, AND UNITED OVERSEAS BANK LIMITED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................ 2

BACKGROUND .......................................................................................................... 3

    Settlement Terms and Proposed Plan of Distribution.................................................. 3

ARGUMENT ............................................................................................................... 4

   I.      THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE.................. 4

     A.    The Settlements Are Procedurally Fair................................................................... 5

       1.     Representative Plaintiffs have adequately represented the Class ........................... 5

       2.     Plaintiffs' Counsel has adequately represented the Class....................................... 7

       3.     The proposed Settlements were negotiated at arm's length.................................. 10

     B.    The Proposed Settlements Are Substantively Fair ....................................................... 12

       1.     The costs, risks, and delay of the trial and appeal favor the Settlements ............ 13

       2.     The remaining *Grinnell* factors also support final approval of the Settlements... 17

           a.     The reaction of the Settlement Class to the Settlements ............................ 18

           b.     The stage of the proceedings........................................................................ 19

           c.     The ability of Settling Defendants to withstand greater judgment.............. 20

           d.     The reasonableness of the Settlement Amount in light of the best
                possible recovery and the risks of litigation................................................ 21

       3.     The Distribution Plan provides an effective method for distributing relief
          satisfying Rule 23(e)(2)(C)(ii) ................................................................... 22

       4.     The proposed attorneys' fees indicate that the Class will receive substantial
          relief from the Settlements......................................................................... 26

       5.     The Settlements identify all relevant agreements that impact the adequacy
          of the relief................................................................................................ 27

       6.     The Settlements treat the Settlement Class equitably .......................................... 27

  II.     THE PROPOSED SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED .. 28

     A.    The Settlement Class Meets The Rule 23(a) Requirements. ....................................... 30

       1.     Numerosity............................................................................................... 31

       2.     Commonality.............................................................................................. 31

       3.     Typicality................................................................................................... 32

       4.     Adequacy.................................................................................................... 33

     B.    The Proposed Settlement Class Satisfies Rule 23(b)(3). ............................................ 33

       1.     Predominance............................................................................................. 34

       2.     Superiority.................................................................................................. 35

III.     THE CLASS NOTICE PLAN INFORMED THE CLASS OF THE
         SETTLEMENTS AND SATISFIED DUE PROCESS ................................................ 36

CONCLUSION ............................................................................................................................ 38

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................ 34, 35

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
  222 F.3d 52 (2d Cir. 2000) ............................................................................................ 33

*Bano v. Union Carbide Corp.*,
  273 F.3d 120 (2d Cir. 2001) ............................................................................................ 4

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ..................................................................................... 5

*Bolanos v. Norwegian Cruise Lines Ltd.*,
  212 F.R.D. 144 (S.D.N.Y. 2002) ................................................................................... 32

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010) ..................................................................................... 33, 34

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 ............................................................................................... 5, 13, 18, 21

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ............................................................................................ 34

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001) .............................................................................................. 5

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ............................................................................................ 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  No. 02-cv-1152, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ............................................. 27

*Frank v. Eastman Kodak Co.*,
  228 F.R.D. 174 (W.D.N.Y. 2005) .................................................................................... 16

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
  991 F.3d 370 (2d Cir. 2021) ........................................................................................... 30

*Guerrero v. Wells Fargo Bank, N.A.*,
  No. C 12-04026 WHA, 2014 WL 1365462 (N.D. Cal. Apr. 7, 2014) ...................................... 12

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................................... 9

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175 (JG) (VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015) .......................... 7

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .............. 6, 33, 34

*In re Airline Ticket Comm'n Antitrust Litig.*,
953 F. Supp. 280 (D. Minn. 1997) ........................................................................................ 23

*In re Am. Int'l Grp. Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) .................................................................................................. 34

*In re Amaranth Natural Gas Commodities Litig.*,
269 F.R.D. 366 (S.D.N.Y. 2010) .......................................................................................... 29

*In re AOL Time Warner, Inc. Sec. and "ER*ISA" *Litig.*,
No. 02-cv-5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................ 16, 19

*In re Credit Default Swaps Antirust Litig.*,
No. 13-md-2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) .................................. 23

*In re Currency Conversion Fee Antitrust Litig.*,
224 F.R.D. 555 (S.D.N.Y. 2004) ..................................................................................... 35, 36

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd sub nom, Priceline.com, Inc. v. Silberman*, 405 F.
App'x 532 (2d Cir. 2010) .................................................................................................. 7, 14

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ............................................................................................ 6

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.*,
343 F. Supp. 3d 394 (S.D.N.Y. 2018), *aff'd*, 822 F. App'x 40 (2d Cir. 2020) .................. 10, 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .................................................................................................... 32

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
No. 02-3400 (CM) (PED), 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................................ 22

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................................... 23

*In re Glob. Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................... 4, 9, 20

*In re GSE Bonds Antitrust Litig.*,
414 F. Supp. 3d 686 (S.D.N.Y. 2019) ............................................................................ passim

*In re Initial Pub. Offering Sec. Litig.*,
   260 F.R.D. 81 (S.D.N.Y. 2009) ................................................................................. 31

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................................................................... 23

*In re Lehman Bros, Holdings Inc.*,
   No. 08-13555 SCC, 2015 WL 7194609 n.1 (S.D.N.Y. Sept. 16, 2015) ................................. 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   327 F.R.D. 483 (S.D.N.Y. 2018) ..................................................................... 16, 23

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................ 23

*In re Mexican Gov't Bonds Antitrust Litig.*,
   No. 18 Civ. 02830 (JPO), 2021 WL 5709215 (S.D.N.Y. Oct. 28, 2021) ............................... 38

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................... 12, 17

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................ 34

*In re Natural Gas Commodities Litig.*,
   231 F.R.D. 171 (S.D.N.Y. 2005) ..................................................................... 29, 30

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) .............................................................................. 27

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ..................... 10, 21, 23

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................. 5, 7, 13, 27

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016) .................................................................................. 5

*In re Prudential Sec. Inc. Ltd. Pshps. Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................................ 31

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) ............................................................................ 29

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ............................................................................ 17

*In re Term Commodities Cotton Futures Litig.*,
   No. 12-cv-5126 (ALC)(KNF), 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022) ......................... 28

*In re Visa Check/Mastermoney Antitrust Litig.*,
   192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ...................................... 16

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) .................................... 15

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002).................................................................................. 18, 19

*Maywalt v. Parker & Parsley Petroleum*,
   67 F.3d 1072 (2d. Cir. 1995)...................................................................................................... 22

*Meredith v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015)................................................................... 18, 20, 26, 35

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .................................................................................................................. 38

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)...................................................................................................... 21

*Ploss v. Kraft Foods Grp., Inc.*,
   431 F. Supp. 3d 1003 (N.D. Ill. 2020) ..................................................................................... 33

*Plummer v. Chemical Bank*,
   668 F.2d 654 (2d Cir. 1982)...................................................................................................... 20

*Shapiro v. JPMorgan Chase & Co.*,
   No. 11 Civ. 8331 (CM). (MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014)................ 7, 13

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011).............................................................................................................. 31

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005).................................................................................................. passim

**Rules**

FED. R. CIV. P. 23(a) ..................................................................................................... 30, 31

FED. R. CIV. P. 23(a)(2)................................................................................................. 31, 32

FED. R. CIV. P. 23(a)(3)....................................................................................................... 32

FED. R. CIV. P. 23(a)(4)....................................................................................................... 33

FED. R. CIV. P. 23(b)(3) .................................................................................................... 33, 35

FED. R. CIV. P. 23(b)(3)(A) .................................................................................................... 35

FED. R. CIV. P. 23(b)(3)(B) .................................................................................................... 35

FED. R. CIV. P. 23(b)(3)(C) .................................................................................................... 35

FED. R. CIV. P. 23(b)(3)(D) .................................................................................................... 35

FED. R. CIV. P. 23(c)(2)(B) .................................................................................................... 36

FED. R. CIV. P. 23(e)(1)(B) .................................................................................................... 36

FED. R. CIV. P. 23(e)(2) .................................................................................................... 5, 13

FED. R. CIV. P. 23(e)(2)(A) .................................................................................................... 5

FED. R. CIV. P. 23(e)(2)(A) .................................................................................................... 5

FED. R. CIV. P. 23(e)(2)(B) .................................................................................................... 5

FED. R. CIV. P. 23(e)(2)(C) .................................................................................................... 13

FED. R. CIV. P. 23(e)(2)(C)(i) .................................................................................................... 13

FED. R. CIV. P. 23(e)(2)(D) .................................................................................................... 13, 27

FED. R. CIV. P. 23(g) .................................................................................................... 7

**Other Authorities**

4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed. 2021) .................................................. 23

6 NEWBERG ON CLASS ACTIONS §§ 18:28 & 18:29 (5th ed. 2021) .................................... 34

Pursuant to the orders preliminarily approving the class action settlements (the "Settlements") in this action (ECF Nos. 509-15)[1] (the "Preliminary Approval Orders") and in accordance with Rule 23(e) of the Federal Rules of Civil Procedure, Representative Plaintiffs[2] respectfully submit this memorandum of law in support of their motion seeking final approval of the Distribution Plan, final certification of the Settlement Class, and final approval of Representative Plaintiffs' Settlements with (1) Citibank, N.A. and Citigroup Inc. (collectively, "Citi"); (2) JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. (collectively, "JPMorgan"); (3) Credit Suisse AG ("Credit Suisse"); (4) Deutsche Bank AG ("Deutsche Bank"); (5) The Hongkong and Shanghai Banking Corporation Limited ("HSBC"); (6) ING Bank N.V. ("ING"); and (7) Australia and New Zealand Banking Group, Ltd. ("ANZ"), Bank of America, N.A. ("BOA"), Barclays Bank PLC ("Barclays"), BNP Paribas, S.A. ("BNPP"), Commerzbank AG ("Commerzbank"), Crédit Agricole Corporate and Investment Bank ("CACIB"), DBS Bank Ltd. ("DBS"), MUFG Bank, Ltd. (f/k/a The Bank of Tokyo-Mitsubishi UFJ, Ltd.) ("MUFG"), Oversea-Chinese Banking Corporation Limited ("OCBC"), The Royal Bank of Scotland plc (n/k/a NatWest Markets plc) ("RBS"), Standard Chartered Bank ("SCB"), UBS AG ("UBS"), and United Overseas Bank Limited ("UOB," and collectively with ANZ, BOA, Barclays, BNPP, Commerzbank, CACIB, DBS, MUFG, OCBC, RBS, SCB, and UBS, the "Group Settling Defendants") (together, the "Settling Defendants").[3]

---

[1] As amended by the Court's Order Amending Orders Preliminarily Approving Settlements (ECF No. 523).

[2] Representative Plaintiffs are Fund Liquidation Holdings, LLC, individually and as assignee and successor-in-interest to FrontPoint Asian Event Driven Fund, L.P., Moon Capital Partners Master Fund Ltd., and Moon Capital Master Fund Ltd. Unless otherwise noted, ECF citations are to the docket in *Fund Liquidation Holdings LLC, et al. v. Citibank, N.A., et al.*, No. 16-cv-05263 (AKH) (S.D.N.Y.) and internal citations and quotation marks are omitted.

[3] All capitalized terms not defined herein have the same meaning as in the Stipulation and Agreement of Settlement with Citi dated May 22, 2018 (ECF No. 473-1) (the "Citi Agreement"), the Stipulation and Agreement of Settlement as to JPMorgan dated November 14, 2018 (ECF No. 473-2) (the "JPMorgan Agreement"), the Stipulation and Agreement of Settlement as to HSBC dated May 3, 2022 (ECF No. 473-3) ("HSBC Agreement"), the Stipulation and Agreement of Settlement as to Credit Suisse (ECF No. 473-4) (the "Credit Suisse Agreement"), the Stipulation

## <u>INTRODUCTION</u>

After more than six years of hard-fought litigation, Representative Plaintiffs have secured seven proposed Settlements that provide **$155,458,000** in non-reversionary all-cash payments for the benefit of the Settlement Class and totally resolve this litigation. These Settlements—the *only* compensation available to investors harmed by manipulation of SIBOR and SOR[4]—dwarf the recoveries achieved in other interbank rate manipulation cases in comparison to the market size.[5] And they are all the more impressive in light of the major litigation risks Plaintiffs faced at every stage. At the time the parties reached their final settlements, six years after the case was filed, they were preparing to argue Defendants' *fourth* motion to dismiss, after a trip to the Second Circuit and back. If Plaintiffs had managed to defeat that motion and finally move this action past the pleadings, Defendants would undoubtedly have put them through a gauntlet of new obstacles in discovery, class certification and trial.

This Court already rigorously vetted the Settlements' merit, as well as the fairness of the proposed distribution plan, at the preliminary approval stage, with two rounds of briefing and two in-person hearings. Following the Court's preliminary approval order, Plaintiffs immediately implemented a robust notice plan to apprise class members of their rights and options. Almost 30,000 copies of the Notice Packet have been directly mailed to putative Class Members, who have visited the Settlement Website more than 10,000 times. *Not one* has objected to date, and

---

and Agreement of Settlement as to Deutsche Bank dated March 17, 2022") (ECF No. 473-5) (the "Deutsche Bank Agreement"), the Stipulation and Agreement of Settlement as to ING dated March 17, 2022 (ECF No. 473-6) (the "ING Agreement"), and the Stipulation and Agreement of Settlement as to the Group Settling Defendants dated May 27, 2022 (ECF No. 499-1) (the "Group Settling Defendants Agreement" and collectively with the Citi Agreement, JPMorgan Agreement, Credit Suisse Agreement, Deutsche Bank Agreement, HSBC Agreement, and ING Agreement, the "Settlement Agreements").

[4] "SIBOR" refers to the Singapore Interbank Offered Rate. "SOR" refers to the Singapore Swap Offer Rate.

[5] *See* ECF No. 499 (Declaration of Vincent Briganti dated May 27, 2022) ¶¶ 25-26.

none have opted out. The favorable reaction to the Settlements by the Class, which overwhelmingly includes sophisticated, institutional investors with the resources to scrutinize the Settlements, only further confirms that this Court should not hesitate to approve them.

## BACKGROUND

Representative Plaintiffs allege that Defendants conspired to manipulate SIBOR, SOR, and the prices of SIBOR- and/or SOR-Based Derivatives in violation of the Sherman Act, Racketeer Influenced and Corrupt Organizations Act, and common law during the Class Period. Representative Plaintiffs claim that due to Defendant's price-fixing conspiracy, they paid more or received less than they should have on their SIBOR- and/or SOR-Based Derivatives transactions during the Class Period. Settling Defendants do not admit any of Representative Plaintiffs' allegations of misconduct in the SIBOR and/or SOR markets by entering into the Settlements and continue to deny any and all wrongdoing, including any allegations that they have violated any United States law.

### Settlement Terms and Proposed Plan of Distribution

As part of their respective Settlements, the Settling Defendants agreed to pay the following amounts:

| | |
|---|---|
| Citi: $9,990,000 | ING: $10,490,000 |
| JPMorgan: $10,989,000 | Credit Suisse: $10,989,000 |
| HSBC: $11,000,000 | Deutsche Bank: $11,000, 000 |
| Group Settling Defendants: $91,000,000 | |

The seven proposed settlements provide for non-reversionary cash payments totaling **$155,458,000** (the "Settlement Funds") that will be distributed to Class Members, less deductions made for settlement administration expenses, attorneys' fees and costs, and any other charges

authorized by the Court (the "Net Settlement Funds"). Under the Distribution Plan, the Net Settlement Funds will be allocated *pro rata* to Authorized Claimants based on the volume of their SIBOR- and/or SOR-Based Derivatives. The Distribution Plan calculates for each SIBOR- and/or SOR-Based Derivatives transaction a "Transaction Notional Amount," which is a score that reflects the interest rate impact of the alleged manipulation on SIBOR- and/or SOR-Based Derivatives. All else being equal, claimants with a higher trading volume can expect a proportionally higher Transaction Notional Amount. An Authorized Claimant's Transaction Notional Amounts for all of its eligible SIBOR- and/or SOR-Based Derivatives transactions will be summed together (the "Transaction Claim Amount") and divided by the sum of all calculated Transaction Claim Amounts to determine the Authorized Claimant's *pro rata* fraction, which will then be multiplied against the Net Settlement Funds to determine the Authorized Claimant's payment amount. *See* ECF No. 473-11 (Distribution Plan). Settling Defendants also agreed to provide cooperation that can be used to assist in the prosecution of claims against any non-settling Defendants that may remain. In exchange, Representative Plaintiffs and all Settling Class Members will release and discharge and covenant not to sue the Released Parties for the Released Claims.

## ARGUMENT

## I.      THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE

Public policy favors the resolution of class actions through settlement. *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004). "[C]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows

the judicial system to focus resources elsewhere." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474-75 (S.D.N.Y. 2013). In service of "the strong judicial policy in favor of settlements, particularly in the class action context," *Wal-Mart Stores*, 396 F.3d at 116-17, a court may approve a class action settlement upon a showing that the settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2).

A settlement is fair, reasonable and adequate and should be approved if the settlement is shown to be both procedurally and substantively fair. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019) ("*Payment Card*"). Rule 23 sets out a number of factors to guide the Court's analysis, with the factors in Rule 23(e)(2)(A) and (B) focusing on the procedural fairness, and those in Rule 23(e)(2)(C) and (D) focusing on substantive fairness. The courts in this Circuit also consider the complementary factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448. 463 (2d Cir. 1974) ("*Grinnell*") to assess the fairness of a class settlement. Applying both the *Grinnell* and Rule 23(e) factors to the Settlements here demonstrates final approval of the Settlements is warranted.

### A.  The Settlements Are Procedurally Fair

To approve a class action settlement, Rule 23 requires the Court to find in part that, "the class representatives and class counsel have adequately represented the class [and] the proposal was negotiated at arm's length[.]" FED. R. CIV. P. 23(e)(2)(A)-(B). Courts presume settlements are procedurally fair when they are "the product of arm's length negotiations between experienced and able counsel on all sides." *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).

### 1.  Representative Plaintiffs have adequately represented the Class

Adequate representation under Rule 23(e)(2)(A) requires that the "interests… served by the Settlement [are] compatible with" those of the class members. *Wal-Mart Stores*, 396 F.3d at 110; *see also In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827

F.3d 223, 232 (2d Cir. 2016) (the focus for adequacy is whether the interests of the proposed settlement class are "sufficiently cohesive to warrant adjudication"). This is satisfied when the class representative's interests are aligned and not antagonistic to those of the class. *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111-12 (S.D.N.Y. 2010); *see also Wal-Mart Stores*, 396 F.3d at 106-07 ("Adequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim.").

These requirements have undoubtedly been satisfied here. Representative Plaintiffs here suffered the same alleged injury as other Class Members, transacting in SIBOR- and/or SOR-Based Derivatives which prices were allegedly fixed by Settling Defendants' manipulation of SIBOR and SOR. As a result of Defendants' alleged manipulation of those benchmarks, Representative Plaintiffs and all Class Members traded in a noncompetitive financial market. The impact of Defendants' alleged misconduct would have been felt market wide, and members of the Class, including Representative Plaintiffs, paid more or received less for their SIBOR- and/or SOR-Based Derivatives transactions based on the artificiality in the market. Class Members and Representative Plaintiffs had and have the same "interest in . . . pursuing the claims of the class" and restoring integrity to the benchmark interbank interest rates. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Moreover, there are no conflicting interests among Representative Plaintiffs and the Settlement Class that would provide a barrier to Representative Plaintiffs' adequate representation of the Class. *See Wal-Mart Stores*, 396 F.3d at 110-11 (class representatives are adequate if their injuries encompass those of the class they seek to represent); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100, at *34 (E.D.N.Y. Oct. 15, 2014)

6

("Even if there was a conflict [relating to the assignment of recovery rights] (and there is not), it would under no conceivable circumstances be so 'fundamental'" to cause class representatives to be inadequate), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). Representative Plaintiffs and Class Members both have a strong interest in obtaining the maximum recovery possible for the impacts caused by Defendants' alleged manipulation of SIBOR- and/or SOR-Based Derivatives.

### 2.   Plaintiffs' Counsel has adequately represented the Class

The second factor in evaluating the Settlements' adequacy is the adequacy of plaintiffs' counsel. *Payment Card*, 330 F.R.D. at 30 (considering whether "plaintiff's attorneys are qualified, experienced and able to conduct the litigation"); *accord* FED. R. CIV. P. 23(g). Plaintiffs' Counsel's extensive class action, antitrust, and complex litigation experience provides strong evidence that the Settlements are procedurally fair. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009), *aff'd sub nom, Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010) (noting the "extensive" experience of counsel in granting final approval of settlement); *see also Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331 (CM). (MHD), 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014) (giving "great weight" to experienced class counsel's opinion that the settlement was fair).

Lowey Dannenberg, P.C. ("Lowey") has led the prosecution of this Action from its inception and negotiated the proposed Settlements. Lowey is among the most knowledgeable and experienced law firms litigating complex class actions involving benchmark interest rate manipulation claims and has done so on behalf of some of the nation's largest pension funds and institutional investors. Declaration of Vincent Briganti in Support of (A) Representative Plaintiffs' Motion for Final Approval of Class Action Settlements; and (B) Plaintiffs' Counsel's Motion for

an Award of Attorneys' Fees and Reimbursement of Expenses ("Briganti Decl.") ¶ 61. The firm serves as lead or co-lead counsel in at least seven class actions (including this one) bringing antitrust and/or Commodity Exchange Act claims against financial institutions for the manipulation of global benchmark interest rates. *See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD) (S.D.N.Y), and *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 15-cv-5844 (GBD) (S.D.N.Y.) (involving the London Interbank Offered Rate ("LIBOR") for Japanese Yen ("Yen-LIBOR) and the Tokyo Interbank Offered Rate ("Euroyen TIBOR")); *Sullivan v. Barclays plc,* No. 13-cv-2811 (PKC) (S.D.N.Y.) (involving the Euro Interbank Offered Rate ("Euribor")); *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 16-cv-06496 (LAK) (S.D.N.Y.) (involving the Australian Bank Bill Swap Rate ("BBSW")); *Sonterra Capital Master Fund Ltd., et al. v. Credit Suisse Group AG, et al.*, No.: 1:15-cv-00871 (SHS) (S.D.N.Y.) (involving Swiss Franc LIBOR); *Sonterra Capital Master Fund Ltd., et al. v. Barclays Bank PLC, et al.*, No. 15-cv-03538 (VSB) (S.D.N.Y.) (involving Sterling LIBOR). Briganti Decl. ¶ 60. In the Euroyen and Euribor litigations, Lowey has obtained substantial court-approved settlements totaling almost $800,000,000 and has achieved additional settlements pending approval in those cases, as well as in the BBSW, Swiss Franc LIBOR and Sterling LIBOR litigations. *See, e.g.*, *Sullivan v. Barclays plc*, No. 13-cv-2811 (PKC) (S.D.N.Y.) ECF Nos. 424, 498, 520; *Laydon v. Mizuho Bank, Ltd*., No. 12-cv-3419 (S.D.N.Y.), ECF Nos. 720, 838, 891, 1013-14, 1060-62; *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 16-cv-06496 (LAK) (S.D.N.Y.) ECF No. 558; *Sonterra Capital Master Fund Ltd., et al. v. Credit Suisse Group AG, et al.*, No.: 1:15-cv-00871 (SHS) (S.D.N.Y.), ECF No. 389; *Sonterra Capital Master Fund Ltd., et al. v. Barclays Bank PLC, et al.*, No. 15-cv-03538 (VSB) (S.D.N.Y.), ECF No. 260.

Moreover, even without formal discovery, Plaintiffs' Counsel led a searching, multi-prong investigation through which it developed sufficient facts and information to conclude that the Settlements before the Court are fair, reasonable, and adequate. *See In re Glob. Crossing,* 225 F.R.D. at 458  ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims"); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014) (quoting *Wal-Mart Stores,* 396 F.3d at 114) ("[A] class action settlement enjoys a strong 'presumption of fairness' where it is the product of arm's length negotiations concluded by experienced, capable counsel after meaningful discovery.").

Prior to filing the original complaint, Plaintiffs' Counsel conducted an extensive investigation, including a review of the regulatory disclosures from the Monetary Authority of Singapore ("MAS") relating to the alleged manipulation of SIBOR and SOR, and correlated that information with other research they had gathered from reviewing U.S. and non-U.S. regulatory orders and settlements involving several Defendants, including orders and settlements with the U.K. Financial Services Authority ("FSA"), U.S. Department of Justice ("DOJ") and the U.S. Commodity Futures Trading Commission ("CFTC"). This research led Plaintiffs' Counsel to determine that the same methods and techniques allegedly used in the manipulation of benchmarks such as Yen-LIBOR, Euroyen TIBOR, Euribor, and others, were likely the same means by which Defendants allegedly manipulated SIBOR and SOR. Briganti Decl. ¶¶ 33, 41.

After studying the similarities and differences in setting SIBOR and SOR versus other benchmark rates and using the general knowledge they had developed from working on their other cases, Plaintiffs' Counsel prepared the original complaint, developed a litigation strategy, identified useful market data and other sources of information, and developed a preliminary gauge of the likely range of classwide damages.  Plaintiffs' Counsel also analyzed the current state of the

law, including in many of the cases in which it litigated, to understand the strengths and weaknesses of pursuing this Action. *Id.* ¶¶ 35, 63. As noted previously, Plaintiffs' Counsel was intimately familiar with the legal arguments Defendants would likely raise regarding subject matter jurisdiction, personal jurisdiction, and the merits of Representative Plaintiffs' pleadings and understood the likely discovery challenges particularly given the application of foreign blocking statutes and data privacy laws. Based on its experience, Plaintiffs' Counsel also began to strategize on how to respond to the likely areas of attack that Defendants would employ on class certification. *Id.*

As Defendants filed each successive motion to dismiss, Plaintiffs' Counsel again analyzed the legal landscape, including this Court's decisions on prior motions to dismiss and the Second Circuit's decisions concerning this Action and other related cases, and continually reassessed the state of the case. *Id.* ¶¶ 39, 44, 52, 55. When settlement negotiations began with each Settling Defendant, Plaintiffs' Counsel was well-equipped with information that allowed it to reach fair, reasonable and adequate settlements.

### 3. The proposed Settlements were negotiated at arm's length

The Rule 23(e) procedural fairness inquiry is consistent with Second Circuit precedent that "a strong initial presumption of fairness attaches to [a] proposed settlement," when the "integrity of the arm's length negotiation process is preserved . . . ." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997); *see also In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 343 F. Supp. 3d 394, 408 (S.D.N.Y. 2018), *aff'd*, 822 F. App'x 40 (2d Cir. 2020) ("When a settlement is the product of arms-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness."). To assess the integrity of the process, the key question is whether

"plaintiffs' counsel is sufficiently well informed" to adequately advise and recommend the settlement to the class representatives and settlement class. See *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 699 (S.D.N.Y. 2019).

In addition to the knowledge acquired during the course of litigating this Action, Plaintiffs' Counsel had the benefit of the Parties' meaningful and productive settlement negotiations, which included discussions of each party's views on the merits of the Action, risks of continued litigation, and the key settlement terms, including the settlement amount and extent of cooperation that would be provided to assist in any further prosecution of this Action. Briganti Decl. ¶ 63.

Coupled with its earlier experience in benchmark manipulation cases as discussed *supra*, Plaintiffs' Counsel developed a settlement strategy that ensured the Class would benefit from a significant settlement while also obtaining information that permitted the litigation against then non-settling Defendants to move forward. Reaching settlements in factually and legally similar cases provided Plaintiffs' Counsel with benchmarks against which to compare the settlement proposals and ultimate settlements here while considering differences in market size. As Plaintiffs' Counsel reached each subsequent settlement, it increased the pressure on the remaining non-settling Defendants, leading to additional settlements until agreements were executed with all of the remaining Defendants in the Action.

The other key factor considered by the courts in this District is the evidence that settlement negotiations were non-collusive and, in this case, Settling Defendants were represented by leading international law firms with extensive experience defending federal class action antitrust, RICO and benchmark manipulation claims and that fiercely advocated for their clients' positions throughout settlement negotiations. *Id.* ¶ 64. Lowey and each respective Settling Defendant engaged in negotiations for months to arrive at a settlement. *See id.* ¶¶ 65-104. Numerous

communications occurred, during which each party expressed its views on the merits, risks, and challenges of the Action, the Settling Defendant's (or Settling Defendants') potential liability, and the appropriate measure of damages in light of the developing applicable law. Even after settlement term sheets were executed, several more weeks (or months) were required to reach agreement on and execute the respective Settlement Agreement. *Id.* ¶¶ 68, 74, 79, 83, 85, 91, 97, 102.

At all times, Plaintiffs' Counsel was well-informed about the facts, risks and challenges of the Action and had a sufficient basis on which to recommend that Representative Plaintiffs enter into the Settlements. Plaintiffs' Counsel's conclusion that the Settlements are fair and reasonable and the process by which the Settlements were reached weigh in favor of finding the Settlements are procedurally fair and should be approved. See *In re NASDAQ Market-Makers Antitrust Litig.* ("*NASDAQ III*"), 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

### B.  The Proposed Settlements Are Substantively Fair

These Settlements represent some of the few (if not the only) avenues of relief for Settlement Class Members impacted by the alleged manipulation of SIBOR- and/or SOR-Based Derivatives. More than $155 million will be paid by Settling Defendants on a non-reversionary basis, which further enhances the value of the recovery. *See Guerrero v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2014 WL 1365462, at *2 (N.D. Cal. Apr. 7, 2014) (finding the lack of reversion of remaining portions of the net settlement an important benefit to the class).

To assess a settlement's substantive fairness, the Court considers whether, "the relief provided for the class is adequate," accounting for the following factors: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed

award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." FED. R. CIV. P. 23(e)(2)(C). The Court is also required to confirm that the Settlement "treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(D).

Courts in this Circuit have long considered the nine *Grinnell* factors in deciding whether a settlement is substantively fair, reasonable, and adequate:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463. The amended Rule 23(e)(2) factors are intended to be complementary to the *Grinnell* factors. *See GSE Bonds*, 414 F. Supp. 3d at 692 ("The Advisory Committee Notes to the 2018 amendments indicate that the four new Rule 23 factors were intended to supplement rather than displace these '*Grinnell*' factors."); *accord Payment Card*, 330 F.R.D. at 29 ("Indeed, there is significant overlap between the *Grinnell* factors and the Rule 23(e)(2)(C-D) factors . . ."). Here, the factors set forth in Rule 23(e) and *Grinnell* weigh heavily in favor of final approval.

### 1. The costs, risks, and delay of the trial and appeal favor the Settlements

Rule 23(e)(2)(C)(i) "implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *Id.*; *see also GSE Bonds*, 414 F. Supp. 3d at 693. In evaluating this factor, the Court's role is to "balance the benefits afforded the Class, including immediacy and certainty of recovery, against the continuing risks of litigation." *GSE Bonds,* 414 F. Supp. 3d at 694; *see also Shapiro*, 2014 WL 1224666, at

*10 (at final approval, the Court's role is not to "decide the merits of the case or resolve unsettled legal questions or to foresee with absolute certainty the outcome of the case" but rather to "assess the risks of litigation against the certainty of recovery under the proposed settlement.").

The costs, risks, and delay of trial and appeal are significant in all benchmark manipulation cases, but particularly in cases involving facts such as these. While Representative Plaintiffs are confident in the merits of their claims and believe they would ultimately prevail at trial, the factual and legal issues in this Action are complex and expansive to litigate. *See GSE Bonds*, 414 F. Supp. 3d at 693 (recognizing the complexity of federal antitrust claims and finding that the "complex issues of fact and law related to the [transactions occurring] at different points in time" weighed in favor of approval); *Currency Conversion Fee,* 263 F.R.D. at 123 ("The complexity of Plaintiffs' claims *ipso facto* creates uncertainty.").

This Action alleged manipulative and collusive conduct between and among at least nineteen institutions over a five-year time-period to rig the price of SIBOR- and/or SOR-Based Derivatives. At the pleadings stage alone, there have been numerous motions to dismiss and amended complaints, motions for reconsideration, and proceedings in the Second Circuit and Supreme Court arising from the proceedings in this Court.

The Court's orders denying in part and granting in part Defendants' motions to dismiss confirm the risks and challenges of prosecuting the Action. The intricate nature of the financial products and market involved, the lengthy time period over which the alleged misconduct occurred, and the number of defendants involved in the alleged anticompetitive conduct made this Action a highly complex and risky case for Representative Plaintiffs to pursue. *See Currency Conversion Fee*, 263 F.R.D. at 123 ("the complexity of Plaintiffs' claims *ipso facto* creates uncertainty").

The risks of continued prosecution would have significantly increased had the Court denied Defendants' last motion to dismiss. As the Court itself noted:

> This is a very complicated and expensive case to prosecute. The concept of any kind of . . . SIBOR being made up by agreements of amorphous individuals on a day-to-day basis is difficult to grasp. And the relationship of the SIBOR rates to the derivative and other kinds of contracts that the plaintiffs have purchased from which they suffered damage is also very difficult to relate. Overcoming these obstacles at trial is risky and difficult. And so there's a very good argument that the parties' liquidation of values by way of th[ese] settlement[s] is a fair and proper approach.

June 9, 2002 Hearing Tr. at 20 (attached as Exhibit 2 to Briganti Decl.). The concerns observed by the Court at the June 9 Hearing reflect just some of the risks. Representative Plaintiffs would also bear the risk of certifying a litigation class, and as the Court pointed out at both the during May 19, 2022 and June 9, 2022 hearings, "It's not at all sure that if this were a different case that there would be a class or a coherent class or a methodology for providing damages that would be satisfactory to the law." June 9, 2022 Hearing Tr. at 21, Briganti Decl. Ex. 2. To demonstrate common price impact and a common damages methodology, expert discovery would be necessary. A battle of experts heightens the risk as "it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986). Expert discovery will likely lead to *Daubert* motions, increasing the litigation costs and risks, and delaying any resolution. *In re Facebook, Inc.,* 343 F. Supp. 3d at 410 (experts "tend[] to increase both the cost and duration of litigation").

Defendants would likely use the complexity of the financial products in the market, the sophistication of their alleged misconduct, the temporal breadth of the alleged conspiracy, and the alleged market movement on various days to argue that a litigation class cannot be certified on

these claims. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 494 (S.D.N.Y. 2018) (stating that "the certainty of maintaining a class action is by no means guaranteed" and noting that maintaining the action as a class requires proving the 16-bank conspiracy that was alleged). While Representative Plaintiffs believe the Court would have certified a litigation class if the Action had continued, such motion would have been vigorously opposed by Defendants. *See GSE Bonds*, 414 F. Supp. 3d at 694 (the risk of maintaining a class through trial "weighs in favor of settlement where it is likely that defendants would oppose class certification if the case were to be litigated"); *see also In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, No. 02-cv-5575 (SWK), 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) ("[T]he process of class certification would have subjected Plaintiffs to considerably more risk than the unopposed certification that was ordered for the sole purpose of the Settlement."). Even if a litigation class were to be certified, that certification could be challenged on appeal, or at another stage in the litigation. *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 89 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ("If factual or legal underpinnings of the plaintiffs' successful class certification motion are undermined once they are tested . . . , a modification of the order, or perhaps decertification, might then be appropriate."); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) ("While plaintiffs might indeed prevail [on a motion for class certification], the risk that the case might be not certified is not illusory and weighs in favor of the Class Settlement."). Representative Plaintiffs would continue to bear the risk of maintaining the class through trial and appeal.

Further, Representative Plaintiffs' ability to prove liability at trial would have been uncertain. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. at 494 ("[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially

16

more difficult issues at the proof stage."); *NASDAQ III*, 187 F.R.D. at 474 (discussing the difficulties of proving antitrust liability where plaintiffs had to prove, among other things, a complex conspiracy involving a larger number defendants, a common motive, actions against defendants' financial interest and/or evidence of coercion). If Representative Plaintiffs had established liability at trial, they would still face the challenge of proving class damages to a jury. There is a substantial risk that a jury might accept one or more of Defendants' damages arguments and award far less than the funds secured by the Settlements, or even nothing at all. "[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *Wal-Mart Stores*, 396 F.3d at 118; *accord In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 283 (S.D.N.Y. 1999). These factors weigh in favor of approval of the Settlements.

Although Representative Plaintiffs and Plaintiffs' Counsel firmly believe that the asserted claims are meritorious, and they would zealously prosecute those claims to prevail at trial, Plaintiffs' Counsel's judgment is that there are very substantial risks attendant with the continued prosecution of the claims. The existence of those risks fully supported entering into these Settlements now before this Court, and those same risks favor the Settlements' approval.

### 2. The remaining *Grinnell* factors also support final approval of the Settlements

The *Grinnell* factors not expressly included in Rule 23(e)(2)(c)(i) also guide the Court in assessing whether the relief provided to the class is adequate. These factors include: "(2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; . . . (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of

reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Grinnell*, 495 F.2d at 463.

### a. The reaction of the Settlement Class to the Settlements

"A positive reaction of the class to the proposed settlement favors its approval by the Court." *Meredith v. SESAC, LLC*, 87 F. Supp. 3d 650, 663 (S.D.N.Y. 2015). The class's reaction to a proposed settlement is an important factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."). To date, no objections have been filed, and no requests for exclusion have been received, while almost 30,000 Notice Packets have been sent to putative Class Members. *See* Briganti Decl., Exs. 3-18.  The Settlement Class's reaction so far indicates that they favor approval of the Settlements, which is significant given the likely composition of the Class. *Wal-Mart Stores*, 396 F.3d at 118 ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'"). As the SIBOR- and/or SOR-Based Derivatives held by Class Members are traded entirely in the over-the-counter ("OTC") derivatives market, the Class is comprised primarily of very sophisticated and experienced institutional investors. OTC derivatives are traded between two parties and not through an exchange or intermediary, primarily through the use of an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement. *See In re Lehman Bros, Holdings Inc.*, No. 08-13555 SCC, 2015 WL 7194609, at *1 n.1 (S.D.N.Y. Sept. 16, 2015) (ISDA Master Agreements "serve[] as the contractual foundation for more than 90% of derivatives transactions globally"). The institutions that enter into these agreements are generally well-funded and well-staffed and have the financial expertise and wherewithal to scrutinize the Settlements. As a result,

the lack of objections (and opt outs) is a particularly noteworthy indication of support. The Settlement Administrator will submit an updated report following the October 31, 2022, objection and opt-out deadlines. To the extent any objections are filed, Plaintiffs' Counsel will file a response addressing the objections.

### b.  The stage of the proceedings

Examining the stage of the proceedings at which the Settlements occur is intended to assess "whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02 CIV. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006); *In re Glob. Crossing*, 225 F.R.D.at 458 ("[T]he question is whether the parties had adequate information about their claims."). This factor does not require extensive formal discovery to have occurred, or indeed any formal discovery at all, "as long as '[counsel] have engaged in sufficient investigation . . . to enable the Court to 'intelligently make . . . an appraisal' of the settlement.'" *AOL Time Warner*, 2006 WL 903236, at *10.

In addition to the knowledge and experience gained from litigating other similar benchmark interest rate manipulation cases (*see* Briganti Decl. ¶¶ 60-61), Representative Plaintiffs conducted extensive factual and legal research and consulted experts to assess the merits of their claims in this Action. Briganti Decl. ¶¶ 32-33, 37, 62-63, 107-08, 111. Representative Plaintiffs reviewed the regulatory orders and settlements from MAS, FSA, DOJ, and CFTC relating to this case (MAS), or other allegedly similar misconduct (FSA, DOJ, CFTC). Plaintiffs' Counsel had the benefit of this Court's decisions on Defendants' motions to dismiss, the Second Circuit's opinion on Representative Plaintiffs' appeal, and decisions in other cases involving the manipulation of financial benchmarks or other financial products. *Id.* ¶¶ 39, 44, 52, 55. The information gathered during this process greatly informed Representative Plaintiffs of the

advantages and disadvantages of entering into the Settlements with Settling Defendants. Although Representative Plaintiffs had not engaged in formal discovery from Settling Defendants, discovery is not required, even at final approval of a settlement. See *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir. 1982). Plaintiffs' Counsel's informal discovery and investigative efforts, together with the information obtained during settlement negotiations, provided Plaintiffs' Counsel a sufficient basis by which to recommend that Representative Plaintiffs enter into the Settlements. Accordingly, Plaintiffs' Counsel's investigative efforts and well-informed views of the strength of claims and likely defenses in the Action weigh in favor of finally approving the Settlements.

In addition, the information developed during the confidential settlement negotiations added to and refined Plaintiffs' Counsel's understanding of the likely strengths, risks, and challenges of the claims in the Action. They provided a further foundation for Plaintiffs' Counsel's valuation and recommendation of the respective Settlements to Representative Plaintiffs. The amount of information available and accessible to Plaintiffs' Counsel plainly demonstrate that Representative Plaintiffs and Plaintiffs' Counsel were well-informed when reaching these Settlements.

### c.  The ability of Settling Defendants to withstand greater judgment

The financial obligation the Settlements impose on each of the Settling Defendants is significant. While each Settling Defendant could withstand a greater judgment than the amount paid in settlement, "[a] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Meredith Corp.,* 87 F. Supp. 3d at 665. The possibility that the Settling Defendants could have sustained a greater judgment is not determinative of substantive fairness or unfairness. *See In re Glob. Crossing,* 225 F.R.D. at 460 ("[T]he fact that a defendant is able to pay

more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate").

### d. The reasonableness of the Settlement Amount in light of the best possible recovery and the risks of litigation

The eighth and ninth *Grinnell* factors—the reasonableness of the settlement in light of the best possible recovery and the risks of litigation—also weigh in favor of approving the Settlements. As the Second Circuit has explained, there is "a range of reasonableness with respect to a settlement" that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). The analysis of these factors requires consideration of "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119. As the Second Circuit has explained, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455 n.3.

Plaintiffs' Counsel believes that the $155,458,000 settlement fund is an excellent result for the Settlement Class. *PaineWebber*, 171 F.R.D. at 125 (stating "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Representative Plaintiffs' experts used their extensive experience in analyzing benchmark interest rate markets and data from the BIS Triennial Surveys to determine the share of the SIBOR market that transacted through the United States. Briganti Decl. ¶ 108. The BIS Triennial Surveys are among the most comprehensive source of information on the size and structure of global foreign exchange and OTC derivative markets and are commonly used by economics experts in estimating market size and class-wide impact arising from interest rate

manipulations. In performing their analyses, the experts controlled for factors including: volume of interdealer market transaction, which were less likely to have been affected by manipulated rates because the counterparties to the transactions would have included Defendants; the time to maturity for certain instruments; and the issue of data completeness, particularly given that the BIS Triennial Survey occurs every three years. *Id.* Then, based on their extensive analysis and knowledge of other similar cases including *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126 (S.D.N.Y.) ("ISDAfix") and *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (S.D.N.Y.) ("U.S. Dollar LIBOR"), these experts selected and applied a quantum of damages percentage in a range that was consistent with other research and information they reviewed concerning market manipulation to develop the damages range used by Plaintiffs' Counsel. After considering various factors, including the transaction volume and outstanding notional amount in SIBOR- and/or SOR-Based Derivatives, length of the class period, and the potential impact of the alleged manipulation, Representative Plaintiffs' experts calculated a damages range of between $389 million and $560 million. Briganti Decl. ¶ 109. Based on this calculation, the Settlements recover between 28% to 43% of the initial estimated class wide damages. *Id.* The Settlements collectively provide substantial recovery to Class Members now, eliminating the uncertainty of a future payout contingent on a successful trial and appeal. *See Maywalt v. Parker & Parsley Petroleum*, 67 F.3d 1072, 1079-80 (2d. Cir. 1995) ("[t]he primary concern is with the substantive terms of the settlement: 'Basic to this . . . is the need to compare the terms of the compromise with the likely rewards of litigation.'").

### 3. The Distribution Plan provides an effective method for distributing relief satisfying Rule 23(e)(2)(C)(ii)

A plan of allocation may be approved so long as it has a "reasonable, rational basis." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-3400 (CM) (PED), 2010 WL 4537550, at *21

(S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009). In determining whether a plan of allocation is fair and reasonable, courts give great weight to the opinion of experienced counsel. *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("in determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (same).

A plan of allocation, however, need not be tailored to fit each and every class member with "mathematical precision." *PaineWebber,* 171 F.R.D. at 133. To determine precisely the distribution of the settlement fund among the myriad claimants in such a class would require counsel or the district court to weigh the strengths and weaknesses of the claims of each class member and would be an almost impossible task." *PaineWebber*, 171 F.R.D. at 133,; *accord In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. at 496; *In re Credit Default Swaps Antirust Litig.*, No. 13-md-2476 (DLC), 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (The challenge of precisely apportioning damages to victims is often magnified in antitrust cases, as "damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."). Rather, the "the goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." WILLIAM B. RUBENSTEIN, 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed. 2021); *accord In re PaineWebber*, 171 F.R.D. at 133; *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997). The proposed Distribution Plan, which was developed in consultation with industry experts and economic consultants (Briganti Decl. ¶ 114), achieves that goal.

As described in Representative Plaintiffs' Memorandum in support of Preliminary Approval (*see* ECF No. 472) and Supplemental Memorandum (ECF No. 498), the Net Settlement Funds will be distributed *pro rata* based on the interest rate impact of the alleged manipulation on SIBOR- and/or SOR-Based Derivatives, based on each claimants respective trading volume and the number of interest payments based on the notional value of the transaction (if any). In particular, it calculates for each SIBOR- and/or SOR-Based Derivatives transaction a "Transaction Notional Amount," which is a score that reflects the interest rate impact of the alleged manipulation on the SIBOR- and/or SOR-Based Derivatives. If all other factors are held constant, claimants with a higher trading volume can expect a proportionally higher Transaction Notional Amount. Further, SIBOR- and/or SOR-Based Derivatives transactions that include multiple interest payments based on the notional value of the transaction (*e.g.*, interest rate swaps) will have higher Transaction Notional Amounts than SIBOR- and/or SOR-Based Derivatives transactions that have the same notional value but are based on fewer interest rate payments. An Authorized Claimant's Transaction Notional Amounts for all of its eligible SIBOR- and/or SOR-Based Derivatives transactions will be summed together (the "Transaction Claim Amount") and divided by the sum of all calculated Transaction Claim Amounts to determine the Authorized Claimants *pro rata* fraction, which will then be multiplied against the Net Settlement Fund to determine the Authorized Claimant's payment amount.

To receive a portion of the Net Settlement Fund, Class Members will submit a Proof of Claim and Release form ("Claim Form"). The Claim Form is straight-forward and simple, only requiring a claimant to provide background information and readily accessible data about their SIBOR- and/or SOR-Based Derivatives transactions, including the transaction type, trade date,

applicable SIBOR or SOR rate, and notional (face) value of the transaction. *See* ECF No. 473-10. This information is comparable to the information requested in other benchmark litigation cases.[6]

Authorized Claimants whose expected distribution based on their *pro rata* fraction is less than the costs of administering the Claim will instead receive a Minimum Payment Amount in an amount to be determined after the Claim Forms are reviewed, calibrated to ensure that a minimal portion of the Net Settlement Funds is reallocated towards Authorized Claimants receiving the Minimum Payment Amount. Any claims payments that go uncollected after a set time period will be reallocated to Authorized Claimants who have cashed their payments. Should there be any balance remaining in the Net Settlement Fund that cannot be redistributed, Plaintiffs' Counsel will submit an additional plan of allocation to the Court for its approval.

Similar distribution methods have been approved for use in numerous similar cases. *See*, *e.g.*, Plan of Distribution, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126 (S.D.N.Y. Mar. 30, 2018), ECF No. 602-1; Plan of Distribution, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126 (S.D.N.Y. Sept. 28, 2018), ECF No. 681-1; Final Judgments and Orders of Dismissal at ¶ 16, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126 (S.D.N.Y. June 1, 2018), ECF Nos. 648-57 (approving plan of distribution as fair, reasonable, and adequate); Final Judgment and Order of Dismissal at ¶ 15, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126 (S.D.N.Y. Nov. 13, 2018), ECF No. 738 (same); Distribution Plan, *In re London Silver Fixing, Ltd. Antitrust Litig.*, Nos. 14-md-2573, 14-mc-2573 (S.D.N.Y. June 25, 2020), ECF No. 451-5; Final Approval Order, *In re London Silver Fixing, Ltd. Antitrust Litig.*, Nos. 14-md-2573, 14-mc-2573 (S.D.N.Y.

---

[6] *See* Proof of Claim and Release Form, *Alaska Elec. Pension Fund, et. al., v. Bank of Am., N.A., et. al.*, No. 14-cv-7126, (S.D.N.Y.), ECF No. 512-3 (claim form requiring submission of, *inter alia*, transactions entered into, received or made payments on, settled, terminated, transacted in, or held during the Settlement Class Period).

June 15, 2021), ECF No. 536 (approving plan of distribution as fair, reasonable, and adequate); Plan of Allocation for the Third Settlement Agreement, *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.,* Nos. 14-md-2548, 14-mc-2548 (S.D.N.Y. Nov. 12, 2021), ECF No. 610-3; Updated Plan of Allocation for Deutsche Bank and HSBC Settlements, *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.,* Nos. 14-md-2548, 14-mc-2548 (S.D.N.Y. Nov. 12, 2021), ECF No. 610-4; Order Regarding Notice of a Revised Plan of Allocation, *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.,* Nos. 14-md-2548, 14-mc-2548 (S.D.N.Y. Jan. 13, 2022), ECF No. 624 at ¶ 4 (preliminarily approving updated Plan of Allocation and Plan of Allocation for a subsequent settlement, with final approval to follow at or after the Fairness Hearing). Accordingly, this proposed Distribution Plan fully merits final approval.

### 4. The proposed attorneys' fees indicate that the Class will receive substantial relief from the Settlements

The attorneys' fees and expenses that will be sought in connection with the Settlements are reasonable and further indicate that the Settlement Class will receive a substantial Net Settlement Fund. Specifically, Plaintiffs' Counsel seeks 25% of the Settlement Funds ($38,864,500), to be paid, if approved by the Court, upon final approval of the Settlements. *See* Briganti Decl., ¶¶ 118-121. As more fully described in the accompanying Plaintiffs' Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses, the percentage of attorneys' fees requested is reasonable given the range of settlement awards made in similar cases in this District and the amount of work contributed by Plaintiffs' Counsel towards the prosecution of the Action. In addition to the request for attorneys' fees, Plaintiffs' Counsel seeks a reimbursement of $179,945.33 (or .12% of the Settlement Fund) for litigation costs and expenses incurred through to the present. *Id.*, ¶¶ 125-126; *see Meredith Corp.,* 87 F. Supp. 3d at 671  (reasonably incurred

expenses may be reimbursed from the settlement fund). The expenses are of the type reasonably incurred in class action litigation.

### 5. The Settlements identify all relevant agreements that impact the adequacy of the relief

The Settlements fully describe the relief to which Class Members are entitled and all agreements that may impact the Settlement. This includes disclosing the existence of Supplemental Agreements that grant each Settling Defendant a qualified right to terminate its respective Settlement. *See, e.g.,* ECF No. 473-1 § 23. This type of agreement, often referred to as a "blow" provision, is common in class action settlements. *See, e.g.*, *GSE Bonds,* 414 F. Supp. 3d at 696 (finding, after review that a similar blow provision "has no bearing on the [settlement] approval analysis"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 948 (9th Cir. 2015); *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 02-cv-1152, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018). Therefore, the Supplemental Agreements do not weigh against approval of the Settlements.

### 6. The Settlements treat the Settlement Class equitably

Rule 23(e)(2)(D) requires that the Settlement "treat[] class members equitably relative to each other. FED. R. CIV. P. 23 (e)(2)(D). The Distribution Plan provides for a *pro rata* distribution of the Net Settlement Funds, which courts have found to satisfy the requirement for equitable treatment. *See, e.g.*, *Payment Card*, 330 F.R.D. at 47 (finding that "pro rata distribution scheme is sufficiently equitable"). All Class Members would release Settling Defendants for claims based on the same factual predicate of this Action. The proposed Class Notice provides information on how to opt out of the Settlements; absent opting out, each Class Member will be bound by the releases. Because the Settlements' releases and the Distribution Plan do not include any improper intra-class preferences or prejudice, the Court should find that the Settlements satisfy this factor.

* * * * *

Based on all of the foregoing factors, including all of the risks that Representative Plaintiffs would face in continuing to litigate this matter, the Court should grant final approval of the Settlements.

## II.      THE PROPOSED SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

For all of the reasons detailed in the Representative Plaintiffs' Memorandum in support of Preliminary Approval (ECF No. 472) and Supplemental Memorandum (ECF No. 498), and as held most recently in the Court's Preliminary Approval Orders (ECF Nos. 509-515), the Settlement Class satisfies all requirements of Rule 23(a) and Rule 23(b)(3). The preliminarily certified Settlement Class, defined as:

> All Persons (including both natural persons and entities) who purchased, sold, held, traded, or otherwise had any interest in SIBOR- and/or SOR-Based Derivatives during the Class Period.[7] Excluded from the Settlement Class are the Defendants and any parent, subsidiary, affiliate or agent of any Defendant or any co-conspirator whether or not named as a Defendant, and the United States Government.

should be granted final certification for settlement purposes.

This Settlement Class consists of Class Members harmed by an alleged multidirectional manipulation designed to benefit Settling Defendants' derivatives trading positions at the expense of their counterparties and market participants. Settlement and litigation classes involving the same type of multidirectional manipulation as alleged here have been approved by a number of courts, with classes including both buyers and sellers of the relevant financial instrument. *See In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC)(KNF), 2022 WL 485005, at *5 (S.D.N.Y. Feb. 17, 2022) (certifying litigation class of investors that included "traders with diverging economic interests, namely long traders, short traders, and hedgers" and alleging

---

[7] "Class Period" means the period of January 1, 2007 through December 31, 2011.

"episodic" manipulation of cotton futures prices); *USD LIBOR*, No. 11-md-2262 (S.D.N.Y. Sept. 17, 2020), ECF Nos. 3175-80 (finally certifying settlement class of exchange plaintiffs); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS) (S.D.N.Y. Aug. 6, 2018), ECF Nos. 1096-1110 (finally certifying settlement classes without regard to differences among class members); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180, 183 (S.D.N.Y. 2005) (certifying a litigation class of "all persons . . . who purchased and/or sold NYMEX natural gas futures" for purposes of pursuing claims that defendants engaged in false reporting and other manipulative conduct to distort prices in the natural gas futures market); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) (holding that "[c]ourts have consistently certified classes that include both purchasers and sellers of any contract relating to a specific underlying commodity during the class period[]," and rejecting defendants' argument that profit-motivated conflicts between each class member's trading positions precluded class certification); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 91-92 (S.D.N.Y. 1998) (finding that the classwide damages relating to a class include purchases and sellers was amendable to classwide resolution); *see also Sullivan v. Barclays PLC et al.*, No. 1:13-cv-02811 (PKC), (S.D.N.Y.), ECF Nos. 424, 498 (finally certifying settlement class in the Euribor litigation); *Laydon v. Mizuho Bank, Ltd. et al.*, No. 1:12-cv-03419 (GBD) (S.D.N.Y.), ECF Nos. 720, 838, 891, 1013, 1014 (finally certifying settlement class in the Euroyen LIBOR litigation); *Alaska Elec. Pension Fund v. Bank of Am. Corp. et al.*, No. 1:14-cv-07126 (JMF) (S.D.N.Y.), ECF Nos. 648-57, 738 (finally certifying settlement class in the ISDAfix litigation); *Dennis et al. v. JPMorgan Chase & Co. et al.*, No. 1:16-cv-06496 (LAK) (S.D.N.Y.), ECF Nos. 460, 517-22, 542, 544 (conditionally certifying settlement class in the BBSW litigation).

As discussed at preliminary approval, the Court need not reach any merits questions regarding the alleged net damages definitively suffered by any individual Class members across the SIBOR- and/or SOR-Based Derivatives they may have traded during the Class Period—the very questions that Representative Plaintiffs and Defendants have mutually agreed to avoid by entering these Settlements.  To approve the Settlements, the Court need only have subject matter jurisdiction, which the Second Circuit has confirmed exists in this case (*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 393 (2d Cir. 2021) (holding that the Court's subject matter jurisdiction "is clear")) and a sufficient basis to certify a settlement class.  Other courts in this District have confirmed that a class of buyers and sellers alleging a multidirectional manipulation poses no conflict to class certification because all class members "a shared interest in compiling the historical data required to demonstrate price artificiality and have the same interest in proving price artificiality." *In re Nat. Gas Commodities Litig.*, 231 F.R.D. at 183. Attempting to limit the class to just those members "who suffered losses by reason of Defendants' manipulation . . . would be nearly impossible . . .without impermissibly inquiring into the merits of Plaintiffs' Complaint.  *Id.* at 179-80; *see* Supplemental Memorandum (ECF No. 498) at 10-15 and cases cited therein.

### A.  The Settlement Class Meets The Rule 23(a) Requirements.

Rule 23(a) permits an action to be maintained as a class action if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  FED. R. CIV. P. 23(a).

### 1.   Numerosity

Rule 23(a) requires that the class be "so numerous that joinder of all class members is impracticable." FED. R. CIV. P. 23(a). Joinder need not be impossible, only "merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *In re Initial Pub. Offering Sec. Litig.,* 260 F.R.D. 81, 90 (S.D.N.Y. 2009). There are at least hundreds, if not thousands, of geographically dispersed persons and entities that fall within the Settlement Class definition. *See* Briganti Decl. ¶ 105. As detailed by the Settlement Administrator and the noticing agent declaration, notice was sent to thousands of potential Class Members, which confirms that the numerosity requirement is satisfied for purpose of class certification. *See id.*, Exs. 3-18; *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. at 90 ("Sufficient numerosity can be presumed at a level of forty members or more."). Joinder of all of these individuals and entities would be impracticable.

### 2.   Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). This is a "'low hurdle' easily surmounted." *In re Prudential Sec. Inc. Ltd. Pshps. Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995). Commonality requires the presence of only a single question common to the class. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).

This case involves numerous common questions of law and fact.  Liability and impact questions that Representative Plaintiffs and Class Members have to answer through the same body of common class-wide proof include, among others:

> i.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to manipulate SIBOR, SOR, and the prices of SIBOR-and/or SOR-Based Derivatives in violation of the Sherman Act, RICO and common law;

ii.      what constitutes a false or manipulative submission by a SIBOR
or SOR contributor panel bank;

iii.     which Defendants conspired to manipulate SIBOR and SOR
during which period(s); and

iv.     what would the non-manipulated SIBOR or SOR rates have
been in the "but-for" world for each day of the Class Period?

These common questions involve dozens of sub-questions of fact and law that are also common to

all members of the Settlement Class. Rule 23(a)(2) is overwhelmingly satisfied for purposes of

conditional certification.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). This permissive standard is

satisfied when "each class member's claim arises from the same course of events and each class

member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom

Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see also Bolanos v. Norwegian Cruise

Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) ("Since the claims only need to share the same

essential characteristics, and need not be identical, the typicality requirement is not highly

demanding.").

The Representative Plaintiffs' and Class Members' claims arise from the same course of

conduct arising from the alleged false reporting and manipulation of SIBOR, SOR, and SIBOR-

and/or SOR-Based Derivatives by Defendants.  Courts generally find typicality in cases alleging

a theory of manipulative conduct that affects all class members in the same fashion. *See, e.g.*, *GSE

Bonds*, 414 F. Supp. 3d at 700-01 ("Courts have repeatedly found that typicality is met when

plaintiffs allege an antitrust price-fixing conspiracy because Plaintiffs must prove a conspiracy, its

effectuation, and damages therefrom--precisely what the absent class members must prove to

recover."); *In re Air Cargo Shipping Servs.*, 2014 WL 7882100, at *31 ("Because the representative plaintiffs will seek to prove that they were harmed by the same overall course of conduct and in the same way as the remainder of the class, their claims are by all appearances typical of the class."); *Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1011 (N.D. Ill. 2020) (finding typicality where named representative and class members bought and lost money on wheat futures due to defendants' alleged scheme to create artificial prices).  Thus, Representative Plaintiffs' claims are typical of the Class Members' claims for purposes of conditional certification.

### 4.  Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4); *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000). As discussed in Argument I.A.2 above, there are no conflicts between Representative Plaintiffs and Class Members, and Representative Plaintiffs' interest in proving liability and damages wholly aligns with the Settlement Class' interest.  Further, Plaintiffs' Counsel is highly experienced in complex class action antitrust litigation and are adequate class counsel.  Accordingly, the requirements of both Rule 23(a)(4) and Rule 23(g) are satisfied.

### B.  The Proposed Settlement Class Satisfies Rule 23(b)(3).

Rule 23(b)(3) certification is proper where the action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). To satisfy Rule 23(b)(3), plaintiffs must establish: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members;" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). Both prongs are satisfied.

### 1. Predominance

"If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally achieve the economies of litigation that Rule 23(b)(3) envisions." *In re Air Cargo Shipping Servs.,* 2014 WL 7882100, at *35. To satisfy the predominance requirement, a plaintiff must show "that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Brown*, 609 F.3d at 483 (ellipses in original).

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Predominance can be established in antitrust cases because the elements of the claims lend themselves to common proof. *See, e.g.,* WILLIAM B. RUBENSTEIN, 6 NEWBERG ON CLASS ACTIONS §§ 18:28 & 18:29 (5th ed. 2021) (noting that allegations of antitrust conspiracies generally establish predominance of common questions). Additionally, the "predominance inquiry will sometimes be easier to satisfy in the settlement context." *In re Am. Int'l Grp. Inc. Sec. Litig.,* 689 F.3d 229, 240 (2d Cir. 2012). Unlike class certification for litigation purposes, a settlement class presents no management difficulties for the court as settlement, not trial, is proposed. *Amchem*, 521 U.S. at 620; *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996) ("*NASDAQ I*") (stating that the predominance test is met "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless").

If the claims against Settling Defendants had not been settled, dozens of common questions would have predominated over individual questions in the prosecution of the claims against them. Representative Plaintiffs and the Class Members would address the same questions regarding allegations of conspiracy, unlawful manipulation of the SIBOR, SOR and the prices of SIBOR- and/or SOR-Based Derivatives, and the damages caused by such alleged manipulation. *See Cordes*

& *Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) ("allegations

of the existence of a price-fixing conspiracy are susceptible to common proof"); *GSE Bonds*, 414

F. Supp. 3d at 701-02 ("whether a price-fixing conspiracy exists is the central question in this case,

outweighing any questions that might be particular to individual plaintiff").

### 2. Superiority

Rule 23(b)(3)'s "superiority" requirement obliges a plaintiff to show that a class action is

superior to other methods available for "fairly and efficiently adjudicating the controversy." FED.

R. CIV. P. 23(b)(3). The Court balances the advantages of class action treatment against alternative

available methods of adjudication. *See* FED. R. CIV. P. 23(b)(3)(A)-(D) (listing four non-exclusive

factors relevant to this determination). The superiority requirement is applied leniently in the

settlement context because the court "need not inquire whether the case, if tried, would present

intractable management problems." *Amchem*, 521 U.S. at 620.

A class action is the superior method for the fair and efficient adjudication and settlement

of this Action. *First*, Class Members are numerous and geographically disbursed, making a "class

action the superior method for the fair and efficient adjudication of the controversy." *See In re

Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004).

*Second*, the majority of Class Members have neither the incentive nor the means to litigate

these claims. The damages most Class Members suffered are likely to be small compared to the

very considerable expense and burden of individual litigation. This makes it uneconomical for an

individual to protect his/her rights through an individual suit.  Notably, no other Class Member

"has displayed any interest in bringing an individual lawsuit" by seeking to join this Action or by

commencing a separate action.  *See Meredith Corp.,* 87 F. Supp. 3d at 661. A class action allows

claimants to "pool claims which would be uneconomical to litigate individually." *Currency*

*Conversion*, 224 F.R.D. at 566. "Under such circumstances, a class action is efficient and serves the interest of justice." *Id.*

*Third*, the prosecution of separate actions by hundreds of individual Class Members would impose heavy burdens upon the Court. It would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Settlement Class. Thus, both prongs of Rule 23(b)(3) are satisfied for purposes of conditional certification.

In total, this Court has a sufficient basis on which to finally certify the Settlement Class.

### III.   THE CLASS NOTICE PLAN INFORMED THE CLASS OF THE SETTLEMENTS AND SATISFIED DUE PROCESS

Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the [settlement]." FED. R. CIV. P. 23(e)(1)(B). The standard for the adequacy of notice to the class is reasonableness. FED. R. CIV. P. 23(c)(2)(B) (for actions certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores*, 396 F.3d at 114. The Settlement Class Members here have received adequate notice and have been given sufficient opportunity to weigh in on or exclude themselves from the Settlements.

The Class Notice plan has been fully implemented. *See generally* Declaration of Jack Ewashko on Behalf of A.B. Data, Ltd. Regarding Notice Administration, executed on October 10, 2022 ("Ewashko Decl.") (attached at Exhibit 2 to the Briganti Decl.) A.B. Data has produced and mailed 20,063 copies of the mailed notice to potential Class Members including (i) Settling

Defendants' known counterparties that transacted in SIBOR- and/or SOR-Based Derivatives, consistent with the obligations set forth in the Settlement Agreements and relevant foreign bank secrecy and/or customer confidentiality laws that may restrict their ability to provide counterparty-identifying information to third parties; (ii) members of the International Swaps and Derivatives Association ("ISDA"), a global trade association for OTC derivatives responsible for maintaining the standardized ISDA Master Agreements; (iii) executives at hedge funds, investment banks, traders, and real-estate companies; and (iii) the Settlement Administrator's proprietary list of banks, brokers, and other nominees, which are likely to trade or hold SIBOR- and/or SOR-Based Derivatives on behalf of themselves and their clients. *See* Ewashko Decl., at ¶¶ 5-12 (describing direct mail component of notice plan).

The Settlement Administrator also caused the publication notice published in *The Wall Street Journal*, *Investor's Business Daily*, *The Financial Times*, *Barron's*, *Stocks & Commodities*, *Hedge Fund Alert*, and *Grant's Interest Rate Observer*, and on hundreds of websites. The Settlement Administrator also disseminated a news release via PR Newswire's US1 Newsline distribution list announcing the Settlements, which was distributed to the news desks of approximately 10,000 newsrooms. *See* Ewashko Decl., at ¶¶ 13-20. The Settlement Administrator maintained a Settlement Website (www.SIBORSettlement.com), where class members were able to review and obtain: (i) the Settlement Agreements with Settling Defendants; (ii) the full-length mail and publication notices; (iii) Court orders and key pleadings; (iv) the proposed Distribution Plan; and (v) a Proof of Claim form for the Settlements. The Distribution Plan and Proof of Claim form were promptly posted on the Settlement Website after being filed with the Court. *See id.* at ¶¶ 21-23.

The Class Notice plan, as well as the mailed notice and publication notice, satisfy due process. *See, e.g.*, Final Judgment Approving Class Action Settlement, *In re JPMorgan Precious Metals Spoofing Litig.*, No. 18-cv-10356 (GHW), (S.D.N.Y. July 7, 2022), ECF No. 115 (holding similar notice plan satisfied "due process"); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18 Civ. 02830 (JPO), 2021 WL 5709215, at *2 (S.D.N.Y. Oct. 28, 2021) (same). The Supreme Court has consistently found that mailed notice satisfies the requirements of due process. *See, e.g., Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950). The mailed notice and publication notice are written in clear and concise language, and reasonably conveyed the necessary information to the average class member. *See Wal-Mart Stores*, 396 F.3d at 114. Class Members have been advised on the nature of the Action, including the relevant claims, issues, and defenses. *See* Ewashko Decl., at Ex. A (Notice Packet). Class Members have been afforded a full and fair opportunity to consider the proposed Settlements, exclude themselves from the Settlements, and respond and/or appear in Court. Further, the Class Notice fully advised Class Members of the binding effect of the judgment on them. *Id.*, Ex. A.

The Court should find that the Class Notice plan as implemented was reasonable and satisfied due process.

## **CONCLUSION**

For the foregoing reasons, Representative Plaintiffs respectfully request that the Court finally approve the Settlements and the Distribution Plan, finally certify the Settlement Class, and enter the proposed Final Approval Orders and Final Judgments dismissing with prejudice the claims against the Settling Defendants.

Dated:  October 10, 2022
White Plains, New York

**LOWEY DANNENBERG, P.C.**

By: */s/ Vincent Briganti*
Vincent Briganti
Geoffrey M. Horn
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914-997-0035
E-mail: vbriganti@lowey.com
E-mail: ghorn@lowey.com

*Counsel for Representative Plaintiffs and
the Proposed Class*